# Exhibit E

November 30, 2020

NexPoint Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

> **RE:** **Termination of Amended and Restated Shared Services Agreement, dated January 1, 2018, and among Highland Capital Management, L.P. ("HCMLP"), and NexPoint Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

**App. 76**

ACL-001587

# Exhibit 2

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE** | § | |
| **DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>Plaintiff,<br><br>vs.<br><br>**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,**<br><br>Defendant. | § § § § § § § § § § | **Adv. Proc. No. 21-03004-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>Plaintiff,<br><br>vs.<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>Defendants. | § § § § § § § § § § § | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>Plaintiff,<br><br>vs.<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>Defendants. | § § § § § § § § § § § § | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>Plaintiff,<br>vs.<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>Defendants. | § § § § § § § § § § § | **Adv. Proc. No. 21-03007-sgj** |

## DECLARATION OF NANCY M. DONDERO

I, Nancy Marie Dondero, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I reside in Vero Beach, Florida and am over the age of 21. The following facts are based on my personal knowledge and are all true and correct. I am willing and able to testify about these matters if and when called upon to do so.

2. I have successfully owned and operated my own private investigation services business for over 30 years. I also have an undergraduate college degree from Pennsylvania State University, which included the study of basic business operations and management.

3. I am also the Family Trustee of The Dugaboy Investment Trust ("Dugaboy"), and I have held that position since October 2015. A true and correct copy of the document appointing me as Family Trustee is attached to this Declaration as Exhibit A. At the times that the notes discussed below were entered into, Dugaboy owned and represented a majority of the Class A shareholders in Highland Capital Management, L.P. ("Highland Capital"). Jim Dondero is my brother and was, at that time, the President and CEO of Highland Capital. I understood that he was one of the founders of Highland Capital and, through The Dugaboy Investment Trust, a majority interest holder.

4. Jim Dondero told me about his current and previous annual salaries at Highland Capital and explained that he was substantially underpaid as compared to other senior executives in the financial services industry. He told me that his annual salary from Highland Capital had been around $500,000 to $700,000 during the preceding several years. I had no reason to doubt the accuracy of what he told me about his compensation from Highland Capital or how that compared unfavorably to the compensation of others in similar positions with other companies in

the industry.

5.       Jim Dondero also advised me that he and certain of his affiliated companies had, on several occasions between 2013 and 2019, borrowed money from Highland Capital and had issued demand and term promissory notes in favor of Highland Capital regarding those loans.  He proposed that Highland Capital enter into an agreement with him and the other borrowers to forgive the Notes upon the occurrence of certain conditions subsequent, as a form of additional contingent compensation to him.

6.       In either December of 2017 or January of 2018, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into the first of a series of verbal agreements with Jim Dondero that provided that the repayment obligation on the notes made in 2017 involved in this litigation would be forgiven if Highland Capital sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control.  I fully understood the implications and terms of this Agreement.

7.       At either the end of 2018 or the beginning of 2019, Jim Dondero and I later entered into the same Agreement to apply to subsequent notes that were issued by him or one of his affiliated companies to Highland Capital in 2018.  I also fully understood the implications and terms of this Agreement.

8.       At either the end of 2019 or the beginning of 2020, Jim Dondero and I again entered into the same agreement to cover and apply to the notes at issue in this litigation that were issued in 2019.  All the Notes referenced herein are collectively referred to as the "Notes," and the agreements between Highland Capital and Jim regarding all of the Notes are collectively referred to herein as the "Agreements**.**"  I also fully understood the implications and terms of these

Agreements.  The Notes are as follows:

i.   A demand note executed on February 2, 2018, between Highland Capital and Jim Dondero in the amount of $3,825,000.[1]

ii.   A demand note executed on August 1, 2018, between Highland Capital and Jim Dondero in the amount of $2,500,000.[2]

iii.   A demand note executed on August 13, 2018, between Highland Capital and Jim Dondero in the amount of $2,500,000.[3]

iv.   A demand note executed on March 28, 2018, between Highland Capital and Highland Capital Management Services, Inc. ("HCMS") in the amount of $150,000.[4]

v.   A demand note executed on June 25, 2018, between Highland Capital and HCMS in the amount of $200,000.[5]

vi.   A demand note executed on May 29, 2019, between Highland Capital and HCMS in the amount of $400,000.[6]

vii.   A demand note executed on June 26, 2019, between Highland Capital and HCMS in the amount of $150,000.[7]

viii.   A demand note executed on October 12, 2017, between Highland Capital and HCRE Partners, LLC ("HCRE") in the amount of $2,500,000.[8]

ix.   A demand note executed on October 15, 2018, between Highland Capital and

---

[1] Pl. Appx. 00678-679.
[2] Pl. Appx. 00681-682.
[3] Pl. Appx. 00684-685.
[4] Pl. Appx. 00118-119.
[5] Pl. Appx. 00121-122.
[6] Pl. Appx. 00124-125.
[7] Pl. Appx. 00127-128.
[8] Pl. Appx. 00205-206.

*ACTIVE 48197723v1*

HCRE in the amount of $750,000.[9]

    x.    A demand note executed on September 25, 2019, between Highland Capital and HCRE in the amount of $900,000.[10]

    xi.    A term note executed on May 31, 2017, between Highland Capital and NexPoint Advisors, L.P. ("NexPoint"), in the amount of $30,746,812.33.[11]

    xii.    A term note executed on May 31, 2017, between Highland Capital and HCMS in the amount of $20,247,628.02.[12]

    xiii.    A term note executed on May 31, 2017, between Highland Capital and HCRE in the amount of $6,059,831.51.[13]

9.    At the time I caused Highland Capital to enter into each of the Agreements, I knew that Highland Capital was a hedge fund and that its general partner was Strand Advisors, Inc. I also knew that Highland Capital owned an interest in each of Cornerstone, MGM, and Trussway, the portfolio companies that were involved in the Agreements. I also knew that Highland Capital's business included buying and selling portfolio companies at a profit. I also knew and believed that Jim would be the person most involved in, and responsible for, the marketing and eventual sale of Cornerstone, MGM, and Trussway by Highland Capital. I also knew and believed that executives in the financial services industry tend to be paid more when the companies they work for perform better.

10.    The Agreements had two primary purposes, both of which would benefit Highland Capital's performance and reputation. First, the Agreements would provide additional incentive

---

[9] Pl. Appx. 00208-209.
[10] Pl. Appx. 00211-212.
[11] Pl. Appx. 00042-43.
[12] Pl. Appx. 00134-135.
[13] Pl. Appx. 00218-219.

*ACTIVE 48197723v1*

and motivation to Jim Dondero to attempt to maximize the value and return to Highland Capital on Trussway, Cornerstone, and MGM, and to remain in Plaintiff's employment. Second, the Agreements would allow Highland Capital to contingently increase Jim Dondero's compensation without requiring additional cash or salary to be paid to him and the consequential effect of such an increase on Highland Capital's financial position.

11.       At the time I caused Highland Capital to enter into each of the Agreements, I did not know every detail about every aspect of Highland Capital's business or the Notes. However, I did have all of the facts and information I considered necessary, appropriate, and reasonable for my decision (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into each of the Agreements. I do not believe that Highland Capital, Dugaboy, or I were deceived or mislead in any manner by Jim Dondero or anyone else regarding the Notes or any of the Agreements.

12.       At the time I caused Highland to enter into each of the Agreements, I appreciated the effect of what I was doing and I understood the nature and consequences of those acts. I was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment.

13.       At the time I caused Highland Capital to enter into each of the Agreements, I believed I had the authority, as the Dugaboy Family Trustee, to cause Dugaboy to cause Highland Capital to enter into the Agreements. I also intended, believed, and expected that each of the Agreements would be a binding and enforceable agreement between Highland Capital and Jim Dondero.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 20 , 2022.

Nancy M. Dondero

# Exhibit A

THE DUGABOY INVESTMENT TRUST
James D. Dondero, Primary Beneficiary

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

DEFENDANT 000037

### THE DUGABOY INVESTMENT TRUST
#### Grant James Scott, Family Trustee

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

   Re:  The Dugaboy Investment Trust

Dear Ms. Breault,

   I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

   This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

**App. 88**

**DEFENDANT 000038**

### RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____        10/12/2015
Family Trustee                                         Date

STATE OF TEXAS          §
COUNTY OF DALLAS     §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under me hand and seal of office this *14th* day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

_____
Notary Public's Signature

[SEAL]                          Expiration: *January 15, 2019*

**App. 89**

**DEFENDANT 000039**

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this ___13th___ day of October, 2015.

Nancy Marie Dondero
**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS        §

COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ___14th___ day of October, 2015.

Notary Public's Signature

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
**January 15, 2019**

[SEAL]

Expiration: _January 15, 2019_

**App. 90**

**DEFENDANT 000040**

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

_____
James D. Dondero

DEFENDANT 000041

# Exhibit 3

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
HCRE Partners, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

**App. 93**

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03005-sgj** |
| **vs.** | § § | |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, AND NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § § | |
| **vs.** | § § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael P. Aigen, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declares as

follows:

1.      I am a member of the law firm of Stinson LLP, counsel to Defendant James

Dondero, Highland Capital Management Services, Inc. and HCRE Partners, LLC n/k/a NexPoint

Real Estate Partners, LLC, and I submit this Declaration in support of the *Defendants' Opposition*

*to Plaintiff Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, which

is being filed concurrently with this Declaration. I submit this Declaration based on my personal knowledge and the documents listed below.

2.        Attached as **Exhibit A** is a true and correct copy of the Transcript of the Video Deposition of James P. Seery, Jr. taken on October 21, 2021 in Adv. Proc. No. 21-03005.

3.        Attached as **Exhibit** B is a true and correct copy of the Transcript of the Remote Deposition of Bruce McGovern taken on November 9, 2021 in Adv. Proc. No 21-03003.

4.        Attached as **Exhibit C** is a true and correct copy of a List of Promissory Notes, bates labeled DEFENDANTS-0000434, that was used by Mr. Dondero at his deposition and produced to Plaintiff.

5.        Attached as **Exhibit D** is a true and correct copy of an email from F. Waterhouse to K. Hendrix, dated November 25, 2020.

6.        Attached as **Exhibit E** is a true and correct copy of an email from F. Waterhouse to K. Hendrix, dated December 31, 2020.

7.        Attached as **Exhibit F** is a true and correct copy of the Expert Report of Steven J. Pully, dated December 10, 2021.

8.        Attached as **Exhibit G** is a true and correct copy of the Expert Report of Alan M. Johnson, dated May 28, 2021.

9.        Attached as **Exhibit H** is a true and correct copy of Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, dated September 27, 2021.

Dated:  January 20, 2022              */s/Michael P. Aigen*
                                                          Michael P. Aigen

# Exhibit A

Page 1

1

2            IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
3                       DALLAS DIVISION

4    In re:                         )
                                    ) Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT, L.P.) Case No.
                                    ) 19-34054-sqj11
6                    Debtor.        )
     ------------------------------- )
7                                   )
     HIGHLAND CAPITAL MANAGEMENT, L.P.)
8                                   )
                     Plaintiff,     )
9                                   )
         -vs-                       ) Adversary
10                                  ) Proceeding No.
     NEXPOINT ADVISORS, L.P., JAMES ) 21-03005-sgj
11   DONDERO, NANCY DONDERO, AND THE )
     DUGABOY INVESTMENT TRUST,      )
12                                  )
                     Defendants.    )
13   -------------------------------

14

15

16      VIDEO DEPOSITION OF JAMES P. SEERY, JR.

17             New York, New York

18          Thursday, October 21, 2021

19

20

21

22

23

24   Reported by:
     MARIANNE WITKOWSKI-SMITH
25   JOB NO. 201192

Page 2

```
 1
 2
 3
 4                    October 21, 2021
 5                    2:02 p.m.
 6
 7
 8        Video Deposition of JAMES P. SEERY, JR.,
 9   individually and on behalf of HIGHLAND CAPITAL
10   MANAGEMENT LP, held at the offices of Pachulski
11   Stang Ziehl & Jones LLP, 780 Third Avenue, New
12   York, New York, before Marianne Witkowski-Smith,
13   a Shorthand Reporter and Notary Public of the
14   State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4
 5   PACHULSKI STANG ZIEHL & JONES
 6   Attorneys for Highland Capital Management LP
     and the Witness
 7
 8        780 Third Avenue
 9        New York, New York 10017
10   BY:  JOHN MORRIS, ESQ.
11        GREGORY DEMO, ESQ.
12        HAYLEY WINOGRAD, ESQ.
13
14   MUNSCH HARDT KOPF & HARR
15   Attorneys for NexPoint Advisors LP
16        500 North Akard Street
17        Dallas, Texas 75201
18
19   BY:  DAVOR RUKAVINA, ESQ.
20        THOMAS BERGHMAN, ESQ.
21
22
23
24
25        (Continued on Next Page)
```

Page 4

```
 1
 2   A P P E A R A N C E S (Cont'd):
 3
 4
 5        STINSON
 6        Attorneys for James Dondero, Nancy Dondero,
          HCRE, HCMS
 7
 8        3102 Oak Lawn Avenue
 9        Dallas, Texas 75219
10   BY:  DEBORAH DEITSCH-PEREZ, ESQ.
         MICHAEL AIGEN, ESQ.
11
12
13
         HELLER, DRAPER, HAYDEN, PATRICK, & HORN
14       Attorneys for The Dugaboy Investment Trust
15       650 Poydras Street
16       New Orleans, Louisiana 70130
17   BY:  WARREN HORN, ESQ.
18
19
20
21   ALSO PRESENT:
22       MANUEL GARCIA, Legal Video Specialist
23       THANHAN NGUYEN, ESQ. (Via Zoom)
24       AARON LAWRENCE, ESQ. (Via Zoom)
25       LA ASIA CANTY (Via Zoom)
```

Page 5

```
 1                J. Seery
 2        VIDEO TECHNICIAN:  This is the
 3   start of Media Label No. 1 in the
 4   video-recorded deposition of James P.
 5   Seery Jr., in the matter of Highland
 6   Capital Management LP vs. NexPoint
 7   Advisors LP, et al., on October the
 8   21st, 2021, at approximately 2:02 p.m.
 9        My name is Manuel Garcia.  I'm the
10   certified legal videographer from TSG
11   Reporting Inc.  The court reporter is
12   Marianne Smith, in association with TSG
13   Reporting.
14        Counsel, please introduce
15   yourselves.
16        MR. RUKAVINA:  My name is Davor
17   Rukavina.  I represent NexPoint
18   Advisors LP.
19        MR. MORRIS:  My name is John
20   Morris from Pachulski Stang Ziehl &
21   Jones, on behalf of Capital -- Highland
22   Capital Management LP, and I'm
23   representing the witness, James P.
24   Seery, Jr., today.
25        MS. DEITSCH-PEREZ:  Hi.  This is
```

App. 98

```
1              J. Seery
2      Deborah Deitsch-Perez from Stinson LLP.
3      I'm on with my partner, Michael Aigen,
4      also from Stinson.  We're representing
5      James Dondero, Nancy Dondero, HCRE and
6      HCMS.
7           MR. HORN:  Warren Horn
8      [inaudible].
9           (Reporter clarification.)
10          MR. HORN:  Warren Horn, H-O-R-N,
11     with Heller, Draper & Horn,
12     representing The Dugaboy Investment
13     Trust.
14          VIDEO TECHNICIAN:  Will the court
15     reporter please swear in the witness.
16 J A M E S   P.   S E E R Y ,  J R.,
17     the witness herein, was thereupon duly
18     sworn by the Notary Public and was
19     examined and testified as follows:
20 EXAMINATION
21 BY MR. RUKAVINA:
22     Q.   Sir, good afternoon.
23          State your name, please.
24     A.   James P. Seery, Jr.
25     Q.   And just so we're clear, you have a
```

```
1              J. Seery
2      laptop in front of you because this is being
3      done remotely as well, but you're not
4      reviewing any material or taking any
5      information or texts or emails like that, are
6      you?
7      A.   No.
8      Q.   Okay.  It's fair to say you've
9      been --
10     A.   I -- I have a phone in front of me,
11     but I don't intend to use it.
12     Q.   Okay.  Fair to say that you've been
13     deposed before?
14     A.   I have.
15     Q.   Approximately how many times?
16     A.   More -- more than twenty-five.
17     Q.   Okay.  And quite a number in this
18     case as well, correct?
19     A.   More than -- probably more than
20     fifteen.
21     Q.   Okay.  The only thing I'd ask -
22     you're -- you're a veteran - is I have an
23     accent and sometimes I talk fast, so don't --
24     don't hesitate to tell me that you didn't
25     understand or ask me to rephrase, please.
```

```
1              J. Seery
2      Please don't hesitate to do that.
3      A.   Thank you.
4      Q.   Sir, just for the record, where do
5      you live?
6      A.   I live in New York City, Upper West
7      Side.
8      Q.   Do you have any real estate or
9      property that -- where you live periodically
10     in the State of Texas?
11     A.   No.
12     Q.   Okay.  Other than your work for
13     Highland here, do you have any business
14     calling that takes you to the State of Texas
15     on a regular basis?
16     A.   No.
17          MR. RUKAVINA:  Okay.  We'll mark
18     as Exhibit 1 the Notice of 30(b)(6).
19          (Brief off-record discussion.)
20          (Exhibit 1, Notice of
21     Deposition/Seery, marked for
22     identification, as of this date.)
23     Q.   Mr. Seery, you've been handed
24     Exhibit 1.
25          Have you seen this document?
```

```
1              J. Seery
2      A.   I believe I have, yes.
3      Q.   Okay.  And are you familiar with
4      the topics I've designated in here?
5           MR. MORRIS:  I think this is
6      missing a page.
7           THE WITNESS:  Going to 1 to 2
8      to --
9           MR. MORRIS:  The topics aren't in
10     this version.
11          MR. RUKAVINA:  Oh, I gave you the
12     wrong one; I apologize --
13          (Simultaneous speaking.)
14          MR. RUKAVINA:  I apologize, I
15     apologize.  Sir, that -- that's the one
16     that, that -- that Notices you
17     personally here today.  Let me try
18     again, and -- and Exhibit 2 will be the
19     30(b)(6).
20          (Exhibit 2, Notice of
21     Deposition/30(b)(6), marked for
22     identification, as of this date.)
23     Q.   Sir, have you seen Exhibit 2
24     before?
25     A.   I believe I have, yes.
```

**App. 99**

Page 10

J. Seery

2    Q.    Okay.  And subject to your
3 counsel's objections, which he sent to me by
4 email, are you prepared to testify on the
5 topics that are designated in here today?
6    A.    Yes.
7    Q.    Okay.  And have you reasonably
8 informed yourself on those topics prior to
9 sitting here today?
10    A.    Yes.
11    Q.    Okay.  Now, some background, and we
12 don't need to go into excruciating detail.
13         What is your educational
14 background?
15    A.    I have a BA in history.  I have a
16 law degree, JD.  And I've taken lots and lots
17 of courses.
18    Q.    And what university or college is
19 your history BA from?
20    A.    Colgate University.
21    Q.    Okay.  And what university is your
22 JD from?
23    A.    New York Law School.
24    Q.    And when did you graduate New York
25 Law School and get your JD?

Page 11

J. Seery

2    A.    1990.
3    Q.    Okay.  And what states have you
4 been licensed in as a lawyer?
5    A.    New York and Connecticut.
6    Q.    Are you currently licensed as a
7 lawyer?
8    A.    I believe I am.
9    Q.    Okay.  Have you ever faced any
10 disciplinary proceedings as a lawyer?
11    A.    No.
12    Q.    With respect to bankruptcy cases,
13 can you give us a brief recitation of -- of
14 your relevant experience in administering
15 Chapter 11 or other bankruptcy estates?
16    A.    Administering, I -- I've been
17 involved or been an active player - either as
18 a lawyer, senior lawyer, investor, and in
19 this case an independent director and CRO -
20 in really my entire career, so I would say
21 hundreds.
22    Q.    Okay.  Do you consider yourself an
23 expert on bankruptcy law?
24    A.    I'm pretty good.
25    Q.    Okay.  And with respect to the

Page 12

J. Seery

2 Highland Capital Management LP bankruptcy
3 case, obviously the plan has been confirmed
4 and it's gone effective.
5         Before the plan went effective,
6 what was your role with the debtor?
7    A.    I was an independent director, and
8 subsequently I was appointed as the CRO and
9 CEO of Highland.
10    Q.    And approximately when did you
11 become an independent director?
12    A.    January 9, 2020.
13    Q.    And just to be clear, what entity
14 were you an independent director of?
15    A.    I was an independent director of
16 Strand Advisors, which was the GP of Highland
17 Capital Management LP and had control of
18 Highland Capital Management LP, which became
19 the debtor - or was the debtor.
20    Q.    And there were two other
21 independent directors, correct?
22    A.    There were, yes.
23    Q.    What were their names, sir?
24    A.    Russell Nelms and John Dubel.
25    Q.    Okay.  And did the three of you --

Page 13

J. Seery

2 were the three of you independent directors
3 since January 9, 2020, until the plan became
4 effective?
5    A.    That's correct.
6    Q.    Were there any other people who,
7 during that time frame, were ever independent
8 directors?
9    A.    No.
10    Q.    Okay.  And, sir, when did you
11 become the CEO and/or CRO?
12    A.    In July of 2020.
13    Q.    Okay.  Prior to July of 2020, was
14 your role with Highland and Strand solely
15 that of an independent director?
16    A.    It -- it was.  I effectively was, I
17 guess, probably the lead independent
18 director, just spent the most time -- I
19 shouldn't say the most time.
20         I spent a significant amount of
21 time on it, as did my fellow directors, but I
22 spent a significant amount of time.
23    Q.    And -- and Mr. Nelms, he was a
24 former bankruptcy judge?
25    A.    Yes.

Page 14

J. Seery

1       Q.   Okay.  And Mr. Duval [ph], what
2  was, just briefly, his background to your
3  understanding?
4       A.   Dubel --
5       Q.   I'm sorry, Dubel.
6       A.   -- and he was a -- he's a very
7  experienced practitioner in distressed
8  corporate management and bankruptcy corporate
9  management.
10      Q.   Okay.  After the bankruptcy plan
11 became effective, what happened to the
12 debtor?
13           In other words, as a corporate
14 entity, what happened to the debtor?
15      A.   The debtor was reconstituted with a
16 new GP and new limited partnership units.
17      Q.   Okay.  And do you have any role
18 with respect to authority at the debtor
19 today?
20      A.   I do.
21      Q.   What is your role, sir?
22      A.   I'm the CEO.
23      Q.   The -- I'm sorry, the CEO?
24      A.   Yes.

Page 15

J. Seery

1       Q.   Okay.  And you're also a
2  post-confirmation trustee, are you not?
3       A.   I am, yes.
4       Q.   And what are you the trustee of?
5       A.   The Claimant trustee.
6       Q.   Okay.  And what role does the
7  Claimant trustee, if any, have with the
8  reorganized debtor?
9       A.   The Claimant trustee is the
10 claimant -- is the trustee for the Claimant
11 Trust, which holds the limited partnership
12 units for the reorganized debtor.
13      Q.   Okay.  And does it also hold any
14 general partnership units for the reorganized
15 debtor?
16      A.   It holds the ownership interest in
17 the GP.
18      Q.   Okay.  Is it fair to say that --
19 that all economic value in the reorganized
20 debtor one way or other inures to the
21 benefit of the Claimant Trust under the plan?
22      A.   It does effectively run up to the
23 Claimant Trust, yes.
24      Q.   And is it fair to say that you are

Page 16

J. Seery

1  in charge of the reorganized debtor?
2       A.   I'm in charge of the reorganized
3  debtor and I'm in charge of the Claimant
4  Trust, but not all of the value runs through
5  me directly.
6       Q.   Because there's also a Litigation
7  Sub-Trust?
8       A.   That's correct, and that doesn't
9  report to me.
10      Q.   As far, sir -- let's just limit it
11 now to the debtor's post effective date
12 operations.
13           Are you the person in charge of
14 those operations?
15      A.   Yes.
16      Q.   Okay.  Are you -- and you said that
17 you're the CEO of the debtor.
18           Are there any other officers,
19 either at the debtor or its new GP, in
20 addition to you?
21      A.   Yes.
22      Q.   Who -- who, sir?
23      A.   Thomas Surgent is the general
24 counsel and David Klos is the CFO.

Page 17

J. Seery

1       Q.   Okay.  And both Mr. Surgeon -- I'm
2  sorry, Surgent and Mr. Klos were previously
3  employed with the debtor prior to the
4  effective date?
5       A.   They were.
6       Q.   Okay.  So in July 2020, you
7  mentioned you became the CEO and CRO of the
8  debtor, correct?
9       A.   That's correct.
10      Q.   Okay.  And prior to that -- well,
11 obviously, you know who Mr. James Dondero is,
12 correct?
13      A.   I do.
14      Q.   Okay.  And part of what happened on
15 January 9, 2020, in summary, was that
16 Mr. Dondero, pursuant to his agreement and
17 Court order, was removed from controlling the
18 debtor.
19           Is that a fair summary?
20      A.   Certain --
21           MR. MORRIS:  Objection to the
22 form of the question.
23      A.   Certain -- certainly with respect
24 to the -- the corporate delegation of

**App. 101**

Page 18

J. Seery

1       J. Seery
2   authority, yes.
3       Q.   Okay.  He stayed on as an employee,
4   but whatever he did - is it fair to say -
5   after January 9, 2020 would be subject to the
6   new independent board?
7       A.   I don't think that would be fair to
8   say.  I think from a corporate rule
9   perspective it would be.  I think he -- he,
10  subsequently, we learned, did quite a few
11  things without --
12       (Reporter clarification.)
13       THE WITNESS:  Subsequently we
14   learned he did quite a few things
15   without oversight by the independent
16   board.
17  BY MR. RUKAVINA:
18       Q.   Okay.  Can you give me an example
19  of what he did without oversight by the
20  independent board?
21       A.   He traded -- traded assets; he
22  managed the Select account on his own; he
23  didn't meet margins calls at direction that
24  the -- that the board, independent board, had
25  said to -- to meet; he tried to overrule me

Page 19

J. Seery

1       J. Seery
2   subsequently and later in the year on asset
3   sales that were being conducted out of
4   certain of the CLOs --
5       (Reporter clarification.)
6       THE WITNESS:  Asset sales -- I'm
7   sorry, asset sales out of certain of
8   the CLOs.
9       So there, there -- if we take time,
10   we can go through dozens.
11  BY MR. RUKAVINA:
12       Q.   Well, I get the general gist.  And
13  is it fair to say that those things that he
14  was doing, amongst others, is why the
15  independent board made you the CEO and CRO?
16       MR. MORRIS:  Objection to the
17   form of the question.
18       Q.   Let me rephrase the question.
19       Why, in July -- first of all, who
20  made you CEO and CRO in July of 2020?
21       A.   The independent board approved it
22  and then the Court approved it.
23       Q.   And you were on that independent
24  board, so you were one of the people that
25  approved it?

Page 20

J. Seery

1       J. Seery
2       MR. MORRIS:  Objection to the
3   form of the question.
4       A.   No, I would have abstained.
5       Q.   I apologize.
6       So the other two board members
7   approved it?
8       A.   Correct.
9       Q.   Okay.  Do you have an understanding
10  as to why they approved you becoming CEO and
11  CRO?
12       A.   We felt like the organization
13  needed a specific leader and a specific
14  direction.  Mr. Dondero's activities were
15  pulling many of the people in the business
16  multiple ways, and we felt that it was both
17  dangerous for the organization and dangerous
18  for the individuals.
19       Q.   Okay.  Between January 9, 2020 and
20  July 2020, when you became CEO and CRO, what
21  should have, pursuant to the settlement and
22  Court agreement, Mr. Dondero's role at the
23  debtor have been?
24       MR. MORRIS:  Objection to the
25   form of the question --

Page 21

J. Seery

1       J. Seery
2       A.   He was --
3       MR. MORRIS:  -- and I just -- I
4   just want to note that I, I -- I don't
5   see how this is connected in any way to
6   the issues in the lawsuits.
7       I'll allow you to ask a few more
8   questions for background purposes, but
9   I -- I just want to note my concern that
10   we're running a little far afield.
11       But you can answer the question.
12       A.   Can you read back the question --
13       (Simultaneous speaking and
14   reporter interjection.)
15       Q.   Between January 9, 2020 and July
16  2020, whenever you became the CEO and CRO,
17  pursuant to the court approved settlement,
18  what should Mr. Dondero's role at the debtor
19  have been?
20       MR. MORRIS:  Objection to the
21   form of the question.
22       A.   I think you have to understand
23  the -- the settlement.  Mr. Dondero initially
24  agreed to be removed from all roles at the
25  debtor.  At the very last second he changed

**App. 102**

Page 22

J. Seery

1  that and wanted to be put back in.  I think
2  it probably had to do with -- with press
3  reports that he didn't like reading.  So he
4  maintained an unpaid role as the portfolio
5  manager.  The portfolio that he really
6  managed was the Select account.
7        What he should have done is he
8  should have taken direction.  He should have
9  honored the margin calls that -- that
10  Jefferies had made, he should have sold
11  assets, he should have reported to the board.
12  He did none of those things.
13        He independently, then, ran
14  roughshod over certain parts of the
15  organization.  He should not have done that.
16  And it was very difficult, with the existing
17  employees, to manage them with Mr. Dondero
18  there because they'd worked for him for a
19  number of years.
20     Q.    That was going to be my next
21  question.
22        Did you feel, prior to July 2020,
23  that some employees, some key employees, were
24  basically doing his bidding instead of what

Page 23

J. Seery

1  the independent board expected them to be
2  doing?
3     A.    I think we had -- we certainly had
4  concerns about that, yes.
5     Q.    And we'll round this off pretty
6  quickly.
7        Did there come a time when you
8  asked Mr. Dondero for his resignation?
9     A.    There did, yes.
10     Q.    And -- and did he give it?
11     A.    He did, yes.
12     Q.    And do you recall the date?
13     A.    It was in October of 2020.
14        MR. RUKAVINA:  I have it in here
15  somewhere.  I'm not sure that it's --
16  well, let's just put it in the record,
17  see if this will refresh your memory.
18        This is going to be 3, right?
19        (Exhibit 3, Email Chain Re:
20  HCMLP Roles, marked for identification,
21  as of this date.)
22        (Brief off-record discussion.)
23  BY MR. RUKAVINA:
24     Q.    Do you recall this email chain,

Page 24

J. Seery

1  sir?
2     A.    Vague -- vaguely.  I'm -- I'm
3  familiar with it, yes.
4     Q.    And does this refresh your memory
5  that Mr. Dondero resigned on October the 9th,
6  2020?
7     A.    I -- I would say it confirms my
8  memory since I said it was in October.
9     Q.    Okay.  But can you now confirm that
10  it was October 9, 2020?
11     A.    Yes.
12     Q.    Okay.  Thank you.  Now, just to put
13  it in the record here because of Mr. Morris'
14  objection, it is -- and I apologize, we're
15  going to talk about the debtor's contentions
16  today in this lawsuit against NexPoint.
17        Is it okay if I say debtor or you
18  want me to say reorganized debtor or --
19     A.    Whatever you're more comfortable,
20  I'm okay.
21     Q.    It is -- well, the -- the debtor
22  the reorganized debtor under the plan,
23  retained interest in this lawsuit; is that
24  accurate?

Page 25

J. Seery

1     A.    That's correct.
2     Q.    Okay.  So it -- it's -- is it the
3  debtor's contention that NexPoint failed to
4  make a payment due, let's say on or before
5  December 31, 2020, on this $30.7 million
6  promissory note?
7     A.    That's correct.
8     Q.    Okay.  And we'll go further in
9  detail, but ultimately, on or about January
10  7, the debtor sent notice that the note was
11  immediately due and payable, correct?
12     A.    That's correct.
13     Q.    And did you make that decision to
14  say that the note is immediately due and
15  payable?
16     A.    I did, yes.
17     Q.    Okay.  Thank you.  Now -- and you
18  were aware, when you made that decision,
19  that -- that NexPoint was affiliated to some
20  degree with Mr. Dondero?
21        MR. MORRIS:  Objection to the
22  form of the question.
23     A.    Yes, I was.
24     Q.    What was your understanding then or

Page 26

J. Seery

1  J. Seery
2  what is your understanding now - you answer
3  it how ever you can - as to what
4  Mr. Dondero's role with NexPoint Advisors LP
5  was in December 2020?
6      A.    I believe it was and continues to
7  be complete ownership control and domination
8  of NexPoint Advisors.
9      Q.    Between January 9, 2020, when you
10  became an independent director, and October
11  9, 2020, when Mr. Dondero resigned, did you
12  form an opinion as to Mr. Dondero's honesty?
13      A.    Between which dates?
14      Q.    January 9 and October 9, 2020.
15      A.    January 9 and October -- yes.
16      Q.    Yes.
17          And did you form an opinion as to
18  his business acumen?
19      A.    To some degree, yes.
20      Q.    Okay.  Did you form an opinion as
21  to his management skills?
22      A.    Yes.
23      Q.    Okay.  What was your opinion
24  with -- pardon me, strike that.
25          What opinion did you form during

Page 27

J. Seery

1  J. Seery
2  that time as to Mr. Dondero's honesty?
3      A.    I think he's dishonest.
4      Q.    Okay.  What opinion did you form as
5  to his business acumen?
6      A.    I think it's challenged.
7      Q.    Can you elaborate?
8      A.    I -- the Select account we've
9  talked about is a -- is a great example.
10          Shorting Zoom in the pandemic and
11  holding it, shorting Netflix for long periods
12  of time, moving money all around without any
13  thought of the corporate form, moving money
14  in and out of different entities.
15          The litigations that he was
16  involved in; Acis alone he could have settled
17  for $2 million and probably burned nearly
18  $200 million of value.
19          So those are just beginning
20  examples.
21      Q.    Given the opinions that you formed
22  as to Mr. Dondero, did you believe that
23  that's also how he was running NexPoint at
24  that time in late 2020?
25      A.    I didn't make any judgments about

Page 28

J. Seery

1  NexPoint.
2      Q.    Okay.  Now, are you familiar with
3  the concepts, in bankruptcy, of solvency or
4  insolvency?
5      A.    Yes.
6      Q.    Okay.  Are you familiar with one or
7  more metrics or definitions --
8      A.    Yes.
9      Q.    -- for solvency -- okay.
10      A.    Yes.
11      Q.    Can you tell me how you understand
12  solvency to be.
13      A.    In which context?
14      Q.    Well, under the Bankruptcy Code.
15      A.    There's no --
16          MR. MORRIS:  Objection to the
17      form of the question.
18      A.    There's no definition of solvency
19  in the bankruptcy code.
20      Q.    Sir, there is.
21          MR. MORRIS:  Well --
22      A.    Failure to pay debts as they come
23  due, balance sheet insolvency --
24      Q.    That's what I'm --

Page 29

J. Seery

1  J. Seery
2          (Simultaneous speaking.)
3      A.    -- depends on the context.
4          (Reporter interjection.)
5      Q.    I'm sorry.
6          So you agree with me -- you agree
7  with me, again, depending on the context,
8  that one definition of insolvency is balance
9  sheet, meaning that your liabilities exceed
10  your assets?
11      A.    That is one definition of
12  insolvency.
13      Q.    And you agree with me that another
14  definition is when you're basically unable to
15  pay your debts as they become due?
16      A.    That's another definition.
17      Q.    Okay.  And I'm going to ask you,
18  when you became -- or after you became an
19  independent director on January 9, 2020, did
20  you form an opinion as to the debtor's
21  solvency?
22      A.    On January 9?
23      Q.    Well, or after that -- after,
24  after --
25          (Simultaneous speaking.)

**App. 104**

J. Seery

1  Q.    -- January 9, 2020.
2  A.    It's a -- it's a long period.  So
3  if you want to break it down --
4  Q.    Yeah.
5  A.    -- in the early part of the case I
6  did not form an opinion as to solvency.
7       I had to determine what the asset
8  values were and what the -- what the claims
9  were.
10  Q.    Did you ever form an opinion -- and
11  the reason why I'm -- I want to separate the
12  debtor from the reorganized debtor.  That's
13  why I'm trying to be sensitive on the dates.
14       So I'm going to say debtor.  Did
15  you ever form an opinion as to the debtor's
16  solvency?
17       MR. MORRIS:  Objection to the
18       form of the question.
19  A.    That's -- that's what I answered.
20  Q.    So you did?
21       MR. MORRIS:  Objection to the
22       form of the question.
23  A.    The -- the debtor's solvency
24  depends on when.

J. Seery

1  Q.    Okay.
2  A.    I think early in the case, as I
3  said, I didn't form any opinion as to
4  solvency.
5  Q.    But at some point did you form an
6  opinion as to solvency?
7  A.    Yeah, I don't know exactly when it
8  was, but at -- at some point it became clear
9  to me that the claims exceeded the asset
10  value.
11  Q.    So is it fair to say that at some
12  point you concluded that the debtor was
13  insolvent based on the balance sheet test?
14       MR. MORRIS:  Objection to the
15       form of the question.
16  A.    Certainly on -- on the balance
17  sheet test, yeah.
18  Q.    What about on the inability to pay
19  debts as they become due; did you ever form
20  an opinion on that test?
21  A.    Well, it was in bankruptcy, so that
22  had already been met.
23  Q.    Okay.  Did you ever form an opinion
24  or have one provided by non-lawyers to you as

J. Seery

1  to whether the debtor was insolvent prior to
2  the petition date?
3  A.    Did I, I -- I do now.
4  Q.    Okay.  What is your opinion?
5  A.    I think the debtor was insolvent
6  and very much insolvent well before the
7  filing.
8  Q.    Into 2018?
9  A.    Certainly.
10  Q.    2017?
11  A.    Certainly.
12  Q.    2016?
13  A.    Yes.
14  Q.    Okay.  And when you say that the
15  debtor was well insolvent before filing, are
16  you applying one or both of the definitions
17  we discussed for insolvency?
18       MR. MORRIS:  Davor, I'm just
19       going to express the same concern I did
20       earlier.  For the life of me, I don't
21       know -- I mean, I know why you're doing
22       this, but it's certainly not related to
23       any of the claims that are at issue in
24       this lawsuit.  So I'm just -- I just --

J. Seery

1       MR. RUKAVINA:  With due respect,
2       John, you've sued my client for
3       fraudulent transfer.  That requires
4       insolvency as an element.  I'm entitled
5       to explore insolvency.
6       MR. MORRIS:  Sure, for -- for
7       2019, go right ahead.  That's when the
8       transfer was made, right?
9       MR. RUKAVINA:  The note --
10       MR. MORRIS:  The note is 2000 --
11       the, the note is -- is May 2, 2019,
12       so --
13       MR. RUKAVINA:  No, sir, you're --
14       I'm sorry, you're confusing this with
15       the HCMA case.  Let's put the note into
16       evidence.
17       MR. MORRIS:  Okay.
18       MR. RUKAVINA:  It's -- I'm not
19       trying to be --
20       (Simultaneous speaking.)
21       MR. MORRIS:  No, no, no, no, no.
22       Let me, let me -- let me restate this.
23       MR. RUKAVINA:  Yeah.
24       MR. MORRIS:  It's for actual

**App. 105**

Page 34

1        J. Seery
2    fraudulent transfer.
3        MR. RUKAVINA:  Yes.
4        MR. MORRIS:  Solvency is not an
5    issue.  Solvency is not an issue.  We
6    have no burden of proving solvency.
7    It's only -- that's exactly why we
8    didn't put constructive fraudulent
9    transfer in the complaint, so we
10    wouldn't do this.
11        MR. RUKAVINA:  We can -- we can
12    debate the law on that, but I think --
13    I think you have answered it.
14  BY MR. RUKAVINA:
15    Q.    To your view, the debtor was
16  insolvent certainly as of 2016?
17    A.    Yeah.
18    Q.    Okay.  And I asked you, and before
19  counsel objected, what definition or, or --
20  or both definitions were you using when you
21  told me that the debtor was insolvent in
22  2019, 2018, 2017 and 2016?
23    A.    I think --
24        MR. MORRIS:  Object to the form
25    of the question.

Page 35

1        J. Seery
2    A.    I -- I think both.  I think you'd
3  have to go through each, but when you
4  properly look at the balance sheet and you
5  add the contingent liabilities, it was pretty
6  clear that the debtor didn't have the -- the
7  wherewithal from the balance sheet
8  perspective to satisfy those ultimate
9  liabilities.
10        In addition, the debtor continually
11  borrowed money when it needed it.  The debtor
12  was -- was always on a very tight leash with
13  respect to liquidity, as money kept getting
14  sucked out at different times.
15    Q.    Okay.  After October 9, 2020, when
16  Mr. Dondero resigned, should Mr. Dondero have
17  had any ability to instruct the debtor's
18  employees as to what to do, if that question
19  makes sense?
20        MR. MORRIS:  Yeah, objection to
21    the form of the question.
22    A.    The -- the answer is with
23  respect -- he was permitted, I believe, after
24  the -- the dates will get a little bit
25  confusing, but with respect to the shared

Page 36

1        J. Seery
2  services, he could make certain direction to
3  the employees and even after the contempt
4  finding could make certain directions with
5  respect to shared services.
6        With respect to operations of
7  HCMLP, no.
8    Q.    Okay.  And that was my question.
9        So if it was an HCMLP operational
10  issue, Mr. Dondero had no ability to instruct
11  anyone else?
12    A.    Or, or -- or any issue --
13    Q.    Any issue --
14    A.    -- but with respect to shared
15  services, he certainly could communicate with
16  them, and if there were shared services that
17  needed to be performed, he could request
18  those.
19    Q.    Now, as of October 9, 2020, is it
20  true that Frank Waterhouse was the chief
21  financial officer of the debtor?
22    A.    That's correct.
23    Q.    And that he was the chief financial
24  officer of the debtor through January 2021?
25    A.    I don't remember the exact date,

Page 37

1        J. Seery
2  but yes, right around there.
3    Q.    Okay.  Was he the chief financial
4  officer of the debtor on January 12, 2021?
5    A.    I -- I believe he was.  I don't
6  recall the exact dates that we did the -- the
7  cutover.
8    Q.    Okay.  Well, let's -- let's try to
9  pin that down.
10        You recall that there was a shared
11  services agreement in place between the
12  debtor and NexPoint?
13    A.    Yes.
14    Q.    Okay.  And you recall that the
15  debtor exercised its opt -- or right to
16  terminate that agreement?
17    A.    That's correct.
18    Q.    Okay.  And do you recall the date,
19  after several extensions, on which that
20  agreement was actually terminated?
21    A.    I don't recall the initial -- I
22  think the notice was in -- in November, late
23  November or December, and it was a -- I
24  believe it was a sixty-day notice for --
25        (Reporter clarification.)

**App. 106**

Page 38

1        J. Seery
2        THE WITNESS:  Sixty-day for NPA,
3    I'm sorry, NPA.
4        And -- there was some sixty days
5    and some thirty days, so I don't recall
6    the exact date that there -- that it was
7    effectively terminated.
8  BY MR. RUKAVINA:
9    Q.    Well, by NPA, you mean NexPoint
10   Advisors?
11   A.    Correct.
12   Q.    Okay.
13   A.    Isn't that who you asked me about?
14   Q.    I know.  I'm just -- for the
15   record, the jury might not know who NPA is.
16   A.    Okay.
17   Q.    Do you recall that we -- you and I
18   had a trial in -- sometime in mid February
19   2021 about the shared services agreements?
20   A.    I know we had a hearing.  I don't
21   recall if you'd call it a trial.  It was a
22   hearing on termination.
23   Q.    Okay.  And -- and do you recall
24   that the debtor had agreed to extend
25   termination until February the 28th, 2021 of

Page 39

1  the shared services agreement?
2    A.    There -- there were extensions; I
3  don't recall the specific dates.
4    Q.    Okay.  Was -- to your recollection,
5  was -- was Mr. Waterhouse the chief financial
6  officer until the termination of that shared
7  services agreement or did he cease being the
8  chief financial officer at some period prior
9  to that?
10   A.    I -- I believe it was to the end,
11   but I'm not -- I'm not absolutely certain
12   about that.
13   Q.    So in December of 2021 -- I'm
14   sorry, strike that.
15       In December of 2020, you were the
16   chief restructuring officer, you were the
17   chief executive officer of the debtor,
18   correct?
19   A.    Yes.
20   Q.    Mr. Waterhouse was the chief
21   financial officer, correct?
22   A.    Yes.
23   Q.    Who else would have been an officer
24   of the debtor in December of 2020?

Page 40

1        J. Seery
2    A.    In December of 2020?
3        Scott Ellington was still the
4  general counsel.
5    Q.    Okay.
6    A.    And I don't believe that we had any
7  other corporate officers.
8    Q.    Mr. Surgent wasn't an officer, to
9  your recollection?
10   A.    He was the CCO --
11   Q.    Okay.
12   A.    -- so I don't believe that's
13   actually a corporate officer.
14   Q.    Was there a COO, do you know?
15   A.    I don't believe so at the time.
16   Q.    Okay.  Now, in the latter half of
17   2020, Mr. Dondero was trying to float some --
18   what we've all called pot plan.
19       Do you recall that?
20       MR. MORRIS:  Objection to the
21   form of the question.
22   A.    The latter half, I -- I guess
23   starting in probably around August --
24   Q.    Okay.
25   A.    -- in -- in connection with the

Page 41

1        J. Seery
2  mediation.
3    Q.    You've heard the term "pot plan"
4  that Mr. Dondero has talked about before,
5  correct?
6    A.    I have, yes.
7    Q.    Okay.  And what did you understand
8  a pot plan, as he was proposing it starting
9  in August of 2020, to be?
10   A.    Yeah, it's not a novel term.
11   Certainly he didn't invent it or -- or
12   probably didn't get it in this case.  He
13   probably got it from his lawyer.
14       But the idea of a pot plan is to
15   put a bunch of money into the middle and
16   create a pot that then the creditors can
17   determine how to divide, and the reorganized
18   debtor moves on with its existence away from
19   the creditor claims.
20   Q.    There was a creditors' committee in
21   the Highland bankruptcy case, correct?
22   A.    Yes.
23   Q.    And how many committee members were
24   there?
25   A.    Four.

Page 42

J. Seery

1
2    Q.   Okay.  And is it fair to say that
3    as part of this pot plan, Mr. Dondero was
4    trying to propose something that might be
5    palatable to that creditor's committee?
6        A.   I think it's fair to say it would
7    have to be palatable to that creditor's
8    committee.
9        Q.   And is it fair to say that -- that
10   starting in August of 2020, you were trying
11   to see if you might facilitate or bridge that
12   gap?
13       A.   I wouldn't say bridge but certainly
14   facilitate --
15       Q.   Okay.  What --
16       A.   -- or if you want to say I did as a
17   bridge between Mr. Dondero and his counsel
18   and -- and the committee and their counsel,
19   that -- that would be fair.
20       Q.   Okay.  Well, let me -- let me look
21   at your prior -- we're saying the same thing,
22   we're just having --
23           (Simultaneous speaking.)
24       A.   I don't think we're having a
25   definitional problem.  I just don't want it

Page 43

J. Seery

1
2    to sound like I was going to bridge it with
3    any sort of finances.
4        Q.   Yeah, that's true, the word
5    "bridge" could be construed to mean that.
6    You're correct.
7            MR. RUKAVINA:  Are we on 4?
8            THE WITNESS:  Yes.
9            (Exhibit 4, Seery Declaration in
10       Support of Motion for TRO, marked for
11       identification, as of this date.)
12           (Brief off-record discussion.)
13       Q.   Do you recall this declaration,
14   sir?
15       A.   Not -- not specifically.
16       Q.   Okay.  But if I represent to you
17   that I pulled this from the docket as your
18   counsel filed it, and assuming that I'm
19   telling the truth, would it -- would this
20   have been a declaration that you caused to be
21   filed?
22       A.   Yeah, I have no -- no reason to
23   challenge it, yes.
24       Q.   Okay.  And we might come back to
25   this a little bit later.  I don't want to

Page 44

J. Seery

1
2    waste your time right now.  But I've lost my
3    place, so we'll come back to it later, after
4    a break.
5            Going back --
6            (Simultaneous speaking.)
7        A.   -- see if there was a bridge quote
8    in here?
9        Q.   No, no, you were -- you were
10   describing that you had been trying to
11   facilitate a settlement, and I was just going
12   to try to use your words so that I wouldn't
13   misstate it.
14           But, but going back, so -- so in
15   August -- starting in August of 2020,
16   Mr. Dondero was trying to propose some pot
17   plan, and it had to have been acceptable to
18   the committee for there to be any settlement.
19           So far I'm correct, right?
20       A.   Yes.
21       Q.   And you as the COO was trying to do
22   what you could to see if you could facilitate
23   the two of them coming to an under --
24   understanding.
25           Is that generally accurate?

Page 45

J. Seery

1
2        A.   That's correct.
3        Q.   Okay.  And did you continue doing
4    so for a period of months after that?
5        A.   Certainly into early November.
6        Q.   Okay.  Would you say that there was
7    a point in time at which you stopped
8    personally - you, Mr. Seery - personally
9    stopped trying to facilitate some settlement
10   between Mr. Dondero and the committee
11   vis-a-vis a pot plan?
12       A.   I think at some point it became
13   very clear to me that it was futile, that --
14   that Mr. Dondero was never going to come up
15   with any real value that would be anywhere
16   close to what the committee would accept.
17           And his structure of his -- his pot
18   plan was always more notes, and the basic
19   assumption was, well, if you're not paying on
20   these notes how -- how do we trust new notes?
21       Q.   And when -- when did that view
22   crystalize in your mind?
23       A.   Probably some -- it probably
24   developed - so crystallized is a fair word -
25   over a period of time.  I think in the -- the

Page 46

J. Seery

1  mediation, through the negotiations in
2  September and October or the -- the multiple
3  re-trades on -- on very specific prior
4  agreements, by November it was clear to me
5  that -- that there was little hope.
6      Q.    Okay.  So we can say by December 1,
7  certainly by December 1, there was very
8  little hope?
9      A.    Yeah, I think that that's
10 probably -- at least in my mind.  I don't
11 know if others felt the same, and there was
12 certainly opportunities for settlement beyond
13 that, but it seemed pretty clear to me that
14 we were moving towards a monetization plan
15 and we started negotiating the separation,
16 not with Mr. Dondero but with the team, of --
17 of the various business and the termination
18 of the --
19      (Reporter clarification.)
20      THE WITNESS:  Businesses and the
21 termination of the shared services,
22 sorry.
23 BY MR. RUKAVINA:
24      Q.    Did you convey that to

Page 47

J. Seery

1  Mr. Waterhouse at any point in time,
2  basically that you believed that
3  Mr. Dondero's pot plan was -- was not going
4  to happen?
5      A.    I -- I don't recall if I did or
6  not.
7      Q.    Did you -- strike that.
8      In -- in the course of these
9  discussions between the committee and
10 Mr. Dondero and -- and maybe your trying to
11 facilitate something, was Mr. Waterhouse even
12 involved directly, to your knowledge?
13     A.    He was certainly involved,
14 assisting Mr. Dondero --
15     Q.    Okay.
16     A.    -- and he certainly provided or his
17 team provided data to me, which ultimately
18 went to the committee.
19     So I would -- I would think he's
20 involved to some degree.  I don't recall that
21 he would ever have been involved in -- in
22 specific discussions --
23     Q.    Okay.
24     A.    -- at least not with me.

Page 48

J. Seery

1  I think it was pretty clear he was
2  involved with discussions with Mr. Dondero.
3      Q.    You -- not you, pardon me.
4      The debtor had an outside financial
5  advisor, correct?
6      A.    That's correct.
7      Q.    And what was that entity's name?
8      A.    DSI.
9      Q.    Is it fair to say that you relied
10 on DSI to some degree in the course of these
11 discussions and negotiations?
12     A.    To some degree, but I don't think
13 it's a fair characterization that they were
14 sort of a hands-on financial advisor around
15 the -- these negotiations.
16     Q.    I just want to -- I just want to
17 understand that, that -- it sounds like, to
18 me, at least on the debtor's side,
19 Mr. Waterhouse was not one of the key
20 individuals trying to facilitate an agreement
21 between the debtor and the committee?
22     A.    I, I --
23     MR. MORRIS:  Objection to the
24 form of the question.

Page 49

J. Seery

1      A.    I don't think that's fair.  I think
2  that I -- I and my professionals, lawyers
3  and -- and DSI, were in the middle between
4  Mr. Dondero and his counsel and the
5  committee.  The committee had their own
6  financial advisors.
7      I drew on Mr. Waterhouse and his
8  team for financial information regarding the
9  debtor's assets throughout the case,
10 certainly since I took the position as CEO.
11     Q.    Okay.
12     A.    Mr. Dondero also drew on that
13 information quite a bit.
14     Q.    At that point in time, let's say in
15 December of 2020, did you understand that
16 Mr. Waterhouse had a role with my client,
17 NexPoint Advisors?
18     A.    Did you say December of 2020?
19     Q.    Yes, sir.
20     A.    Did he have a --
21     (Simultaneous speaking.)
22     A.    -- he was -- I think he was
23 treasurer and he was an executive officer of
24 some -- one of the funds.

Page 50

J. Seery

1                     J. Seery
2     Q.    Now, you mentioned the debtor's
3 monetization plan that the debtor filed.
4         I think that's the word you used,
5 right, monetization plan?
6     A.    Correct.
7     Q.    Okay.  And in, in -- in a nutshell
8 amongst other things, that plan -- well, you,
9 you tell the -- the Court.
10         What was the monetization plan
11 intended to do?
12     A.    It was aptly named.  It was
13 intended to monetize the assets of the debtor
14 over a period of time that we thought was
15 legitimate to run the businesses in a way
16 that would maximize value for the estate.
17     Q.    And some of the assets of the
18 debtor, at least in the latter half of 2020,
19 included promissory notes from Mr. Dondero
20 and other entities affiliated with
21 Mr. Dondero; is that correct?
22     A.    That's correct.
23     Q.    And some of those promissory notes
24 were demand notes; is that correct?
25     A.    That's correct.

Page 51

J. Seery

1                     J. Seery
2     Q.    And some of those promissory notes
3 were term notes, at least as of that time; is
4 that correct?
5     A.    That's correct.
6     Q.    Okay.  And I think, actually, it's
7 in this declaration which we marked 4, did
8 we?
9     A.    Yes.
10     Q.    Yes.  So you filed -- or, I'm
11 sorry, sir, you -- this was filed on December
12 7, 2020.
13         And I think if you go to paragraph
14 26 and 27, you'll see that you're discussing
15 demand notes.
16     A.    That's correct.
17     Q.    And in paragraph 29 it says that on
18 December 30 -- I'm sorry, strike that.
19         In paragraph 29 it says (as read):
20         On December 3, 2020, at my
21       instruction, the debtor's counsel
22       sent letters to representatives of
23       Mr. Dondero and each of the
24       corporate obligors, demanding
25       payment of all unpaid principal

Page 52

J. Seery

1                     J. Seery
2     and accrued interest due under the
3     demand notes by December 11, 2020.
4         Was that a true statement?
5     A.    Yes.
6     Q.    Why did you decide to make demand
7 of the demand notes at that time?
8     A.    Well, it was pretty -- this will be
9 a long answer, but it's pretty clear that I
10 made a mistake, that I should have demanded
11 payment from Mr. Dondero earlier in the case.
12         The demand notes were due and
13 owing, they could be called at any time, and
14 I thought that leaving them outstanding would
15 provide a way to facilitate a grand bargain,
16 or a pot plan.
17         And by the time -- the beginning of
18 December, when we knew we were moving forward
19 with the monetization plan, it was time to
20 start to collect the assets of the debtor, so
21 I made a decision that we should demand
22 payment on each of the notes.
23     Q.    At that time, on December the 3rd,
24 2020, were you aware of the $30.7 million
25 NexPoint note?

Page 53

J. Seery

1                     J. Seery
2     A.    Yes.
3     Q.    Okay.  And did you understand that
4 at that point in time that was a term note?
5     A.    Yes.
6     Q.    Okay.  And, and did you have a -- a
7 plan at that point in time as to -- and did
8 you -- pardon me.  Strike all that.
9         Did you understand that -- that
10 that had a thirty-year term originally when
11 it was executed?
12     A.    Yeah, you should understand that --
13 and maybe you do, and that's -- so we'll make
14 sure the record is clear.
15         Each of the -- the term notes were
16 not term notes.  They were -- they became
17 term notes because they were roll-up of
18 demand notes, and they were roll-up of demand
19 notes in 27 -- 2017, when things at the
20 debtor and for Mr. Dondero became very
21 precarious.
22         Certain lawsuits had been filed,
23 the asset stripping in the Cayman Islands had
24 begun.  It was a difficult time.  So without
25 any consideration whatsoever, Mr. Dondero, on

Page 54

J. Seery

1  both sides, extended the terms -- rolled up
2  those notes and extended the terms of those
3  notes for thirty years and generally -
4  although not all - very low interest rate and
5  very easy terms, no -- no security, no
6  covenants.
7          So those became the term notes, but
8  they were always potentially subject to other
9  litigation demands.
10 Q.    You weren't around with the debtor
11 or NexPoint in 2017, were you?
12 A.    No.
13 Q.    Okay.  So you have no personal
14 knowledge about the execution of any notes at
15 that time?
16 A.    I, I would differ and say I do -- I
17 wasn't in the room, but I have the evidence
18 by the virtue of the fact that I've seen the
19 backup to the notes, and they actually
20 contain the schedule with the roll -- the
21 notes that are being rolled up.
22 Q.    So you're -- you're making an
23 educated deduction, based on your
24 professional experience, but you aren't

Page 55

J. Seery

1  either the maker or the lender in 2017, when
2  these notes -- when this note was executed,
3  were you?
4          MR. MORRIS:  Objection to the
5          form of the question.
6  A.    I haven't been the maker or the, or
7  the -- or the lender on any of these notes.
8          MR. RUKAVINA:  Well, this is
9          going to be Exhibit 5.  This is the
10         note that we're here on today.
11         (Exhibit 5, Promissory Note
12         Dated May 31, 2017, marked for
13         identification, as of this date.)
14         (Brief off-record discussion.)
15 BY MR. RUKAVINA:
16 Q.    So if we go to the last page of
17 this exhibit, this references prior notes,
18 and the body of this basically says that each
19 of the prior notes are superseded by the new
20 note, correct?
21         MR. MORRIS:  Objection to the
22         form of the question.  Can you just
23         point that to Mr. Seery so --
24 Q.    Sure.  So, Mr. Seery, if you see

Page 56

J. Seery

1  Section 9, (as read):
2          The original of each of the
3          prior notes superseded hereby
4          shall be marked void.
5  A.    Yes, so --
6  Q.    And then you see the prior notes in
7  the preamble?
8  A.    Uh-huh.
9  Q.    So is this what you were just
10 talking about, that this promissory note was
11 a roll-up of these five prior demand notes?
12 A.    That's correct.
13 Q.    Okay.  Now, if -- if we look at
14 this -- I'm looking at the last page here,
15 sir.
16 A.    Uh-huh.
17 Q.    The initial note amount of the
18 original five was 27,675,000; is that
19 correct?
20 A.    That's correct.
21 Q.    And -- and as of May 31, 2017, this
22 says that principal and interest outstanding
23 was 30,746,812.33; is that correct?
24 A.    That's what it says, yes.

Page 57

J. Seery

1  Q.    Okay.  Is -- is the logical
2  conclusion that -- that on those five
3  promissory notes, not even all the interest
4  had been kept current?
5  A.    I, I --
6          MR. MORRIS:  Objection to the
7          form of the question.
8  A.    Yeah, I'd have to do the math on
9  each of them.  You're talking about three
10 years, 240 -- yeah, it looks roughly but not
11 all of the -- it looks like some payments
12 were made, but -- but certainly on -- it
13 doesn't look like it completely kept current,
14 at least on some of these.
15 Q.    Well, can you think of a reason --
16 other than the failure to pay interest, can
17 you think of reason as to why the initial
18 note amount increased by at least $3 million
19 in that time frame?
20         MR. MORRIS:  Objection to the
21         form of the question.
22 A.    No, I -- I would think it would be
23 an accrual.  And it's just unclear to me on
24 each of them whether there were pay-downs,

**App. 111**

Page 58

J. Seery

1 whether there were times where it didn't pay
2 down, but certainly in the -- in the
3 aggregate, they didn't pay down. And so I
4 just don't know if it was -- if there was
5 some payments or not; I don't recall.
6    Q.   Okay. And -- and we're not here on
7 the HCMFA note, but are you general --
8 generally familiar that in April of 2019,
9 Mr. Dondero executed a document that took two
10 promissory notes that HCMFA had issued that
11 were demand notes and extended them until May
12 31, 2021?
13    A.   That's not what it did, no.
14    Q.   What do you understand happened?
15    A.   It, it -- they were -- they were
16 demand notes without maturity, and the -- the
17 obligor was given the statement from the
18 holder, HCMLP, that it wouldn't collect on
19 those notes until May 31, 2021.
20       And that was done because HCMFA did
21 not have the money to pay, and because it was
22 an advisor, it had to make representations
23 that it could support itself.
24    Q.   So is it fair to say that, at least

Page 59

J. Seery

1 prior to the time that you became CEO/CRO,
2 the debtor was lax in its enforcement of its
3 rights as the payee under promissory notes
4 from the advisors?
5    A.   That's --
6       MR. MORRIS: Objection to form of
7    the question.
8    A.   That's completely unfair.
9       (Simultaneous speaking.)
10    A.   -- virtually no basis for you to
11 say something like that.
12       It's a demand note that hadn't been
13 demanded, and then -- then it was to a third
14 party, so they could rely on the fact that
15 HCMFA would have -- wouldn't have to have
16 outflows to payoff demands that could happen
17 at any time; that gave an agreement to extend
18 the term, which is not really a term, it's
19 just we won't demand it.
20       So how -- how you call that lax,
21 I -- that doesn't have -- has nothing to do
22 with being lax.
23    Q.   Well, I thought you testified a few
24 minutes ago that, at least in 2017, the

Page 60

J. Seery

1 debtor was facing serious problems and that
2 Mr. Dondero was rolling up these notes for --
3 for some ulterior purpose?
4    A.   Not ulterior purpose. The purpose
5 is really, really obvious. He wanted to
6 extend out the term so that they wouldn't
7 become due, couldn't be demanded at any time.
8    Q.   Okay. So that -- that goes back to
9 my question, which you said was not a fair
10 question --
11    A.   No, I said your characterization
12 was unfair. You can't call that being lax.
13 It's a demand note. You can either demand it
14 or not demand it, but if you don't demand it,
15 it doesn't mean you're being lax.
16    Q.   Okay. Fair enough. But if, if --
17 so we're still on Exhibit 5 --
18       If the debtor had allowed for these
19 five notes' accrued interest to go unpaid for
20 a period of one or more years, wouldn't that
21 suggest to you that the debtor was, as -- as
22 a payee, not strictly enforcing its rights?
23    A.   I believe the underlying terms
24 allowed it to accrue.

Page 61

J. Seery

1    Q.   Okay. Okay. So is it your
2 testimony, sir, that prior to you becoming
3 CEO/CRO, the debtor did or did not enforce
4 its rights as the payee under various
5 promissory notes according to industry
6 standards, as you would understand them to
7 be?
8       MR. MORRIS: Objection to the
9    form of the question.
10    A.   I think industry standards are --
11 are a bit nebulous, particularly when you're
12 talking about the payee and the payor being
13 controlled by the same person. But I think
14 there's nothing uncommon about letting a note
15 accrue when it's permitted to accrue.
16    Q.   Do you believe that there -- strike
17 that.
18       Do you believe that the debtor,
19 prior to you becoming CEO/CRO, had acted
20 inappropriately with permitting the roll-up
21 of these five notes into Exhibit 5 or -- or
22 changing the -- the HCMFA notes from demand
23 to May 31, 2021?
24       MR. MORRIS: Objection to the

Page 62

J. Seery

1    form of the question.
2        A.   Yeah, with -- with respect to the
3    HCMFA, I don't know -- I don't think that's
4    inappropriate, based on the shared services
5    and a tangential relationship between the
6    affiliates, although clearly it was
7    aggrandizing to Mr. Dondero and his
8    interests, which it syphoned off tons of
9    value from the debtor as opposed to HCMLP.
10           With respect to the roll-up of
11   these notes for thirty years, without --
12   without real consideration, I think that that
13   was --
14           (Reporter clarification.)
15           THE WITNESS:  Inappropriate, yes.
16   BY MR. RUKAVINA:
17       Q.   So if we go back now to December of
18   2020, early December of 2020, you've made
19   demand - as we've just read in your
20   declaration - on demand notes, and you've
21   testified that you were aware of the
22   existence of this note.
23           Did you, at that point in time,
24   have any plans as to how to monetize this

Page 63

J. Seery

1    note, number -- Exhibit 5 --
2        A.   Yes.
3        Q.   -- on December 3, 2020?
4        A.   Yes.
5        Q.   Okay.  What was the plan back then?
6        A.   It depended on what happened to the
7    note, but ultimately we would seek to sell
8    the note because of its long tenor, but
9    likely we would end up suing Mr. -- or NPA,
10   the -- the maker of the note, for fraudulent
11   conveyance in 2017.
12       Q.   On account of the roll-up?
13       A.   Correct.
14       Q.   Okay.  Did the debtor ever actually
15   solicit any offers of -- whereby someone
16   might buy this note, No. 5, Exhibit 5?
17       A.   No.
18       Q.   Okay.  Did you form an opinion or
19   were -- were you given an opinion from a
20   non-lawyer as to what the monetization value
21   of this note, Exhibit 5, might have been in
22   early December of 2020?
23       A.   I -- we did form an opinion, and --
24   and we discounted it substantially.

Page 64

J. Seery

1        Q.   Can you tell the Court
2    approximately what amount?
3        A.   Off the top of my head, I don't
4    recall.
5        Q.   Okay.  But -- but substantially?
6        A.   Substantially.  The reason is
7    pretty obvious.  This is a -- if you don't
8    win the fraudulent conveyance suit, you've
9    got a long-dated note with Mr. Dondero on the
10   other side.
11           He's not generally viewed as a
12   creditworthy counter-party and he controls
13   the inflows that go into NPA.  So the chances
14   you are ever going to be paid early are
15   extremely low, and the chances that it's
16   going to default are probably pretty high.
17       Q.   And this was an unsecured note,
18   correct?
19       A.   That's correct.
20       Q.   Okay.  So you -- going into
21   December 31, 2020, were you hoping that
22   NexPoint would default on this note?
23           MR. MORRIS:  Objection to the
24   form of the question.

Page 65

J. Seery

1        A.   I -- I think hoping is -- is not
2    the right term.  I think I -- I assumed that
3    they wouldn't, because you'd have to not
4    understand, you know, what happens when you
5    default on a term note and it gets
6    accelerated.
7            But if it happened, if I had
8    that -- if that fortune befell the estate, I
9    thought that would be a good thing.
10       Q.   Let's look at the -- some of the
11   terms of this note, sir.  So we're on Exhibit
12   5.  And in particular, Section 2.1, sir, the
13   second sentence says (as read):
14           Borrower shall pay the
15           annual installment on the 31st day
16           of December of each calendar year.
17           Do you see that sentence, sir?
18       A.   I do.
19       Q.   Do you believe that that means that
20   the payment must be on the 31st of December
21   or is it -- should it be read as on or before
22   the 31st day of December?
23       A.   It's -- it says on, but typically
24   there's no issue about prepayment and that

Page 66

```
 1                J. Seery
 2   paragraph 3 says you can prepay.
 3        Q.    Well, so you see how -- how this
 4   Section 2.1 uses the word "borrower," right?
 5        A.    Yes.
 6        Q.    And borrower isn't defined here,
 7   but logically it's maker, right?
 8        A.    Correct.
 9        Q.    Okay.  So that's just probably
10   sloppiness, right?
11             MR. MORRIS:  Objection to the
12        form of the question.
13        A.    Appears to be.
14        Q.    Okay.  And then you, you
15   actually -- you saw Section 3, that talks
16   about the -- the prepayment (as read):
17             Maker may prepay in whole or
18        in part the unpaid principal or
19        accrued interest of this note.
20             Do you see that, sir?
21        A.    Yes.
22        Q.    Okay.  (As read):
23             Any payments on this note
24        shall be applied first to unpaid
25        accrued interest hereon and then
```

Page 67

```
 1                J. Seery
 2        to unpaid principal hereof -
 3        correct?
 4        A.    Correct.
 5        Q.    Okay.  So that, that goes -- that
 6   ties back to your prior answer, that even
 7   though Section 2.1 says on the 31st day of
 8   December, it's logical to read it on or
 9   before the 31st day of December?
10             MR. MORRIS:  Objection to the
11        form of the question.
12        A.    It, it -- it would be.  Your --
13   your interest amounts would be different but
14   yes.
15        Q.    Okay.  Well, can -- so going back
16   to Section 3, it says prepay accrued
17   interest.
18             How does one prepay accrued
19   interest?
20        A.    Interest accrues on this note.  How
21   you prepay it is you send the money before
22   the accrual date.
23        Q.    Okay.  Fair enough.  And going back
24   to Section 3, the -- the style of that
25   section - whatever the word is - it says
```

Page 68

```
 1                J. Seery
 2   prepayment allowed, renegotiation
 3   discretionary.
 4             You see where it says renegotiation
 5   discretionary?
 6        A.    Yes.
 7        Q.    Can you -- can you see anything
 8   actually in that paragraph that talks about a
 9   renegotiation?
10        A.    Nope.
11        Q.    Okay.  And just to -- to be clear,
12   do you see anything in here that talks about
13   that headings are for stylistic purposes only
14   and have no meaning?
15        A.    I -- I don't see anything --
16        Q.    Okay.
17        A.    -- that says that.
18             I just think that, one, the
19   headings are probably appropriate; two,
20   renegotiation is always discretionary.
21        Q.    Okay.  Well, but nothing in here
22   suggests to you, does it, sir, that -- that
23   the debtor was prohibited from renegotiating
24   anything about this note?
25        A.    No, the -- the holder of the note,
```

Page 69

```
 1                J. Seery
 2   the payee, could negotiate/renegotiate or
 3   not.
 4             In fact, it says that.  Because it
 5   says it as a waiver, that the maker hereby
 6   waives any grace, demand, presentment -- it's
 7   got a very clear, broad waiver of any kind of
 8   implication that there might be some courtesy
 9   that the payee would have to give to the
10   maker.
11             MR. RUKAVINA:  Are we on 6?
12             Okay.  Sir, I'm going to hand you
13        what's -- what's going to be marked as
14        Exhibit 6, which is your January 7, 2021
15        letter.
16             (Exhibit 6, Correspondence
17        Dated January 7, 2021, marked for
18        identification, as of this date.)
19             (Brief off-record discussion.)
20             THE WITNESS:  By the way,
21        who's -- who's Aaron Lawrence?  I
22        didn't see that person earlier.
23             MR. MORRIS:  That is, I think, a
24        paralegal with Quinn.
25             THE WITNESS:  Oh, okay.
```

**App. 114**

Page 70

```
1                    J. Seery
2              MR. MORRIS:  Or an assistant,
3       maybe an associate.
4              I apologize if you're an attorney.
5       I apologize.  In any event, but -- but,
6       Mr. Lawrence you're with Quinn, right?
7              MR. LAWRENCE:  Yes, I am.
8              MR. MORRIS:  Yeah, thank you.
9              MR. LAWRENCE:  I -- I've -- I've
10      taken the bar.
11             MR. MORRIS:  Yeah.  Oh, okay.
12      Thank you.
13             MS. DEITSCH-PEREZ:  Does that
14      imply you've just taken the bar?
15             MR. LAWRENCE:  Yes.
16             MS. DEITSCH-PEREZ:  Okay.  Thank
17      you.
18             (Simultaneous speaking.)
19      BY MR. RUKAVINA:
20         Q.    Mr. Seery, you have Exhibit 6.
21      Do you recognize this document?
22         A.    I do, yes.
23         Q.    Okay.  And -- and that's your
24      electronic signature there?
25         A.    That is.
```

Page 71

```
1                    J. Seery
2          Q.    And you authorized this document to
3       be issued to NexPoint Advisors?
4          A.    I did, yes.
5          Q.    Okay.  Did you discuss this
6       document, prior to you sending it, with the
7       independent board?
8          A.    Yes.
9          Q.    Okay.  And what do you recall about
10      that discussion?  Who was there; how did it
11      happen?
12         A.    I don't recall it specifically.
13      That would be at regular meetings and we
14      talked about the case.  This came shortly
15      after -- as we were moving towards -- I don't
16      remember the exact confirmation date, but it
17      was, you know, in and around that time.  And
18      this was a material asset of the estate, so
19      talking to them about that would have been
20      normal course of action.
21         Q.    Part of what you discussed with
22      them, was it how the debtor should respond to
23      the missed December 31 payment?
24         A.    I don't -- I don't think that's a
25      fair characterization.  I would have said
```

Page 72

```
1                    J. Seery
2       that they missed the payment, we're going to
3       accelerate it unless you have some objection.
4       They didn't object.  This would have been
5       standard for anyone I know who's a holder of
6       a note.
7          Q.    So there was no discussion with the
8       board about maybe giving NexPoint a chance to
9       fix that default before sending this note?
10         A.    No.
11         Q.    Okay.  Same question:  Did you
12      discuss the substance of this letter, before
13      you sent it, with the committee?
14         A.    I doubt it and I don't recall.  I
15      don't think so.  It wouldn't -- it wouldn't
16      have been -- if there had been a committee
17      call, we would have told them about it, but I
18      wouldn't have been seeking permission.
19         Q.    Okay.  Did you keep notes of your
20      meetings or discussions with the other board
21      members generally?
22         A.    Sometimes.  Not -- not always.  It
23      depends.
24         Q.    I've heard tell that you're a
25      copious note -- note-taker; is that
```

Page 73

```
1                    J. Seery
2       incorrect?
3          A.    I don't -- I don't think that's
4       fair.
5          Q.    Okay.
6          A.    I take -- I take notes but not
7       always.
8          Q.    Do you have any memory, not that
9       you should, as to whether you took any notes
10      of the -- the meeting with the other board
11      members we just discussed, about where the
12      substance of this letter was discussed?
13         A.    I don't recall.  It would have been
14      unusual for me to put the substance of that
15      kind of board meeting - if it was a board
16      meeting or if it was just a call - into
17      notes, because I would have -- if it's a
18      board meeting, we would have had minutes, and
19      if it was just a call for something like
20      this, it wouldn't have risen to the level of
21      we're taking notes and writing it down.
22         Q.    Okay.
23         A.    I didn't have any reason to record
24      every single thing I said with them because
25      our collective memories are good and
```

**App. 115**

Page 74

J. Seery

```
1   they're -- they're pretty honest folks.
2      Q.   Okay.  Did -- did either you or
3   anyone video-record or audio-record any of
4   the discussions that you had with the other
5   board members ever?
6
7      A.   No.
8      Q.   Okay.  Were any of those meetings
9   with the other board members by Zoom or
10  Webex?
11     A.   Very few, I mean, typically not.
12     Q.   Okay.  The very few that might have
13  taken place, do you recall if -- if anyone
14  pressed a record button on Zoom or Webex?
15     A.   Nobody would have.
16     Q.   Okay.
17     A.   I can't imagine anyone would have
18  recorded it without requesting permission
19  from the other participants.
20          We didn't do much in that group by
21  Zoom or Webex, we just -- it wasn't standard
22  operating procedure for the group.
23     Q.   Do you recall any of the other
24  board members, or anyone else on any board,
25  discussing -- seeking permission to record
```

Page 75

J. Seery

```
1   any of those meetings?
2      A.   No, never.
3      Q.   Did you keep any calendar or
4   logbook where you might be able to find the
5   dates on which you had any call or meeting
6   with the other board members?
7      A.   If it was an official board
8   meeting, certainly it would have been in
9   Outlook.
10     Q.   Okay.  And if it was an official
11  board meeting, would there have been an
12  agenda circulated prior to the meeting?
13     A.   Not always, because these were
14  always done - particularly at this time,
15  where we were in litigation - with counsel.
16     Q.   And I take it that they would have
17  been done more or less sometimes on an ad-hoc
18  basis because of developments that might
19  happen?
20     A.   They -- they could, yes.
21     Q.   Okay.  Did you -- in responding to
22  my discovery requests in this NexPoint
23  lawsuit, did you consult any of your
24  handwritten notes, as to whether there was
25
```

Page 76

J. Seery

```
1   anything in there responsive?
2      A.   I believe I looked -- I want to
3   make sure I don't -- I don't know if I can
4   distinguish between your requests and the
5   other requests around these notes, but I
6   certainly looked through some of my notes to
7   see if I had any specific items that might
8   have been requested.  I don't recall if there
9   was something about whether I had a
10  conversation with John --
11          (Reporter clarification.)
12          THE WITNESS:  John Dubel and Russ
13     Nelms, the other directors.
14  BY MR. RUKAVINA:
15     Q.   But you do recall, in response to
16  discovery requests, looking at your
17  handwritten notes to see if there was
18  something responsive?
19     A.   Yes, and I just don't recall the
20  specific topics, because there were some that
21  were specific topics particularly around the,
22  the -- the made-up story about a subsequent
23  event and things like that kind of nonsense.
24     Q.   Do you recall whether you provided
25
```

Page 77

J. Seery

```
1   to the debtor's or the reorganized debtor's
2   counsel any handwritten notes for potential
3   review and production?
4      A.   I don't believe I did, because if
5   I -- if I found something, I would have but
6   I -- but I didn't find something
7   specifically, I didn't -- wouldn't have given
8   notes that were nonresponsive.
9      Q.   Similar question:  Did you -- you
10  have a Gmail account by email, right?
11     A.   I do, yes.
12     Q.   Okay.  And -- and I'm not an
13  expert, but that wouldn't be on the debtor's
14  or reorganized debtor's server, would it?
15     A.   It would not.
16     Q.   Okay.  Did you review your personal
17  emails with respect to whether there was
18  anything responsive there to the discovery
19  requests in this NexPoint lawsuit?
20     A.   Yes.
21     Q.   Okay.  And if you found something,
22  did you send it to counsel for potential
23  review for privilege and potential production
24  to me?
25
```

**App. 116**

Page 78

J. Seery

1   J. Seery
2   A.   Yes.
3   Q.   Okay.  Did you, on your own,
4   withhold anything believing -- well, strike
5   that.
6        Is it fair to say that anything you
7   thought might be responsive you provided to
8   counsel?
9   A.   I did, and I provided them complete
10  access to my email.
11  Q.   And you didn't intentionally
12  withhold anything that might be -- strike
13  that.
14       Other than privileged material, did
15  you intentionally withhold anything that you
16  believed was responsive to my discovery
17  requests?
18  A.   I -- I didn't withhold anything.
19  If there was -- determined to be privileged,
20  then it would have been determined by
21  counsel.
22  Q.   Understood.
23       MR. MORRIS:  And if it was --
24       just to be clear, Davor, if it was
25       determined to be duplicative of other

Page 79

J. Seery

1   emails that we produced --
2        (Simultaneous speaking.)
3        MR. RUKAVINA:  I'm totally fine
4   with that.
5   Q.   I just want to make sure that you,
6   Mr. Seery, did not --
7   A.   No, I didn't --
8   Q.   -- intentionally -- intentionally
9   withhold anything just because you didn't
10  want it produced?
11  A.   No, certainly not, nor -- neither
12  intentionally nor accidentally, because I
13  turned everything over.
14  Q.   Understood.  Going back to
15  Exhibit 6, I've asked you about the board,
16  I've asked you about the committee.
17       And you -- you said, I believe,
18  that you don't remember having a discussion
19  about the substance of Exhibit 6 with the
20  committee, right?
21  A.   I don't think I -- certainly not in
22  advance of it, I would not -- it wouldn't
23  have been standard to -- to do that, unless
24  there had been a meeting right around then,

Page 80

J. Seery

1   and I would have mentioned that I had done
2   this.
3   Q.   Did -- similar to the -- the prior
4   answer, would you have recorded in Outlook or
5   some other means any meetings that you had
6   with the committee in the January 2021 time
7   frame?
8   A.   Yeah, it would have -- any meetings
9   with the committee would have been official.
10  Q.   Okay.  You could -- you could find
11  out what days those would have been had on?
12  A.   I believe so, yes.
13  Q.   And prior to these meetings, and
14  I'm talking about January 2021 now, were
15  there -- was there an agenda shared in
16  advance either by the debtor or by the
17  committee?
18  A.   I believe oftentimes there was with
19  the committee.
20  Q.   Do you recall - and I think I know
21  your answer - whether there was any such
22  agenda related to whether the debtor should
23  declare the NexPoint note, Exhibit 5,
24  immediately due and payable?

Page 81

J. Seery

1   A.   Well, I don't recall a meeting
2   around this, so I -- I certainly wouldn't
3   recall an agenda.
4   Q.   Now I'm going to ask about
5   Mr. Waterhouse.
6        Before you authorized this letter,
7   Exhibit 6, to go out, did you discuss the
8   substance of this letter with Mr. Waterhouse?
9   A.   I don't believe so.
10  Q.   How did you find out that the
11  December 31, 2020 payment had not been made
12  by NexPoint?
13  A.   I believe I was told during the
14  cash-flow meetings that we had weekly.
15  Q.   Okay.  What -- was that like a
16  certain set day of the week or --
17  A.   Yeah.
18  Q.   What day of the week was --
19  A.   -- was either Tuesday or Wednesday.
20  Q.   Okay.  Do you recall who told you
21  that this payment had not been made?
22  A.   I don't recall specifically, no.
23  Q.   Okay.  Would you have received a
24  report from which that would have been

Page 82

J. Seery

1   evident?
2   A.   I would get a cash flow,
3   thirteen-week --
4   (Reporter clarification.)
5   THE WITNESS:  Thirteen-week cash
6   flow.  I'm sorry.
7   Q.   So -- so to the best of your
8   recollection, do you recall, on the one hand,
9   whether someone told you, Mr. Seery, NexPoint
10  didn't pay or, on the other hand, whether you
11  said where is NexPoint's payment?
12  MR. MORRIS:  Objection to the
13  form of the question.
14  A.   I -- I don't recall.  It could
15  have -- it could have easily been either,
16  because it certainly would have been
17  something I would have asked about.  NexPoint
18  and others had already failed to pay their
19  shared service payments, so it was a question
20  as to whether any other payments would be
21  coming.
22  Q.   Okay.  And who would have logically
23  been, pursuant to your course of practice, on
24  these weekly cash flow meetings?

Page 83

J. Seery

1   A.   Typically it would be sometimes
2   Frank Waterhouse, Kristin Hendrix, Dave
3   Klos - not always but most of the time - and
4   Jack Donohue from DSI --
5   Q.   Okay.
6   A.   Fred Caruso as well, I believe --
7   Q.   So in --
8   A.   -- DSI.
9   Q.   -- in early January 2021, do you
10  have any reason to believe that any of those
11  meetings would have been recorded visually or
12  audio-recorded?
13  A.   No, I would think they would not
14  have been.
15  Q.   Would any meetings -- I'm sorry,
16  strike that -- any minutes of those
17  discussions have been kept?
18  A.   No, no minutes would have been
19  kept.
20  Q.   So you would get the, the -- the
21  thirteen-week report you mentioned.
22  Would you get any other documents
23  in the nature of an agenda or an update to
24  you as the chief executive?

Page 84

J. Seery

1   A.   I don't --
2   MR. MORRIS:  Objection to the
3   form of the question.
4   A.   I -- I don't believe so with
5   respect to the thirteen-week cash flow
6   discussion.
7   Q.   So what -- what do you remember
8   saying or doing right then, when you learned
9   that NexPoint did not make a December 31
10  payment?
11  A.   I don't recall the specific date,
12  but as soon as I knew that the payment was
13  late, I would have accelerated the note and
14  told counsel to draft the acceleration and
15  demand.
16  Q.   And you don't recall discussing
17  that with Mr. Waterhouse?
18  A.   I don't recall it.
19  Q.   What about with Mr. Klos?
20  A.   I don't recall it.
21  Q.   And obviously I don't want to hear
22  about your discussion with counsel.
23  Other than counsel and DS -- or
24  DSI, do you -- do you recall discussing with

Page 85

J. Seery

1   anyone at the debtor the fact that NexPoint
2   hadn't made the payment and that you were
3   going to do something about that payment?
4   A.   I would have only discussed it -- I
5   think I would only have discussed it with
6   counsel and with DSI, had DSI get the
7   outstanding full amount up to whatever date
8   we were going to set in the demand notice,
9   and then send out the demand notice.
10  I wasn't going to advertise to
11  anybody exactly what I was doing, because
12  HCMLP had the right to do what it could do.
13  Q.   Okay.  And I'm going to struggle to
14  ask the next question, so it's going to take
15  me several questions and counsel will object.
16  Prior to the December 31 missed
17  payment, did you issue any instructions to
18  employees of the debtor to do anything
19  differently with respect to facilitating
20  NexPoint making that payment than they had
21  done in the past?
22  MR. MORRIS:  Objection to --
23  (Simultaneous speaking.)
24  A.   -- payment or any other payment?

**App. 118**

Page 86

J. Seery

1    J. Seery
2    Q.    This payment.
3    A.    No.
4         (Reporter clarification.)
5    MR. MORRIS:  I'm sorry, objection
6    to form.
7         THE WITNESS:  And I said -- I
8    think my answer was no.
9    BY MR. RUKAVINA:
10   Q.    So we've -- we've learned that in
11   early December of 2020, the debtor was going
12   to be able to -- strike that.
13        You agree with me that in December
14   of 2020, it would have been to the debtor's
15   economic advantage for NexPoint to miss the
16   annual payment?
17        MR. MORRIS:  Objection to the
18   form of the question.
19   A.    I -- I don't know if that's fair,
20   because right now we're having to deal with
21   what I would say are completely nonsensical
22   defenses and spend millions of dollars to
23   collect what are obviously true and owing
24   amounts that are due to the debtor.  So I
25   don't know that it was necessarily in our

Page 87

J. Seery

1    best interest to have this happen.
2         Overall, I think we will collect
3    it, and it will be in our interest rather
4    than having a thirty-year note to -- owed by
5    NPA, to have a collected amount, which I
6    expect to collect in full.
7    Q.    As opposed to selling the note at a
8    substantial discount, correct?
9    A.    That would have been one of the
10   options, yes, or suing on a fraudulent
11   conveyance.
12        (Reporter clarification.)
13        THE WITNESS:  On a fraudulent
14   conveyance.
15   BY MR. RUKAVINA:
16   Q.    So again, without ascribing any
17   mal-intent here, it turned out for the debtor
18   to be better, in December of 2020, that
19   NexPoint missed its payment, correct?
20        MR. MORRIS:  Objection to the
21   form of the question.
22   A.    Again, we'll -- we'll find out
23   after we collect.
24   Q.    Okay.  So I just want to again

Page 88

J. Seery

1    round off --
2    A.    Quite -- quite clearly, though,
3    just so -- so it's -- there's no ambiguity,
4    it's far better to collect the full amount of
5    the note than wait to be paid on an unsecured
6    basis over the next twenty-plus years.
7    Q.    And again, just to round off this
8    topic, you did not instruct anyone at the
9    debtor to do anything or fail to do anything
10   to try to ensure that NexPoint misses that
11   payment, did you?
12   A.    No.
13   Q.    Okay.  Did you, to the best of your
14   recollection, issue any instructions to
15   employees of the debtor having anything to do
16   with NexPoint making the December 31, 2020
17   payment?
18   A.    None at all.
19   Q.    Okay.  So we go back to Exhibit 6,
20   and you'll see in the middle there it talks
21   about the amount due and payable is
22   $24,471,000 and change.
23        Do you see that, sir?
24   A.    Yes.

Page 89

J. Seery

1    Q.    Do you recall who calculated that
2    amount?
3    A.    I believe I got that from DSI.
4    Q.    Okay.  Did you ever ask yourself or
5    ask anyone why the amount was more than
6    $6 million less than the principal amount of
7    the note?
8    A.    I knew the answer.
9    Q.    What's the answer?
10   A.    That there were payments made on
11   the note.
12        MR. RUKAVINA:  Okay.  In fact --
13   Mr. Nguyen, pull up the exhibit that I
14   don't have here.
15        You're going to have to bear with
16   me; I forgot to bring one exhibit, and I
17   apologize to everyone involved.
18        MR. MORRIS:  No apology needed.
19   BY MR. RUKAVINA:
20   Q.    Okay.  So -- so this was -- so,
21   Mr. Seery, this is a document produced by the
22   debtor.  Please scroll up and down.
23        I want to ask you first, do you
24   have any idea who created this document or

Page 90

J. Seery

1  when or why?  Because I'll represent to you
2  that it was just produced to us like this,
3  without any kind of context.
4      A.   I -- I don't know specifically, no.
5      Q.   You don't know specifically, but
6  could it be DSI?
7           Is this the kind of -- does it look
8  like the kind of report that DSI would have
9  made?
10          MR. MORRIS:  Objection to the
11      form of the question.
12      A.   I don't think so.  I would think
13  this would have been produced by NPA or -- or
14  HCMLP's accounting group.
15      Q.   Well, scroll down to the next page
16  Mr. Nguyen.
17          So you see, sir, on 5/31/2020, a --
18          (Reporter clarification.)
19          MR. RUKAVINA:  I'm sorry.
20      Q.   A $575,550.56 payment made?
21      A.   Yes.
22      Q.   Okay.  And prior to that, there had
23  been advanced payments, or -- or payments on
24  more than just the principal and interest,

Page 91

J. Seery

1  right?
2      A.   There --
3          MR. MORRIS:  Objection to the
4      form of the question.
5      A.   -- there were but there's a very
6  odd entry above that, on 12/30/19 with a --
7  instead of having parentheses, having a
8  negative sign.
9          I'm not sure if that's a payment or
10  what that is.
11      Q.   Well, let's scroll back to the
12  first page and see what these headings are.
13          So if we look in the far right
14  column, total paid, do you see that, sir?
15      A.   Yes, I do.
16      Q.   And principal paid.
17          So scroll back to the next page,
18  Mr. Nguyen.
19          Do you see those now, the payments?
20      A.   I do.  I just -- I'm just pointing
21  out that that's --
22      Q.   Okay.
23      A.   -- not a correct way to do it, but
24  it could have just -- maybe they did it as a

Page 92

J. Seery

1  negative number as opposed to having it
2  negative in the -- in the Excel file --
3      Q.   Well, sir --
4      A.   -- automatically.
5      Q.   -- how do you know that the note
6  hadn't be been prepaid, that the December 31,
7  2020 payment hadn't been prepaid?
8      A.   Well, I know there was a payment
9  due.
10      Q.   Okay.  But you didn't ask
11  Mr. Waterhouse or anyone else whether the
12  note had been prepaid or that payment had
13  been prepaid, did you?
14      A.   In the cash-flow discussions, the
15  fact that NPA owed the money on 12/31 was a
16  common discussion.  So if it had been
17  prepaid, it wouldn't have been owed.
18      Q.   And who prepared those cash-flow
19  discussion reports?
20      A.   Waterhouse's team.
21      Q.   Okay.  When you learned that the
22  December 31, 2020 payment had not been --
23  been made, did you ask anyone as to whether
24  that payment had hypothetically been prepaid

Page 93

J. Seery

1  at some point in the -- previous to that?
2          MR. MORRIS:  Objection to the
3      form of the question.
4      A.   I don't believe that I did.
5      Q.   Okay.
6      A.   We certainly had discussions on
7  other notes, whether there had been
8  prepayments.  And it would have come up
9  around this note, but I don't have a specific
10  recollection of, around December 20, asking
11  whether something had been prepaid.  There
12  was an amount due - it was listed as due and
13  owing - and I expected to get it paid.
14      Q.   And I apologize, the $24 million
15  figure in Exhibit 6, DSI supplied that?
16      A.   I believe so.
17      Q.   And do you know whether DSI
18  consulted employees of the debtor to
19  calculate that amount?
20      A.   I assume they did.  I don't -- I
21  don't know the answer.
22      Q.   Why didn't you -- strike that.
23          Before you sent this letter on --
24  that's Exhibit 6 -- well, first of all, did

Page 94

J. Seery

1   J. Seery
2   you understand at that point in time, on or
3   before January 7, 2021, why NexPoint didn't
4   make the December 31 payment?
5   A.    I don't recall if I knew before
6   that --
7   Q.    Okay.
8   A.    -- or right around that time --
9   Q.    Okay.
10  A.    -- but I -- I came to know --
11        (Simultaneous speaking.)
12  Q.    You came to know it?
13  A.    Uh-huh.
14  Q.    Do you recall if you asked anyone,
15  prior to sending this letter, why that
16  payment hadn't been made or did someone
17  volunteer that information to you?
18        (Simultaneous speaking and
19        reporter interjection.)
20        MR. MORRIS:  Objection to the
21        form of the question.
22  A.    I -- I think you asked me that
23  already.  I'm not sure if I asked about it
24  being made or someone pointed it out to me.
25        It was certainly a -- a topic I was

Page 95

J. Seery

1   anticipating, as to -- because they had not
2   made the payment in -- on the shared
3   services, as with all the other related
4   entities, because Dondero had directed that
5   those payments not be made.  So I was curious
6   as to whether they were going to make the
7   payments that were due on the term notes.
8   Q.    So let's, let's -- let's break that
9   down.
10        I had asked you before, I believe,
11  as to how you learned of the lack of payment.
12  Now I'm asking you, once you learned about
13  the lack of payment, did you ask why didn't
14  the payment get made?
15        MR. MORRIS:  Objection to the
16        form of the question.
17  A.    No, I -- I don't think I would have
18  asked why the payment didn't get made.
19  Either -- as I said, either right before
20  this, at this time or shortly thereafter, I
21  learned -- I knew that the other payments
22  hadn't been made.  I believe that I knew that
23  Dondero had directed that.  I just don't know
24  exactly, around these notes, about all of the

Page 96

J. Seery

1   payments; if it was before or right around
2   thereafter.
3   Q.    And when you say before or right
4   around thereafter, are you referring to
5   January 7, 2021?
6   A.    Correct.
7   Q.    Okay.  And -- and so you can't tell
8   me right now the exact date, but whenever you
9   learned about why the payment -- the NexPoint
10  payment hadn't been made, what did you learn?
11  A.    I learned that the NexPoint payment
12  hadn't been made.
13  Q.    Okay.  I'm sorry.  What did you
14  learn about why it hadn't been made?
15        MR. MORRIS:  Objection to the
16        form of --
17  A.    I was told that Mr. Dondero
18  directed that no payments be made to the
19  debtor.
20  Q.    Who told you that?
21  A.    I believe it was Kristin Hendrix
22  who had heard it from Frank Waterhouse, was
23  directed by Frank Waterhouse.
24  Q.    So to the best of your

Page 97

J. Seery

1   recollection, Dondero told Waterhouse, who
2   told Hendrix, who told you?
3   A.    Correct.
4   Q.    Okay.  So do you agree with me that
5   before you sent this Exhibit 6, this letter,
6   the debtor could have undertaken some action
7   in the nature of trying to get NexPoint to
8   cure its default?
9         MR. MORRIS:  Objection to the --
10  A.    The debtor could have, yes.
11  Q.    And you made the decision
12  ultimately to -- let's just say call the note
13  immediately due and payable?
14  A.    That's correct.
15  Q.    Why did you make that decision as
16  opposed to seeing, with NexPoint, if
17  something could be worked out?
18  A.    Number one, I'm a fiduciary.  I'm a
19  fiduciary to HCMLP.  It's my job to maximize
20  the value of the estate and to collect the
21  assets of the estate, including this note.
22        Number two, in furtherance of that
23  duty, the note specifically provides that
24  it's due on a specific date and that there is

**App. 121**

J. Seery

1  waived any notice of presentment, any demand.
2  Once the payment is missed, the entire amount
3  is due and owing.
4     Q.   And I believe you've called my
5  defenses nonsensical, right?
6     A.   There -- there's so many different
7  ones, but most of them, yeah.
8     Q.   Okay.  And did you take any steps,
9  prior to sending Exhibit 6, to see if
10 NexPoint had any defenses as to why that
11 payment hadn't been made?
12    A.   No.
13    Q.   Okay.  And again, you didn't ask
14 anyone whether that note had been prepaid?
15    A.   We had discussed the note and what
16 was due and owing, so it had never been
17 volunteered to me that it otherwise had been
18 prepaid in a way that would have obviated the
19 need to make this payment, so it's pretty
20 clear that this payment had to be made.
21    MR. RUKAVINA:  Okay.  I need a
22 restroom break.  Five or ten minutes?
23    (Simultaneous speaking.)
24    VIDEO TECHNICIAN:  The time is

J. Seery

1  3:18.  We're going off the record.
2     (Recess taken.)
3     VIDEO TECHNICIAN:  The time is
4  3:29.  We're back on the record.
5     MR. RUKAVINA:  So, just for the
6  record, the document that my associate
7  showed to Mr. Seery during questioning
8  a few moments ago is going to be
9  emailed to Mr. Morris and the court
10 reporter, and it will be marked as
11 Exhibit 7.
12    (Exhibit 7, Loan Document
13 D-NNL-029141, marked for
14 identification, as of this date.)
15 BY MR. RUKAVINA:
16    Q.   Mr. Seery, before the break you
17 mentioned that Ms. Hendrix told you that
18 Mr. Waterhouse told her that Mr. Dondero said
19 that there'll be no payments -- whatever
20 words you used; that's not my question.
21    My question is, do you have that in
22 any email or any writing or any recording?
23    A.   I don't believe so.
24    One thing that I just wanted to add

J. Seery

1  is that I was admonished by the court
2  reporter during the break that I was speaking
3  a little too quickly, and so I will try to
4  slow down quite a bit.  And I'll try to be a
5  little bit more clear.  I've been bouncing
6  between the camera and the court reporter.
7     Q.   I think you should look at this
8  one.
9     A.   Okay.
10    Q.   So, again, you said you don't think
11 that there is any email or recording of what
12 Mr. Dondero said, correct?
13    A.   Not to my recollection, no.  He
14 didn't -- he didn't say it to me.
15    Q.   Okay.  And -- and during the break,
16 did you have any more of a recollection as to
17 the time, whether it's prior to or before
18 Exhibit 6, that you learned that?
19    A.   I, I, I -- I do not have any
20 additional recollection, no.
21    Q.   Okay.  Are you aware that
22 Mr. Waterhouse was deposed a couple days ago,
23 a couple/three days ago?
24    A.   I am, yes.

J. Seery

1     Q.   Okay.  Did you read all or part of
2  his deposition?
3     A.   Yes.
4     Q.   Okay.  All of it?
5     A.   It was rather lengthy so no, not
6  all of it.
7     Q.   Okay.  Did you see any of the video
8  of it?
9     A.   No.
10    Q.   Okay.  Did you read any of my
11 examination of him?
12    A.   Yes.
13    Q.   Okay.  Do you recall if you read
14 the whole of my examination of him?
15    A.   I certainly read the last part of
16 your examination of him.
17    Q.   Including where Mr. Waterhouse
18 testified about what Mr. Dondero told him
19 with respect to these payments?
20    A.   Yes.
21    Q.   Okay.  But it's your testimony that
22 you had heard that well before you read that
23 deposition transcript?
24    A.   Oh, absolutely.

**App. 122**

J. Seery

1
2    Q.    Okay.  And when you read
3    Mr. Waterhouse's -- parts of his transcript,
4    did it include Ms. Deborah Deitsch-Perez's
5    questions?
6    A.    There was a section at the end that
7    it was unclear to me who was asking the
8    question, because I think there was also a --
9    another attorney --
10   Q.    Okay.
11   A.    -- Debra Dandeneau.
12         (Simultaneous speaking.)
13   A.    -- so I wasn't sure who was -- who
14   was asking -- I didn't know who represented
15   whom and who was asking the questions.
16   Q.    Did you ever discuss with
17   Mr. Waterhouse the substance of what
18   Mr. Dondero told him vis-a-vis not making any
19   more payments?
20   A.    I don't believe so, no.
21   Q.    Did you ever -- other than legal
22   counsel, did you ever discuss that with
23   anyone at Highland, to your recollection?
24   A.    Yes.
25   Q.    Okay.  With whom?

J. Seery

1
2    A.    Ms. Hendrix and Mr. Klos.
3    Q.    Why Mr. Klos?
4    A.    He's my CFO.
5    Q.    To your knowledge, did he overhear
6    Mr. Waterhouse or Mr. Dondero say something
7    to that same effect?
8    A.    I don't believe he did, no.
9    Q.    Is it fair to say that other than
10   Mr. Waterhouse's deposition from a few days
11   ago, the universe of what you heard about
12   what Mr. Dondero instructed came from
13   Ms. Hendrix?
14   A.    I don't think that's fair.  I might
15   have heard it from Mr. Klos, who heard it
16   from Mr. Hendrix -- from Ms. Hendrix, I'm
17   sorry.
18   Q.    Okay.
19   A.    So around this time it was clear
20   that the payment wasn't made, the shared
21   services payments had -- had not been made,
22   none of the payments from related entities
23   had been made, and it was clear Mr. Dondero
24   had directed that no payments be made.  And
25   even around the negotiations for any kind of

J. Seery

1
2    transition, it was very difficult to agree on
3    any payments because Mr. Dondero had this
4    edict of no payments.
5         And I just don't recall if it was
6    before January 7, at January 7 or immediately
7    thereafter.  I just -- it -- I don't recall.
8    It may have even been as far back as
9    December.  I don't know the exact answer.
10   Q.    Did Highland, prior to the plan
11   becoming effective, have any written policies
12   or procedures in place with respect to how it
13   would operate any aspect of its business
14   practices?
15   A.    Certainly.
16   Q.    Okay.  Do you recall whether any of
17   those policies or -- or procedures related to
18   enforcing debt obligations due and payable to
19   Highland?
20   A.    I -- I don't recall seeing anything
21   like that.
22   Q.    Do you recall whether you ever
23   tried to consult any policies and procedures
24   before your letter of January the 6th?
25   A.    I, I did not nor -- nor would I

J. Seery

1
2    have.
3    Q.    Because, again, you made the
4    determination that the payment hadn't been
5    made, the note says what it says, and it was
6    the fiduciary obligation that you felt to the
7    estate to call the note?
8    A.    That's correct.
9         MR. MORRIS:  Objection to the
10   form of the question.
11   Q.    Did any part of your motivation
12   involve trying to stick it to Mr. Dondero?
13   A.    Not at all.
14   Q.    Okay.  Did you consider any
15   alternatives to the January 6 letter before
16   you sent it?
17        MR. MORRIS:  Objection to the
18   form of the question.
19   Q.    And I think -- let's exclude
20   discussions you might have had with counsel.
21        MR. MORRIS:  Same objection.
22   A.    No, I -- I think I just considered
23   that the note was due and we would accelerate
24   it.  It wasn't paid, we'd accelerate it and
25   try to collect the whole.

Page 106

J. Seery

1
2    Q.    After you sent your letter of
3   January 7, did you issue any instructions to
4   Mr. Waterhouse or anyone else at the debtor
5   with respect to anything having to do with
6   the NexPoint note or missed payment?
7    A.    I don't believe so, no.
8    Q.    Are you aware that on or about
9   January 12, 2021, Mr. Waterhouse and
10  Mr. Dondero had a telephone conversation, at
11  least one, regarding the missed payment?
12   A.    I am aware of that from your --
13  Mr. Waterhouse's deposition.  I had no
14  knowledge of that before the --
15   Q.    Mr. Waterhouse never talked to you
16  about that prior to you seeing it in his
17  deposition?
18   A.    No.
19   Q.    Okay.  You're aware that on or
20  about January the 14th, 2021, NexPoint did
21  make a $1.4 million and change payment?
22   A.    Yes, I am.
23          MR. RUKAVINA:  Okay.
24          (Brief off-record discussion.)
25          MR. RUKAVINA:  Sir, this is going

Page 107

J. Seery

1
2   to be marked Exhibit 8.  This is your
3   letter of January 15, 2021.
4          (Exhibit 8, Correspondence
5   Dated January 15, 2021, marked for
6   identification, as of this date.)
7          (Brief off-record discussion.).
8          THE WITNESS:  Oh, 7 is to come?
9          MR. RUKAVINA:  Yes, sir.
10   Q.    Do you recognize Exhibit 8?
11   A.    I do, yes.
12   Q.    Okay.  Do you recall authorizing
13  this to be sent under your electronic
14  signature?
15   A.    Yes.
16   Q.    Okay.  Do you recall what prompted
17  you to send Exhibit 8?
18   A.    Yes.
19   Q.    What was it?
20   A.    I believe the -- I think it's the
21  day before I was on the stand in a court
22  hearing, and I testified that I'd accelerated
23  this note.  Mr. Dondero was there.
24          It appears to me that he
25  immediately learned or realized, oh, my gosh,

Page 108

J. Seery

1
2   my edict caused the acceleration of note.  I
3   don't know if he paid attention to the prior
4   demand -- acceleration and demand note.
5          So a payment was received on the
6   14th for $1.4 million.  And under the terms
7   of the note, my understanding of the law, we
8   applied the payment to the balance and
9   reiterated our demand.
10   Q.    When you were just now putting
11  words in Mr. Dondero's mouth, were you
12  speculating as to his mental process or did
13  he say anything like that to you?
14   A.    He wasn't allowed to talk to me and
15  I didn't -- so I was speculating, but part of
16  it is that -- I believe the colloquy you had
17  yesterday with Frank had -- or two days ago,
18  had a reference to Mr. Dondero being in
19  court.  I don't remember if that was on an
20  email or if it was in the -- the colloquy
21  that you had.
22   Q.    But at least as of January the
23  15th, 2021, your then mental impression was
24  that it was an event that occurred on January
25  the 14th, 2021 that prompted that

Page 109

J. Seery

1
2   $1.4 million payment?
3    A.    I -- I think so, either the 14th or
4   the 13th.  I know -- I recall testifying to
5   the acceleration and that the note -- the
6   payment had been missed and we had
7   accelerated it.
8    Q.    Do you recall what -- was that like
9   the Dondero PI -- do you recall what
10  proceeding that was?
11   A.    I don't -- I don't recall --
12          (Simultaneous speaking.)
13   A.    -- at least two that week, I
14  believe.
15   Q.    Sitting here today, you think it
16  was January 13 or January 14?
17   A.    Yes.
18   Q.    Okay.  Did you ask Mr. Waterhouse
19  anything about that $1.4 million payment
20  before you sent Exhibit 8?
21   A.    No.
22   Q.    Okay.  Did you ask anyone else at
23  the debtor -- again, we're excluding legal
24  counsel.
25          Did you ask anyone else at the

**App. 124**

J. Seery

1 debtor as to anything having to do with why
2 that $1.4 million payment had come in?
3
4     A.    I did not. I don't -- well, I
5 don't recall doing that.
6     Q.    Why didn't you return -- I'm sorry,
7 strike that.
8         Why didn't the debtor return the
9 payment?
10    A.    Because I would apply it on account
11 and reduce the total amount owed and make the
12 demand again.
13    Q.    Why wouldn't you have applied it to
14 the amounts owing under the shared services
15 agreement and payroll reimbursement
16 agreement?
17    A.    I believe because it was on account
18 of the note, and the note had already been
19 accelerated, so any payments are on account
20 of the note.
21    Q.    What led you to believe that the
22 payment was on account of the note?
23    A.    I don't recall.
24    Q.    So until you read Mr. Waterhouse's
25 transcript, you had no knowledge of his -

J. Seery

1 let's just say January 12, whatever day it
2 was - conference with Mr. Dondero, correct?
3
4     A.    None.
5     Q.    And no knowledge of what they may
6 have discussed?
7     A.    No.
8     Q.    Okay. Can you think of a reason
9 why Dondero would have caused that
10 $1.4 million payment to have been made?
11         MR. MORRIS: Objection to the
12     form of the question.
13    A.    Can I speculate?
14    Q.    If you're speculating, tell me
15 you're speculating, sure.
16    A.    I -- I can speculate, yeah.
17    Q.    Speculate.
18    A.    He realized that the note had been
19 accelerated and that he was going to try to
20 decelerate it.
21         You know, one thing sort of
22 interesting that -- well, maybe there's a
23 question on it.
24         MR. RUKAVINA: Let's go off the
25     record for a second.

J. Seery

1         (Brief off-record discussion.)
2         VIDEO TECHNICIAN: The time is
3 3:40. We're going off the record.
4         (Recess taken.)
5         VIDEO TECHNICIAN: The time is
6 3:42. We're back on the record.
7         (Brief off-record discussion.)
8         MR. RUKAVINA: So during --
9 during the break, Mr. Morris was kind
10 enough to print out exhibit -- the --
11 the prior report that we had seen that
12 is now marked as Exhibit 7.
13         And I will represent to you,
14 Mr. Seery, and to the Court that Exhibit
15 7 is a true and correct copy of what was
16 previously on the Zoom, care of my
17 associate.
18         Okay. Sir, we're going to now go
19 to 9, Exhibit 9, which is going to be the
20 shared services agreement.
21         (Exhibit 9, Amended and Restated
22     Shared Services Agreement, marked for
23     identification, as of this date.)
24    Q.    Now, sir, I've handed you

J. Seery

1 Exhibit 9, and you're certainly free to read
2 it. This purports to be the amended and
3 restated shared services agreement between
4 NexPoint and the debtor.
5         I'll represent to you that it is a
6 true and correct copy, as filed by your
7 attorneys. And if I'm wrong about that, then
8 certainly you're not going to be held to your
9 answers.
10         But just sitting here today, do you
11 have any reason to suspect the authenticity
12 of Exhibit 9?
13    A.    No.
14    Q.    Okay. All right. So this is
15 called the "Amended and Restated Shared
16 Services Agreement" as of January 1, 2018.
17         To the best of your knowledge, was
18 this the latest iteration prior to its
19 termination or were there any subsequent
20 amendments?
21         MR. MORRIS: Objection to the
22     form of the question.
23    A.    I don't recall.
24    Q.    And obviously the document speaks

Page 114

J. Seery

1  for itself, but as the CRO/CEO, what was your
2  understanding of what this contract
3  effectuated as between the debtor and
4  NexPoint?
5      A.    Part of the way the debtor was set
6  up and the way it was run was that the debtor
7  would provide certain services to certain of
8  the affiliated entities.  And those would be,
9  to some degree, embodied in this agreement.
10         Oftentimes the debtor provided
11 services to affiliates without any agreement,
12 oftentimes they provided additional services
13 that may not have been in the agreement, and
14 that was because they were such closely
15 related parties.
16     Q.    As of December 2020, do you agree
17 with me -- as of December 31, 2020, do you
18 agree with me that this agreement had not yet
19 been terminated?
20     A.    As of December 20?
21     Q.    I'm sorry.
22         As of December 31, 2020, do you
23 agree with me that this agreement had not yet
24 been terminated?

Page 115

J. Seery

1      A.    Yeah, I think the termination
2  notice had gone out but it had not yet become
3  effective.
4      Q.    Okay.  And we see here what -- some
5  of the services that the debtor was
6  providing.  We see it on the top of page 4,
7  if you want to flip there.
8          It says, amongst other things,
9  finance and accounting, payments,
10 bookkeeping, cash management.
11         Do you see all that, sir?
12     A.    Yes.
13     Q.    Okay.  Do you have an understanding
14 of what those terms under this agreement
15 meant?
16         MR. MORRIS:  Objection to the
17     form of the question.
18     A.    Yes, I do.
19     Q.    Okay.  Give me your understanding,
20 please, sir.
21     A.    The debtor provided back office
22 support for -- under those terms, for the
23 affiliated entity and received some form of
24 remuneration in exchange for that and other

Page 116

J. Seery

1  services.
2      Q.    And when you said affiliated
3  entity, in this instance, are you referring
4  to NexPoint?
5      A.    Uh-huh.  Yes, I am.
6      Q.    Okay.  When you say back office
7  services, would that have included, as of
8  December 2020, helping NexPoint ensure that
9  NexPoint pays from its own funds its
10 obligations coming due?
11     A.    I -- I think as part of back office
12 services -- that's the heading of the
13 section, and so part of it is to assist in
14 preparing payments and calculating what those
15 should be.
16     Q.    So obviously the debtor wasn't
17 responsible for paying NexPoint's
18 obligations, right?
19     A.    That's correct.
20     Q.    But the debtor had some level of
21 responsibility to help NexPoint pay its
22 accounts payable on a timely basis, correct?
23     A.    Yes.
24     Q.    And that would have been from

Page 117

J. Seery

1  NexPoint's funds?
2      A.    Correct.
3      Q.    And is the same true for NexPoint's
4  loan obligations?
5      A.    I believe so, yes.
6      Q.    So if Mr. Waterhouse testified that
7  it was reasonable for NexPoint, in December
8  2020, to rely on the debtor to facilitate the
9  December 31 note payment, would you have
10 reason to disagree with that?
11         MR. MORRIS:  Objection to the
12     form of the question.
13     A.    I would, yes.
14     Q.    Okay.  And what's your disagreement
15 and your reason for the disagreement?
16     A.    Because the debtor does work to
17 figure out how much payments are, whether
18 they be on notes or whether they be for some
19 other service that the affiliated entity has
20 gotten.
21         The debtor's accounting team puts
22 together that schedule, and then the debtor
23 needs direction from an officer at NexPoint
24 to make the payment.  If the debtor has

Page 118

J. Seery

1   already been told don't make the payment, it
2   wouldn't be scheduled.
3       Q.    So, to summarize, it's ultimately
4   up to NexPoint to specifically approve or
5   disapprove any potentially scheduled
6   payments?
7       A.    Correct.
8       Q.    Okay.  And in this instance, what
9   you've learned is that Mr. Waterhouse was
10  told by Dondero, don't make the payment?
11      A.    Correct.
12      Q.    Okay.  And that -- that is the sum
13  of your understanding as to why the
14  December 31 payment wasn't made?
15      A.    I don't think that's the sum of it.
16  There's -- there's emails that show that
17  Ms. Hendrix prepared and requested from
18  Mr. Waterhouse payment of these amounts
19  okayed and he approves them.  So they -- they
20  are the amounts that are permitted to be
21  approved, and they're all to third parties.
22  None of them are to HCMLP.
23      Q.    Are you aware of any email where
24  Ms. Hendrix prepared the December 31 note

Page 119

J. Seery

1   payment by NexPoint for Mr. Waterhouse's
2   approval?
3       A.    No, I'm not.
4       Q.    If there is no such email, do you
5   have any explanation or understanding for why
6   there wouldn't be such an email?
7       A.    Sure.
8       Q.    Okay.  What is it?
9       A.    She was told not to make the
10  payment.
11      Q.    So, consequently, she did not
12  include it in any upcoming payment list?
13      A.    Correct.
14      Q.    And that goes back to what you
15  tell -- told me before, that Waterhouse told
16  her what Dondero told him, right?
17      A.    That's correct.
18      Q.    Okay.  And are you aware that
19  Mr. Waterhouse said -- testified that that
20  instruction had come sometime in early
21  December of 2020?
22      A.    I don't recall.
23            This was in the testimony
24  yesterday?

Page 120

J. Seery

1       Q.    From a couple days ago.
2       A.    Yeah, two days ago, I'm sorry.
3             I don't recall the specific dates
4   that he said that.
5       Q.    Well, whatever the -- whatever the
6   dates that he testified about were with
7   respect to the Dondero discussion, would you
8   have any reason to dispute those dates?
9       A.    No.
10      Q.    Okay.  So, sir, is it your
11  understanding that having been given that
12  instruction by Mr. Dondero, that employees of
13  the debtor, including Mr. Waterhouse, had no
14  further obligation with respect to that
15  December 31 payment?
16           MR. MORRIS:  Objection to the
17      form of the question.
18      A.    I think they -- I think they took
19  the direction of Mr. Dondero to heart and
20  followed his direction.
21      Q.    Is it your belief that they had no
22  obligation to subsequently ask Mr. Dondero
23  whether he meant it?
24           MR. MORRIS:  Objection to the

Page 121

J. Seery

1   form of the question.
2       A.    Absolutely.
3       Q.    Did they have no such obligation?
4       A.    No.
5       Q.    Is it your understanding that they
6   had no obligation to communicate with
7   Mr. Dondero and inform him of the
8   consequences that would happen if that
9   payment wasn't made?
10           MR. MORRIS:  Objection to the
11      form.
12           (Simultaneous speaking and
13      reporter interjection.)
14      A.    I -- I don't think it would be
15  appropriate for the employees of the debtor
16  to go to the founder of the organization, who
17  owns and controls all of the entities, after
18  he's given them a direction, to go challenge
19  his direction.  And that's just not the way
20  Highland ever worked, from what I could see.
21      Q.    Did you believe, in December of
22  2020, that employees of Highland had a
23  conflict of interest with respect to their
24  dual role as employees of NexPoint with

Page 122

J. Seery

1 respect to that promissory note?
2      A.    Not specifically with respect to
3 the promissory note, but generally it was a
4 concern of mine throughout the case.
5      Q.    Well, we can -- can we agree on
6 this; that when Mr. Dondero gave
7 Mr. Waterhouse that instruction,
8 Mr. Waterhouse should have known that that
9 instruction was not on behalf of Highland
10 because Mr. Dondero no longer had any
11 management role with Highland?
12      MR. MORRIS:  Objection to the
13      form of the question.
14      A.    I think he should have known that,
15 yes.
16      Q.    And can we therefore agree that
17 Mr. Waterhouse should have known that that
18 instruction from Dondero was coming from
19 NexPoint --
20      MR. MORRIS:  Objection --
21      (Simultaneous speaking.)
22      Q.    -- Dondero wearing his NexPoint
23 hat?
24      A.    I -- I think you're trying to parse

Page 123

J. Seery

1 something that doesn't exist.  There's no
2 hats.  There's one hat for Mr. Dondero.  He
3 controls all of the entities other than
4 HCMLP.
5      And his edicts, whether they be
6 from prior to our taking over HCMLP as
7 independent directors or with respect to any
8 of the other entities, are final.
9      Q.    Mr. Dondero might not have had two
10 hats, but in December of 2020, would you
11 agree that Mr. Waterhouse wore two hats?
12      A.    Yes, he did.
13      Q.    The CFO of the debtor and the
14 treasurer of NexPoint?
15      A.    That's correct.
16      Q.    And both being executive officer
17 positions, correct?
18      A.    Correct.
19      Q.    Pardon me.  With, to your
20 understanding, under Delaware law, fiduciary
21 duties to his respective principals, correct?
22      A.    I believe these are both Delaware
23 but I'm not positive.
24      Q.    Certainly you would have expected

Page 124

J. Seery

1 Mr. Waterhouse to have fiduciary duties, in
2 December of 2020, to the debtor?
3      A.    Yes.
4      Q.    Okay.  That's the role that I'm
5 asking about, sir.
6      Mr. Waterhouse simultaneously being
7 the CFO of the debtor, the payee on a large
8 promissory note, and the treasurer of
9 NexPoint, the maker on that same promissory
10 note, did you not perceive there to be any
11 conflict of interest?
12      MR. MORRIS:  Objection to the
13      form of the question.
14      A.    No, no more than -- I -- I
15 perceived a concern throughout the case, but
16 no more than there had been at any other time
17 with any of these related entities.
18      Q.    Except, sir, that at this time,
19 Mr. Waterhouse had a fiduciary duty to the
20 bankruptcy estate.
21      Would you agree with that?
22      A.    Yes.
23      Q.    Okay.  And do you agree that his
24 fiduciary duty to the bankruptcy estate, in

Page 125

J. Seery

1 December of 2020 with respect to this
2 promissory note, might have conflicted with
3 his duties - whatever they were - to
4 NexPoint?
5      (Simultaneously speaking.)
6      (Reporter interjection.)
7      A.    I'm sorry.
8      MR. MORRIS:  Objection to the
9      form of the question.
10      A.    Potentially but not necessarily.
11 Mr. Waterhouse took direction from the man in
12 control of NexPoint.  That man directs his
13 inferiors, which would include the treasurer.
14 So following that direction doesn't cause any
15 conflict with respect to NexPoint.
16      Q.    On the debtor's side, you mentioned
17 before, for example, that -- that you
18 believed after the payment was made, that
19 your fiduciary duties necessitated the
20 calling of the note, right?
21      A.    I don't know if they necessitated
22 it.  They certainly informed it.
23      Q.    Informed it.
24      But -- so they certainly informed

J. Seery

1    it, correct?
2    A.    Yes.
3    Q.    Okay.  And would you expect
4    Mr. Waterhouse to have had similar duties to
5    the bankruptcy estate?
6         MR. MORRIS:  Objection to the
7         form of the question.
8    A.    No, I believe that would be my
9    direction, if I had -- I would be his
10   superior at HCMLP.  If I directed that we
11   collect it, we collect it.  If I direct that
12   we don't, then we don't.
13   Q.    Is it fair to say, from your prior
14   testimony, that at no time prior to January
15   1, 2021 did Mr. Waterhouse, Mr. Klos or
16   Ms. Hendrix tell you about the Dondero
17   instruction not to make any more payments?
18        MR. MORRIS:  Objection to the
19        form of the question.
20   A.    Prior to when?
21   Q.    January 1, 2021.
22   A.    I -- I don't -- as I said, I don't
23   recall if it was right around the time of
24   the -- the payment had been failed to be made

J. Seery

1    on the 31st, and we sent it, or if it was in
2    December.  I believe I testified to that
3    before.  And the shared service payments
4    hadn't been made, so there may have been some
5    discussion that Dondero's cut it off.
6    Q.    Well, I -- I think I asked you
7    before about the timing in reference to the
8    January 7 letter, when --
9    A.    Correct.
10   Q.    -- you said it might have been
11   right around there.
12        Am, am I understanding -- or strike
13   all that.
14        Is it your testimony that maybe you
15   learned about the Dondero instruction on or
16   before December 31, 2020?
17        MR. MORRIS:  Objection, asked and
18        answered.
19   A.    That -- that's correct.  I don't
20   recall when I learned but, factually, I know
21   that the payments on shared services hadn't
22   been made.  I could not have known that the
23   December 31 payment wouldn't have been made
24   on December 31 until after December 31.

J. Seery

1    Q.    Well, but you could have learned
2    that Mr. Dondero had instructed that the
3    December 31 payment not be made ahead of
4    time, could you not have?
5    A.    I -- I could have, but I did not
6    learn that.
7    Q.    Okay.  That's -- that's what I'm
8    trying -- that's what I'm trying to
9    ascertain.  I'm trying to refresh your
10   memory.
11        So you can now testify that prior
12   to the payment not being made, you did not
13   know about the Dondero instruction not to
14   make the payment?
15   A.    With respect to the -- the note
16   payment, that's correct.
17   Q.    Okay.  So what -- that's what I
18   mean.
19        It would have had to have been
20   January 1 or after -- January 1, 2021 or
21   after that you learned about that?
22   A.    I would have to have learned of the
23   effect of it.  If the -- if the actual
24   statement was don't make any payments

J. Seery

1    irrespective of when they're due, that could
2    have been made in early December.  I wouldn't
3    have known the effect of it.
4        I knew the effect with respect to
5    the shared service because it wouldn't be
6    paid.  He might have changed his mind and I
7    didn't know that.
8    Q.    Okay.  I'm going to -- I'm going to
9    try again.
10        On or about January 31, 2020 --
11   A.    December 31.
12   Q.    Thank you.
13        On or before December 31, 2020,
14   sitting here today, do you remember being
15   informed of the Dondero instruction not to
16   make payments?
17        MR. MORRIS:  Objection, asked and
18        answered.
19   A.    Again, I don't recall the exact
20   date I learned.  I believe I certainly knew
21   that the shared service payments had not been
22   made.  I believe I knew that that related to
23   a Dondero edict.
24   Q.    So you're saying shared services in

Page 130

J. Seery

1    J. Seery
2    response to my answer.
3         Why, why does -- why is that
4    relevant?  Because from that you deduced that
5    all payments were to cease?
6    A.   No, they were due before.
7    Q.   That's -- okay, I apologize.
8         So this shared services contract
9    required periodic payments, right?
10   A.   Correct.
11   Q.   And, and -- and are you saying that
12   before December 31, 2020, NexPoint had
13   already failed to make at least one of those
14   periodic payments?
15   A.   I believe so, yes.
16   Q.   Okay.  Did you, at that point in
17   time, inquire as to why that payment hadn't
18   been made?
19   A.   I don't recall, but I loosely
20   recall - but I don't know exactly when I
21   learned it - that there had been this edict.
22   Q.   Okay.  I'll use that word "edict."
23   That's the one -- we're both saying the same
24   thing, right --
25   A.   Correct.

Page 131

J. Seery

1    J. Seery
2    Q.   -- where Dondero tells Waterhouse
3    no more payments, right?
4    A.   Fair enough.
5    Q.   So sitting here today, it is
6    possible that before December 31, 2020, you
7    had heard vis-a-vis Ms. Hendrix that NexPoint
8    would not be making its scheduled payment
9    because of the Dondero edict?
10   A.   Scheduled payment on the note?
11   Q.   On the note.
12   A.   No, I don't think that's fair.
13   Q.   That's all I'm -- okay.  So I'm --
14   I'm asking just about the note.
15        As of December 31, 2020, sitting
16   here today, do you remember having heard that
17   NexPoint would not be making its December 31
18   payment because of the Dondero edict?
19   A.   I pretty clearly recall that the
20   payments had not been made, and I had heard
21   that there had been an edict.
22        The full implication of that edict
23   and whether it extended to the note I did not
24   know until the payment was missed.
25   Q.   Understood.  I think that -- I

Page 132

J. Seery

1    J. Seery
2    think -- thank you.  I understand now.
3         So you knew that there had been an
4    edict not to make payments, you just didn't
5    realize definitively that that edict also
6    applied to the promissory note payment?
7    A.   Correct.
8    Q.   Okay.  By December 31, 2020, had
9    the debtor laid off certain people, certain
10   employees, let's just say for cost-cutting
11   purposes as opposed to regular terminations,
12   you know -- you know what I'm trying to say?
13   Had there been just --
14   A.   Had there been a RIF?
15   Q.   A reduction --
16        (Simultaneous speaking.)
17   Q.   Yes, yes.
18   A.   No, there had not been.
19   Q.   So to your understanding, the
20   debtor personnel that would have had any
21   involvement with these treasury and payment
22   services, helping affiliated companies make
23   their payments, all those personnel were
24   still there?
25   A.   Largely the same.

Page 133

J. Seery

1    J. Seery
2    Q.   Okay.  When you say largely, can
3    you think of anyone right now that was no
4    longer there or changed?
5    A.   Not specifically.  There were --
6    there was some attrition during 2020 and we
7    didn't specifically replace those of those,
8    but some -- some people we did replace.  We
9    actually hired people in 2020.
10   Q.   But as with respect -- pardon me.
11   As it respects -- strike that.
12        With respect only to the payment
13   we're talking about, i.e. scheduling future
14   permission to pay them, all those personnel
15   that would have had a role in -- on that for
16   the debtor were still there in December 2020?
17   A.   I -- I believe that group was
18   largely the same.
19   Q.   Waterhouse, Klos and Hendrix?
20   A.   Ellison Rober -- I can't remember
21   her last name.  So there -- there were a
22   couple others in that group as well, and then
23   there were some other junior people that
24   would have assisted them.
25   Q.   I'm going to ask you a hypothetical

**App. 130**

Page 134

J. Seery

1    J. Seery
2    question.  Let's say that on December the
3    10th, 2020, Hendrix tells you that Dondero
4    has instructed that the note payment by
5    NexPoint will not be made.
6            Would you have issued any
7    instructions to employees of the debtor
8    following up on that, what you just learned?
9            MR. MORRIS:  Objection to the
10           form of the question.
11       A.   I, I don't know -- know if --
12   knowing what I know now and that they hadn't
13   made the shared service payments at that time
14   and that it seemed to be going towards
15   litigation, I would not have done anything, I
16   don't think.
17       Q.   Okay.  So, again, to round off this
18   topic, you do not believe that employees of
19   the debtor had any obligation, after
20   Dondero's edict, to follow up with NexPoint
21   about its upcoming note payment?
22       A.   No.
23       Q.   Okay.  Did you consult this shared
24   services agreement, to your recollection,
25   before your January 7, 2021 letter?

Page 135

1    J. Seery
2        A.   I certainly --
3            MR. MORRIS:  Objection to the --
4            (Simultaneous speaking and
5    reporter interjection.)
6        A.   I certainly was familiar with the
7    agreement and had consulted it numerous
8    times.
9            If your question is did I consult
10   this agreement with respect to that demand
11   letter, the answer's no.
12       Q.   Okay.  If you'll turn to Section
13   2.06 of this agreement for me, sir.
14           And certainly you can look at the
15   definitions, but the staff and services
16   provider, that's the debtor, right?
17       A.   Yes.
18       Q.   And management company, that's
19   NexPoint, right?
20       A.   Yes.
21       Q.   Okay.  So Section 2.06, the last
22   sentence, sir, that basically says that the
23   debtor will not have any duties or
24   obligations to NexPoint unless those duties
25   and obligations are specifically provided for

Page 136

1    J. Seery
2    in this agreement.
3            Did I paraphrase that correctly?
4        A.   Roughly, yes.
5        Q.   Okay.  And if we flip to Section
6    6.01, sir, and -- and take a second, please,
7    to read that section.
8        A.   (Document review.)
9            Okay.
10       Q.   And -- and you might want to look
11   at the definition of covered person real
12   quick.  I believe you'll find it includes the
13   debtor.
14       A.   Okay.
15       Q.   So I read this and, and -- and it
16   says (as read):
17           Except as otherwise
18           expressly provided herein, each
19           covered person shall discharge its
20           duties under this agreement with
21           the care, skill, prudence and
22           diligence under the circumstances
23           then prevailing that a prudent
24           person acting in a like capacity
25           and familiar with such matters

Page 137

1    J. Seery
2            would use in the conduct of an
3            enterprise of a like character and
4            with like aims.
5            Did I read that correctly?
6        A.   Roughly.
7        Q.   Okay.  Do you have any
8    understanding of that section, sitting here
9    today?
10       A.   I know what every one of those
11   words mean.
12       Q.   Okay.  Reading that, do you still
13   believe that Mr. Waterhouse and Mr. Klos and
14   Ms. Hendrix had no duty to go back to
15   Mr. Dondero and advise him of the
16   ramifications of his edict and try to
17   persuade him otherwise?
18           MR. MORRIS:  Objection to the
19           form of the question.
20       A.   Yes, I do.
21       Q.   Okay.
22       A.   I believe that they didn't have any
23   further duty.
24       Q.   If you had issued an edict in the
25   heat of the moment or based on bad advice,

Page 138

J. Seery

1   would you expect your officers to come to you
2   and say, Mr. Seery, just so you know, there's
3   going to be consequences, please reconsider?
4        MR. MORRIS:  Objection to the --
5   A.   Me personally?
6   Q.   Yes.
7        MR. MORRIS:  -- form of the
8   question.
9        (Simultaneous speaking and
10   reporter interjection.)
11   A.   My relationship with people who
12   work with or for me is very different than I
13   understand Mr. Dondero's.  But as a
14   professional and someone who's been doing
15   this for thirty years, if I give my
16   direction, I expect it to be followed.  And I
17   know, from what I have heard and seen,
18   Mr. Dondero is that to the nth degree.
19   Q.   So, again, I understand that you
20   expect your instructions, Mr. Seery's
21   instructions, to be followed.
22   A.   Yes.
23   Q.   But from your officers, do you
24   believe that they have an obligation to come

Page 139

J. Seery

1   to you, after you issue an instruction and if
2   they believe it's bad for the company, to
3   dissuade you of that instruction?
4   A.   I, I --
5        MR. MORRIS:  Objection to the
6   form of the question.
7   A.   I would prefer that they did, yes.
8   Q.   Okay.  NexPoint was paying the
9   debtor's employees in this -- including
10   Mr. Waterhouse, Mr. Klos and Ms. Hendrix, for
11   services under this contract, correct?
12   A.   Correct.
13   Q.   And other than amounts in
14   controversy that are not insignificant,
15   NexPoint paid millions of dollars to the
16   debtor under this contract, did it not?
17   A.   I don't believe it paid millions --
18   Q.   Okay.
19   A.   -- of dollars.
20        MR. MORRIS:  Yeah, objection.
21   Q.   Okay.  But it paid -- it paid some
22   amount under this contract?
23   A.   I would say for the services, one
24   would easily say a paltry amount.  And the

Page 140

J. Seery

1   vehicle, NPA, was used largely to strip
2   assets and value out of Highland.
3   Q.   But the same Mr. Waterhouse that
4   has a duty to you, as the chief executive
5   officer, to tell you that one of your courses
6   of action is going to be detrimental has no
7   such duty to Mr. Dondero, because
8   Mr. Dondero's a tyrant?
9        MR. MORRIS:  Objection to the
10   form of the question.
11   A.   I said I would prefer that a
12   Mr. Waterhouse or anyone else who works for
13   or with me advise me if they think the course
14   of action I'm taking is incorrect.  If I
15   listen to their advice and make my decision,
16   then we live with my decision.  I don't want
17   to revisit it ten times.
18        So I don't know whether
19   Mr. Waterhouse told Mr. Dondero that that
20   course might have ramifications.  One would
21   think that a man who's run these businesses
22   for this long and had put this company into
23   bankruptcy and had left hundreds of millions
24   of dollars strewn across the street of

Page 141

J. Seery

1   losses, that one would have some
2   understanding of what those ramifications
3   might be, and maybe Mr. Waterhouse didn't.  I
4   don't know; I wasn't there.
5   Q.   Do you agree, sir, that Section 601
6   also applied to you with respect to -- as a
7   covered person, with respect to how you
8   conducted business under this contract?
9        Do you --
10   A.   Could I -- no, I think it -- well,
11   I can --
12   Q.   Take a second -- take a second to
13   read the definition of covered person.
14   A.   Uh-huh.
15   Q.   And, look, we can agree that you're
16   not making any legal conclusions here.  I'm
17   just...
18        (Document review.)
19   A.   I believe it does, yes.
20   Q.   Yet before you sent your January 7
21   letter, you did not check to see whether
22   NexPoint had made any prepayments on the
23   note, correct?
24   A.   I think I testified that I didn't

**App. 132**

Page 142

J. Seery

1  check, but our -- my understanding, based
2  upon the work of the accounting group, was
3  that the payment was due and scheduled.  It
4  had to be paid.
5       If it had not been due, it had been
6  prepaid, it would not have been scheduled.
7  So there was no need for me to go doublecheck
8  that.
9       Q.   And you did not separately inquire
10  of anyone at the debtor as to whether
11  NexPoint had a defense to your January 7
12  letter, correct?
13       MR. MORRIS:  Objection to the
14       form of the question.
15       A.   No, I did not.
16       Q.   Is that not, sir, something that
17  would have been prudent to do pursuant to
18  Section 601, check as to whether NexPoint had
19  made a prepayment or had a defense?
20       MR. MORRIS:  Objection --
21       A.   I --
22       (Simultaneous speaking.)
23       A.   -- I don't believe that's something
24  that would have been required by this or any

Page 143

J. Seery

1  other provision.
2       Q.   Do you believe that Section 601
3  played any role at all, now that you're
4  reading it, with respect to your decision to
5  call the note as opposed to call NexPoint and
6  say, hey, what happened?
7       A.   I don't -- I don't believe it
8  governs it at all.
9       Q.   Do you believe it governed in any
10  respect whatever Mr. Waterhouse and
11  Mr. Dondero discussed on or about January --
12  January 12, 2021?
13       A.   I don't know the substance of their
14  discussion, other than that the -- what we've
15  referred to as the edict, at least that's as
16  it's been reported.  But I don't know what
17  colloquy they had with respect to
18  ramifications of making a payment or not.
19       Clearly, there should have been
20  more ramifications for not making the shared
21  services payments, but Mr. Dondero issued a
22  similar edict or --
23       (Simultaneous speaking.)
24       Q.   Mr. Dondero didn't issue a similar

Page 144

J. Seery

1  edict?
2       A.   I said he did.
3       Q.   He did.
4       So why didn't you terminate the
5  services agreement immediately upon
6  NexPoint's failure to pay?
7       A.   Well, we would have, I think, if we
8  thought we could.  We also had an issue that
9  both NexPoint and HCMFA were providing
10  services to retail funds and had no ability
11  to provide any of those services without
12  Highland.  They literally had left themselves
13  completely exposed, while just stripping out
14  fees.
15       Q.   Do you believe with respect to
16  Section 601, standard of care, that the
17  parties prior course of dealing, i.e. rolling
18  up prior notes, had any role on January 7,
19  2021?
20       MR. MORRIS:  Objection to the
21       form of the question.
22       A.   No, I don't.
23       Q.   Okay.  Did you take any prior
24  course of action between the parties into

Page 145

J. Seery

1  account when you executed and issued your
2  January 27, 2021 letter?
3       A.   Certainly.  The payments are
4  typically made on time, and if they're not
5  paid, then it's prudent and required to
6  accelerate the note.
7       Q.   But five times before, you -- you
8  knew by then that five times before, demand
9  notes were rolled up into a term note, which
10  you said before, I believe, was for an
11  improper purpose?
12       MR. MORRIS:  Objection to the
13       form --
14       A.   At least three of them that are
15  sub -- subject to the current litigation.  I
16  don't recall if it was five, but this one
17  contained five notes, if -- three term notes
18  that were rolled notes.  But those were done
19  prior to bankruptcy and they were done with
20  Mr. Dondero on both sides of the transaction.
21       Q.   So your borrower, who owes you
22  24 million and change that you're under a
23  contract with that the borrower is paying
24  you, where you provide employees to the

Page 146

J. Seery

1  borrower, and your affiliate entity misses a
2  scheduled payment, you believe that you have
3  no obligation to do anything before you
4  called the note immediately due?
5     A.    That -- that's absolutely correct.
6        MR. RUKAVINA:  Okay.  Do you mind
7     if we take another restroom break?
8        MR. MORRIS:  Sure.
9        MR. RUKAVINA:  I'm getting
10    near -- near the end.  Five minutes,
11    please.
12       (Brief off-record discussion.)
13       VIDEO TECHNICIAN:  The time is
14    4:16.  We're off the record.
15       (Recess taken.)
16       VIDEO TECHNICIAN:  The time is
17    4:21.  We're back on the record.
18  BY MR. RUKAVINA:
19    Q.    Did you have a view, as of December
20  2020 or January 2021, as to whether the
21  debtor owed any fiduciary duties to NexPoint?
22       MR. MORRIS:  Objection to the
23    form of the question.
24    A.    I -- I believe I did.
25

Page 147

J. Seery

1     Q.    And what was your view?
2     A.    I don't think -- certainly by that
3  time, if there ever had been, I don't think
4  by that time there were any fiduciary duties
5  owed.
6     Q.    Okay.  Real quick, we're still on
7  this shared services agreement, sir, page 4.
8  This is a list of services to be provided.
9  I'm just -- you can read it in detail, but I
10  just have a very simple question.  4B talks
11  about legal compliance risk analysis.
12       In December of 2020, was the debtor
13  providing legal services to NexPoint?
14    A.    I don't believe so, or at least not
15  any -- there might have been some assistance.
16  I'm trying to think what would have been done
17  at that time in terms of support, but there
18  certainly -- compliance was probably
19  transferred pretty fully by then.
20       I don't think NexPoint was involved
21  in any litigation at that point, certainly
22  not that the debtor was supporting, so I -- I
23  don't think very much, if anything.
24    Q.    Okay.  Do you know whether NexPoint
25

Page 148

J. Seery

1  had written policies and procedures in place
2  with respect to how it conducted its
3  business?
4     A.    I'm not sure.
5        MR. RUKAVINA:  Okay.  You can put
6     that down, sir.
7        (Brief off-record discussion.)
8        MR. RUKAVINA:  So this is going
9     to be Exhibit 10.
10       (Exhibit 10, Email Chain
11    D-NNL-007578 - D-NNL-007579, marked
12    for identification, as of this date.)
13  BY MR. RUKAVINA:
14    Q.    Sir, you are not on this email
15  chain, so I don't expect to authenticate it.
16       But have you seen this email chain
17  before, between Mr. Waterhouse and
18  Ms. Hendrix on January 12, 2021?
19    A.    I believe I have, yes.
20    Q.    Okay.  Was it in preparation for
21  this deposition or had you seen it before?
22    A.    Only in preparation for the
23  deposition.
24    Q.    Were you aware that Mr. Waterhouse
25

Page 149

J. Seery

1  was asking Ms. -- asking Ms. Hendrix for the
2  total principal on this note on January 12,
3  2021?
4        I'm sorry, were you aware of it at
5  about that point in time?
6     A.    No, not until I saw this email.
7     Q.    Okay.  Did you ever discuss -- so I
8  think -- I think you've -- you've said it
9  earlier, that you did not know until
10  Mr. Waterhouse's deposition that
11  Mr. Waterhouse and James Dondero had a
12  communication on January 12, 2021, right?
13    A.    I did not know.
14    Q.    Did -- did you know from
15  Ms. Hendrix that she had had any
16  communications with Mr. Waterhouse on or
17  about January 12, 2021, about how much the
18  missed payment was?
19    A.    No, I did not.
20    Q.    Okay.  Have you asked her about
21  what this email was in reference to since
22  you've seen this email?
23    A.    No, I have not.
24       MR. RUKAVINA:  Okay.  This is
25

Page 150

                    J. Seery
1    going to be Exhibit 11, sir.
2        (Exhibit 11, Email Chain
3    D-NNL-028514 - D-NNL-028515, marked
4    for identification, as of this date.)
5        Q.    So, Mr. Seery, this -- you're not
6    on this email chain, but this email begins on
7    December 10, 2020, from Ms. Hendrix to
8    Mr. Romey -- I'm sorry, from Mr. Romey to
9    Ms. Hendrix, where he writes (as read):
10       Can you tell me the original
11       maturity date for the NPA loan
12       before it was restructured?  Sorry
13       for the hustle.  Seery is asking
14       for this ASAP for today's court
15       hearing.
16       Do you see that, sir?
17       A.    I do see it.
18       Q.    Do you recall asking Mr. Romey
19   anything about that loan or anything about
20   this on or about January -- December 10,
21   2020?
22       MR. MORRIS:  Objection to the --
23       A.    Not specifically.
24       Q.    Okay.  It says that you were --

Page 151

                    J. Seery
1    there was a court hearing.
2        Do you remember what that court
3    hearing might have been?
4        A.    I -- I don't.
5        Q.    Okay.  Do you have any recollection
6    as to why you would have been asking about
7    the original maturity date of the NPA loan
8    before it was restructured?
9        A.    I think it's a mistake, that there
10   were -- there were five notes --
11       Q.    Okay.
12       A.    -- that were rolled into this one.
13       I may have just been checking
14   whether they were all demand or if any of
15   them have had a maturity.  I don't -- I don't
16   know why I would have been asking for it.  I
17   don't recall what the hearing was about.
18       Q.    Fair enough.  You testified before
19   that -- and I'm not trying to put words in
20   your mouth, sir.
21       You testified before that there was
22   something maybe inappropriate or shady about
23   the roll-up of the five notes into the one
24   NexPoint note.

Page 152

                    J. Seery
1        Whatever -- whatever words you
2    used, was that your speculation as to why it
3    happened, was that your logical deduction, or
4    did someone tell you that that's why the
5    notes were rolled up?
6        MR. MORRIS:  Objection --
7        (Simultaneous speaking.)
8        A.    -- logical deduction.
9        (Reporter clarification.)
10   BY MR. RUKAVINA:
11       Q.    Excluding lawyers, sir, and
12   excluding now in litigation, that back
13   when -- when the debtor existed and you were
14   the CEO/CRO, did you ask anyone at the debtor
15   or did you ask Mr. Dondero why those notes
16   had been rolled up into the $30.7 million
17   note?
18       A.    I don't believe I asked
19   Mr. Dondero.
20       I know I inquired as to whether the
21   debtor got anything for the extension of the
22   maturity.
23       Q.    Who did you inquire of?
24       A.    I don't recall specifically.

Page 153

                    J. Seery
1        Q.    Mr. Surgent?
2        A.    I don't recall specifically.  He
3    wouldn't, he wouldn't have -- it would either
4    have been Frank Waterhouse or someone else in
5    accounting; was anything paid?  And --
6    because there were a number of notes that
7    were rolled up in a similar fashion, and it
8    all happened around the same thing; a number
9    of things were happening to the debtor at
10   that time.
11       Q.    Why did the debtor or the
12   reorganized debtor not retain Mr. Waterhouse
13   after the termination of the shared services
14   agreements?
15       A.    I didn't need him.
16       Q.    Okay.  Mr. Klos was promoted to
17   CFO?
18       A.    Correct.
19       Q.    Okay.  Did you have any personal
20   dislike of Mr. Waterhouse ever?
21       A.    No.
22       Q.    Did you have any personal views
23   that his services as CFO were not up to
24   par --

Page 154

J. Seery

1         MR. MORRIS:  Objection --
2    Q.    -- not up to what you expected them
3    to be?
4    A.    No, I just preferred, for what we
5    were doing, Mr. Klos.
6    Q.    Did you ever form the opinion that
7    Mr. Waterhouse was -- I don't know what word
8    to use -- Mr. Dondero's stooge or tentacle?
9    A.    No.
10   Q.    Okay.  Did you have any opinion as
11   to whether he was -- again, I don't know what
12   word to use -- whether he was a responsible,
13   proper CFO when he was the CFO of Highland
14   and you were the CRO?
15   A.    While he was CFO, I -- I think he
16   was adequate, but I think the challenge that
17   the employees had at Highland was the pull
18   that Dondero had, the go-betweens that he
19   had.
20        And it's hard to say at a specific
21   time, because I know a lot more now,
22   including to do with payments, including tens
23   of millions of dollars offshore, with respect
24   to Ellington.

Page 155

J. Seery

1    So I -- I know way more now, so
2    it's hard to separate those things.  But with
3    respect to Mr. Waterhouse, I think he was --
4    he was adequate.  I think the team was very
5    good.  And I think that the -- I was always
6    concerned about loyalties.
7    Q.    Did you ever, when you were the
8    CRO, discipline, censure, caution
9    Mr. Waterhouse about anything?
10        MR. MORRIS:  Objection to the
11        form of the question.
12   A.    I actually gave him a raise on his
13   base salary because he couldn't get bonuses
14   because of the Court order structure.  I did
15   caution him and many employees about
16   loyalties and their duties to the debtor.
17   Q.    And you remember cautioning him
18   specifically about that or as part of larger
19   group?
20   A.    As part -- I -- I believe it was
21   part of the larger group.  I certainly did it
22   with both legal and accounting, particularly
23   after Judge Jernigan's expressed --
24   expression of concern in -- in and around

Page 156

J. Seery

1    July of 2020.
2    Q.    After you learned about the
3    NexPoint missed December 31, 2020 payment,
4    did you give any instructions to
5    Mr. Waterhouse or anyone else to the effect
6    of don't negotiate any settlement or cure or
7    anything on that default without talking to
8    me first?
9    A.    I don't believe that I had any
10   discussion like that with anybody, but it
11   would have been clear, I think, that once the
12   demand letter went out and I had been
13   responsible for initiating it, that the full
14   amount was due, and if anybody wanted to
15   negotiate anything, they would have to do it
16   through me.
17        And certainly no one had the
18   ability to negotiate any monetary settlements
19   with respect to the debtor's assets without
20   talking to me and the board.
21   Q.    Okay.  Why is that?
22   A.    Because we were in bankruptcy and I
23   was the CEO, and I told everybody on the team
24   that they had to come through me.  Any

Page 157

J. Seery

1    material decisions had to go through me.
2    Q.    And you told that to
3    Mr. Waterhouse?
4    A.    The whole accounting team as well
5    as the legal team.
6    Q.    Do you recall if that's in writing
7    anywhere?
8    A.    I don't think so.
9    Q.    Did you define materiality to them;
10   do you recall?
11   A.    I don't think so.
12   Q.    Okay.  So you never expressly
13   prohibited Mr. Waterhouse from hypothetically
14   accepting any cure to reinstate that note,
15   but you would have expected him to know that
16   he had no authority to do so on behalf of the
17   debtor?
18   A.    Oh, I --
19        MR. MORRIS:  Object -- objection
20        to the form of the question.
21   A.    -- I -- I think it would have been
22   beyond obvious that he had no authority to do
23   that for the debtor.
24   Q.    Do you think that would have been

**App. 136**

Page 158

1    J. Seery
2    beyond obvious to Mr. Dondero?
3    A.    Yes, I do, well --
4    Q.    Why --
5    A.    -- beyond -- well beyond obvious.
6    Q.    Why is that?
7    A.    Because the shared services had
8    already been terminated.  We were heading
9    towards a confirmation of a monetization
10   plan.  He had already failed to pay shared
11   service amounts.  He had already been found
12   in contempt of court.
13          The idea that he could cut a deal
14   with a former employee over material asset of
15   the debtor is nonsensical.
16   Q.    Okay.  Mr. Waterhouse wasn't a
17   former employee on January 12, 2021, was he?
18   A.    No, he was not, correct.
19   Q.    And although the notice of
20   termination had gone out for the shared
21   services agreement, it had not been
22   terminated as of January 12, 2021, correct?
23   A.    That's correct.
24          Are you -- are you implying that --
25   that there was such a deal and you're going

Page 159

1    J. Seery
2    to make up a new story?
3    Q.    Well, sir, I object to you saying
4    I'm going to make anything up.  I'll let
5    Mr. Waterhouse and Mr. Dondero testify as
6    they did.
7          But certainly you would -- you
8    would not be aware of any deal that Frank or
9    James Dondero might have made, right?
10   A.    I -- I would not be aware of any
11   such deal.
12   Q.    Certainly you would have never,
13   ahead of time or after the fact, authorized
14   any such deal?
15   A.    No, I would not.
16   Q.    Okay.  Why not?  Why not accept a
17   cure and reinstate the note?
18   A.    Because the full amount of the note
19   was due.  We're in a monetization plan.  This
20   is an opportunity to monetize an asset.
21          MR. RUKAVINA:  Just a moment,
22   please.
23          THE WITNESS:  Sure.
24          MR. RUKAVINA:  It's 4:30 local,
25   right?

Page 160

1    J. Seery
2          Mr. Seery, allow me just five
3    minutes to consult with my co-counsel.  I
4    believe that I'm done, but before I make
5    that decision, I just want to have a few
6    minutes.
7          THE WITNESS:  Certainly.
8          VIDEO TECHNICIAN:  The time is
9    4:34.  We're going off the record.
10         (Recess taken.)
11         VIDEO TECHNICIAN:  The time is
12   4:40.  We're back on the record.
13         (Brief off-record discussion.)
14         MR. MORRIS:  Pass the witness.
15         Mr. Seery, thank you for doing this
16   in person in your beautiful city.
17         THE WITNESS:  Thank you.  It's
18   coming back, slowly.
19         MS. DEITSCH-PEREZ:  Okay.  Good
20   afternoon, Mr. Seery.
21         THE WITNESS:  Good afternoon.
22   EXAMINATION
23   BY MS. DEITSCH-PEREZ:
24   Q.    When Mr. Rukavina started
25   questioning you, and you were describing your

Page 161

1    J. Seery
2    background, you mentioned that you had been
3    involved in hundreds of bankruptcies.
4          Could you tell us, just by listing
5    them, the -- the most substantial companies
6    that you were involved with bankruptcies for?
7    A.    United Airlines, TWA, Columbia Gas,
8    Lehman Brothers.  It, it -- it's a
9    thirty-year career, so...
10   Q.    I'm just asking for the highlights.
11   A.    Those aren't bad.
12   Q.    Okay.  Were there any other
13   financial services companies that you were
14   involved in the bankruptcy or restructuring
15   of?
16   A.    Lehman Brothers would be considered
17   a financial services company.
18   Q.    Okay.  And what kind of company
19   would you consider Highland?
20   A.    Highland is a financial advisor.
21   Q.    Okay.  Were there any other
22   financial advisors that you were involved in
23   the restructuring or bankruptcy of?
24   A.    I guess technically MF Global, in
25   some of its places, would fall into that

Page 162

J. Seery

1  category.  Madoff would fall into that
2  category.
3
4      Q.    Any others?
5      A.    There may be.  Off the top of my
6  head, I don't recall.
7      Q.    Okay.  And in the course of those
8  engagements, were you generally aware of the
9  top-level executive compensation for the
10 top-level executives prior to the -- the
11 bankruptcies?
12     A.    Not specifically.  It just depends
13 on each -- each company.
14     Q.    Generally, were you -- were you
15 aware?  Is that the kind of thing you took
16 note of?
17     A.    Not -- it -- I was more concerned
18 with the particular issue that I was dealing
19 with as opposed to whether somebody -- what
20 somebody made.
21     Q.    In the bankruptcies that you were
22 involved with, with the -- with the larger
23 companies and all of the financial services
24 or financial advisory companies, can you --
25 can you tell me generally the range of

Page 163

J. Seery

1  compensation for the CEOs --
2      A.    I, I --
3            (Simultaneous speaking.)
4      A.    -- no, I wouldn't be able to tell
5  you that.
6      Q.    Even a ballpark you couldn't --
7  couldn't say?
8      A.    They're all different kinds of
9  companies.
10     Q.    I understand, but can you -- for
11 any of those companies, can you give me a
12 ballpark of what the compensation was?
13     A.    It could be anywhere in any
14 particular year from zero to $25 million.
15     Q.    Okay.  And is there a general
16 pattern that founder CEOs have higher
17 compensation than hired-off-the-street CEOs?
18           MR. MORRIS:  Objection to the
19     form of the question.
20     A.    No, there's not.  In fact, it could
21 sometimes go the other way.
22     Q.    But -- but is it sometimes the
23 case, in your experience, that founder CEO
24 compensation is on the high end?

Page 164

J. Seery

1            MR. MORRIS:  Objection to the
2      form of the question.
3      A.    I, I -- I don't have any basis to
4  say that.  It really depends upon the company
5  and it depends on the performance of the
6  company.  Just because you founded something
7  and you sit on a log doesn't mean you get
8  paid a lot of money.
9      Q.    Do you know what the CEO
10 compensation was for the CEO of Lehman prior
11 to the bankruptcy?
12     A.    In which year?
13     Q.    The, the year prior -- the years
14 prior to the bankruptcy.
15     A.    I -- I don't know.
16     Q.    Does it -- does it refresh your
17 recollection that it was in the range of
18 $70 million?
19     A.    There's no chance it was in the
20 range of $70 million.  He would have gotten
21 stock awards and it would depend on what
22 those were worth.
23           (Simultaneous speaking.)
24     A.    Obviously -- obviously, they ended

Page 165

J. Seery

1  up being worth -- I think the number is -- I
2  think it's zero.
3            You're aware of that, correct?
4      Q.    Prior to the bankruptcy.
5      A.    Oh, prior to it being worth zero,
6  it -- it was worth a lot more.
7      Q.    But as you sit here today, you
8  don't know what any of the CEOs of the
9  companies you advised made --
10           MR. MORRIS:  Objection --
11     Q.    -- that's what you're telling us?
12           MR. MORRIS:  Objection to the
13     form of the question.
14     A.    I didn't say I advised those
15 companies.
16           MR. MORRIS:  Thank you.
17     Q.    But you were involved in the -- in
18 the bankruptcy or reorganization --
19     A.    No --
20           (Simultaneous speaking.)
21     A.    -- I -- I don't have at my
22 fingertips the amount that the CEOs of
23 various companies made in various industries
24 over the last thirty years.

**App. 138**

Page 166

J. Seery

2    Q.    And -- and not even in a general
3  way, other than zero to 25 million?
4    A.    That's a pretty good range.
5    Q.    Okay.  Do you have an understanding
6  of what the typical compensation is -- for a
7  financial advisory CEO is for a company that
8  has a billion or more under management?
9    A.    It depends on the type of assets
10  that are under management, it tends -- it
11  depends on the performance of the assets and
12  it depends on the cost structure of the
13  business.
14    Q.    And taking those things into
15  account, can you describe for us what the
16  compensation for a CEO of a financial advisor
17  firm is, where there are assets under
18  management of a billion or more?
19    A.    When you [mean] a financial
20  advisor, do you mean an FA type firm or do
21  you -- financial advisor, or do you mean
22  somebody who advises investors?
23    Q.    I -- I'm talking about a company
24  similar to Highland.
25    A.    So high -- Highland is a -- is a

Page 167

J. Seery

2  combination of types of businesses.  It's
3  basically, in the last five years, at best a
4  melting ice cube.  It receives certain
5  management fees and then it gives away
6  services at below cost.
7       So Highland was run at a loss.
8  Typically people who run businesses that
9  operate at an operating loss don't get paid a
10  lot of money.
11    Q.    Let me -- let me ask you, you're
12  now -- you've been the CEO of Highland for a
13  while, right?
14    A.    That's correct.
15    Q.    And you're going to remain the CEO
16  for a while longer?
17    A.    Perhaps.
18    Q.    And do you have an expectation of
19  how many years in total you'll likely be the
20  CEO of Highland?
21    A.    The less the better.
22    Q.    But aside from that, do you have an
23  expectation of how many years you will likely
24  be the CEO of Highland?
25    A.    I don't.  I hope we complete the

Page 168

J. Seery

2  monetization by 2022.  Whether I'm the CEO or
3  not that will depend on the oversight board
4  and whether I want to continue to do it.
5    Q.    Okay.  And if you are as -- as
6  successful as you hope to be, whatever that
7  is, how much do you expect to make as the CEO
8  of Highland on average for each year that you
9  will have been the CEO of Highland?
10       MR. MORRIS:  Objection to the
11    form of the question.
12    A.    I -- I don't have a particular
13  expectation right now.  I have to negotiate
14  that, but I would expect to make a few
15  million dollars a year.
16    Q.    Have you not negotiated your
17  potential contingent compensation yet?
18    A.    I have not.
19    Q.    What -- what do you intend to ask
20  for?
21       MR. MORRIS:  Objection to the
22    form of the question.
23    A.    I'd like to get a significant
24  amount of money, as much as I can get and
25  treat my team fairly, but it has to be fair

Page 169

J. Seery

2  based on the returns that we get for the
3  investors.
4    Q.    So based on, if you were as -- as
5  successful as you hope to be, what do you
6  think that number would be on an annual
7  basis?
8       (Simultaneous speaking and
9    reporter interjection.)
10       MR. MORRIS:  Objection to the
11    form of the question.
12    A.    I would expect it to be at least a
13  few million dollars a year.  If I was as
14  successful as I think we will be, it should
15  be significantly more than that.
16    Q.    Okay.  And so what does -- what
17  is -- because I don't know you very well,
18  Mr. Seery.
19       To you, what is significantly more
20  than a few million a year?
21    A.    Just to be clear, you don't know me
22  at all.  We've never met, so we'll -- we'll
23  make sure that that's clear so we don't --
24  there's no implication that there's some
25  prior relationship or that we've ever worked

Page 170

J. Seery

1  in any matter, in any connection whatsoever
2  other than this one.
3
4        Now, your question was?
5        MS. DEITSCH-PEREZ:  Can you read
6    it back?
7        (As read by the reporter):
8    "QUESTION:  And so what does --
9    what is -- because I don't know you
10   very well, Mr. Seery.  To you, what is
11   significantly more than a few million a
12   year?"
13   A.    It will depend on -- on the cost.
14  It depends on the overall performance, and --
15  and that will dictate whether there's upside
16  to a performance bonus.
17   Q.    Is significantly -- let -- let's
18  break this down to little pieces.
19        A few million, is that two, three,
20  four, five?  What is a few million?
21   A.    Typically I think of two as a
22  couple, three as a few.
23   Q.    Okay.  Is four also a few?
24   A.    Four is a little more than a few,
25  but it could be in that neighborhood.

Page 171

J. Seery

1   Q.    Okay.  So what is significantly
2  more than 3 to 4 million?
3   Q.    Is that twenty?
4        That would be --
5   A.    That would be --
6        MR. MORRIS:  Objection --
7        (Simultaneous speaking and
8    reporter interjection.)
9   A.    Twenty is significantly more than a
10  few, but it's -- it's not any -- there's no
11  prospect of $20 million of a bonus in this
12  type of arrangement.  There's simply not
13  enough assets here.
14   Q.    Okay.  So when you say
15  significantly more than a few, do you mean
16  something like ten, 10 million a year?
17        MR. MORRIS:  Objection to the
18    form of the question.
19   A.    Again, I -- I don't have a specific
20  number in mind.  I think that's -- that
21  there's no chance of that either.
22   Q.    So can you tell me what you mean by
23  significantly more than a few million?
24   A.    Five is significantly more than
25  three.

Page 172

J. Seery

1   Q.    Okay.  Does that mean you're hoping
2  for compensation of 8 million a year or
3  5 million a year, just so I understand you?
4        MR. MORRIS:  Objection to the
5    form of the question.  Come on.
6   A.    There's no chance of $8 million a
7  year here.  There's not enough assets.
8  There's not enough value in the estate to pay
9  anybody that amount, which is why Highland
10  would never pay anybody that amount anyway,
11  because when you have a melting ice cube and
12  you don't get any performance fees because
13  your performance is terrible, you don't pay
14  somebody that much money.
15  MO*    MS. DEITSCH-PEREZ:  Move to
16    strike.
17   Q.    In your experience with the various
18  companies you've mentioned, have you seen
19  executives given loans as part of their
20  executive compensation?
21   A.    You know, I don't --
22        MR. MORRIS:  Objection to the
23    form of the question.
24   A.    I don't know.  I don't -- I don't

Page 173

J. Seery

1  recall.  I've certainly seen loans be given
2  as part of compensation.
3        Typically senior executives, in my
4  experience, don't get loans because loans
5  either have to be paid back or structured in
6  an odd way.
7        If they're structured just to avoid
8  taxes, most legitimate companies don't want
9  to do that, so most companies will either pay
10  somebody a -- base salary and deferred
11  amounts or will pay them with stock.
12   Q.    But you have seen loans given as
13  part of compensation?
14   A.    I -- I don't think I've seen it.  I
15  know that it exists.  I -- I don't recall any
16  senior executives in any companies that I've
17  worked around where a loan to a senior
18  executive was a -- was a material issue in a
19  case.
20   Q.    Have you also seen circumstances
21  where executives or just high-level employees
22  are given loans that are eventually forgiven
23  as part of their compensation?
24   A.    I -- I know it exists.  Again, I

Page 174

J. Seery

1  don't think it's been something or -- or
2  characteristic in any case either that I've
3  been involved with, invested in, worked on.
4     Q.    Given the nature of your work in
5  bankruptcies, does that simply mean that the
6  issue of loans and the forgiveness of the
7  loans has not been materially challenged in
8  the various engagements that you've
9  undertaken?
10    A.    No, I don't think -- I think it's
11 because it's not a material issue, and so you
12 don't -- you don't see very many companies
13 that I have been around where significant
14 amounts of the assets are company --
15 intercompany related loans or -- or loans to
16 the senior executives, where it's all
17 controlled by the same executive.  It's a --
18    Q.    Have you --
19    A.    -- it's a rare item.
20    Q.    Have you made any investigation, as
21 part of your role in this case, into whether
22 there are other companies that -- that have
23 similar loan programs, where executives or
24 senior officers receive loans that have the

Page 175

J. Seery

1  potential to be forgiven?
2        MR. MORRIS:  Objection to the
3     form of the question.
4     A.    Yeah, again, I don't -- I don't --
5  I don't think there's a program involved in
6  this situation, and I don't think there's any
7  potential for loans to be forgiven, so I --
8  it's not something that I've seen elsewhere,
9  although forgivable loans can be used for
10 certain types of compensation to employees to
11 retain them, certainly would be -- be
12 humorous to do that with respect to a
13 founder, but I don't -- in my experience, I
14 haven't seen this as a -- as a material issue
15 like it is in this case.
16    Q.    And I was asking whether you had
17 investigated, so that you could -- currently,
18 whether or not there are other companies in
19 which there was a practice like the one you
20 just described.
21       MR. MORRIS:  Objection, asked and
22    answered.
23    A.    I haven't done any other
24 investigation, other than -- than my

Page 176

J. Seery

1  experience.
2     Q.    Okay.  Did you investigate whether
3  or not any of the following people - mike
4  Hurley, Tim Lawlor, Pat Daugherty, Jack Yang,
5  Paul Adkins, Labraya Mamoud [ph], Jean Luc
6  Everland [ph] or Appou Landoseri [ph]
7  received loans that were potentially
8  forgivable and then that were, in whole or in
9  part, forgiven?
10       MR. MORRIS:  Objection to the
11    form of the question.
12    A.    I have looked at that, yes.
13    Q.    Okay.  And what did you determine?
14    A.    I determined that Highland, I don't
15 believe, has made a loan to any employee
16 other than Okada and Dondero in about twelve
17 years; that no loans were forgiven, notes --
18 so they were -- actually, I don't believe
19 they got any before 2014, maybe '13.
20       No senior executive got it except
21 with respect to Yang, but he was employed by
22 New York, not by HCMLP.  That was part --
23 effectively, was part of a severance when he
24 left.  And I don't think there's been any

Page 177

J. Seery

1  that have been north of $500,000, so nothing
2  like this.
3        And I did determine that Okada's --
4  I believe he only had one loan.  I could be
5  wrong on that, but that's the only one I
6  recollect, and he paid it back.
7     Q.    And did he pay it back in
8  connection with this bankruptcy, a demand of
9  the bankruptcy?
10    A.    He did, yes.
11    Q.    Under threat of lawsuit?
12    A.    No.  I spoke to Mark and I said you
13 should go talk to your counsel, you have a
14 very good counsel, Sullivan & Cromwell.
15       He went and talked to them and he
16 said you're right, they said I have to pay it
17 back.  And he did, and we structured it.
18    Q.    So did you determine that the --
19 you mentioned Yang.
20       But the others that I listed, did
21 you determine whether they had or had not
22 received loans that had been forgiven in
23 whole or in part?
24    A.    It looks like they had, and that

**App. 141**

Page 178

J. Seery

1  was about more than ten or twelve years ago
2  and it had not been done since.  None of
3  those were obviously a founder, none of them
4  were more than $500,000.
5      Q.   Okay.  And did you learn that all
6  of the notes that existed in relation to
7  those loans for the people that I listed --
8  none of the notes actually contained the
9  forgiveness term?
10         MR. MORRIS:  Objection to the
11     form of the question.
12     A.   I -- I do not know that, no.
13     Q.   Well, did you search for the notes
14  at issue?
15     A.   I did not look at the notes, I just
16  looked at the dollar amounts.
17     Q.   Did you talk to anyone who had been
18  involved in the -- the issuance of the notes
19  to the people that I listed that were
20  eventually forgiven?
21     A.   No.
22     Q.   Okay.  Are -- are you aware that
23  it's generally the case, when companies use
24  potentially forgivable loans as a part of

Page 179

J. Seery

1  compensation, that the notes are bona fide
2  notes from the start that don't have a
3  forgiveness term and that the forgiveness
4  term, for tax purposes, is subsequent and
5  that taxes then are only paid when the note
6  is actually forgiven?
7          MR. MORRIS:  Objection to the
8      form of the question.
9      A.   My experience and understanding of
10  that is actually different.  When an employee
11  receives a forgivable loan as part of either
12  their retention, and often it happens as a --
13  a way to either retain somebody or to employ
14  someone, that it's very clear that it's
15  forgivable up front.  Otherwise, it would be
16  a trust-me loan.
17         Now, certainly the founder who
18  controls everything can make his own trust-me
19  loan because he can trust himself, but -- but
20  to structure it to avoid taxes, my experience
21  is that that's actually illegal.
22     Q.   If you make payments on the loan
23  and it's only forgivable if certain
24  conditions occur in the future that are not

Page 180

J. Seery

1  certain --
2          MR. MORRIS:  Objection to the
3      form.
4      Q.   -- doesn't that -- does -- in your
5  understanding, isn't that a -- a loan that,
6  until it's forgiven, is a bona fide loan of
7  which no taxes are owed?
8          MR. MORRIS:  Objection to the
9      form of the question.
10     A.   I think you've described -- I
11  apologize.
12         I think you've described what I'd
13  call a scam.
14     Q.   Let's step -- step back a second,
15  Mr. Seery.
16         If I use the term "tax efficient
17  transaction," what do you understand that to
18  mean?
19         MR. MORRIS:  Objection to the --
20         (Simultaneous speaking.)
21     Q.   -- something is tax efficient, what
22  does that mean to you, so I just make sure
23  we're -- we're talking the same language?
24         MR. MORRIS:  Objection to the

Page 181

J. Seery

1  form of the question.
2      A.   It -- it means a transaction
3  that's -- that's structured in a way to
4  minimize the -- the tax cost.
5      Q.   Okay.  And is your impression of
6  Mr. Dondero that, if he has a choice between
7  doing a transaction in a tax efficient way
8  and a non-tax efficient way, that he would
9  pick the tax efficient way?
10     A.   I believe he would, yes.
11     Q.   Okay.  And are you condemning of
12  that --
13     A.   No.
14     Q.   -- is it a bad thing?
15     A.   Tax -- tax avoidance is a --
16     Q.   Taxi efficiency.
17     A.   I said tax avoidance is a duty,
18  taxi evasion is a crime.
19     Q.   Okay.  So when you say "duty," what
20  do you mean?
21         Remember, a jury is listening to
22  this so I want it to be clear.
23     A.   I believe --
24         MR. MORRIS:  That's not entirely

Page 182

J. Seery

1    clear, just to be -- just to be
2    certain.  You may never get to a jury,
3    but go ahead.
4        A.   I don't recall if that was a -- a
5    quote from Learned Hand or one of the other
6    well known --
7        Q.   It had that sound to you?
8        A.   -- judges, but I -- I think that
9    structuring a transaction that has legitimate
10   purposes in a tax efficient way is not
11   necessarily problematic.
12       Structuring a transaction to avoid
13   taxes, and -- and mainly or solely to avoid
14   taxes, is actually a -- a violation of the
15   Internal Revenue Code.
16       Q.   And looking at the various loans to
17   Mr. Dondero and the related company loans
18   that are the subject of the notes litigation
19   that you are here today to testify about, was
20   it the case that annual payments both on the
21   term loans and interest payments on the
22   demand loans were made?
23       A.   Oftentimes, yes.
24       Q.   Okay.  And is that a characteristic

Page 183

J. Seery

1    of a bona fide loan, that --
2        MR. MORRIS:  Objection to the
3    form of the question.
4        (Technical disruption.)
5        Q.   -- later, but as long as that
6    hasn't happened, interest payments should be
7    made, and if it's a --
8        MR. RUKAVINA:  We lost you,
9    Deborah.  Deborah, we lost you.
10       MS. DEITSCH-PEREZ:  Can you --
11   did you hear me?
12       MR. RUKAVINA:  No.
13       MS. DEITSCH-PEREZ:  Okay.  I'll,
14   I'll -- I'll start over then.
15       Q.   In your experience, is it a
16   characteristic of a bona fide loan, whether
17   demand or a term loan, that until it is
18   actually forgiven -- until and unless it is
19   forgiven, that annual interest payments
20   should be made on a demand loan, and whatever
21   is due pursuant to the terms of the note on
22   the term loan should also be made annually?
23       MR. MORRIS:  Objection to the
24   form of the question.

Page 184

J. Seery

1        A.   I -- I think that's a
2    characteristic of a bona fide loan, but I
3    think that you can have an accruing loan that
4    doesn't have those payments that is also a
5    bona fide loan.  And so I -- I do think these
6    are bona fide loans.  The money was given, a
7    note was signed, the amounts are owed.
8        Q.   And do you have a reason to believe
9    that if it was in Mr. Dondero's power to
10   attempt to have these loans subject to a
11   condition under which there would be
12   forgiveness of the loan, is that something
13   that is -- that surprises you?
14       MR. MORRIS:  Objection to the
15   form of the question.
16       A.   It -- it shocks me.
17       Q.   So you don't think that if
18   Mr. Dondero had the opportunity to -- to have
19   contingent compensation rather than
20   compensation in 2017, 2018 or '19, but move
21   it out into the future, it surprises you
22   that -- that he would want to do that?
23       MR. MORRIS:  Objection to the
24   form of the question.

Page 185

J. Seery

1        A.   Can -- can you read that question
2    back --
3        (Simultaneous speaking.)
4        A.   -- I didn't understand it.
5        MS. DEITSCH-PEREZ:  The court
6    reporter can read it back.
7        (As read by the reporter):
8        "QUESTION:  So you don't think
9        that if Mr. Dondero had the opportunity
10       to have contingent compensation rather
11       than compensation in 2017, 2018 or '19,
12       but move it out into the future, it
13       surprises you that -- that he would
14       want to do that?"
15       MR. MORRIS:  Objection to the
16       form of the question.
17       A.   I -- I don't see any evidence
18   whatsoever that that's what he did.  And in
19   fact, the way the business was run and the
20   monies he took out from various different
21   places connected to the business shows that
22   that wasn't the case.
23   MO*      MS. DEITSCH-PEREZ:  Move to strike
24       because you didn't answer --

**App. 143**

Page 186

                    J. Seery
1                   J. Seery
2            MR. MORRIS:  And, and -- and I --
3    and I object, you asked him if -- I
4    just -- I, I --
5            MS. DEITSCH-PEREZ:  Well, John --
6            MR. MORRIS:  -- it's not -- the
7        judge will rule.
8        Go ahead.
9    BY MS. DEITSCH-PEREZ:
10       Q.    You've heard of -- Highland has
11   interests in Cornerstone, Trussway and MGM,
12   that's correct?
13           MR. MORRIS:  Objection to the
14       form of the question.
15       A.    You should be precise.  Highland
16   owns certain equity interests in Cornerstone,
17   approximately 4 percent.  Highland owns,
18   indirectly, all of the interests -- almost
19   all of the interests in Trussway.  Highland
20   owns a small piece of MGM.
21       Q.    Okay.  And have you made any
22   inquiry into whether employees at Highland
23   referred to these colloquially as portfolio
24   companies?
25       A.    I --

Page 187

1                   J. Seery
2            MR. MORRIS:  Object --
3        A.    I -- I know that cornerstone is
4    sometimes referred to as a portfolio company.
5    I know that Trussway is referred to as a
6    portfolio company.
7            It would be -- I've never heard
8    anyone refer to as -- MGM as a portfolio
9    company.
10       Q.    Have you ever made an inquiry as to
11   whether sometimes it was colloquially called
12   a portfolio company?
13       A.    I -- I haven't made an inquiry as
14   to it, no.  I've been around the business for
15   a year-and-a-half, nineteen months.
16       Q.    Have you ever heard Mr. Dondero
17   refer to MGM as one of the portfolio
18   companies?
19       A.    No, I haven't.  It would be very
20   odd if he would.
21       Q.    When you -- in the early days, when
22   you communicated with Mr. Dondero about the
23   prospects for the assets at Highland, did he
24   appear to have high hopes for the
25   monetization and increase in value of

Page 188

1                   J. Seery
2    Cornerstone, Trussway and MGM?
3            MR. MORRIS:  Objection to the
4        form of the question.
5        A.    I don't recall him ever talking to
6    me very much about Cornerstone and potential
7    upside or Trussway.
8            He did have high hopes, or
9    expressed high hopes, of upside value in MGM.
10   But at the same time, he sold 1.7 million
11   shares after the filing for 7250.  So that
12   sort of belied that optimism, but he
13   expressed some optimism that MGM would have
14   upside.  And of course he sat on the board,
15   so he'd have some insight into it.
16       Q.    And it looks like, hopefully, he
17   was right to -- in that optimism?
18           MR. MORRIS:  Objection to the
19       form of the question.
20       Q.    Is that right?
21       A.    We'll find out.
22       Q.    So far it appears that his optimism
23   may be justified; is that right?
24       A.    There's -- there's a transaction.
25   It's subject to approval and closure.

Page 189

1                   J. Seery
2        Q.    Okay.
3        A.    Certainly hope so.
4        Q.    If in fact all three of those
5    companies, MGM -- or Highland's interest in
6    those three companies are successfully
7    monetized, will the assets of Highland exceed
8    its liabilities?
9            MR. MORRIS:  Objection to the
10       form of the question.
11       A.    Extremely unlikely.
12       Q.    Possible though?
13           MR. MORRIS:  Objection to the
14       form of the question.
15       Q.    In your educated opinion --
16           (Simultaneous speaking.)
17       A.    Can I -- can I answer your
18   question --
19       Q.    Yes.
20       A.    -- unless "possible though" is just
21   a quip, because then I won't answer it.
22       Q.    No --
23       A.    Is that a question?
24       Q.    -- it's not a quip --
25       A.    Oh, okay.

Page 190

J. Seery

1    Q.   -- it is a question.
2    A.   It's -- we know what the -- at
3  least now what the potential upside is to
4  MGM.  We don't know what the upside is for
5  Cornerstone or Trussway, but we understand
6  the performance of the companies and the
7  framework with which somebody would value
8  them.
9        So it would be extremely unlikely,
10  not impossible but extremely unlikely, for
11  those two companies - with MGM capped - to
12  have a performance that exceeded the total
13  amount of claims.
14    Q.   How close a matter is it?
15        MR. MORRIS:  Objection --
16        (Simultaneous speaking and
17  reporter interjection.)
18    Q.   How -- how close -- how close --
19  let me -- let me strike that and start again.
20        What would MGM, Trussway and
21  Cornerstone need to be monetized for in order
22  for the overall assets of Highland to exceed
23  its liabilities?
24        MR. MORRIS:  Objection to the

Page 191

J. Seery

1  form of the question.
2    A.   I'm not in a position to answer
3  that, but all of the assets minus the
4  expenses to get there would need to exceed
5  $400 million.
6    Q.   And right now, what do you think
7  the assets are worth?
8        MR. MORRIS:  Objection to the
9  form of the question.
10    A.   Again, I don't -- I know what MGM
11  is potentially worth, but it's hard to -- I
12  can't count that until it's done.
13    Q.   I know but --
14        (Simultaneous speaking.)
15        MR. MORRIS:  Let him finish,
16  please let him finish.
17    A.   You don't -- can't count that until
18  it's done.  And then the other -- the other
19  businesses we have to put through a process,
20  to see what they're worth.  And they're,
21  they're, they're -- they've got potential
22  upside but they have challenges as well.
23    Q.   Okay.  Assuming you are as
24  successful as you hope to be, and crediting

Page 192

J. Seery

1  for the moment the potential value of the MGM
2  transaction, what do you think the assets of
3  Highland are likely to be worth?
4        MR. MORRIS:  Objection to the
5  form of the question.
6    A.   I -- I don't know.  Part of it
7  depends on -- again, it's the costs.  It's
8  collection of $63 million notes in these
9  litigations, and then it's the ultimate value
10  of those assets.
11        But I would hope that we would be
12  very successful in the asset monetization,
13  where we would be able to get at lease
14  $300 million with those -- those assets and
15  others.
16    Q.   Do you think that if you're as
17  successful as you hope to be, that the assets
18  will be worth more than 400 million net of
19  the collection costs?
20    A.   I --
21        MR. MORRIS:  Objection to the
22  form of the question.
23    A.   I believe I already said I believe
24  that's unlikely, but I'm an optimistic

Page 193

J. Seery

1  fellow.
2    Q.   So then you hope it is likely?
3    A.   I certainly hope so.
4        And, again, that -- that hope
5  counts on $63 million of note collections
6  that I do expect to collect.
7        MR. MORRIS:  Deborah?
8        MS. DEITSCH-PEREZ:  Yes.
9        MR. MORRIS:  I apologize for
10  interrupting, but sometime between now
11  and 6:00 I'm going to have to take
12  about a ten or a twelve-minute break.
13  I have no idea how much you have.
14        If you're going to finish in twenty
15  minutes, then let's do that.  If you're
16  going to take more than an hour, I
17  just -- just please stop at some point
18  by, you know, 5:30, 5:35, so I can take
19  that break.
20        I just have to attend to something
21  that -- it won't take too long, but I
22  just wanted to let you know that so you
23  weren't surprised.
24        MS. DEITSCH-PEREZ:  Okay.  If

**App. 145**

Page 194

J. Seery

1  you're okay, let me do one more segment
2  and then I'll let you -- I'll excuse
3  you to -- to do your errands and we'll
4  come back?
5          MR. MORRIS:  Sure.
6          (Brief off-record discussion.)
7          MS. DEITSCH-PEREZ:  He needs --
8  he needs his ten or twelve minutes
9  before 6:00 --
10         THE WITNESS:  Got it, got it.
11         MS. DEITSCH-PEREZ:  -- is that
12  right?
13         MR. MORRIS:  Yep.
14 BY MS. DEITSCH-PEREZ:
15     Q.   Okay.  When Mr. Rukavina was
16 questioning you, he was questioning you about
17 the nonpayment of the NexPoint Advisors loan.
18 Remember that?
19         And you -- were you only talking
20 about NexPoint, that -- that loan not the
21 HCMS term loan and not the HCRE term loan?
22     A.   He was only asking me about the
23 NexPoint, as I understood it.
24     Q.   Okay.  So let me ask you, are you

Page 195

J. Seery

1  aware that there were what -- at issue in
2  these litigations, a term loan between
3  Highland and HCMS?
4      A.   Yes.
5      Q.   And a term loan between Highland
6  and HCRE?
7      A.   Yes.
8      Q.   Okay.  And when was the last
9  payment due on the HCMS term loan and the
10 HCRE term loan?
11         MR. MORRIS:  Objection to the
12 form of the question.
13     A.   I -- I don't recall exactly.  I
14 thought they were -- they were all in and
15 around the same time.  If they weren't the
16 31st, they were right there.
17     Q.   All right.  And were the annual
18 payments for the HCMS and HCRE term loans
19 made by December 31, 2020?
20     A.   They were not.
21     Q.   And were the annual -- and was a
22 payment made on each of those loans in
23 January of 2021?
24     A.   I believe a payment was made after

Page 196

J. Seery

1  they were accelerated for each of those
2  loans, similar to the situation with the NPA
3  loan.
4      Q.   Let me show you - hang on, let me
5  pull it up - what I have marked as -- I
6  marked it as exhibit -- premarked it as
7  Exhibit 111, just to make sure I cleared
8  Mr. Rukavina's exhibits.  But it's an
9  arbitrary number, we're not missing 100-odd
10 exhibits.
11         Okay.  Can you see the exhibit?
12         And I did email it to Mr. Morris
13 prior to the deposition.  Do you have it
14 there?
15         MR. MORRIS:  No, I didn't see
16 your email.
17     A.   I see it on the screen.
18     Q.   Okay.  You have it in your email.
19 If there are any of them that you need to
20 break for a moment and have the exhibits
21 printed so that you can look at the whole
22 thing, please let me know and we can stop,
23 okay?
24         So have you seen what I've marked

Page 197

J. Seery

1  as Exhibit 111 before?
2      A.   I believe I have.
3      Q.   Okay.  And did you cause the letter
4  to be sent out?
5      A.   I did, yes.
6      Q.   And did you write the letter?
7      A.   I don't believe I wrote it.  I
8  would have marked it up to some degree.
9      Q.   Who wrote Exhibit 111, which is the
10 letter to Mr. Dondero from you, dated
11 January 7, entitled "Demand on Promissory
12 Note"?
13         MR. MORRIS:  Objection to the
14 form of the question.
15     A.   My counsel.
16     Q.   Okay.  Do you know in particular
17 who wrote it?
18 DI*     MR. MORRIS:  I'm going to direct
19 the witness not to answer.
20         MS. DEITSCH-PEREZ:  Just he can
21 answer that, whether he knows who wrote
22 it?
23         MR. MORRIS:  Sure, he can answer
24 that question.

Page 198

J. Seery

1     A.   Yes, I know.
2     Q.   Okay.  And can you tell me who
3 wrote it?
4          MR. MORRIS:  No.
5     Q.   And that's because your counsel has
6 directed you not to answer --
7          MR. MORRIS:  That's right.
8     Q.   -- or because you don't know?
9          MR. MORRIS:  It's because I'm
10    directing him not to answer.  We're not
11    going to even find out whether he knows
12    or not because it's privileged.
13    Q.   Okay.  Is this the only letter that
14 you caused to be sent to Highland Capital
15 Management Services with regard to the term
16 loan in the original principal amount of
17 20,247,628?
18    A.   I don't recall.  I would expect
19 there to have been a follow-up letter as
20 well, but I don't recall specifically.
21         Perhaps you have it.
22    Q.   I do not.  That's why I'm asking, I
23 don't see a letter like the one that we saw
24 earlier that was to NexPoint.

Page 199

J. Seery

1     A.   I don't recall specifically; I
2 would have to look.  If we had it, we would
3 have produced it.
4     Q.   Okay.  And if you had it, would you
5 also have attached it to the complaint --
6          MR. MORRIS:  Objection to the
7     form --
8     Q.   -- the way the NexPoint letter was
9 attached to the complaint?
10         MR. MORRIS:  Objection to the
11    form of the question.
12    A.   I -- I don't know if we would have
13 or not.  I think the demand is sufficient on
14 its own.
15    Q.   Other than the possibility that
16 there was a -- let me back up.
17         Was there a payment made in January
18 on the HCMS term loan?
19    A.   I thought there was, but I don't
20 recall specifically.  I'd have to look at
21 the -- it would be in the complaint, I would
22 think.
23    Q.   Okay.  And if the complaint says
24 there was, then there -- then that would be

Page 200

J. Seery

1 the case?
2     A.   If there was, it would have --
3 similar to the NPA, it would have been
4 applied on account.
5     Q.   Other than the letter that's been
6 marked as Exhibit 111, did you have any
7 communications with anyone at Highland
8 Capital Management Services about the note or
9 the payment or the nonpayment other than this
10 possible post-payment letter and the -- that
11 was similar to the NexPoint one that we
12 looked at earlier?
13         MR. MORRIS:  Objection to the
14    form of the question.
15    A.   I would only have communicated
16 through the demands.
17    Q.   Okay.  So just to make it very
18 clear, did you talk with Mr. Dondero about
19 the HCMS note payment, nonpayment or status
20 of the -- of the demand?
21    A.   No.
22    Q.   And did you talk with
23 Mr. Waterhouse about the note, the payment,
24 the nonpayment or the status of the demand?

Page 201

J. Seery

1     A.   Not that I recall.
2     Q.   Okay.  What about Ms. Hendrix and
3 Mr. Klos; did you talk with either of them
4 about the note, the nonpayment, the payment
5 or the status of the -- of -- of the loan?
6     A.   Do you mean at the time this demand
7 note was sent?
8     Q.   Yes, in -- in December of 2020 or
9 January/February of 2021, that time frame.
10    A.   Not that I recall specifically, no.
11    Q.   And was it your understanding that
12 Highland provided shared services to Highland
13 Capital Management Services?
14         MR. MORRIS:  Objection to the
15    form of the question.
16    A.   It did not have a shared service
17 arrangement --
18    Q.   That wasn't -- wasn't my question.
19    A.   I'm answering your question .
20         But lots of free services were
21 given to lots of Dondero entities by lots of
22 Highland employees, who were never paid, over
23 the years.
24    Q.   Was it your understanding that

Page 202

J. Seery

1   J. Seery
2   Highland provided shared services to Highland
3   Capital Management Services?
4   A.    No.
5        MR. MORRIS:  Objection to the
6   form --
7   A.    Sorry.
8        MR. MORRIS:  -- of the question.
9   A.    No, shared -- shared services refer
10  to a specific agreement.  There was no --
11  there was no agreement or other arrangement.
12       Highland employees did things
13  wherever Dondero asked them to do.
14  Q.    I, I -- I assume, when you say
15  there was no agreement, you're talking about
16  no formal written agreement like the one
17  we've looked at for NexPoint earlier today --
18       MR. MORRIS:  Objection to --
19  Q.    -- is that what you're referring
20  to?
21       MR. MORRIS:  Objection to the
22  form of the question.
23  A.    No, I'm referring to any type of
24  agreement.
25       You, you -- you refer to these

Page 203

J. Seery

1   J. Seery
2   companies as if they're standalone operating
3   entities that actually do things.  These are
4   entries on paper that move money around.
5        So when Dondero asks an employee to
6   do work on behalf of himself, whether that's
7   closing his own house loans, whether that's
8   coming over and doing work at his house or
9   whether it's working for Highland Capital
10  Management Services, they -- they did it and
11  Highland was not compensated.
12  Q.    Have you -- have you investigated
13  whether there was effective compensation for
14  the services that Highland provided to
15  Highland Capital Management Services?
16       MR. MORRIS:  Objection to the
17  form of the question.
18  A.    I -- I don't know what effective
19  compensation means, but I have investigated
20  whether Highland Capital Management received
21  anything from HCM Services.
22  Q.    And who did you ask?
23  A.    It's been part of the ongoing
24  review of the business throughout the second
25  half of this case and into the spring of this

Page 204

J. Seery

1   J. Seery
2   year.
3   Q.    And did you determine, in the
4   course of that investigation, that there was
5   a pattern and practice of Highland providing
6   services like the ones in the NexPoint shared
7   services agreement to Highland Capital
8   Management Services?
9   A.    I think you asked me if we got some
10  sort of -- I think you said either indirect
11  or some other form of compensation.
12       The answer was no.  There were
13  things that Highland employees did at
14  different times at Mr. Dondero's directions
15  for these various entities, none of which
16  were paid for.
17  Q.    Was it generally the case that
18  Highland provided the back office services
19  for Highland Capital Management Services,
20  such as bill paying?
21  A.    Sometimes.  I don't know that it
22  was generally the case.  It depended.  And
23  Highland Capital --
24       (Simultaneous speaking.)
25  A.    -- and Highland Capital Management

Page 205

J. Seery

1   J. Seery
2   Services really just owned certain things and
3   took money out of Highland.
4        The fact of the matter is, Highland
5   Capital Services' main business is that it
6   gives money to Jim Dondero.  I think he owes
7   around a hundred million to services.
8   MO*       MS. DEITSCH-PEREZ:  Move to
9        strike.  That wasn't my question.
10  Q.    I asked you whether or not you
11  noticed, in the course of your various
12  investigations, that Highland Capital
13  Management provided back office services like
14  bill paying for cap -- for Highland Capital
15  Management Services?
16  A.    I --
17       MR. MORRIS:  Objection to the
18  form of the question.
19  A.    And I -- and I answered that I
20  don't think you can think of this company --
21  this entity - or company, Highland Capital
22  Services Inc. - in that manner.
23       It didn't -- it didn't have, for
24  example, advisory services that anybody there
25  was performing for third parties like NPA.

Page 206

1    J. Seery
2  So there wasn't doing work for a fund, et
3  cetera, so I don't -- there were certain
4  things that were done.  Whether they were ad
5  hoc or specific, I didn't see any true
6  pattern that this was similar to an agreement
7  where third -- true third-party services were
8  being continually performed.
9       Q.    Did Highland Capital Management
10 Services have employees that you knew of?
11      A.    No.
12      Q.    Okay.  So if it wanted to pay a
13 bill, it was using employees at Highland
14 Capital Management to do that, correct?
15      A.    If it had a bill, yeah.
16      Q.    Okay.  And in fact, did -- did
17 Highland Capital Management charge Highland
18 Capital Management Services for shared
19 services?
20      A.    I don't believe so.
21      MS. DEITSCH-PEREZ:  Let me show
22 you another document that I'll -- has
23 been premarked as Exhibit 110.
24      MR. MORRIS:  Are we going to be
25 able to take that break shortly?

Page 207

1    J. Seery
2       MS. DEITSCH-PEREZ:  If you want
3  to take it now, that's fine.
4       MR. MORRIS:  Yeah, I would
5  appreciate it.
6       MS. DEITSCH-PEREZ:  Well,
7  actually, why don't -- if you don't
8  mind, let me just finish 110.
9       MR. MORRIS:  Okay.
10      MS. DEITSCH-PEREZ:  I think that
11 will be pretty quick and then --
12      MR. MORRIS:  Okay.
13      MS. DEITSCH-PEREZ:  -- then we
14 can break.
15      Is that all right?
16      MR. MORRIS:  Sure.
17 BY MS. DEITSCH-PEREZ:
18      Q.    Okay.  Okay.  Can you see Exhibit
19 110?
20      A.    I can, yes.
21      Q.    Okay.  And I'm going to scroll down
22 because what I'm going to ask you about is
23 the email from Fred Caruso to Brian Collins,
24 JP Sevilla, Frank Waterhouse, Dave Klos, with
25 a copy to you.

Page 208

1    J. Seery
2       Do you recall Exhibit 110?
3       A.    Not specifically, no.
4       Q.    Do you generally -- well, first,
5  who's Fred Caruso?
6       A.    He is a partner at DSI.
7       Q.    Okay.  And were Brian -- and who
8  are Brian Collins, JP Sevilla -- the other --
9  the others we've spoken about.
10      So who are Collins and Sevilla?
11      A.    Brian Collins -- at this time
12 Collins, I believe, was still head of HR at
13 HCMLP and Sevilla was a counsel at HCMLP, but
14 they were really working for the transition,
15 which I don't know if it had a name at that
16 point, whether it was Highgate or Skyview.
17      But that's what they were working
18 on, and this had to do with transition of the
19 business, the service part of the business,
20 from Highland to other entities.
21      Q.    But am I correct that this is a
22 demand from HCMLP to the companies listed in
23 Exhibit 110 for money?
24      A.    It looks to be that, yes.
25      Q.    Okay.  And the email says there are

Page 209

1    J. Seery
2  outstanding fees and cost reimbursements.
3       What kind of fees were these?
4       A.    I believe some of these were fees
5  related to shared services and others were
6  reimbursements for costs.
7       Q.    Okay.  And do you see that there is
8  a line item for HCM Services and a -- and the
9  amount 116,531 is listed?
10      A.    Yes.
11      Q.    And so was that HCMLP demanding
12 money from HCM Services for services that
13 HCMLP had provided to HCM Services?
14      A.    I don't --
15      MR. MORRIS:  Objection to the
16 form of the question.
17      A.    I don't think so.
18      Q.    Why not?
19      A.    I think it's for cost
20 reimbursement.
21      Q.    What, what cost was -- was it
22 seeking to be reimbursed for?
23      A.    I -- I don't recall.  This is not
24 a -- something I recall specifically.
25      Q.    But in any event, this Exhibit 110

Page 210

J. Seery

2  confirms that HCMLP was either providing
3  services or advancing costs for HCM Services
4  and then billing HCM Services?
5       THE WITNESS:  Objection to the
6  form of the question.
7       A.    I -- I believe it was the latter.
8       Q.    Can you exclude the possibility
9  that this was an instance of HCMLP billing
10 HCM Services for services performed by HCMLP?
11      A.    Well, there was no agreement, so I
12 don't know the basis of it, but we could look
13 for it.  I don't -- I don't think that's the
14 case.
15      Q.    Do you know whether or not there
16 was an oral agreement with respect to HCM
17 providing services to HCM Services?
18      A.    Not that I ever heard of.
19      Q.    Did you ever specifically make an
20 inquiry --
21      A.    I, I have made --
22      (Simultaneous speaking.)
23      A.    You're not finished?  I'm sorry.
24      Q.    You can -- you can answer.
25      A.    I, I have --

Page 211

J. Seery

2       Q.    I take it you got the gist.
3       A.    I have made inquiry regarding
4  whether there was any arrangement for -- to
5  provide services and pay back for those
6  services, and I was told there wasn't.
7       Q.    Who did you make --
8       A.    That's my recollection.
9       Q.    Who did you -- who did you make an
10 inquiry to?
11      A.    Our -- our accounting team.
12      Q.    And any -- which people?
13      A.    That would be Waterhouse and Klos
14 and Hendrix.
15      It's not a specific inquiry that I
16 made.  There was -- this was over the time
17 during the case.
18      Q.    You actually have a specific
19 recollection of speaking to any of the people
20 that you just listed, like to Surgent, Klos
21 and --
22      A.    I didn't mention Surgent.
23      Q.    Okay.  Klos, Hendrix and
24 Waterhouse?
25      A.    Yes.

Page 212

J. Seery

2       Q.    Okay.  Do you have a specific
3  recollection of asking any or -- any of them
4  whether there was an unwritten agreement
5  between HCM and HCM Services for HCM to
6  provide shared services, back office
7  services, to HCM Services?
8       A.    No, I never would have asked that
9  question.
10      Q.    Did -- do you have a specific
11 recollection of what question you did ask?
12      A.    Yes.
13      Q.    What was it?
14      A.    Do we have a shared services
15 agreement.
16      Q.    Did you make it clear that you were
17 asking for a written or unwritten agreement?
18      A.    No.  As I said, if I asked if there
19 was an agreement, I would have assumed it was
20 a formal written agreement because that's the
21 way the business was run.
22      And I didn't ask if there was some
23 unwritten, secret, hidden or not so secret
24 but not shared with anybody agreement.  I
25 don't -- it's not something I inquired about.

Page 213

J. Seery

2       Q.    Did you ask whether there was an
3  agreement caused by a pattern and practice of
4  conduct?
5       A.    No.
6       MR. MORRIS:  Hey, Deborah, I'd
7  really like to take that break now.
8  That's why I started giving a --
9       MS. DEITSCH-PEREZ:  Okay.
10      MR. MORRIS:  -- a warning quite
11 some time ago.
12      Thank you.
13      MS. DEITSCH-PEREZ:  Okay, okay.
14      MR. MORRIS:  Yep, let -- let's
15 come back --
16      VIDEO TECHNICIAN:  The time is
17 5:37.  We're going off the record.
18      (Recess taken.)
19      VIDEO TECHNICIAN:  The time is
20 5:58.  We're back on the record.
21 BY MS. DEITSCH-PEREZ:
22      Q.    Mr. Seery, I'm showing you what's
23 been premarked as Exhibit 112.  I don't know
24 if you have it there, but if not, let me
25 scroll through it.

**App. 150**

Page 214

J. Seery

1    J. Seery
2    Have you seen it before?
3    A.    It -- it looks familiar, yes.
4    Q.    Okay.  This is a letter dated
5    January 7, from you to Mr. Dondero at HCR --
6    HCRE Partners.
7    Did you cause this letter to be
8    sent?
9    A.    Yes.
10    Q.    And like Exhibit 1 -- I think 111,
11    was this written by your counsel?
12    A.    It -- it certainly had my counsel's
13    input and my input, so how --
14    Q.    Okay.
15    A.    -- I probably got a base and marked
16    it up, and they finished it.
17    Q.    Okay.  And --
18    A.    Same as the other.
19    Q.    Okay.  And was there any
20    communication, other than Exhibit 112,
21    between you and HCRE Partners about the HCRE
22    term loan?
23    A.    No.
24    Q.    Do you know whether -- was there a
25    payment due on the HCRE term loan, in your

Page 215

J. Seery

1    view, by December 31, 2020?
2    A.    I believe there was, yes.
3    Q.    And was it made?
4    A.    No.
5    Q.    And was the payment made in January
6    of 2021?
7    A.    A payment was made in January of
8    2021 on account that -- the full amount that
9    was demanded.
10    Q.    Well, when high -- when HCM
11    received the payment from HCRE Partners, who
12    facilitated the -- the making of the payment,
13    as far as you know?
14    A.    I don't know.
15    Q.    Do you know if anyone from Highland
16    Capital Management was involved in the making
17    of HCRE's payment to HCM?
18    A.    I don't know.
19    Q.    Do you know whether HCRE had
20    employees?
21    A.    I don't believe it did.
22    Q.    And so was it your understanding,
23    generally, that HCM employees provided
24    services like paying bills for HCRE Partners?

Page 216

J. Seery

1    J. Seery
2    MR. MORRIS:  Objection to the
3    form of the question.
4    A.    It was similar to HCM Services, but
5    that doesn't mean they were the only people
6    to do anything for HCRE; I just don't know.
7    Q.    Well, when HCM received the
8    payments in January of 2021 from HCRE and HCM
9    Services, was there any communication that
10    these payments were being made to pay down
11    the term loan generally as opposed to -- to
12    making the payment otherwise to be made on
13    December 31, 2020?
14    MR. MORRIS:  Objection to the
15    form of the question.
16    A.    I -- I'm not sure I understand your
17    question, but I -- I don't recall any
18    specific communication.  Certainly if there
19    was a payment made, we would have applied it
20    on the total balance due, as you described.
21    Q.    But did anyone on behalf of the
22    HCRE or HCMS communicate that the payments
23    were to be applied to the total balance due
24    as opposed to fulfilling the payment that
25    otherwise was typically made at the end of

Page 217

J. Seery

1    the -- of the year?
2    MR. MORRIS:  Objection to the
3    form of the question.
4    A.    Again, I -- I don't think I
5    understand your question, but I don't know if
6    there was any communication at all.  I just
7    don't recall.
8    Q.    You don't recall one?
9    A.    No.
10    Q.    Did you look, in the course of
11    responding to the discovery, at the -- what
12    the -- the means by which HCM received the
13    payments from HCRE and HCMS?
14    MR. MORRIS:  Objection to the
15    form of the question.
16    A.    I -- I believe I did.  I certainly
17    looked at the total payments that came in
18    from various entities and how we applied
19    them, but I don't recall any specifics around
20    communication.
21    Q.    Well, did you look for the wire
22    transfer information?
23    MR. MORRIS:  Objection to the
24    form of the question.

**App. 151**

Page 218

J. Seery

1    A.    I, I --
2    Q.    Was there -- let me rephrase.
3          Was -- did the payments come in by
4  wire?
5    A.    I don't recall.
6    Q.    Did you look for any communication
7  that would accompany the payment?
8          For example, a check can have a
9  note on the note line, a wire can have a note
10  on the re line, an ACH payment can have a
11  note on a re line.  Did you attempt, in
12  responding to the discovery in these notice
13  cases, to find any such communications?
14    MR. MORRIS:  Objection to the
15    form of the question.
16    A.    I'm relatively certain it didn't
17  come in as a check, because I would have
18  known that.  I just don't recall if it came
19  in by wire or ACH, and I didn't look for any
20  specific communication that accompanied the
21  wire or the ACH payment.
22    Q.    Okay.  And with respect to HCRE,
23  did you send a letter like the one we looked
24  at earlier for NexPoint, contending that the
25

Page 219

J. Seery

1  payment had been applied to the principal
2  balance as opposed to satisfying and curing
3  any default on the note?
4    MR. MORRIS:  Objection to the
5    form of the question.
6    A.    If -- if we did send it, it would
7  have been in the -- the production.  It
8  certainly would have -- there was no cure
9  provision in the notes, so we would have
10  applied it in the same way as we did the NPA
11  payment and the services payment.
12    Q.    If there are in fact no
13  post-payment letters for the HCRE term loan
14  and the HCMS term loan, was there a reason
15  for that?
16    A.    No, no reason if there are none.
17  They're not required.  The notes are very
18  clear with respect to the waiver of demand,
19  presentment.
20          So there's no requirement of it.  I
21  thought there would be, that I would have
22  sent it, but I don't -- don't recall
23  specifically.
24    Q.    Did anyone on behalf of HCRE ever
25

Page 220

J. Seery

1  communicate an acknowledgment or acceptance
2  that the loan was in default and that the
3  payment would be applied to the principal --
4  to the balance?
5    A.    Other than the terms of the note,
6  no.
7    Q.    And do you have an understanding of
8  why -- strike that.
9          Do you have an understanding, based
10  on personal knowledge, of why the HCRE and
11  HCMS payments were not made in December of
12  2020?
13    MR. MORRIS:  Objection to the
14    form of the question.
15    A.    I -- I believe I do.
16    Q.    And what is that knowledge based
17  on?
18    A.    The same edict that we discussed
19  with Mr. Rukavina earlier in the day.
20    Q.    So tell me the actual words that
21  you contend Ms. Hendrix said to you that
22  caused you to believe whatever it is you
23  believe about what Mr. Dondero said.
24    MR. MORRIS:  Objection to the
25

Page 221

J. Seery

1  form of the question, and -- asked and
2  answered.
3    A.    I -- I don't recall the specific
4  words.
5    Q.    Now, at -- in -- and -- and you
6  don't recall when the words were sent to you
7  either; you can't say whether it was December
8  or January or some other time?
9    MR. MORRIS:  Objection to the
10    form of the question --
11    A.    No, I --
12    MR. MORRIS:  -- mischaracterizes
13    the testimony.
14    A.    -- I'm pretty clear that it -- I
15  learned of the action in December.
16          I may have learned of the words in
17  December.  It could have been in January, on
18  or about the time I sent the demand note.
19  But it wouldn't have been, as you phrased it,
20  some other time.
21    Q.    Now, in -- in or around December of
22  2020, you understood there was a dispute
23  between Mr. Dondero and -- and affiliated
24  companies and the debtor about whether the
25

**App. 152**

Page 222

J. Seery

affiliated companies had overpaid shared
service fees to Highland, correct?
   A.   Absolutely not.
   Q.   Are you not aware that Mr. Dondero
contended that NexPoint, for example, had
overpaid Highland by many millions of dollars
for shared service fees?
   A.   I'm quite aware that Mr. Dondero
has fabricated a story as part of the
negotiations for a pot plan.  In fact, he
included it in one of the term sheets, to
fabricate a claim about additional services.
        I'm also quite aware of other
evidence that shows that's not the case.
   Q.   Let's take this in pieces.
        How much did Mr. Dondero contend
shared services had been overpaid --
   A.   I don't recall --
   Q.   -- what amount?
   A.   I don't recall the exact amount.
   Q.   More than 10 million?
   A.   I think he claimed 14, some number
like that, but it doesn't have any connection
to reality.

Page 223

J. Seery

   Q.   Mr. Seery, what did you do to
investigate whether or not there had been
overpayments of shared service fees by
NexPoint to Highland?
        MR. MORRIS:  I'm just going to
   caution the -- the questioner not to go
   too far down this path.  These are
   topics that are related to a completely
   separate contested matter, actually --
        (Simultaneous speaking.)
        MR. MORRIS:  Okay.  So I just --
   okay, that's fine.
        MR. RUKAVINA:  Yeah, I'm not
   trying to litigate that, it's --
        MR. MORRIS:  Yep.
        MS. DEITSCH-PEREZ:  -- it's
   relevant to this whole incident that
   Mr. Seery is --
        MR. MORRIS:  I don't think so,
   but --
        MS. DEITSCH-PEREZ:  -- is --
        MR. MORRIS:  -- but go ahead, I'm
   not directing him not to answer.
        MS. DEITSCH-PEREZ:  I -- I'm not

Page 224

J. Seery

   going to call him a liar like he's been
   calling everybody else, so I'll be
   polite about it, but it is relevant --
        THE WITNESS:  Well, the reason
   for that is because I don't lie, and I
   just -- I just don't do it.  I don't
   fabricate testimony.  So you can call
   me whatever you like.  It doesn't
   matter.  I -- I tell the truth.
        I have a very good memory.  To the
   extent I can't remember the specific
   words of something from months ago, I --
   I'm unable to remember those specific
   words, but I have a pretty darn good
   memory.
BY MS. DEITSCH-PEREZ:
   Q.   Okay.  But -- but it would be in
your interest -- interest to -- to take
something that was said about a clear dispute
about the shared services payments and try to
apply it to some other payments, wouldn't it,
Mr. Seery?
   A.   Not -- not in any way whatsoever.
   Q.   Well, that's why I'm asking,

Page 225

J. Seery

Mr. Seery.  You were aware of the dispute,
whether -- regardless of your belief as to
the bona fides of it, you were aware of an
actual dispute about whether NexPoint had
overpaid shared services fees, correct?
   A.   I --
        MR. MORRIS:  Objection to the
   form of the question.
   A.   I -- I would not concede that
there's a dispute, because there is no
legitimate disagreement among what was
performed and what was paid.
        I will -- I will agree that
Mr. Dondero came up with a story, or we can
say a -- an idea, that NexPoint had somehow
overpaid for the services that it received.
   Q.   Ms. -- Mr. Seery, I -- I understand
that you're -- you are anxious to be an
advocate for your side.  I'm asking you for
strictly factual testimony.
        Was there a dispute, meaning one
side said one thing and the other side said
the other, about whether shared services fees
had been overpaid?

Page 226

J. Seery

2  MR. MORRIS: Objection, asked and
3  answered.
4  A.   I -- I will concede that
5  Mr. Dondero claimed that shared services by
6  NexPoint were overpaid for.
7  Q.   Okay. And will you also concede
8  that you disagreed with that?
9  A.   I don't need to concede that. I do
10  disagree with that.
11  Q.   Okay. Hence, we have a dispute,
12  okay.
13  MR. MORRIS: Objection to the
14  form of the question.
15  Q.   Mr. Seery, if you don't recall the
16  words that Ms. Hendrix said to you, how do
17  you know that whatever this edict was that
18  you have mentioned did not relate simply to
19  don't pay any more shared services because
20  they have been overpaid?
21  MR. MORRIS: Objection to the
22  form of the question, "ans" and
23  answered -- asked and answered.
24  A.   Again, I believe that it was
25  Ms. Hendrix. It could have been Mr. Klos.

Page 227

J. Seery

1  Over time it could be both. We've certainly
2  had discussions about it. I believe that it
3  related to the shared services. I believe it
4  also related to the notes, because the notes
5  weren't paid.
6  Q.   Okay. And am I correct that the
7  only reason you believe it also applied to
8  the notes was because the notes weren't
9  paid --
10  MR. MORRIS: Objection --
11  Q.   -- not because of the words used?
12  A.   The -- the words were not limiting
13  to -- that I recall in any way.
14  Q.   Were the words -- did the words
15  specifically include don't pay the notes?
16  A.   I believe I testified that I don't
17  recall the specific words, so I can't --
18  Q.   Okay.
19  A.   -- say what the specific words
20  were.
21  Q.   And -- and, Mr. Seery, I recognize
22  that you're a smart guy and a cagey witness,
23  so you have said several times that the
24  reason you believe the edict applied to the

Page 228

J. Seery

1  notes was because they weren't paid.
2  And I'm just asking you to answer,
3  honestly, whether your belief that the edict
4  concerned the notes was simp -- happenstance
5  of what happened, not because of what was
6  said to you?
7  MR. MORRIS: Objection to the
8  form of the question, asked and
9  answered.
10  A.   The idea that you're calling me
11  cagey is -- is insulting and rude, so you
12  should please withdraw that. No one's ever
13  called me cagey, and I always am honest.
14  I said very specifically to
15  Mr. Rukavina how I heard what I heard, how I
16  came to understand it. I don't recall the
17  specific words or the exact time. It is
18  clear that the facts are and what happened,
19  so that supports my interpretation of what I
20  heard and my recollection of it.
21  Q.   You -- you can't admit, as you sit
22  here today, you're not sure whether or not
23  the edict concerned the notes?
24  A.   I didn't hear the edict. All I

Page 229

J. Seery

1  know is that we didn't get the shared service
2  payments and we didn't get the -- we didn't
3  get the -- the note payments, and I read
4  Mr. Waterhouse's testimony from two days ago,
5  which seemed to confirm everything I just
6  said.
7  So it -- I think it makes sense,
8  but I don't have a specific recollection of
9  what was told to me and I do recollect that
10  the shared service payments were not made,
11  but that was before the amounts on the notes
12  were due, so there wouldn't have been a
13  discussion about the notes.
14  Q.   Now, did you look at the payment
15  history on all of the term loan notes that --
16  that payments had been made prior to December
17  31, 2020 in excess of the amounts due, if
18  you -- if -- if the obligor was paying the
19  minimums for the number of years the notes
20  had been outstanding?
21  A.   Which -- which notes?
22  Q.   All of the note -- did you do that
23  exercise for all of the notes, all of the
24  term loan notes?

Page 230

J. Seery

1
2    MR. MORRIS: Objection to the
3    form of the question.
4    A.    We -- we looked at the payments on
5    each of the notes, yes.
6    Q.    And did you determine whether or
7    not the amounts paid in total prior to
8    December 31, 2020 exceeded the total amount
9    due of principal and interest on the minimum
10   principal and interest payments due on those
11   notes --
12         (Simultaneous speaking.)
13   A.    I --
14   Q.    -- outstanding?
15   A.    We certainly looked at that.  I
16   don't believe that's the case for each of
17   them, but I don't have a specific
18   recollection of how they each balance out.
19   Q.    Did any of the loans have payments
20   that were made that, in total, exceeded the
21   total amount of minimum principal and
22   interest payments due on the loans for the
23   number of years they had been outstanding?
24   A.    One of them may have; I don't
25   recall.  I don't recall specifically which

Page 231

J. Seery

1    one.
2
3    Q.    And were there documents that you
4    looked at in connection with that inquiry?
5    A.    There would be a payment ledger.
6    Q.    And have you produced that payment
7    ledger?
8    A.    Yes.
9         MR. MORRIS: Yes, we have.
10   Q.    Is there anyone from HCRE that you
11   contend -- and I apologize if I asked that,
12   because I'm -- I'm maybe mixing up HC -- HCMS
13   and HCRE.
14         But is there anyone from HCRE
15   that -- that acknowledged to you or said
16   something to you, admitting that the payment
17   that was made in January of 2021 was a
18   payment towards the overall principal and not
19   the payment that was due at the end of 2020?
20   A.    No, I don't believe I had
21   discussion with anybody who claimed to
22   represent HCRE; which, as you said, had no
23   employees.
24   Q.    Have you -- strike that.
25         Earlier I couldn't tell if it was

Page 232

J. Seery

1
2    Mr. Morris talking or you, and I apologize
3    for that, but somebody said something like
4    constructive fraud is not an issue in any of
5    the note cases and therefore, you know, we
6    shouldn't be looking at -- at solvency.
7         MR. MORRIS: That would have --
8         MS. DEITSCH-PEREZ: Was that you?
9         MR. MORRIS: -- that would --
10   that would have been me.
11        There is no claim for constructive
12   fraudulent transfer.
13   BY MS. DEITSCH-PEREZ:
14   Q.    And so let me ask Mr. Seery, as the
15   30(b)(6) witness for HCM, is it your position
16   that constructive fraud and therefore
17   solvency has no bearing on any of the note
18   cases?
19        MR. MORRIS: Objection to the
20   form of the question.
21   A.    With respect to these claims, I
22   think that the -- the allegations are pretty
23   clear that there is no agreement, there's no
24   subsequent agreement.  That's nonsense.  If
25   there is one --

Page 233

J. Seery

1
2    Q.    Mr. -- Mr. Seery --
3    A.    Well, I'm answering your question.
4         (Simultaneous speaking.)
5         MR. MORRIS: Please let him
6    finish.
7    A.    So when -- if, in some world, that
8    story is bought, then we think it's clearly
9    an actual fraud.
10   MO*      MS. DEITSCH-PEREZ: Move to
11   strike.
12   Q.    I'm asking a simple question,
13   Mr. Seery.  As HCM's 30(b)(6) witness, do you
14   agree with the assertion of your counsel that
15   constructive fraud is not an issue, is not
16   something HCM is asserting in the note cases?
17   A.    That's correct.
18   Q.    Okay.  And therefore, is it also
19   your position, as the 30(b)(6) witness for
20   HCM, that whether Highland was or was not
21   solvent at the time the notes were made or at
22   the time the forgiveness condition was agreed
23   upon, that the solvency of Highland is
24   irrelevant to those issues?
25        MR. MORRIS: Objection, it's not

Page 234

J. Seery

1  J. Seery
2  a 30(b)(6) topic, and I object to the
3  extent it calls for a legal conclusion.
4        MS. DEITSCH-PEREZ:  I'm -- I'm
5  just -- can you read it back and have
6  the witness answer.
7        MR. MORRIS:  Okay.
8        (As read by the reporter):
9        "QUESTION:  And therefore, is it
10  also your position, as the 30(b)(6)
11  witness for HCM, that whether Highland
12  was or was not solvent at the time the
13  notes were made or at the time the
14  forgiveness condition was agreed upon,
15  that the solvency of Highland is
16  irrelevant to those issues?"
17  A.    I -- I don't think it's irrelevant.
18  It's not a precondition to a case for an
19  actual fraud.  But when these things are done
20  in the face of solve -- insolvency, when
21  they're -- when -- when the supposed
22  agreements are done on the eve or after
23  bankruptcy, that sure adds to the badges of
24  fraud.
25        MS. DEITSCH-PEREZ:  Then, John,

Page 235

J. Seery

1  J. Seery
2  we -- we may have an issue about
3  picking up this deposition.  Let me --
4  let me ask another question.
5  Q.    Do you have a solvency analysis
6  done for these note cases?
7  A.    Not for these note cases, no.
8  Q.    And are you prepared to explain
9  right now, in this deposition, how -- what
10  Highland's solvency was at any of the time
11  periods, either when the notes were made or
12  when the alleged agreement regarding
13  forgiveness -- potential forgiveness of the
14  notes was entered into?
15        Are you prepared today to tell us
16  what you think about Highland's solvency and
17  why?
18        MR. MORRIS:  Objection to the
19        form of the question.
20  A.    I -- I believe I already did, but I
21  can do it again, if you'd like.  Mr. Rukavina
22  asked me very specific questions about where
23  I thought solvency was, and I gave my very
24  specific answers.
25  Q.    For each -- for the dates of each

Page 236

J. Seery

1  J. Seery
2  of -- each of the notes and when the
3  forgiveness condition arose, what is your
4  answer as to whether Highland was solvent and
5  why?
6        MR. MORRIS:  Objection to the
7        form of the question.
8  A.    There's -- there's about twelve
9  different dates in there, but why don't I
10  make it easy.
11        In '17, I think Highland was
12  insolvent.  Highland had significant exposure
13  to litigation claims that it had not properly
14  put on its balance sheet, and I think the
15  actions of the principals show that they
16  understood the risks with respect to those
17  claims.  And that's why you have a number of
18  actions, including taking money offshore,
19  including rolling out these notes thirty
20  years.  That's 2017.
21        '18 is similar, because the --
22  because the actions get more and more
23  developed and the claims against Highland get
24  bigger and bigger.
25        In '19 it comes crumbling down and

Page 237

J. Seery

1  J. Seery
2  Redeemer gets a very large arbitration award
3  that it's about to win and Highland files for
4  bankruptcy.
5        I don't -- the -- the idea that
6  there are these subsequent agreements, we
7  don't even agree that that exists.  We think
8  it's completely fabricated and false.  But to
9  the extent it incurred -- occurred during '17
10  '18, December/January.  '18, '19,
11  December/January.  '19, '20 after the
12  bankruptcy, yeah, I think that -- that pretty
13  much shows that they fall into insolvency.
14        Again, with an actual fraud, we
15  don't need it.  But it certainly helps with
16  the badges of fraud.
17  Q.    Is that your complete answer?
18  A.    To -- to your question, yes.
19  Q.    And do you have -- Highland has
20  made breach of fiduciary duty claims against
21  Dugaboy and then aiding and abetting claims
22  against Nancy Dondero and Jim Dondero?
23  A.    That's correct.
24  Q.    Can you tell me from whence those
25  fiduciary duties come?

**App. 156**

Page 238

J. Seery

1    A.    Yes.
2    Q.    Where are -- where can we find
3  them?
4
5         MR. MORRIS:  Objection to the
6    form of the question.
7    A.    They're -- they're in the amended
8  complaint.
9    Q.    No, no, no, where -- where do the
10  duties come from?  What are the duties based
11  on?
12    A.    With respect to both Dugaboy and
13  Nancy Dondero, Nancy Dondero is the trustee
14  of Dugaboy.  Dugaboy was a limited partner.
15  Limited partners are not permitted to run the
16  affairs of the partnership.
17         She has testified that she made
18  agreements on behalf of Highland.  So she
19  stepped into the role of a general partner,
20  as did Dugaboy.  Her testimony was very clear
21  on these points, that she cut the agreements
22  on behalf of Highland.
23    Q.    Okay.  So it is -- are you saying
24  that it is the HCMLP partnership agreement
25  that gives rise to the fiduciary duties?

Page 239

J. Seery

1         MR. MORRIS:  Objection to the
2    form of the question, asked and
3    answered, mischaracterizes the
4    testimony.  It calls for a legal
5    conclusion.
6    A.    It -- it's -- in my opinion, it's
7  the law, and our position is it's the law,
8  that when a limited partner takes over the
9  operation and running of the partnership and
10  takes on those duties, they step into the
11  role of a general partner.
12         And that is the -- we don't believe
13  this agreement exists, but if it were to
14  somehow metastasize into something of an
15  agreement, then clearly we believe that it
16  breached the fiduciary duties that those
17  persons and entities who took on those duties
18  would have to the partnership.
19    Q.    Okay.  And I'm -- I'm just -- I'm
20  just trying to understand your testimony.
21         You're talking about duties under
22  the -- the HCM fourth amended limited
23  partnership agreement?
24         MR. MORRIS:  Objection to the

Page 240

J. Seery

1    form of the question, mischaracterizes
2    the testimony.
3    A.    The duties are under Delaware law
4  related to partnerships.
5    Q.    Yes.  And the partnership duties
6  that you're talking about are the HCMLP --
7  the fourth amended partnership agreement; is
8  that right?
9         MR. MORRIS:  Objection to the
10    form of the question, calls for a legal
11    conclusion.
12    A.    That's the partnership agreement,
13  yes.
14    Q.    Okay.  And you're not saying these
15  duties just arise out of the air?
16         MR. MORRIS:  Objection to the
17    form of the question, mischaracterizes
18    the testimony.
19    A.    I didn't say they arise out of the
20  air, no.
21    Q.    Okay.  I mean, you are the witness
22  designated to talk about these -- these
23  breach of fiduciary duty claims, correct?
24    A.    That is correct.

Page 241

J. Seery

1    Q.    Is there anything other than law,
2  generally, and the fourth amended limited
3  partnership agreement of Highland Capital
4  Management that gives rise to the duties that
5  you are contending Dugaboy breached and Nancy
6  Dondero and Jim Dondero allegedly aided in
7  the breaching of?
8         MR. MORRIS:  Objection, asked and
9    answered.
10    A.    There's also facts.
11    Q.    Okay.  And the, the facts -- the
12  fact that you said underlaid the claim was
13  their -- the supposed stepping into the shoes
14  of the general partner, is -- is --
15         MR. MORRIS:  Objection to --
16    Q.    -- anything else?
17         MR. MORRIS:  Objection to the
18    form of the question, mischaracterizes
19    the testimony, asked and answered.
20    A.    Stepping into --
21    Q.    Mr. Seery, correct me if I'm wrong.
22  If there's some other fact that you are
23  pointing to, let me know.
24         MR. MORRIS:  Objection to the

**App. 157**

Page 242

J. Seery

1  form of the question, asked and
2  answered.
3     A.   I -- I believe I gave a pretty
4  good, concise summary, but is there more that
5  you want to know?
6        When it -- our position is that
7  when a limited partner takes over the
8  management or any of the management roles of
9  the partnership and enters into an agreement
10 on behalf of the partnership, they stepped
11 into the general partner role.
12       When they're in the general partner
13 role they have fiduciary duties to the
14 partnership and all of the partners.  When
15 they breach those duties, which we argue is
16 the case if this supposed agreement were
17 actually something, then they should be
18 liable for the damages caused by those
19 breaches.
20    Q.   You've said, a couple times now, if
21 a limited partner steps in and manages the
22 partnership.
23       Can you tell me every way in which
24 you contend Dugaboy or Nancy Dondero as the

*(Line numbers 1-25; note original shows 25 lines)*

Page 243

J. Seery

1  trustee of Dugaboy took a management step?
2     A.   Nancy Dondero and Jim Dondero claim
3  that Nancy Dondero and Dugaboy entered into
4  an agreement on behalf of the partnership and
5  gave away 63 million -- or maybe that's the
6  total amount of the notes, but some 50
7  million-ish amount of notes for virtually
8  nothing - and in most instances could
9  actually be nothing - with no investigation,
10 no discussion, no analysis and really no
11 authority.
12       But they -- they assert that that
13 was the agreement.  And without any
14 consideration received by this entity,
15 nothing, they claim that they did this.
16       Now we don't -- we don't believe
17 this agreement exists, again, to be clear.
18 We think it's fabricated.  We think that
19 that's really beyond any kind of dispute.  We
20 think you all know that too, but we'll play
21 along.
22    Q.   Is there any other action that you
23 contend is management that you contend
24 Dugaboy or Nancy undertook with respect to

Page 244

J. Seery

1  Highland?
2     A.   No.  Taking control of the payment
3  to an affiliate of the general partner for no
4  consideration and claiming that you are able
5  to do that, we think that is sufficient.
6  MO*    MR. DEITSCH-PEREZ:  Move to
7        strike everything after "No."
8     Q.   Let me just get it clear.  There is
9  no other action, other than entering into
10 this agreement, that you contend is
11 management by Dugaboy or Nancy Dondero; is
12 that correct?
13    A.   No, that's not correct.  It's
14 everything around the supposed agreement.
15 So, so it -- it can't be cabined to just what
16 the supposed agreement is, it's all of the
17 other -- lack of -- of -- if it were a real
18 agreement, the lack of any sort of care, the
19 lack of any sort of loyalty, it all permeates
20 from this supposed agreement --
21       (Simultaneous speaking.)
22    A.   -- these folks haven't thought
23 through --
24       MR. MORRIS:  Just let him finish.

Page 245

J. Seery

1     A.   -- the full implications of what
2  they are arguing.
3     Q.   Okay.  Other than the things that
4  you have testified to in the last ten or
5  fifteen minutes, there are no other acts of
6  supposed management that you contend Dugaboy
7  or Nancy undertook that form the basis for
8  the breach of fiduciary duty claims, correct?
9        MR. MORRIS:  Objection to the
10 form of the question.
11    A.   I -- I think I've touched on all of
12 them.
13    Q.   Okay.  Thank you.  Okay.  I'm going
14 to show you what has been marked as --
15 premarked as Exhibit 109.
16       Is this a document that you have
17 seen before?
18    A.   I -- I believe I have, but you're
19 literally just showing me a slice of the
20 heading.
21    Q.   I know.  It's the -- it's the
22 Notice of Filing of Debtor's Amended
23 Schedules, and then annexed to it - let me
24 get to that - are the Global Notes and

**App. 158**

Page 246

J. Seery

1   Statement of Limitations, Methods and
2   Disclaimers Regarding Debtor's Amended
3   Schedules of Assets and Liabilities.
4        Is that a document that you have
5   seen before?
6   A.   I -- I don't recall it
7   specifically.
8   Q.   Well, let me ask a different way.
9   In -- this was filed in September of 2020.
10        What was your role with respect to
11  filings of the debtor in September of 2020?
12  A.   Depending on the filing, I executed
13  many of them.  So if I executed this one,
14  please let me know.
15        I certainly was around and
16  consulted with respect to all the filings.  I
17  was the CEO of the company.
18        That's my signature, so I've seen
19  this.
20  Q.   Okay, okay.
21        (Simultaneous speaking.)
22  A.   I may not have seen the -- I don't
23  know if I -- I just don't recall the, the --
24  the piece at the top.

Page 247

J. Seery

1   Q.   Okay.  But, generally, if you
2   signed a declaration under penalty of perjury
3   for non-individual debtors that was then
4   annexed to a filing, you would have looked
5   through the filing and assured yourself that
6   it was correct, to the best of your knowledge
7   and belief?
8   A.   I would have either looked through
9   the filing or I would have reviewed it with
10  my team, whomever prepared it.
11  Q.   And so as you sit here today, do
12  you have any reason to believe that there are
13  inaccuracies in docket 1082?
14        MR. MORRIS:  Do you want to
15        give -- do you need to read the
16        document?
17  A.   I have no --
18  Q.   Yeah.  And I -- and I emailed it to
19  John, so if you want to sit down and take a
20  look at it, please --
21        (Simultaneous speaking.)
22  A.   No, I -- I don't need to review it.
23        No one's brought anything to my
24  attention.  I don't -- I have no reason to

Page 248

J. Seery

1   believe it wasn't accurate at the time.
2        MS. DEITSCH-PEREZ:  Okay.  Thank
3        you.
4        Okay.  Why don't we take a few
5   minutes and I'm going to have a look at
6   my notes and -- and I'll have a better
7   idea of how much longer I have then.
8        VIDEO TECHNICIAN:  The time is
9   6:36.  We're going off the record.
10        (Recess taken.)
11        VIDEO TECHNICIAN:  The time is
12  6:41.  We're back on the record.
13        MS. DEITSCH-PEREZ:  Okay.  Thank
14        you.
15        Thank you very much, Mr. Seery.
16  I'm going to pass back to whomever might
17  want to ask you anything more.
18        MR. RUKAVINA:  Well, I think
19  Mr. Horn is busy.  I have one more
20  question for you, Mr. Seery.
21        MR. HORN:  I -- I have no
22  questions, so I'll defer to Davor if he
23  has --
24        MR. RUKAVINA:  Thank you, thank

Page 249

J. Seery

1   you.
2   EXAMINATION
3   BY MR. RUKAVINA:
4   Q.   My only question was as follows:
5   When you were answering counsel's questions,
6   you mentioned something about a payment
7   ledger on the notes.
8        Do you recall that?
9   A.   Not a specific -- I would have
10  looked at a payment ledger.  I don't have
11  a -- I'm not thinking of one particular
12  payment ledger.
13        The one that -- that was one of the
14  exhibits --
15  Q.   That's where I'm going --
16  A.   -- is a type of payment ledger.
17        That one, it looks like it was --
18  that's actually the actual schedule of
19  payment, because it shows as if the payments
20  had made -- it doesn't show what's been made,
21  but it actually shows you the schedule of --
22  all the way to maturity, I believe, and so --
23  Q.   Well, here's -- here's where I'm
24  going with this.

**App. 159**

Page 250

```
1              J. Seery
2       A.    Okay.
3       Q.    For the $30.7 million note, to the
4  best of your knowledge, did the debtor
5  maintain a payment ledger showing any
6  historical payments on that $30.7 million
7  note?
8       A.    Yes, we would have -- we would
9  have.
10      Q.    And to the best of your knowledge,
11 would that have been produced in this
12 litigation?
13      A.    Yes.
14      Q.    Okay.  To the best of your
15 knowledge, is Exhibit 7 that or is Exhibit 7
16 something else?
17      A.    I think Exhibit 7 is something
18 else.  It's just because I hadn't seen this
19 one.  It may be that this was -- I think
20 it's -- I think it's something else.
21 RQ*     MR. RUKAVINA:  Okay.  Mr. Morris,
22      I'll just ask the debtor, I've -- I've
23      asked and we only got this in PDF,
24      there's no metadata.
25           I would just ask if the debtor
```

Page 251

```
1              J. Seery
2  would be willing to please check to see
3  what the native of this Exhibit 7 is and
4  please send it to me, along with any
5  metadata.
6       MR. MORRIS:  Email that exhibit
7  to me --
8       MR. RUKAVINA:  I will.
9       MR. MORRIS:  -- and I'll be able
10 to do that, but I do know that if you
11 look -- I'm certain it was in one of
12 the supplemental productions.
13      MR. RUKAVINA:  Yes, we received
14 it recently.
15      MR. MORRIS:  Right.  So in one of
16 the supplemental productions I know
17 that we produced schedules showing all
18 payments made against all notes at
19 issue, and I think we even gave you the
20 backup with the bank statements, you
21 know, fully redacted -- yeah.
22      MR. MORRIS:  -- to show only the
23 payments --
24      MR. RUKAVINA:  Let's talk
25 offline --
```

Page 252

```
1              J. Seery
2       (Simultaneous speaking.)
3       MR. MORRIS:  -- you've got all of
4  that.
5       MR. RUKAVINA:  Let's talk
6  offline, because I'm not sure that I
7  agree we have that --
8       MR. MORRIS:  Yeah.
9       MR. RUKAVINA:  -- but if the
10 debtors produced it, then we'll --
11      MR. MORRIS:  I know I instructed
12 my team to produce it, so I -- I'm --
13      MR. RUKAVINA:  Okay.
14      MR. MORRIS:  -- I'm pretty
15 confident they did what I asked.
16      MR. RUKAVINA:  That was all I
17 had.  Thank you, sir.
18      THE WITNESS:  Thank you.
19      MS. DEITSCH-PEREZ:  Okay.  Let me
20 follow up with that -- with the
21 witness.  And then if it's really a
22 conversation with counsel, we could
23 move it on to that.
24 EXAMINATION
25 BY MS. DEITSCH-PEREZ:
```

Page 253

```
1              J. Seery
2       Q.    But to your knowledge, were the
3  native files such as spreadsheets and emails
4  provided to counsel to produce them, such
5  that we should be able to see the Word
6  versions of the notes, any emails about the
7  notes and the payments, so --
8       MR. MORRIS:  You -- you've got
9  that.  That's not for this witness.  We
10 can talk about that offline.  He
11 doesn't know anything about like the
12 actual --
13      Q.    Well, let -- let me just ask him.
14           Did he provide the native files to
15 counsel?
16      A.    I'm not quite sure what you mean by
17 native files, but counsel had access to -- we
18 did full -- had access to the systems, and we
19 did full data review of the systems and
20 produced everything responsive.
21           So I'm not sure exactly what you
22 mean by that, but -- but certainly counsel
23 had access to -- to those --
24           (Simultaneous speaking.)
25      Q.    -- understand that -- that native
```

Page 254

J. Seery

1 J. Seery
2 files means a document, if it's in Excel,
3 providing it in Excel; or if it's in email,
4 providing it as a -- in a -- in email format,
5 a PST format or something that will show the
6 metadata; or if it's a Word document, in --
7 in Word, with its properties showing.
8        That's -- that's what I mean.  Do
9 you know if that was done?
10       A.    Counsel certainly had access to all
11 of that.  We didn't just PDF things and send
12 them to counsel.  It was done electronically.
13 So anything on the system responsive was --
14 was accessible.
15       Q.    Okay.  And just who is the person
16 who conducted the searches to respond to
17 discovery requests?
18       A.    It would have been through the
19 Pachulski firm, you know, working in -- with
20 outside -- either DSI or one of the outside
21 providers, to go through and -- and find
22 certain -- whatever the terms they came up
23 with to find the data.
24       Q.    And do you know who the actual
25 people were that -- that did the -- the

Page 255

J. Seery

1 J. Seery
2 searching?
3       A.    At Pachulski?  I don't -- I should
4 know, but I worked mostly through John.
5       Q.    Okay.  And then what about the
6 non-lawyers; who were the non-lawyers who
7 worked on collecting materials responsive to
8 the discovery requests?
9       A.    I believe -- at third parties or
10 at --
11            (Simultaneous speaking.)
12       Q.    -- you just mentioned DSI or I
13 mean --
14       A.    DSI --
15       Q.    -- anyone other than the lawyer --
16 outside lawyers.
17       A.    Yeah, DSI.  The outside firm, ISI.
18 I don't know if Robert Half was involved in
19 some of this production as well.  He's been
20 on --
21            MR. MORRIS:  Robert Half does
22       document review.
23       A.    -- the payroll for a long time now
24 during this case.
25            MR. MORRIS:  They do -- they do

Page 256

J. Seery

1 J. Seery
2 the document review.
3        I mean, I could just -- I could
4 just represent to you that -- that we
5 came up with search terms, my firm ran
6 the searches.  There may have been
7 certain financial data that we had to get
8 from DSI, but we produced whatever came
9 up with the search terms to -- to Robert
10 Half.
11        They -- they did their review, they
12 sent the documents to us.  We did a
13 little quality control and we produced
14 it.
15       Q.    Okay.  And are -- are you
16 confident, Mr. Seery, that you have looked
17 for and produced whatever documents there
18 are that concern the -- the loan payments due
19 and made at the end of 2020, beginning of
20 2021?
21       A.    I -- I am.  It was done in the
22 same -- same manner that -- that Mr. Morris
23 just described.
24            MR. MORRIS:  Yeah.  And I would
25       again encourage you guys -- I've asked

Page 257

J. Seery

1 J. Seery
2 probably five different ways in
3 interrogatories, in emails, if you
4 actually think there's something out
5 there, instead of just fishing, you
6 should let me know if you think that
7 there's --
8            MR. RUKAVINA:  Oh, oh, no, and I
9 do think --
10            MR. MORRIS:  Yeah, I mean --
11       (Simultaneous speaking.)
12            MR. MORRIS:  I've asked so many
13 times and -- and I --
14            MR. RUKAVINA:  There's no --
15 there's no need to have this on the
16 record --
17            MS. DEITSCH-PEREZ:  Yeah, and
18 Mr. Seery mentioned in -- in the course
19 of the examination that they had not
20 looked at the actual transfer
21 documents, the -- I think the -- if
22 there was a wire or an ACH, to see if
23 there were notations on them and
24 that --
25            MR. MORRIS:  He said he didn't.

Page 258

1              J. Seery
2        THE WITNESS:  I said I didn't.
3        MR. MORRIS:  He said he didn't.
4        THE WITNESS:  I said I didn't.
5  BY MS. DEITSCH-PEREZ:
6        Q.    Well, do you know if anybody did?
7        A.    I don't know, but certainly that's
8     something that accounting would see rather
9     easily.
10 RQ*       MS. DEITSCH-PEREZ:  Okay.  So I
11          would like confirmation that that was
12          looked for, and -- and the same as I
13          requested previously, the Word versions
14          of -- of the notes.
15          MR. MORRIS:  Okay.
16          THE WITNESS:  I, I -- I think
17       that the materials that Mr. Morris
18       described has all that with bank
19       statements.
20          MR. MORRIS:  It's okay, thank
21       you.
22          Are we done?
23          MS. DEITSCH-PEREZ:  Thank you.
24          MR. MORRIS:  Yep.
25          MS. DEITSCH-PEREZ:  Yes.

Page 259

1              J. Seery
2        VIDEO TECHNICIAN:  The time is
3        6:49.  This concludes today's
4        deposition, Thursday, October 21, 2021.
5
6
7
8
9
10 I,            , do hereby certify under
11 penalty of perjury that I have read the foregoing
12 transcript of my deposition taken on         ;
13 that I have made such corrections as appear noted
14 herein in ink, initialed by me; that my testimony as
15 contained herein, as corrected, is true and correct.
16
17 DATED this ____ day of _____, 20  ,
18 at _____,      .
19
20
21
22
23              _____
23              JAMES P. SEERY, JR.
24
25

Page 260

1
2        C E R T I F I C A T E
3
4  STATE OF NEW YORK      )
5                         )ss.:
6  COUNTY OF NEW YORK     )
7
8        I, MARIANNE WITKOWSKI-SMITH, a Notary
9     Public within and for the State of New York,
10    do hereby certify:
11       That JAMES P. SEERY, JR., the witness
12    whose deposition is hereinbefore set forth,
13    was duly sworn by me and that such deposition
14    is a true record of the testimony given by
15    the witness.
16       I further certify that I am not
17    related to any of the parties to this action
18    by blood or marriage, and that I am in no
19    way interested in the outcome of this
20    matter.
21       IN WITNESS WHEREOF, I have hereunto
22    set my hand this 22nd day of October, 2021.
23              _____
24
25              MARIANNE WITKOWSKI-SMITH

Page 261

1
2  ----------------I N D E X------------------
3  WITNESS        EXAMINATION BY          PAGE
4  JAMES P.       MR. RUKAVINA        6, 249
   SEERY, JR.
5                 MS. DEITSCH-PEREZ   160, 252
6
7  Directions:  197
8  Motions:  172, 185, 205, 233, 244
9
10 ------------ PRODUCTION REQUESTS ------------
11 PAGE:  250  Native Exhibit 7 and metadata.
12        258  Transfer documents notations and
               Word versions of notes.
13
14
15 --------------------EXHIBITS--------------------
16 EXHIBIT                      PAGE LINE
17 Exhibit 1
   Notice of Deposition
18 Seery                        8   20
19 Exhibit 2
   Notice of Deposition
20 30(b)(6)                     9   20
21 Exhibit 3
   Email Chain
22 Re: HCMLP Roles              23  20
23 Exhibit 4
   Seery Declaration in Support of
24 Motion for TRO               43  9
25         (Continued on Next Page)

|  | Page 262 |  |  |
|---|---|---|---|
| 1 |  |  |  |
| 2 | ----------------EXHIBITS(Cont'd)---------------- |  |  |
| 3 | EXHIBIT | PAGE | LINE |
| 4 | Exhibit 5 |  |  |
|  | Promissory Note |  |  |
| 5 | Dated May 31, 2017 | 55 | 12 |
| 6 | Exhibit 6 |  |  |
|  | Correspondence |  |  |
| 7 | Dated January 7, 2021 | 69 | 16 |
| 8 | Exhibit 7 |  |  |
|  | Loan Document |  |  |
| 9 | D-NNL-029141 | 99 | 12 |
| 10 | Exhibit 8 |  |  |
|  | Correspondence |  |  |
| 11 | Dated January 15, 2021 | 107 | 4 |
| 12 | Exhibit 9 |  |  |
|  | Amended and Restated |  |  |
| 13 | Shared Services Agreement | 112 | 22 |
| 14 | Exhibit 10 |  |  |
|  | Email Chain |  |  |
| 15 | D-NNL-007578 - D-NNL-007579 | 148 | 11 |
| 16 | Exhibit 11 |  |  |
|  | Email Chain |  |  |
| 17 | D-NNL-028514 - D-NNL-028515 | 150 | 3 |
| 18 | * * * |  |  |
| 19 | PREMARKED |  |  |
|  | EXHIBITS | PAGE | LINE |
| 20 | (Not Provided to Reporter) |  |  |
| 21 | Exhibit 109 | 245 | 16 |
| 22 | Exhibit 110 | 206 | 23 |
| 23 | Exhibit 111 | 196 | 8 |
| 24 | Exhibit 112 | 213 | 23 |
| 25 |  |  |  |

Page 263

```
 1                              ERRATA SHEET
 2  Case Name:
 3  Deposition Date:
 4  Deponent:
 5  Pg. No. Now Reads    Should Read  Reason
 6  ____ ____ _____   _____   _____
 7  ____ ____ _____   _____   _____
 8  ____ ____ _____   _____   _____
 9  ____ ____ _____   _____   _____
10  ____ ____ _____   _____   _____
11  ____ ____ _____   _____   _____
12  ____ ____ _____   _____   _____
13  ____ ____ _____   _____   _____
14  ____ ____ _____   _____   _____
15  ____ ____ _____   _____   _____
16  ____ ____ _____   _____   _____
17  ____ ____ _____   _____   _____
18  ____ ____ _____   _____   _____
19  ____ ____ _____   _____   _____
20
                        _____
21                        Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____, 2021.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____
```

**$**

**$1.4** 106:21 108:6 109:2,19 110:3 111:10

**$2** 27:17

**$20** 171:11

**$200** 27:18

**$24** 93:15

**$24,471,000** 88:23

**$25** 163:15

**$3** 57:19

**$30.7** 25:6 52:24 152:17 250:3,6

**$300** 192:15

**$400** 191:6

**$500,000** 177:2 178:5

**$575,550.56** 90:21

**$6** 89:7

**$63** 192:9 193:6

**$70** 164:19,21

**$8** 172:7

**1**

**1** 5:3 8:18,20,24 9:7 46:7,8 113:17 126:16,22 128:21 214:10

**1.7** 188:10

**10** 148:10,11 150:8, 21 171:16 222:22

**100-odd** 196:10

**1082** 247:14

**109** 245:16

**10th** 134:3

**11** 11:15 52:3 150:2,3

**110** 206:23 207:8,19 208:2,23 209:25

**111** 196:8 197:2,10 200:7 214:10

**112** 213:23 214:20

**116,531** 209:9

**12** 37:4 106:9 111:2 143:13 148:19 149:3, 13,18 158:17,22

**12/30/19** 91:7

**12/31** 92:16

**13** 109:16 176:20

**13th** 109:4

**14** 109:16 222:23

**14th** 106:20 108:6,25 109:3

**15** 107:3,5

**15th** 108:23

**17** 236:11 237:9

**18** 236:21 237:10

**19** 184:21 185:12 236:25 237:10,11

**1990** 11:2

**2**

**2** 9:7,18,20,23 33:12

**2.06** 135:13,21

**2.1** 65:13 66:4 67:7

**20** 93:11 114:21 237:11 259:17

**20,247,628** 198:18

**2000** 33:11

**2014** 176:20

**2016** 32:13 34:16,22

**2017** 32:11 34:22 53:19 54:12 55:2,13 56:22 59:25 63:12 184:21 185:12 236:20

**2018** 32:9 34:22 113:17 184:21 185:12

**2019** 33:8,12 34:22

58:9

**2020** 12:12 13:3,12, 13 17:7,16 18:5 19:20 20:19,20 21:15,16 22:23 23:14 24:7,11 25:6 26:5,9, 11,14 27:24 29:19 30:2 35:15 36:19 39:16,25 40:2,17 41:9 42:10 44:15 49:16,19 50:18 51:12,20 52:3,24 62:19 63:4,23 64:22 81:12 86:11,14 87:19 88:17 92:8,23 114:17,18,23 116:9 117:9 119:22 121:23 123:11 124:3 125:2 127:17 129:11,14 130:12 131:6,15 132:8 133:6,9,16 134:3 146:21 147:13 150:8,22 156:2,4 195:20 201:9 215:2 216:13 220:13 221:23 229:18 230:8 231:19 246:10,12 256:19

**2021** 5:8 36:24 37:4 38:19,25 39:14 58:13,20 61:24 69:14,17 80:7,15 83:10 94:3 96:6 106:9,20 107:3,5 108:23,25 126:16,22 128:21 134:25 143:13 144:20 145:3 146:21 148:19 149:4, 13,18 158:17,22 195:24 201:10 215:7, 9 216:8 231:17 256:20 259:4

**2022** 168:2

**21** 259:4

**21st** 5:8

**24** 145:23

**240** 57:11

**25** 166:3

**26** 51:14

**27** 51:14 53:19 145:3

**27,675,000** 56:19

**28th** 38:25

**29** 51:17,19

**2:02** 5:8

**3**

**3** 23:19,20 51:20 63:4 66:2,15 67:16,24 171:3

**30** 51:18

**30(b)(6)** 8:18 9:19 232:15 233:13,19 234:2,10

**30,746,812.33** 56:24

**31** 25:6 55:13 56:22 58:13,20 61:24 64:22 71:23 81:12 84:10 85:17 88:17 92:7,23 94:4 114:18,23 117:10 118:15,25 120:16 127:17,24,25 128:4 129:11,12,14 130:12 131:6,15,17 132:8 156:4 195:20 215:2 216:13 229:18 230:8

**31st** 65:16,21,23 67:7,9 127:2 195:17

**3:18** 99:2

**3:29** 99:5

**3:40** 112:4

**3:42** 112:7

**3rd** 52:23

**4**

**4** 43:7,9 51:7 115:7 147:8 171:3 186:17

**400** 192:19

**4:16** 146:15

**4:21** 146:18

**4:30** 159:24

**4:34** 160:9

**4:40** 160:12

**4B** 147:11

**5**

**5** 55:10,12 60:18 61:22 63:2,17,22 65:13 80:24 172:4

**5/31/2020** 90:18

**50** 243:7

**5:30** 193:19

**5:35** 193:19

**5:37** 213:17

**5:58** 213:20

**6**

**6** 69:11,14,16 70:20 79:16,20 81:8 88:20 93:16,25 97:6 98:10 100:19 105:15

**6.01** 136:6

**601** 141:6 142:19 143:3 144:17

**63** 243:6

**6:00** 193:12 194:10

**6:36** 248:10

**6:41** 248:13

**6:49** 259:3

**6th** 104:24

**7**

**7** 25:11 51:12 69:14, 17 94:3 96:6 99:12, 13 104:6 106:3 107:8 112:13,16 127:9 134:25 141:21 142:12 144:19 197:12 214:5 250:15, 17 251:3

**7250** 188:11

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 17    Filed 07/09/2305    Page 91 of 226    PageID 60393

Index: 8..anxious

**8**

**8** 107:2,4,10,17
109:20 172:3

**9**

**9** 12:12 13:3 17:16
18:5 20:19 21:15
24:11 26:9,11,14,15
29:19,22 30:2 35:15
36:19 56:2 112:20,22
113:2,13

**9th** 24:6

**A**

**Aaron** 69:21

**abetting** 237:21

**ability** 35:17 36:10
144:11 156:19

**absolutely** 39:12
101:25 121:3 146:6
222:4

**abstained** 20:4

**accelerate** 72:3
105:23,24 145:7

**accelerated** 65:7
84:14 107:22 109:7
110:19 111:19 196:2

**acceleration** 84:15
108:2,4 109:5

**accent** 7:23

**accept** 45:16 159:16

**acceptable** 44:17

**acceptance** 220:2

**accepting** 157:15

**access** 78:10
253:17,18,23 254:10

**accessible** 254:14

**accidentally** 79:13

**accompanied**
218:21

**accompany** 218:8

**account** 18:22 22:7
27:8 63:13 77:11
110:10,17,19,22
145:2 166:15 200:5
215:9

**accounting** 90:15
115:10 117:22 142:3
153:6 155:23 157:5
211:11 258:8

**accounts** 116:23

**accrual** 57:24 67:22

**accrue** 60:25 61:16

**accrued** 52:2 60:20
66:19,25 67:16,18

**accrues** 67:20

**accruing** 184:4

**accurate** 24:25
44:25 248:2

**ACH** 218:11,20,22
257:22

**Acis** 27:16

**acknowledged**
231:15

**acknowledgment**
220:2

**acted** 61:20

**acting** 136:24

**action** 71:20 97:7
140:7,15 144:25
221:16 243:23
244:10

**actions** 236:15,18,22

**active** 11:17

**activities** 20:14

**acts** 245:6

**actual** 33:25 128:24
220:21 225:5 233:9
234:19 237:14
249:19 253:12
254:24 257:20

**acumen** 26:18 27:5

**ad** 206:4

**ad-hoc** 75:18

**add** 35:5 99:25

**addition** 16:21 35:10

**additional** 100:21
114:13 222:13

**adds** 234:23

**adequate** 154:17
155:5

**Adkins** 176:6

**administering**
11:14,16

**admit** 228:22

**admitting** 231:16

**admonished** 100:2

**advance** 79:23 80:17

**advanced** 90:24

**advancing** 210:3

**advantage** 86:15

**advertise** 85:11

**advice** 137:25
140:16

**advise** 137:15
140:14

**advised** 165:10,15

**advises** 166:22

**advisor** 48:6,15
58:23 161:20 166:16,
20,21

**advisors** 5:7,18
12:16 26:4,8 38:10
49:7,18 59:5 71:3
161:22 194:18

**advisory** 162:24
166:7 205:24

**advocate** 225:20

**affairs** 238:16

**affiliate** 146:2 244:4

**affiliated** 25:20
50:20 114:9 115:24
116:3 117:20 132:22
221:24 222:2

**affiliates** 62:7 114:12

**afield** 21:10

**afternoon** 6:22
160:20,21

**agenda** 75:13 80:16,
23 81:4 83:24

**aggrandizing** 62:8

**aggregate** 58:4

**agree** 29:6,13 86:13
97:5 104:2 114:17,
19,24 122:6,17
123:12 124:22,24
141:6,16 225:14
233:14 237:7 252:7

**agreed** 21:24 38:24
233:22 234:14

**agreement** 17:17
20:22 37:11,16,20
39:2,8 48:21 59:18
110:15,16 112:21,23
113:4,17 114:10,12,
14,19,24 115:15
134:24 135:7,10,13
136:2,20 144:6 147:8
158:21 202:10,11,15,
16,24 204:7 206:6
210:11,16 212:4,15,
17,19,20,24 213:3
232:23,24 235:12
238:24 239:14,16,24
240:8,13 241:4
242:10,17 243:5,14,
18 244:11,15,17,19,
21

**agreements** 38:19
46:5 153:15 234:22
237:6 238:18,21

**ahead** 33:8 128:4
159:13 182:4 186:8
223:23

**aided** 241:7

**aiding** 237:21

**Aigen** 6:3

**aims** 137:4

**air** 240:16,21

**Airlines** 161:7

**allegations** 232:22

**alleged** 235:12

**allegedly** 241:7

**allowed** 60:19,25
68:2 108:14

**alternatives** 105:15

**ambiguity** 88:4

**amended** 112:22
113:3,16 238:7
239:23 240:8 241:3
245:23 246:3

**amendments**
113:21

**amount** 13:20,22
56:18 57:19 64:3
85:8 87:6 88:5,22
89:3,6,7 93:13,20
98:3 110:11 139:23,
25 156:15 159:18
165:23 168:24
172:10,11 190:14
198:17 209:9 215:9
222:20,21 230:8,21
243:7,8

**amounts** 67:13
86:24 110:14 118:19,
21 139:14 158:11
173:12 174:15
178:17 184:8 229:12,
18 230:7

**analysis** 147:12
235:5 243:11

**and/or** 13:11

**annexed** 245:24
247:5

**annual** 65:16 86:16
169:6 182:21 183:20
195:18,22

**annually** 183:23

**ans** 226:22

**answer's** 135:11

**answering** 201:20
233:3 249:6

**answers** 113:10
235:24

**anticipating** 95:2

**anxious** 225:19

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 17    Filed 01/09/22    Page 92 of 226    PageID 60394
Document 17-7    Filed 07/06/05

Index: apologize..breach

**apologize** 9:12,14, 15 20:5 24:15 70:4,5 89:18 93:15 130:7 180:12 193:10 231:11 232:2

**apology** 89:19

**appears** 66:13 107:24 188:22

**applied** 66:24 108:8 110:13 132:6 141:7 200:5 216:19,23 217:19 219:2,11 220:4 227:8,25

**apply** 110:10 224:22

**applying** 32:17

**appointed** 12:8

**Appou** 176:7

**approval** 119:3 188:25

**approve** 118:5

**approved** 19:21,22, 25 20:7,10 21:17 118:22

**approves** 118:20

**approximately** 5:8 7:15 12:10 64:3 186:17

**April** 58:9

**aptly** 50:12

**arbitrary** 196:10

**arbitration** 237:2

**argue** 242:16

**arguing** 245:3

**arise** 240:16,20

**arose** 236:3

**arrangement** 171:12 201:18 202:11 211:4

**ASAP** 150:15

**ascertain** 128:10

**ascribing** 87:17

**asks** 203:5

**aspect** 104:13

**assert** 243:13

**asserting** 233:16

**assertion** 233:14

**asset** 19:2,6,7 30:8 31:10 53:23 71:18 158:14 159:20 192:13

**assets** 18:21 22:12 29:10 49:10 50:13,17 52:20 97:22 140:3 156:20 166:9,11,17 171:13 172:8 174:15 187:23 189:7 190:23 191:4,8 192:3,11,15, 18 246:4

**assist** 116:14

**assistance** 147:16

**assistant** 70:2

**assisted** 133:24

**assisting** 47:15

**associate** 70:3 99:7 112:18

**association** 5:12

**assume** 93:21 202:14

**assumed** 65:3 212:19

**assuming** 43:18 191:24

**assumption** 45:19

**assured** 247:6

**attached** 199:6,10

**attempt** 184:11 218:12

**attend** 193:21

**attention** 108:3 247:25

**attorney** 70:4 102:9

**attorneys** 113:8

**attrition** 133:6

**audio-record** 74:4

**audio-recorded** 83:13

**August** 40:23 41:9 42:10 44:15

**authenticate** 148:16

**authenticity** 113:12

**authority** 14:19 18:2 157:17,23 243:12

**authorized** 71:2 81:7 159:13

**authorizing** 107:12

**automatically** 92:5

**average** 168:8

**avoid** 173:8 179:21 182:13,14

**avoidance** 181:16, 18

**award** 237:2

**awards** 164:22

**aware** 25:19 52:24 62:22 100:22 106:8, 12,19 118:24 119:19 148:25 149:5 159:8, 10 162:8,15 165:4 178:23 195:2 222:5, 9,14 225:2,4

**B**

**BA** 10:15,19

**back** 21:12 22:2 43:24 44:3,5,14 60:9 62:18 63:6 67:6,15, 23 79:15 88:20 91:12,18 99:5 104:8 112:7 115:22 116:7, 12 119:15 137:14 146:18 152:13 160:12,18 170:6 173:6 177:7,8,18 180:15 185:3,7 194:5 199:17 204:18 205:13 211:5 212:6 213:15,20 234:5 248:13,17

**background** 10:11, 14 14:3 21:8 161:2

**backup** 54:20 251:20

**bad** 137:25 139:3 161:11 181:15

**badges** 234:23 237:16

**balance** 28:24 29:8 31:14,17 35:4,7 108:8 216:20,23 219:3 220:5 230:18 236:14

**ballpark** 163:7,13

**bank** 251:20 258:18

**bankruptcies** 161:3, 6 162:11,21 174:6

**bankruptcy** 11:12, 15,23 12:2 13:24 14:9,11 28:4,15,20 31:22 41:21 124:21, 25 126:6 140:24 145:20 156:23 161:14,23 164:12,15 165:5,19 177:9,10 234:23 237:4,12

**bar** 70:10,14

**bargain** 52:15

**base** 155:14 173:11 214:15

**based** 31:14 54:24 62:5 137:25 142:2 169:2,4 220:10,17 238:10

**basic** 45:18

**basically** 22:25 29:14 47:3 55:19 135:22 167:3

**basis** 8:15 59:11 75:19 88:7 116:23 164:4 169:7 210:12 245:8

**bear** 89:16

**bearing** 232:17

**beautiful** 160:16

**befell** 65:9

**beginning** 27:19 52:17 256:19

**begins** 150:7

**begun** 53:24

**behalf** 5:21 122:10 157:17 203:6 216:21 219:25 238:18,22 242:11 243:5

**belied** 188:12

**belief** 120:22 225:3 228:4 247:8

**believed** 47:3 78:16 125:19

**believing** 78:4

**benefit** 15:22

**bidding** 22:25

**bigger** 236:24

**bill** 204:20 205:14 206:13,15

**billing** 210:4,9

**billion** 166:8,18

**bills** 215:25

**bit** 35:24 43:25 49:14 61:12 100:5,6

**board** 18:6,16,20,24 19:15,21,24 20:6 22:12 23:2 71:7 72:8, 20 73:10,15,18 74:6, 9,24 75:7,8,12 79:16 156:21 168:3 188:14

**body** 55:19

**bona** 179:2 180:7 183:2,17 184:3,6,7 225:4

**bonus** 170:16 171:11

**bonuses** 155:14

**bookkeeping** 115:11

**borrowed** 35:11

**borrower** 65:15 66:4,6 145:22,24 146:2

**bought** 233:8

**bouncing** 100:6

**breach** 237:20 240:24 242:16 245:9

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 177    Filed 01/20/22    Page 93 of 226    PageID 60395

Index: breached..communicate

**breached** 239:17
241:6

**breaches** 242:20

**breaching** 241:8

**break** 30:4 44:4 95:9
98:23 99:17 100:3,16
112:10 146:8 170:18
193:13,20 196:21
206:25 207:14 213:7

**Brian** 207:23 208:7,8,
11

**bridge** 42:11,13,17
43:2,5 44:7

**briefly** 14:3

**bring** 89:17

**broad** 69:7

**Brothers** 161:8,16

**brought** 247:24

**bunch** 41:15

**burden** 34:6

**burned** 27:17

**business** 8:13 20:15
26:18 27:5 46:18
104:13 141:9 148:4
166:13 185:20,22
187:14 203:24 205:5
208:19 212:21

**businesses** 46:21
50:15 140:22 167:2,8
191:20

**busy** 248:20

**button** 74:14

**buy** 63:17

———

**C**

———

**cabined** 244:16

**cagey** 227:23
228:12,14

**calculate** 93:20

**calculated** 89:2

**calculating** 116:15

**calendar** 65:17 75:4

**call** 38:21 59:21
60:13 72:17 73:16,19
75:6 97:13 105:7
143:6 180:14 224:2,8

**called** 40:18 52:13
98:5 113:16 146:5
187:11 228:14

**calling** 8:14 125:21
224:3 228:11

**calls** 18:23 22:10
234:3 239:5 240:11

**camera** 100:7

**cap** 205:14

**capacity** 136:24

**Capital** 5:6,21,22
12:2,17,18 198:15
200:9 201:14 202:3
203:9,15,20 204:7,
19,23,25 205:5,12,
14,21 206:9,14,17,18
215:17 241:4

**capped** 190:12

**care** 112:17 136:21
144:17 244:19

**career** 11:20 161:9

**Caruso** 83:7 207:23
208:5

**case** 7:18 11:19 12:3
30:6 31:3 33:16
41:12,21 49:10 52:11
71:14 122:5 124:16
163:24 173:20 174:3,
22 175:16 178:24
182:21 185:23 200:2
203:25 204:17,22
210:14 211:17
222:15 230:16
234:18 242:17
255:24

**cases** 11:12 218:14
232:5,18 233:16
235:6,7

**cash** 82:3,6,25 84:6
115:11

**cash-flow** 81:15
92:15,19

**category** 162:2,3

**caused** 43:20 108:2
111:9 198:15 213:3
220:23 242:19

**caution** 155:9,16
223:7

**cautioning** 155:18

**Cayman** 53:23

**CCO** 40:10

**cease** 39:8 130:5

**censure** 155:9

**CEO** 12:9 13:11
14:23,24 16:18 17:8
19:15,20 20:10,20
21:16 49:11 156:24
163:24 164:10,11
166:7,16 167:12,15,
20,24 168:2,7,9
246:18

**CEO/CRO** 59:2 61:4,
20 152:15

**CEOS** 163:2,17,18
165:9,23

**certified** 5:10

**certify** 259:10

**cetera** 206:3

**CFO** 16:25 103:4
123:14 124:8 153:18,
24 154:14,16

**chain** 23:20,25
148:11,16,17 150:3,7

**challenge** 43:23
121:19 154:17

**challenged** 27:6
174:8

**challenges** 191:23

**chance** 72:8 164:20
171:21 172:7

**chances** 64:14,16

**change** 88:23 106:21
145:23

**changed** 21:25
129:7 133:4

**changing** 61:23

**Chapter** 11:15

**character** 137:3

**characteristic** 174:3
182:25 183:17 184:3

**characterization**
48:14 60:12 71:25

**charge** 16:2,3,4,14
206:17

**check** 141:22 142:2,
19 218:9,18 251:2

**checking** 151:14

**chief** 36:20,23 37:3
39:6,9,17,18,21
83:25 140:5

**choice** 181:7

**circulated** 75:13

**circumstances**
136:22 173:21

**city** 8:6 160:16

**claim** 222:13 232:11
241:13 243:3,16

**claimant** 15:6,8,10,
11,22,24 16:4

**claimed** 222:23
226:5 231:21

**claiming** 244:5

**claims** 30:9 31:10
32:24 41:19 190:14
232:21 236:13,17,23
237:20,21 240:24
245:9

**clarification** 6:9
18:12 19:5 37:25
46:20 62:15 76:12
82:5 86:4 87:13
90:19 152:10

**clear** 6:25 12:13 31:9
35:6 45:13 46:5,14
48:2 52:9 53:14
68:11 69:7 78:24
98:21 100:6 103:19,
23 156:12 169:21,23
179:15 181:23 182:2
200:19 212:16
219:19 221:15
224:20 228:19
232:23 238:20

**cleared** 196:8

**client** 33:3 49:17

**CLOS** 19:4,8

**close** 45:16 190:15,
19

**closely** 114:15

**closing** 203:7

**closure** 188:25

**co-counsel** 160:3

**code** 28:15,20
182:16

**Colgate** 10:20

**collect** 52:20 58:19
86:23 87:3,7,24 88:5
97:21 105:25 126:12
193:7

**collected** 87:6

**collecting** 255:7

**collection** 192:9,20

**collections** 193:6

**collective** 73:25

**college** 10:18

**Collins** 207:23
208:8,10,11,12

**colloquially** 186:23
187:11

**colloquy** 108:16,20
143:18

**Columbia** 161:7

**column** 91:15

**combination** 167:2

**comfortable** 24:20

**committee** 41:20,23
42:5,8,18 44:18
45:10,16 47:10,19
48:22 49:6 72:13,16
79:17,21 80:7,10,18,
20

**common** 92:17

**communicate** 36:15
121:7 216:22 220:2

243:18 244:9

communicated 187:22 200:16

communication 149:13 214:20 216:9, 18 217:7,21 218:7,21

communications 149:17 200:8 218:14

companies 132:22 161:5,13 162:23,24 163:10,12 165:10,16, 24 172:19 173:9,10, 17 174:13,23 175:19 178:24 186:24 187:18 189:5,6 190:7,12 203:2 208:22 221:25 222:2

company 135:18 139:3 140:23 161:17, 18 162:13 164:5,7 166:7,23 174:15 182:18 187:4,6,9,12 205:20,21 246:18

compensated 203:11

compensation 162:9 163:2,13,18,25 164:11 166:6,16 168:17 172:3,21 173:3,14,24 175:11 179:2 184:20,21 185:11,12 203:13,19 204:11

complaint 34:9 199:6,10,22,24 238:8

complete 26:7 78:9 167:25 237:17

completely 57:14 59:9 86:21 144:14 223:9 237:8

compliance 147:12, 19

concede 225:10 226:4,7,9

concepts 28:4

concern 21:9 32:20 122:5 124:16 155:25 256:18

concerned 155:7 162:17 228:5,24

concerns 23:5

concise 242:5

concluded 31:13

concludes 259:3

conclusion 57:3 234:3 239:6 240:12

conclusions 141:17

condemning 181:12

condition 184:12 233:22 234:14 236:3

conditions 179:25

conduct 137:2 213:4

conducted 19:3 141:9 148:3 254:16

conference 111:3

confident 252:15 256:16

confirm 24:10 229:6

confirmation 71:1 158:9 258:11

confirmed 12:3

confirms 24:8 210:2

conflict 121:24 124:12 125:16

conflicted 125:3

confusing 33:15 35:25

connected 21:5 185:22

Connecticut 11:5

connection 40:25 170:2 177:9 222:24 231:4

consequences 121:9 138:4

consideration 53:25 62:13 243:15 244:5

considered 105:22 161:16

constructive 34:8 232:4,11,16 233:15

construed 43:5

consult 75:25 104:23 134:23 135:9 160:3

consulted 93:19 135:7 246:17

contained 145:18 178:9 259:15

contempt 36:3 158:12

contend 220:22 222:17 231:11 242:25 243:24 244:11 245:7

contended 222:6

contending 218:25 241:6

contention 25:4

contentions 24:16

contested 223:10

context 28:14 29:3,7 90:4

contingent 35:5 168:17 184:20 185:11

continually 35:10 206:8

continue 45:3 168:4

continues 26:6

contract 114:3 130:8 139:12,17,23 141:9 145:24

control 12:17 26:7 125:13 244:3 256:13

controlled 61:14 174:18

controlling 17:18

controls 64:13 121:18 123:4 179:19

controversy 139:15

conversation 76:11 106:10 252:22

convey 46:25

conveyance 63:12

64:9 87:12,15

COO 40:14 44:21

copious 72:25

copy 112:16 113:7 207:25

cornerstone 186:11, 16 187:3 188:2,6 190:6,22

corporate 14:9,14 17:25 18:8 27:13 40:7,13 51:24

correct 7:18 12:21 13:5 16:9 17:9,10,13 20:8 25:2,8,12,13 36:22 37:17 38:11 39:19,22 41:5,21 43:6 44:19 45:2 48:6, 7 50:6,21,22,24,25 51:4,5,16 55:21 56:13,20,21,24 63:14 64:19,20 66:8 67:3,4 87:9,20 91:24 96:7 97:4,15 100:13 105:8 111:3 112:16 113:7 116:20,23 117:3 118:8,12 119:14,18 123:16,18,19,22 126:2 127:10,20 128:17 130:10,25 132:7 139:12,13 141:24 142:13 146:6 153:19 158:18,22,23 165:4 167:14 186:12 206:14 208:21 222:3 225:6 227:7 233:17 237:23 240:24,25 241:22 244:13,14 245:9 247:7 259:15

corrected 259:15

corrections 259:13

correctly 136:3 137:5

Correspondence 69:16 107:4

cost 166:12 167:6 170:13 181:5 209:2, 19,21

cost-cutting 132:10

costs 192:8,20 209:6

210:3

counsel 5:14 16:25 34:19 40:4 42:17,18 43:18 49:5 51:21 75:16 77:3,23 78:8, 21 84:15,23,24 85:7, 16 102:22 105:20 109:24 177:14,15 197:16 198:6 208:13 214:11 233:14 252:22 253:4,15,17, 22 254:10,12

counsel's 10:3 214:12 249:6

count 191:13,18

counter-party 64:13

counts 193:6

couple 100:23 120:2 133:22 170:22 242:21

couple/three 100:24

courses 10:17 140:6

court 5:11 6:14 17:18 19:22 20:22 21:17 50:9 64:2 99:10 100:2,7 107:21 108:19 112:15 150:15 151:2,3 155:15 158:12 185:6

courtesy 69:8

covenants 54:7

covered 136:11,19 141:8,14

create 41:16

created 89:25

crediting 191:25

creditor 41:19

creditor's 42:5,7

creditors 41:16

creditors' 41:20

creditworthy 64:13

crime 181:19

CRO 11:19 12:8 13:11 17:8 19:15,20

Case 21-03007-sgj   Doc 153   Filed 01/20/22   Entered 01/20/22 22:37:32   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 01/20/22   Page 95 of 226   PageID 60397

Index: CRO/CEO..describing

20:11,20 21:16
154:15 155:9

**CRO/CEO** 114:2

**Cromwell** 177:15

**crumbling** 236:25

**crystalize** 45:22

**crystallized** 45:24

**cube** 167:4 172:12

**cure** 97:9 156:7
157:15 159:17 219:9

**curing** 219:3

**curious** 95:6

**current** 57:5,14
145:16

**cut** 127:6 158:13
238:21

**cutover** 37:7

---

**D**

**D-NNL-007578**
148:12

**D-NNL-007579**
148:12

**D-NNL-028514**
150:4

**D-NNL-028515**
150:4

**D-NNL-029141**
99:14

**damages** 242:19

**Dandeneau** 102:11

**dangerous** 20:17

**darn** 224:15

**data** 47:18 253:19
254:23 256:7

**date** 8:22 9:22 16:12
17:5 23:13,22 32:3
36:25 37:18 38:6
43:11 55:14 67:22
69:18 71:16 84:12
85:8 96:9 97:25
99:15 107:6 112:24
129:21 148:13 150:5,

12 151:8

**dated** 55:13 69:17
107:5 197:11 214:4
259:17

**dates** 26:13 30:14
35:24 37:6 39:4 75:6
120:4,7,9 235:25
236:9

**Daugherty** 176:5

**Dave** 83:3 207:24

**David** 16:25

**Davor** 5:16 32:19
78:24 248:23

**day** 65:16,23 67:7,9
81:17,19 107:21
111:2 220:20 259:17

**days** 38:4,5 80:12
100:23,24 103:10
108:17 120:2,3
187:21 229:5

**deal** 86:20 158:13,25
159:8,11,14

**dealing** 144:18
162:18

**debate** 34:12

**Deborah** 6:2 102:4
183:10 193:8 213:6

**Debra** 102:11

**debt** 104:18

**debtor** 12:6,19
14:13,15,16,19 15:9,
13,16,21 16:2,4,18,
20 17:4,9,19 20:23
21:18,25 24:18,19,
22,23 25:11 30:13,15
31:13 32:2,6,16
34:15,21 35:6,10,11
36:21,24 37:4,12,15
38:24 39:18,25 41:18
48:5,22 50:3,13,18
52:20 53:20 54:11
59:3 60:2,19,22 61:4,
19 62:10 63:15 68:23
71:22 80:17,23 85:2,
19 86:11,24 87:18
88:10,16 89:23 93:19
96:20 97:7,11 106:4
109:23 110:2,8 113:5

114:4,6,7,11 115:6,
22 116:17,21 117:9,
17,23,25 120:14
121:16 123:14 124:3,
8 132:9,20 133:16
134:7,19 135:16,23
136:13 139:17
142:11 146:22
147:13,23 152:14,15,
22 153:10,12,13
155:17 157:18,24
158:15 221:25
246:12 250:4,22,25

**debtor's** 16:12 24:16
25:4 29:20 30:16,24
35:17 48:19 49:10
50:2 51:21 77:2,14,
15 86:14 117:22
125:17 139:10
156:20 245:23 246:3

**debtors** 247:4
252:10

**debts** 28:23 29:15
31:20

**decelerate** 111:20

**December** 25:6 26:5
37:23 39:14,16,25
40:2 46:7,8 49:16,19
51:11,18,20 52:3,18,
23 62:18,19 63:4,23
64:22 65:17,21,23
67:8,9 71:23 81:12
84:10 85:17 86:11,13
87:19 88:17 92:7,23
93:11 94:4 104:9
114:17,18,21,23
116:9 117:8,10
118:15,25 119:22
120:16 121:22
123:11 124:3 125:2
127:3,17,24,25 128:4
129:3,12,14 130:12
131:6,15,17 132:8
133:16 134:2 146:20
147:13 150:8,21
156:4 195:20 201:9
215:2 216:13 220:12
221:8,16,18,22
229:17 230:8

**December/january**
237:10,11

**decide** 52:6

**decision** 25:14,19
52:21 97:12,16
140:16,17 143:5
160:5

**decisions** 157:2

**declaration** 43:9,13,
20 51:7 62:21 247:3

**declare** 80:24

**deduced** 130:4

**deduction** 54:24
152:4,9

**default** 64:17,23 65:6
72:9 97:9 156:8
219:4 220:3

**defense** 142:12,20

**defenses** 86:22
98:6,11

**defer** 248:23

**deferred** 173:11

**define** 157:10

**defined** 66:6

**definition** 28:19
29:8,11,14,16 34:19
136:11 141:14

**definitional** 42:25

**definitions** 28:8
32:17 34:20 135:15

**definitively** 132:5

**degree** 10:16 25:21
26:19 47:21 48:11,13
114:10 138:19 197:9

**Deitsch-perez** 5:25
6:2 70:13,16 160:19,
23 170:5 172:16
183:11,14 185:6,24
186:5,9 193:9,25
194:8,12,15 197:21
205:8 206:21 207:2,
6,10,13,17 213:9,13,
21 223:17,22,25
224:17 232:8,13
233:10 234:4,25
244:7 248:3,14
252:19,25 257:17
258:5,10,23,25

**Deitsch-perez's**

102:4

**Delaware** 123:21,23
240:4

**delegation** 17:25

**demand** 50:24 51:15
52:3,6,7,12,21 53:18
56:12 58:12,17
59:13,20 60:14,15
61:23 62:20,21 69:6
84:16 85:9,10 98:2
108:4,9 110:12
135:10 145:9 151:15
156:13 177:9 182:23
183:18,21 197:12
199:14 200:21,25
201:7 208:22 219:19
221:19

**demanded** 52:10
59:14 60:8 215:10

**demanding** 51:24
209:11

**demands** 54:10
59:17 200:17

**depend** 164:22 168:3
170:13

**depended** 63:7
204:22

**depending** 29:7
246:13

**depends** 29:3 30:25
72:23 162:12 164:5,6
166:9,11,12 170:14
192:8

**deposed** 7:13
100:23

**deposition** 5:4
101:3,24 103:10
106:13,17 148:22,24
149:11 196:14 235:3,
9 259:4,12

**Deposition/30(b)(6)**
9:21

**Deposition/seery**
8:21

**describe** 166:15

**describing** 44:10
160:25

Case 21-03007-sgj   Doc 153   Filed 01/20/22   Entered 01/20/22 22:37:32   Desc Main
Case 3:21-cv-00881-X   Document 17   Filed 01/19/22   Page 96 of 226   PageID 60398

Index: designated..effectively

**designated** 9:4 10:5 240:23

**detail** 10:12 25:10 147:10

**determination** 105:4

**determine** 30:8 41:17 176:14 177:4, 19,22 204:3 230:6

**determined** 78:19, 20,25 176:15

**detrimental** 140:7

**developed** 45:24 236:23

**developments** 75:19

**DI** 197:19

**dictate** 170:15

**differ** 54:17

**differently** 85:20

**difficult** 22:17 53:24 104:2

**diligence** 136:22

**direct** 126:12 197:19

**directed** 95:5,24 96:19,24 103:24 126:11 198:7

**directing** 198:11 223:24

**direction** 18:23 20:14 22:9 36:2 117:24 120:20,21 121:19,20 125:12,15 126:10 138:17

**directions** 36:4 204:14

**directly** 16:6 47:13

**director** 11:19 12:7, 11,14,15 13:15,18 26:10 29:19

**directors** 12:21 13:2, 8,21 76:14 123:8

**directs** 125:13

**disagree** 117:11 226:10

**disagreed** 226:8

**disagreement** 117:15,16 225:12

**disapprove** 118:6

**discharge** 136:19

**disciplinary** 11:10

**discipline** 155:9

**Disclaimers** 246:3

**discount** 87:9

**discounted** 63:25

**discovery** 75:23 76:17 77:19 78:16 217:12 218:13 254:17 255:8

**discretionary** 68:3, 5,20

**discuss** 71:5 72:12 81:8 102:16,22 149:8

**discussed** 32:18 71:21 73:11,12 85:5, 6 98:16 111:6 143:12 220:19

**discussing** 51:14 74:25 84:17,25

**discussion** 8:19 23:23 43:12 55:15 69:19 71:10 72:7 79:19 84:7,23 92:17, 20 106:24 107:7 112:2,8 120:8 127:6 143:15 146:13 148:8 156:11 160:13 194:7 229:14 231:21 243:11

**discussions** 47:10, 23 48:3,12 72:20 74:5 83:18 92:15 93:7 105:20 227:3

**dishonest** 27:3

**dislike** 153:21

**dispute** 120:9 221:23 224:20 225:2,5,11,22 226:11 243:20

**disruption** 183:5

**dissuade** 139:4

**distinguish** 76:5

**distressed** 14:8

**divide** 41:17

**docket** 43:17 247:14

**document** 8:25 58:10 70:21 71:2,6 89:22,25 99:7,13 113:25 136:8 141:19 206:22 245:17 246:5 247:17 254:2,6 255:22 256:2

**documents** 83:23 231:3 256:12,17 257:21

**dollar** 178:17

**dollars** 86:22 139:16, 20 140:25 154:24 168:15 169:13 222:7

**domination** 26:7

**Dondero** 6:5 17:12, 17 21:23 22:18 23:9 24:6 25:21 26:11 27:22 35:16 36:10 40:17 41:4 42:3,17 44:16 45:10,14 46:17 47:11,15 48:3 49:5, 13 50:19,21 51:23 52:11 53:20,25 58:10 60:3 62:8 64:10 95:5, 24 96:18 97:2 99:19 100:13 101:19 102:18 103:6,12,23 104:3 105:12 106:10 107:23 108:18 109:9 111:3,9 118:11 119:17 120:8,13,20, 23 121:8 122:7,11, 19,23 123:3,10 126:17 127:16 128:3, 14 129:16,24 131:2, 9,18 134:3 137:15 138:19 140:8,20 143:12,22,25 145:21 149:12 152:16,20 154:19 158:2 159:5,9 176:17 181:7 182:18 184:19 185:10 187:16,22 197:11

**200:**19 201:22 202:13 203:5 205:6 214:5 220:24 221:24 222:5,9,17 225:15 226:5 237:22 238:13 241:7 242:25 243:3,4 244:12

**Dondero's** 20:14,22 21:18 26:4,12 27:2 47:4 108:11 127:6 134:20 138:14 140:9 154:9 184:10 204:14

**Donohue** 83:5

**doublecheck** 142:8

**doubt** 72:14

**dozens** 19:10

**draft** 84:15

**Draper** 6:11

**drew** 49:8,13

**DS** 84:24

**DSI** 48:9,11 49:4 83:5,9 84:25 85:7 89:4 90:7,9 93:16,18 208:6 254:20 255:12, 14,17 256:8

**dual** 121:25

**Dubel** 12:24 14:5,6 76:13

**due** 25:5,12,15 28:24 29:15 31:20 33:2 52:2,12 60:8 80:25 86:24 88:22 92:10 93:13 95:8 97:14,25 98:4,17 104:18 105:23 116:11 129:2 130:6 142:4,6 146:5 156:15 159:19 183:22 195:10 214:25 216:20,23 229:13,18 230:9,10, 22 231:19 256:18

**Dugaboy** 6:12 237:21 238:12,14,20 241:6 242:25 243:2, 4,25 244:12 245:7

**duly** 6:17

**duplicative** 78:25

**duties** 123:22 124:2 125:4,20 126:5 135:23,24 136:20 146:22 147:5 155:17 237:25 238:10,25 239:11,17,18,22 240:4,6,16 241:5 242:14,16

**duty** 97:24 124:20,25 137:14,23 140:5,8 181:18,20 237:20 240:24 245:9

**Duval** 14:2

---

**E**

**earlier** 32:21 52:11 69:22 149:10 198:25 200:13 202:17 218:25 220:20 231:25

**early** 30:6 31:3 45:5 62:19 63:23 64:15 83:10 86:11 119:21 129:3 187:21

**easily** 82:16 139:25 258:9

**easy** 54:6 236:10

**economic** 15:20 86:15

**edict** 104:4 108:2 129:24 130:21,22 131:9,18,21,22 132:4,5 134:20 137:16,24 143:16,23 144:2 220:19 226:17 227:25 228:4,24,25

**edicts** 123:6

**educated** 54:24 189:15

**educational** 10:13

**effect** 103:7 128:24 129:4,5 156:6

**effective** 12:4,5 13:4 14:12 16:12 17:5 104:11 115:4 203:13, 18

**effectively** 13:16

15:23 38:7 176:24

**effectuated** 114:4

**efficiency** 181:17

**efficient** 180:17,22
181:8,9,10 182:11

**elaborate** 27:7

**electronic** 70:24
107:13

**electronically**
254:12

**element** 33:5

**Ellington** 40:3
154:25

**Ellison** 133:20

**email** 10:4 23:20,25
77:11 78:10 99:23
100:12 108:20
118:24 119:5,7
148:11,15,17 149:7,
22,23 150:3,7
196:13,17,19 207:23
208:25 251:6 254:3,4

**emailed** 99:10
247:19

**emails** 7:5 77:18
79:2 118:17 253:3,6
257:3

**embodied** 114:10

**employ** 179:14

**employed** 17:4
176:22

**employee** 18:3
158:14,17 176:16
179:11 203:5

**employees** 22:18,24
35:18 36:3 85:19
88:16 93:19 120:13
121:16,23,25 132:10
134:7,18 139:10
145:25 154:18
155:16 173:22
175:11 186:22
201:23 202:12
204:13 206:10,13
215:21,24 231:23

**encourage** 256:25

**end** 39:11 63:10
102:6 146:11 163:25
216:25 231:19
256:19

**ended** 164:25

**enforce** 61:4

**enforcement** 59:3

**enforcing** 60:23
104:18

**engagements** 162:8
174:9

**ensure** 88:11 116:9

**entered** 235:14
243:4

**entering** 244:10

**enterprise** 137:3

**enters** 242:10

**entire** 11:20 98:3

**entities** 27:14 50:20
95:5 103:22 114:9
121:18 123:4,9
124:18 201:22 203:3
204:15 208:20
217:19 239:18

**entitled** 33:5 197:12

**entity** 12:13 14:15
115:24 116:4 117:20
146:2 205:21 243:15

**entity's** 48:8

**entries** 203:4

**entry** 91:7

**equity** 186:16

**errands** 194:4

**estate** 8:8 50:16 65:9
71:18 97:21,22 105:7
124:21,25 126:6
172:9

**estates** 11:15

**et al** 5:7

**evasion** 181:19

**eve** 234:22

**event** 70:5 76:24
108:24 209:25

**eventually** 173:23
178:21

**Everland** 176:7

**evidence** 33:17
54:18 185:18 222:15

**evident** 82:2

**exact** 36:25 37:6 38:6
71:16 96:9 104:9
129:20 222:21
228:18

**examination** 6:20
101:12,15,17 160:22
249:3 252:24 257:19

**examined** 6:19

**examples** 27:20

**exceed** 29:9 189:7
190:23 191:5

**exceeded** 31:10
190:13 230:8,20

**Excel** 92:3 254:2,3

**excess** 229:18

**exchange** 115:25

**exclude** 105:19
210:8

**excluding** 109:23
152:12,13

**excruciating** 10:12

**excuse** 194:3

**executed** 53:11 55:3
58:10 145:2 246:13,
14

**execution** 54:15

**executive** 39:18
49:24 83:25 123:17
140:5 162:9 172:21
173:19 174:18
176:21

**executives** 162:10
172:20 173:4,17,22
174:17,24

**exercise** 229:24

**exercised** 37:15

**exhibit** 8:18,20,24
9:18,20,23 23:20

43:9 55:10,12,18
60:18 61:22 63:2,17,
22 65:12 69:14,16
70:20 79:16,20 80:24
81:8 88:20 89:14,17
93:16,25 97:6 98:10
99:12,13 100:19
107:2,4,10,17 109:20
112:11,13,15,20,22
113:2,13 148:10,11
150:2,3 196:7,8,12
197:2,10 200:7
206:23 207:18 208:2,
23 209:25 213:23
214:10,20 245:16
250:15,17 251:3,6

**exhibits** 196:9,11,21
249:15

**exist** 123:2

**existed** 152:14 178:7

**existence** 41:18
62:23

**existing** 22:17

**exists** 173:16,25
237:7 239:14 243:18

**expect** 87:7 126:4
138:2,17,21 148:16
168:7,14 169:12
193:7 198:19

**expectation** 167:18,
23 168:13

**expected** 23:2 93:14
123:25 154:3 157:16

**expenses** 191:5

**experience** 11:14
54:25 163:24 172:18
173:5 175:14 176:2
179:10,21 183:16

**experienced** 14:8

**expert** 11:23 77:14

**explain** 235:8

**explanation** 119:6

**explore** 33:6

**exposed** 144:14

**exposure** 236:12

**express** 32:20

**expressed** 155:24
188:9,13

**expression** 155:25

**expressly** 136:18
157:13

**extend** 38:24 59:18
60:7

**extended** 54:2,3
58:12 131:23

**extension** 152:22

**extensions** 37:19
39:3

**extent** 224:12 234:3
237:9

**extremely** 64:16
189:11 190:10,11

**F**

**FA** 166:20

**fabricate** 222:13
224:8

**fabricated** 222:10
237:8 243:19

**face** 234:20

**faced** 11:9

**facilitate** 42:11,14
44:11,22 45:9 47:12
48:21 52:15 117:9

**facilitated** 215:13

**facilitating** 85:20

**facing** 60:2

**fact** 54:19 59:15 69:4
85:2 89:13 92:16
159:13 163:21
185:20 189:4 205:4
206:16 219:13
222:11 241:13,23

**facts** 228:19 241:11,
12

**factual** 225:21

**factually** 127:21

**fail** 88:10

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 177    Filed 07/09/24    Page 98 of 226    PageID 60400

Index: failed..great

**failed** 25:4 82:19
126:25 130:13
158:10

**failure** 28:23 57:17
144:7

**fair** 7:8,12 15:19,25
17:20 18:4,7 19:13
31:12 42:2,6,9,19
45:24 48:10,14 49:2
58:25 60:10,17 67:23
71:25 73:4 78:6
86:19 103:9,14
126:14 131:4,12
151:19 168:25

**fairly** 168:25

**fall** 161:25 162:2
237:13

**false** 237:8

**familiar** 9:3 24:4
28:3,7 58:9 135:6
136:25 214:3

**fashion** 153:8

**fast** 7:23

**February** 38:18,25

**feel** 22:23

**fees** 144:15 167:5
172:13 209:2,3,4
222:3,8 223:4 225:6,
24

**fellow** 13:21 193:2

**felt** 20:12,16 46:12
105:6

**fide** 179:2 180:7
183:2,17 184:3,6,7

**fides** 225:4

**fiduciary** 97:19,20
105:6 123:21 124:2,
20,25 125:20 146:22
147:5 237:20,25
238:25 239:17
240:24 242:14 245:9

**fifteen** 7:20 245:6

**figure** 93:16 117:18

**file** 92:3

**filed** 43:18,21 50:3
51:10,11 53:22 113:7

246:10

**files** 237:3 253:3,14,
17 254:2

**filing** 32:8,16 188:11
245:23 246:13 247:5,
6,10

**filings** 246:12,17

**final** 123:9

**finance** 115:10

**finances** 43:3

**financial** 36:21,23
37:3 39:6,9,22 48:5,
15 49:7,9,16 161:13,17,
20,22 162:23,24
166:7,16,19,21 256:7

**find** 75:5 77:7 80:11
81:11 87:23 136:12
188:21 198:12
218:14 238:3 254:21,
23

**finding** 36:4

**fine** 79:4 207:3
223:13

**fingertips** 165:23

**finish** 191:16,17
193:15 207:8 233:6
244:25

**finished** 210:23
214:16

**firm** 166:17,20
254:19 255:17 256:5

**fishing** 257:5

**fix** 72:9

**flip** 115:8 136:5

**float** 40:17

**flow** 82:3,7,25 84:6

**folks** 74:2 244:23

**follow** 134:20 252:20

**follow-up** 198:20

**foregoing** 259:11

**forgivable** 175:10
176:9 178:25 179:12,
16,24

**forgiven** 173:23
175:2,8 176:10,18
177:23 178:21 179:7
180:7 183:19,20

**forgiveness** 174:7
178:10 179:4 184:13
233:22 234:14
235:13 236:3

**forgot** 89:17

**form** 17:23 19:17
20:3,25 21:21 25:23
26:12,17,20,25 27:4,
13 28:18 29:20 30:7,
11,16,19,23 31:4,6,
16,20,24 34:24 35:21
40:21 48:25 55:6,23
57:8,22 59:7 61:10
62:2 63:19,24 64:25
66:12 67:11 82:14
84:4 86:6,18 87:22
90:12 91:5 93:4
94:21 95:17 96:17
105:10,18 111:12
113:23 115:18,24
117:13 120:18 121:2,
12 122:14 124:14
125:10 126:8,20
134:10 137:19 138:8
139:7 140:11 142:15
144:22 145:14
146:24 154:7 155:12
157:21 163:20 164:3
165:14 168:11,22
169:11 171:18 172:6,
24 175:4 176:12
178:12 179:9 180:4,
10 181:2 183:4,25
184:16,25 185:17
186:14 188:4,19
189:10,14 191:2,10
192:6,23 195:13
197:15 199:8,12
200:15 201:16 202:6,
22 203:17 204:11
205:18 209:16 210:6
216:3,15 217:4,16,25
218:16 219:6 220:15
221:2,11 225:9
226:14,22 228:9
230:3 232:20 235:19
236:7 238:6 239:3
240:2,11,18 241:19
242:2 245:8,11

**formal** 202:16 212:20

**format** 254:4,5

**formed** 27:21

**fortune** 65:9

**forward** 52:18

**found** 77:6,22 158:11

**founded** 164:7

**founder** 121:17
163:17,24 175:14
178:4 179:18

**fourth** 239:23 240:8
241:3

**frame** 13:7 57:20
80:8 201:10

**framework** 190:8

**Frank** 36:20 83:3
96:23,24 108:17
153:5 159:8 207:24

**fraud** 232:4,16 233:9,
15 234:19,24 237:14,
16

**fraudulent** 33:4
34:2,8 63:11 64:9
87:11,14 232:12

**Fred** 83:7 207:23
208:5

**free** 113:2 201:21

**front** 7:2,10 179:16

**fulfilling** 216:24

**full** 85:8 87:7 88:5
131:22 156:14
159:18 215:9 245:2
253:18,19

**fully** 147:20 251:21

**fund** 206:2

**funds** 49:25 116:10
117:2 144:11

**furtherance** 97:23

**futile** 45:13

**future** 133:13 179:25
184:22 185:13

**G**

**gap** 42:12

**Garcia** 5:9

**Gas** 161:7

**gave** 9:11 59:18
122:7 155:13 235:23
242:4 243:6 251:19

**general** 15:15 16:24
19:12 40:4 58:8
163:16 166:2 238:19
239:12 241:15
242:12,13 244:4

**generally** 44:25 54:4
58:9 64:12 72:21
122:4 162:8,14,25
178:24 204:17,22
208:4 215:24 216:11
241:3 247:2

**gist** 19:12 211:2

**give** 11:13 18:18
23:11 69:9 115:20
138:16 156:5 163:12
247:16

**giving** 72:8 213:8

**Global** 161:24
245:25

**Gmail** 77:11

**go-betweens**
154:19

**good** 6:22 11:24
65:10 73:25 155:6
160:19,21 166:4
177:15 224:11,15
242:5

**gosh** 107:25

**governed** 143:10

**governs** 143:9

**GP** 12:16 14:17 15:18
16:20

**grace** 69:6

**graduate** 10:24

**grand** 52:15

**great** 27:9

Index: group..incorrect

**group** 74:20,22
90:15 133:17,22
142:3 155:20,22

**guess** 13:17 40:22
161:24

**guy** 227:23

**guys** 256:25

---

**H**

**H-O-R-N** 6:10

**half** 40:16,22 50:18
203:25 255:18,21
256:10

**hand** 69:12 82:9,11
182:6

**handed** 8:23 112:25

**hands-on** 48:15

**handwritten** 75:25
76:18 77:3

**hang** 196:5

**happen** 47:5 59:17
71:11 75:20 87:2
121:9

**happened** 14:12,15
17:15 58:15 63:7
65:8 143:7 152:4
153:9 183:7 228:6,19

**happening** 153:10

**happenstance**
228:5

**hard** 154:21 155:3
191:12

**hat** 122:24 123:3

**hats** 123:3,11,12

**HC** 231:12

**HCM** 203:21 209:8,
12,13 210:3,4,10,16,
17 212:5,7 215:11,
18,24 216:4,7,8
217:13 232:15
233:16,20 234:11
239:23

**HCM's** 233:13

**HCMA** 33:16

**HCMFA** 58:8,11,21
59:16 61:23 62:4
144:10

**HCMLP** 23:21 36:7,9
58:19 62:10 85:13
97:20 118:23 123:5,7
126:11 176:23
208:13,22 209:11,13
210:2,9,10 238:24
240:7

**HCMLP's** 90:15

**HCMS** 6:6 194:22
195:4,10,19 199:19
200:20 216:22
217:14 219:15
220:12 231:12

**HCR** 214:5

**HCRE** 6:5 194:22
195:7,11,19 214:6,
21,25 215:12,20,25
216:6,8,22 217:14
218:23 219:14,25
220:11 231:10,13,14,
22

**HCRE's** 215:18

**head** 64:4 162:6
208:12

**heading** 116:13
158:8 245:21

**headings** 68:13,19
91:13

**hear** 84:22 183:12
228:25

**heard** 41:3 72:24
96:23 101:23 103:11,
15 131:7,16,20
138:18 186:10 187:7,
16 210:18 228:16,21

**hearing** 38:20,22
107:22 150:16 151:2,
4,18

**heart** 120:20

**heat** 137:25

**held** 113:9

**Heller** 6:11

**helping** 116:9 132:22

**helps** 237:15

**Hendrix** 83:3 96:22
97:3 99:18 103:2,13,
16 118:18,25 126:17
131:7 133:19 134:3
137:14 139:11
148:19 149:2,16
150:8,10 201:3
211:14,23 220:22
226:16,25

**hereof** 67:2

**hereon** 66:25

**hesitate** 7:24 8:2

**hey** 143:7 213:6

**hidden** 212:23

**high** 64:17 163:25
166:25 187:24 188:8,
9 215:11

**high-level** 173:22

**higher** 163:17

**Highgate** 208:16

**Highland** 5:5,21 8:13
12:2,9,16,18 13:14
41:21 102:23 104:10,
19 121:21,23 122:10,
12 140:3 144:13
154:14,18 161:19,20
166:24,25 167:7,12,
20,24 168:8,9 172:10
176:15 186:10,15,17,
19,22 187:23 189:7
190:23 192:4 195:4,6
198:15 200:8 201:13,
23 202:2,12 203:9,
11,14,15,20 204:5,7,
13,18,19,23,25
205:3,4,12,14,21
206:9,13,17 208:20
215:16 222:3,7 223:5
233:20,23 234:11,15
236:4,11,12,23
237:3,19 238:18,22
241:4 244:2

**Highland's** 189:5
235:10,16

**highlights** 161:10

**hired** 133:9

**hired-off-the-street**
163:18

**historical** 250:6

**history** 10:15,19
229:16

**hoc** 206:5

**hold** 15:14

**holder** 58:19 68:25
72:5

**holding** 27:11

**holds** 15:12,17

**honest** 74:2 228:14

**honestly** 228:4

**honesty** 26:12 27:2

**honored** 22:10

**hope** 46:6,9 167:25
168:6 169:5 189:3
191:25 192:12,18
193:3,4,5

**hopes** 187:24 188:8,
9

**hoping** 64:22 65:2
172:2

**Horn** 6:7,10,11
248:20,22

**hour** 193:17

**house** 203:7,8

**HR** 208:12

**humorous** 175:13

**hundred** 205:7

**hundreds** 11:21
140:24 161:3

**Hurley** 176:5

**hustle** 150:14

**hypothetical** 133:25

**hypothetically**
92:25 157:14

---

**I**

**i.e.** 133:13 144:18

**ice** 167:4 172:12

**idea** 41:14 89:25
158:13 193:14
225:16 228:11 237:5
248:8

**identification** 8:22
9:22 23:21 43:11
55:14 69:18 99:15
107:6 112:24 148:13
150:5

**illegal** 179:22

**imagine** 74:17

**immediately** 25:12,
15 80:25 97:14 104:6
107:25 144:6 146:5

**implication** 69:8
131:22 169:24

**implications** 245:2

**imply** 70:14

**implying** 158:24

**impossible** 190:11

**impression** 108:23
181:6

**improper** 145:12

**inability** 31:19

**inaccuracies** 247:14

**inappropriate** 62:5,
16 151:23

**inappropriately**
61:21

**inaudible** 6:8

**incident** 223:18

**include** 102:4 119:13
125:14 227:16

**included** 50:19
116:8 222:12

**includes** 136:12

**including** 97:22
101:18 120:14
139:10 154:23
236:18,19

**incorrect** 73:2
140:15

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 179-17    Filed 11/09/04305    Page 100 of 226    PageID 60402

Index: increase..Labraya

**increase** 187:25

**increased** 57:19

**incurred** 237:9

**independent** 11:19 12:7,11,14,15,21 13:2,7,15,17 18:6,15, 20,24 19:15,21,23 23:2 26:10 29:19 71:7 123:8

**independently** 22:14

**indirect** 204:10

**indirectly** 186:18

**individuals** 20:18 48:21

**industries** 165:24

**industry** 61:6,11

**inferiors** 125:14

**inflows** 64:14

**inform** 121:8

**information** 7:5 49:9,14 94:17 217:23

**informed** 10:8 125:23,24,25 129:16

**initial** 37:21 56:18 57:18

**initialed** 259:14

**initially** 21:23

**initiating** 156:14

**ink** 259:14

**input** 214:13

**inquire** 130:17 142:10 152:24

**inquired** 152:21 212:25

**inquiry** 186:22 187:10,13 210:20 211:3,10,15 231:4

**insight** 188:15

**insignificant** 139:15

**insolvency** 28:5,24 29:8,12 32:18 33:5,6

234:20 237:13

**insolvent** 31:14 32:2,6,7,16 34:16,21 236:12

**installment** 65:16

**instance** 116:4 118:9 210:9

**instances** 243:9

**instruct** 35:17 36:10 88:9

**instructed** 103:12 128:3 134:4 252:11

**instruction** 51:21 119:21 120:13 122:8, 10,19 126:18 127:16 128:14 129:16 139:2, 4

**instructions** 85:18 88:15 106:3 134:7 138:21,22 156:5

**insulting** 228:12

**intend** 7:11 168:19

**intended** 50:11,13

**intentionally** 78:11, 15 79:9,13

**intercompany** 174:16

**interest** 15:17 24:24 52:2 54:5 56:23 57:4, 17 60:20 66:19,25 67:13,17,19,20 87:2, 4 90:25 121:24 124:12 182:22 183:7, 20 189:5 224:19 230:9,10,22

**interesting** 111:22

**interests** 62:9 186:11,16,18,19

**interjection** 21:14 29:4 94:19 121:14 125:7 135:5 138:11 169:9 171:8 190:18

**Internal** 182:16

**interpretation** 228:20

**interrogatories** 257:3

**interrupting** 193:11

**introduce** 5:14

**inures** 15:21

**invent** 41:11

**invested** 174:4

**investigate** 176:3 223:3

**investigated** 175:18 203:12,19

**investigation** 174:21 175:25 204:4 243:10

**investigations** 205:12

**Investment** 6:12

**investor** 11:18

**investors** 166:22 169:3

**involve** 105:12

**involved** 11:17 27:16 47:13,14,21,22 48:3 89:18 147:21 161:3, 6,14,22 162:22 165:18 174:4 175:6 178:19 215:17 255:18

**involvement** 132:21

**irrelevant** 233:24 234:16,17

**irrespective** 129:2

**ISI** 255:17

**Islands** 53:23

**issuance** 178:19

**issue** 32:24 34:5 36:10,12,13 65:25 85:18 88:15 106:3 139:2 143:25 144:9 162:18 173:19 174:7, 12 175:15 178:15 195:2 232:4 233:15 235:2 251:19

**issued** 58:11 71:3

134:6 137:24 143:22 145:2

**issues** 21:6 233:24 234:16

**item** 174:20 209:8

**items** 76:8

**iteration** 113:19

___

## J

**Jack** 83:5 176:5

**James** 5:4,23 6:5,24 17:12 149:12 159:9 259:23

**January** 12:12 13:3 17:16 18:5 20:19 21:15 25:10 26:9,14, 15 29:19,22 30:2 36:24 37:4 69:14,17 80:7,15 83:10 94:3 96:6 104:6,24 105:15 106:3,9,20 107:3,5 108:22,24 109:16 111:2 113:17 126:15, 22 127:9 128:21 129:11 134:25 141:21 142:12 143:12,13 144:19 145:3 146:21 148:19 149:3,13,18 150:21 158:17,22 195:24 197:12 199:18 214:5 215:6,8 216:8 221:9, 18 231:17

**January/february** 201:10

**JD** 10:16,22,25

**Jean** 176:6

**Jefferies** 22:11

**Jernigan's** 155:24

**Jim** 205:6 237:22 241:7 243:3

**job** 97:20

**John** 5:19 12:24 33:3 76:11,13 186:5 234:25 247:20 255:4

**Jones** 5:21

**JP** 207:24 208:8

**Jr** 5:5,24 6:24 259:23

**judge** 13:24 155:24 186:7

**judges** 182:9

**judgments** 27:25

**July** 13:12,13 17:7 19:19,20 20:20 21:15 22:23 156:2

**junior** 133:23

**jury** 38:15 181:22 182:3

**justified** 188:23

___

## K

**key** 22:24 48:20

**kind** 69:7 73:15 76:24 90:4,8,9 103:25 112:10 161:18 162:15 209:3 243:20

**kinds** 163:9

**Klos** 16:25 17:3 83:4 84:20 103:2,3,15 126:16 133:19 137:13 139:11 153:17 154:6 201:4 207:24 211:13,20,23 226:25

**knew** 52:18 84:13 89:9 94:5 95:22,23 129:5,21,23 132:3 145:9 206:10

**knowing** 134:12

**knowledge** 47:13 54:15 103:5 106:14 110:25 111:5 113:18 220:11,17 247:7 250:4,10,15 253:2

**Kristin** 83:3 96:22

___

## L

**Label** 5:3

**Labraya** 176:6

**lack** 95:12,14 244:18, 19,20

**laid** 132:9

**Landoseri** 176:7

**language** 180:24

**laptop** 7:2

**large** 124:8 237:2

**largely** 132:25 133:2, 18 140:2

**larger** 155:19,22 162:22

**late** 27:24 37:22 84:14

**latest** 113:19

**law** 10:16,23,25 11:23 34:12 108:7 123:21 239:8 240:4 241:2

**Lawlor** 176:5

**Lawrence** 69:21 70:6,7,9,15

**lawsuit** 24:17,24 32:25 75:24 77:20 177:12

**lawsuits** 21:6 53:22

**lawyer** 11:4,7,10,18 41:13 255:15

**lawyers** 49:3 152:12 255:16

**lax** 59:3,21,23 60:13, 16

**lead** 13:17

**leader** 20:13

**learn** 96:11,15 128:7 178:6

**learned** 18:10,14 84:9 86:10 92:22 95:12,13,22 96:10,12 100:19 107:25 118:10 127:16,21 128:2,22,23 129:21 130:21 134:8 156:3 182:6 221:16,17

**lease** 192:14

**leash** 35:12

**leaving** 52:14

**led** 110:21

**ledger** 231:5,7 249:8, 11,13,17 250:5

**left** 140:24 144:13 176:25

**legal** 5:10 102:21 109:23 141:17 147:12,14 155:23 157:6 234:3 239:5 240:11

**legitimate** 50:15 173:9 182:10 225:12

**Lehman** 161:8,16 164:11

**lender** 55:2,8

**lengthy** 101:6

**letter** 69:15 72:12 73:12 81:7,9 93:24 94:15 97:6 104:24 105:15 106:2 107:3 127:9 134:25 135:11 141:22 142:13 145:3 156:13 197:4,7,11 198:14,20,24 199:9 200:6,11 214:4,7 218:24

**letters** 51:22 219:14

**letting** 61:15

**level** 73:20 116:21

**liabilities** 29:9 35:5,9 189:8 190:24 246:4

**liable** 242:19

**liar** 224:2

**licensed** 11:4,6

**lie** 224:6

**life** 32:21

**limit** 16:11

**Limitations** 246:2

**limited** 14:17 15:12 238:14,15 239:9,23 241:3 242:8,22

**limiting** 227:13

**liquidity** 35:13

**list** 119:13 147:9

**listed** 93:13 177:21 178:8,20 208:22 209:9 211:20

**listen** 140:16

**listening** 181:22

**listing** 161:4

**literally** 144:13 245:20

**litigate** 223:15

**litigation** 16:7 54:10 75:16 134:15 145:16 147:22 152:13 182:19 236:13 250:12

**litigations** 27:15 192:10 195:3

**live** 8:5,6,9 140:17

**LLP** 6:2

**loan** 99:13 117:5 150:12,20 151:8 173:18 174:24 176:16 177:5 179:12, 17,20,23 180:6,7 183:2,17,18,21,23 184:3,4,6,13 194:18, 21,22 195:3,6,10,11 196:4 198:17 199:19 201:6 214:22,25 216:11 219:14,15 220:3 229:16,25 256:18

**loans** 172:20 173:2, 5,13,23 174:7,8,16, 25 175:8,10 176:8,18 177:23 178:8,25 182:17,18,22,23 184:7,11 195:19,23 196:3 203:7 230:19, 22

**local** 159:24

**log** 164:8

**logbook** 75:5

**logical** 57:2 67:8 152:4,9

**logically** 66:7 82:23

**long** 27:11 30:3 52:9 63:9 140:23 183:6 193:22 255:23

**long-dated** 64:10

**longer** 122:11 133:4 167:16 248:8

**looked** 76:3,7 176:13 178:17 200:13 202:17 217:18 218:24 230:4,15 231:4 247:5,9 249:11 256:16 257:20 258:12

**loosely** 130:19

**loss** 167:7,9

**losses** 141:2

**lost** 44:2 183:9,10

**lot** 154:22 164:9 165:7 167:10

**lots** 10:16 201:21,22

**low** 54:5 64:16

**loyalties** 155:7,17

**loyalty** 244:20

**LP** 5:6,7,18,22 12:2, 17,18 26:4

**Luc** 176:6

---

**M**

**made** 19:15,20 22:11 25:19 33:9 52:10,21 57:13 62:19 81:12,22 85:3 89:11 90:10,21 92:24 94:16,24 95:3, 6,15,19,23 96:11,13, 15,19 97:12 98:12,21 103:20,21,23,24 105:3,5 111:10 118:15 121:10 125:19 126:25 127:5, 23,24 128:4,13 129:3,23 130:18 131:20 134:5,13 141:23 142:20 145:5 159:9 162:20 165:10, 24 174:21 176:16

182:23 183:8,21,23 186:21 187:10,13 195:20,23,25 199:18 210:21 211:3,16 215:4,6,8 216:10,12, 19,25 220:12 229:11, 17 230:20 231:17 233:21 234:13 235:11 237:20 238:17 249:21 251:18 256:19 259:13

**made-up** 76:23

**Madoff** 162:2

**main** 205:5

**maintain** 250:5

**maintained** 22:5

**make** 25:5,14 27:25 36:2,4 52:6 53:13 58:23 76:4 79:6 84:10 94:4 95:7 97:16 98:20 106:21 110:11 117:25 118:2, 11 119:10 126:18 128:15,25 129:17 130:13 132:4,22 140:16 159:2,4 160:4 168:7,14 169:23 179:19,23 180:23 196:8 200:18 210:19 211:7,9 212:16 236:10

**maker** 55:2,7 63:11 66:7,17 69:5,10 124:10

**makes** 35:19 229:8

**making** 54:23 85:21 88:17 102:18 131:8, 17 141:17 143:19,21 215:13,17 216:12

**mal-intent** 87:18

**Mamoud** 176:6

**man** 125:12,13 140:22

**manage** 22:18

**managed** 18:22 22:7

**management** 5:6,22 12:2,17,18 14:9,10

26:21 115:11 122:12 135:18 166:8,10,18 167:5 198:16 200:9 201:14 202:3 203:10, 15,20 204:8,19,25 205:13,15 206:9,14, 17,18 215:17 241:5 242:9 243:2,24 244:12 245:7

**manager** 22:6

**manages** 242:22

**manner** 205:22 256:22

**Manuel** 5:9

**margin** 22:10

**margins** 18:23

**Marianne** 5:12

**mark** 8:17 177:13

**marked** 8:21 9:21 23:21 43:10 51:7 55:13 56:5 69:13,17 99:11,14 107:2,5 112:13,23 148:12 150:4 196:6,7,25 197:9 200:7 214:15 245:15

**material** 7:4 71:18 78:14 157:2 158:14 173:19 174:12 175:15

**materiality** 157:10

**materially** 174:8

**materials** 255:7 258:17

**math** 57:9

**matter** 5:5 170:2 190:15 205:4 223:10 224:10

**matters** 136:25

**maturity** 58:17 150:12 151:8,16 152:23 249:23

**maximize** 50:16 97:20

**meaning** 29:9 68:14 225:22

**means** 65:20 80:6 181:3 203:19 217:13 254:2

**meant** 115:16 120:24

**Media** 5:3

**mediation** 41:2 46:2

**meet** 18:23,25

**meeting** 73:10,15, 16,18 75:6,9,12,13 79:25 81:2

**meetings** 71:13 72:20 74:8 75:2 80:6, 9,14 81:15 82:25 83:12,16

**melting** 167:4 172:12

**members** 20:6 41:23 72:21 73:11 74:6,9, 24 75:7

**memories** 73:25

**memory** 23:18 24:5, 9 73:8 128:11 224:11,16

**mental** 108:12,23

**mention** 211:22

**mentioned** 17:8 50:2 80:2 83:22 99:18 125:17 161:2 172:19 177:20 226:18 249:7 255:12 257:18

**met** 31:23 169:22

**metadata** 250:24 251:5 254:6

**metastasize** 239:15

**Methods** 246:2

**metrics** 28:8

**MF** 161:24

**MGM** 186:11,20 187:8,17 188:2,9,13 189:5 190:5,12,21 191:11 192:2

**Michael** 6:3

**mid** 38:18

**middle** 41:15 49:4 88:21

**mike** 176:4

**million** 25:6 27:17,18 52:24 57:19 89:7 93:15 106:21 108:6 109:2,19 110:3 111:10 145:23 152:17 163:15 164:19,21 166:3 168:15 169:13,20 170:11,19,20 171:3, 11,16,23 172:3,4,7 188:10 191:6 192:9, 15,19 193:6 205:7 222:22 243:6 250:3,6

**million-ish** 243:8

**millions** 86:22 139:16,18 140:24 154:24 222:7

**mind** 45:22 46:11 129:7 146:7 171:20 207:8

**mine** 122:5

**minimize** 181:5

**minimum** 230:9,21

**minimums** 229:20

**minus** 191:4

**minutes** 59:25 73:18 83:17,19 98:23 146:11 160:3,6 193:16 194:9 245:6 248:6

**mischaracterizes** 221:13 239:4 240:2, 18 241:19

**missed** 71:23 72:2 85:17 87:20 98:3 106:6,11 109:6 131:24 149:19 156:4

**misses** 88:11 146:2

**missing** 9:6 196:10

**misstate** 44:13

**mistake** 52:10 151:10

**mixing** 231:12

**MO** 172:16 185:24 205:8 233:10 244:7

**moment** 137:25 159:21 192:2 196:21

**moments** 99:9

**monetary** 156:19

**monetization** 46:15 50:3,5,10 52:19 63:21 158:9 159:19 168:2 187:25 192:13

**monetize** 50:13 62:25 159:20

**monetized** 189:7 190:22

**money** 27:12,13 35:11,13 41:15 58:22 67:21 92:16 164:9 167:10 168:24 172:15 184:7 203:4 205:3,6 208:23 209:12 236:18

**monies** 185:21

**months** 45:4 187:15 224:13

**Morris** 5:19,20 9:5,9 17:22 19:16 20:2,24 21:3,20 25:22 28:17, 22 30:18,22 31:15 32:19 33:7,11,18,22, 25 34:4,24 35:20 40:20 48:24 55:5,22 57:7,21 59:7 61:9,25 64:24 66:11 67:10 69:23 70:2,8,11 78:23 82:13 84:3 85:23 86:5,17 87:21 89:19 90:11 91:4 93:3 94:20 95:16 96:16 97:10 99:10 105:9,17,21 111:11 112:10 113:22 115:17 117:12 120:17,25 121:11 122:13,21 124:13 125:9 126:7,19 127:18 129:18 134:9 135:3 137:18 138:5,8 139:6,21 140:10 142:14,21 144:21 145:13 146:9,23 150:23 152:7 154:2 155:11 157:20 160:14 163:19 164:2

**Morris'** 24:14

**Motion** 43:10

**motivation** 105:11

**mouth** 108:11 151:21

**move** 172:16 184:21 185:13,24 203:4 205:8 233:10 244:7 252:23

**moves** 41:18

**moving** 27:12,13 46:15 52:18 71:15

**multiple** 20:16 46:3

---

**N**

**named** 50:12

**names** 12:23

**Nancy** 6:5 237:22 238:13 241:6 242:25 243:3,4,25 244:12 245:8

**native** 251:3 253:3, 14,17,25

**nature** 83:24 97:8 174:5

**nebulous** 61:12

**necessarily** 86:25 125:11 182:12

**necessitated** 125:20,22

**needed** 20:13 35:11 36:17 89:19

**negative** 91:9 92:2,3

**negotiate** 156:7,16, 19 168:13

**negotiate/ renegotiate** 69:2

**negotiated** 168:16

**negotiating** 46:16

**negotiations** 46:2 48:12,16 103:25 222:11

**neighborhood** 170:25

**Nelms** 12:24 13:23 76:14

**net** 192:19

**Netflix** 27:11

**Nexpoint** 5:6,17 24:17 25:4,20 26:4,8 27:23 28:2 37:12 38:9 49:18 52:25 54:12 64:23 71:3 72:8 75:23 77:20 80:24 81:13 82:10,18 84:10 85:2,21 86:15 87:20 88:11,17 94:3 96:10,12 97:8,17 98:11 106:6,20 113:5 114:5 116:5,9,10,22 117:8,24 118:5 119:2 121:25 122:20,23

123:15 124:10 125:5, 13,16 130:12 131:7, 17 134:5,20 135:19, 24 139:9,16 141:23 142:12,19 143:6 144:10 146:22 147:14,21,25 151:25 156:4 194:18,21,24 198:25 199:9 200:12 202:17 204:6 218:25 222:6 223:5 225:5,16 226:6

**Nexpoint's** 82:12 116:18 117:2,4 144:7

**Nguyen** 89:14 90:17 91:19

**nineteen** 187:15

**non-individual** 247:4

**non-lawyer** 63:21

**non-lawyers** 31:25 255:6

**non-tax** 181:9

**nonpayment** 194:18 200:10,20,25 201:5

**nonresponsive** 77:9

**nonsense** 76:24 232:24

**nonsensical** 86:21 98:6 158:15

**normal** 71:20

**north** 177:2

**Notary** 6:18

**notations** 257:23

**note** 21:4,9 25:7,11, 15 33:10,11,12,16 52:25 53:4 55:3,11, 12,21 56:11,18 57:19 58:8 59:13 60:14 61:15 62:23 63:2,8,9, 11,17,22 64:10,18,23 65:6,12 66:19,23 67:20 68:24,25 72:6, 9,25 80:24 84:14 87:5,8 88:6 89:8,12 92:6,13 93:10 97:13, 22,24 98:15,16

105:5,7,23 106:6 107:23 108:2,4,7 109:5 110:18,20,22 111:18 117:10 118:25 122:2,4 124:9,11 125:3,21 128:16 131:10,11,14, 23 132:6 134:4,21 141:24 143:6 145:7, 10 146:5 149:3 151:25 152:18 157:15 159:17,18 162:16 179:6 183:22 184:8 193:6 197:13 200:9,20,24 201:5,8 218:10,12 219:4 220:6 221:19 229:4, 23 232:5,17 233:16 235:6,7 250:3,7

**note-taker** 72:25

**noted** 259:13

**notes** 45:18,20 50:19,23,24 51:2,3, 15 52:3,7,12,22 53:15,16,17,18,19 54:3,4,8,15,20,22 55:3,8,18,20 56:4,7, 12 57:4 58:11,12,17, 20 59:4 60:3 61:6,22, 23 62:12,21 72:19 73:6,9,17,21 75:25 76:6,7,18 77:3,9 93:8 95:8,25 117:19 144:19 145:10,18,19 151:11,24 152:6,16 153:7 176:18 178:7, 9,14,16,19 179:2,3 182:19 192:9 218:13 219:10,18 227:5,9,16 228:2,5,24 229:12, 14,16,20,22,24,25 230:5,11 233:21 234:13 235:11,14 236:2,19 243:7,8 245:25 248:7 249:8 251:18 253:6,7 258:14

**notes'** 60:20

**notice** 8:18,20 9:20 25:11 37:22,24 85:9, 10 98:2 115:3 158:19 245:23

**noticed** 205:11

**Notices** 9:16

**November** 37:22,23 45:5 46:5

**NPA** 38:2,3,9,15 63:10 64:14 87:6 90:14 92:16 140:2 150:12 151:8 196:3 200:4 205:25 219:11

**nth** 138:19

**number** 7:17 22:20 63:2 92:2 97:19,23 153:7,9 165:2 169:6 171:20 196:10 222:23 229:20 230:23 236:17

**numerous** 135:7

**nutshell** 50:7

---

**O**

**object** 34:24 72:4 85:16 157:20 159:3 186:3 187:2 234:2

**objected** 34:19

**objection** 17:22 19:16 20:2,24 21:20 24:15 25:22 28:17 30:18,22 31:15 35:20 40:20 48:24 55:5,22 57:7,21 59:7 61:9,25 64:24 66:11 67:10 72:3 82:13 84:3 85:23 86:5,17 87:21 90:11 91:4 93:3 94:20 95:16 96:16 97:10 105:9,17,21 111:11 113:22 115:17 117:12 120:17,25 121:11 122:13,21 124:13 125:9 126:7,19 127:18 129:18 134:9 135:3 137:18 138:5 139:6,21 140:10 142:14,21 144:21 145:13 146:23 150:23 152:7 154:2 155:11 157:20 163:19 164:2 165:11, 13 168:10,21 169:10

171:6,17 172:5,23 175:3,22 176:11 178:11 179:8 180:3, 9,20,25 183:3,24 184:15,24 185:16 186:13 188:3,18 189:9,13 190:16,25 191:9 192:5,22 195:12 197:14 199:7, 11 200:14 201:15 202:5,18,21 203:16 205:17 209:15 210:5 216:2,14 217:3,15,24 218:15 219:5 220:14, 25 221:10 225:8 226:2,13,21 227:11 228:8 230:2 232:19 233:25 235:18 236:6 238:5 239:2,25 240:10,17 241:9,16, 18,25 245:10

**objections** 10:3

**obligation** 105:6 120:15,23 121:4,7 134:19 138:25 146:4

**obligations** 104:18 116:11,19 117:5 135:24,25

**obligor** 58:18 229:19

**obligors** 51:24

**obviated** 98:19

**obvious** 60:6 64:8 157:23 158:2,5

**occur** 179:25

**occurred** 108:24 237:9

**October** 5:7 23:14 24:6,9,11 26:10,14, 15 35:15 36:19 46:3 259:4

**odd** 91:7 173:7 187:20

**off-record** 8:19 23:23 43:12 55:15 69:19 106:24 107:7 112:2,8 146:13 148:8 160:13 194:7

**offers** 63:16

**office** 115:22 116:7, 12 204:18 205:13 212:6

**officer** 36:21,24 37:4 39:7,9,17,18,22,24 40:8,13 49:24 117:24 123:17 140:6

**officers** 16:19 40:7 138:2,24 174:25

**official** 75:8,11 80:10

**offline** 251:25 252:6 253:10

**offshore** 154:24 236:18

**oftentimes** 80:19 114:11,13 182:24

**Okada** 176:17

**Okada's** 177:4

**okayed** 118:20

**one's** 228:13 247:24

**ongoing** 203:23

**operate** 104:13 167:9

**operating** 74:22 167:9 203:2

**operation** 239:10

**operational** 36:9

**operations** 16:13,15 36:6

**opinion** 26:12,17,20, 23,25 27:4 29:20 30:7,11,16 31:4,7,21, 24 32:5 63:19,20,24 154:7,11 189:15 239:7

**opinions** 27:21

**opportunities** 46:13

**opportunity** 159:20 184:19 185:10

**opposed** 62:10 87:8 92:2 97:17 132:11 143:6 162:19 216:11, 24 219:3

**opt** 37:15

**optimism** 188:12,13, 17,22

**optimistic** 192:25

**options** 87:11

**oral** 210:16

**order** 17:18 155:15 190:22

**organization** 20:12, 17 22:16 121:17

**original** 56:3,19 150:11 151:8 198:17

**originally** 53:10

**outflows** 59:17

**Outlook** 75:10 80:5

**outstanding** 52:14 56:23 85:8 209:2 229:21 230:14,23

**overhear** 103:5

**overpaid** 222:2,7,18 225:6,17,25 226:6,20

**overpayments** 223:4

**overrule** 18:25

**oversight** 18:15,19 168:3

**owed** 87:5 92:16,18 110:11 146:22 147:6 180:8 184:8

**owes** 145:22 205:6

**owing** 52:13 86:23 93:14 98:4,17 110:14

**owned** 205:2

**ownership** 15:17 26:7

**owns** 121:18 186:16, 17,20

---

**P**

**p.m.** 5:8

**Pachulski** 5:20 254:19 255:3

**paid** 64:15 88:6

91:15,17 93:14 105:24 108:3 129:7 139:16,18,22 142:5 145:6 153:6 164:9 167:9 173:6 177:7 179:6 201:23 204:16 225:13 227:6,10 228:2 230:7

**palatable** 42:5,7

**paltry** 139:25

**pandemic** 27:10

**paper** 203:4

**par** 153:25

**paragraph** 51:13,17, 19 66:2 68:8

**paralegal** 69:24

**paraphrase** 136:3

**pardon** 26:24 48:4 53:8 123:20 133:10

**parentheses** 91:8

**parse** 122:25

**part** 17:15 30:6 42:3 66:18 71:21 101:2,16 105:11 108:15 114:6 116:12,14 155:19,21, 22 172:20 173:3,14, 24 174:22 176:10,23, 24 177:24 178:25 179:12 192:7 203:23 208:19 222:10

**participants** 74:19

**parties** 114:16 118:22 144:18,25 205:25 255:9

**partner** 6:3 208:6 238:14,19 239:9,12 241:15 242:8,12,13, 22 244:4

**partners** 214:6,21 215:12,25 238:15 242:15

**partnership** 14:17 15:12,15 238:16,24 239:10,19,24 240:6, 8,13 241:4 242:10, 11,15,23 243:5

**partnerships** 240:5

**parts** 22:15 102:3

**party** 59:15

**pass** 160:14 248:17

**past** 85:22

**Pat** 176:5

**path** 223:8

**pattern** 163:17 204:5 206:6 213:3

**Paul** 176:6

**pay** 28:23 29:15 31:19 57:17 58:2,4, 22 65:15 82:11,19 116:22 133:14 144:7 158:10 172:9,11,14 173:10,12 177:8,17 206:12 211:5 216:10 226:19 227:16

**pay-downs** 57:25

**payable** 25:12,16 80:25 88:22 97:14 104:18 116:23

**payee** 59:4 60:23 61:5,13 69:2,9 124:8

**paying** 45:19 116:18 139:9 145:24 204:20 205:14 215:25 229:19

**payment** 25:5 51:25 52:11,22 65:21 71:23 72:2 81:12,22 82:12 84:11,13 85:3,4,18, 21,25 86:2,16 87:20 88:12,18 90:21 91:10 92:8,9,13,23,25 94:4, 16 95:3,12,14,15,19 96:10,11,12 98:3,12, 20,21 103:20 105:4 106:6,11,21 108:5,8 109:2,6,19 110:3,9, 22 111:10 117:10,25 118:2,11,15,19 119:2,11,13 120:16 121:10 125:19 126:25 127:24 128:4, 13,15,17 130:17 131:8,10,18,24 132:6,21 133:12 134:4,21 142:4

143:19 146:3 149:19 156:4 195:10,23,25 199:18 200:10,20,24 201:5 214:25 215:6, 8,12,13,18 216:12, 19,24 218:8,11,22 219:2,12 220:4 229:15 231:5,6,16, 18,19 244:3 249:7, 11,13,17,20 250:5

**payments** 57:12 58:6 66:23 82:20,21 89:11 90:24 91:20 95:6,8,22 96:2,19 99:20 101:20 102:19 103:21,22,24 104:3,4 110:19 115:10 116:15 117:18 118:7 126:18 127:4,22 128:25 129:17,22 130:5,9,14 131:3,20 132:4,23 134:13 143:22 145:4 154:23 179:23 182:21,22 183:7,20 184:5 195:19 216:8,10,22 217:14,18 218:4 220:12 224:21,22 229:3,4,11,17 230:4, 10,19,22 249:20 250:6 251:18,23 253:7 256:18

**payoff** 59:17

**payor** 61:13

**payroll** 110:15 255:23

**pays** 116:10

**PDF** 250:23 254:11

**penalty** 247:3 259:11

**people** 13:6 19:24 20:15 132:9 133:8,9, 23 138:12 167:8 176:4 178:8,20 211:12,19 216:5 254:25

**perceive** 124:11

**perceived** 124:16

**percent** 186:17

**performance** 164:6 166:11 170:14,16

172:13,14 190:7,13

**performed** 36:17
206:8 210:10 225:13

**performing** 205:25

**period** 30:3 39:9
45:4,25 50:14 60:21

**periodic** 130:9,14

**periodically** 8:9

**periods** 27:11
235:11

**perjury** 247:3 259:11

**permeates** 244:20

**permission** 72:18
74:18,25 133:14

**permitted** 35:23
61:16 118:21 238:15

**permitting** 61:21

**person** 16:14 61:14
69:22 136:11,19,24
141:8,14 160:16
254:15

**personal** 54:14
77:17 153:20,23
220:11

**personally** 9:17 45:8
138:6

**personnel** 132:20,23
133:14

**persons** 239:18

**perspective** 18:9
35:8

**persuade** 137:17

**petition** 32:3

**ph** 14:2 176:6,7

**phone** 7:10

**phrased** 221:20

**PI** 109:9

**pick** 181:10

**picking** 235:3

**piece** 186:20 246:25

**pieces** 170:18
222:16

**pin** 37:9

**place** 37:11 44:3
74:13 104:12 148:2

**places** 161:25
185:22

**plan** 12:3,5 13:3
14:11 15:22 24:23
40:18 41:3,8,14 42:3
44:17 45:11,18 46:15
47:4 50:3,5,8,10
52:16,19 53:7 63:6
104:10 158:10
159:19 222:11

**plans** 62:25

**play** 243:21

**played** 143:4

**player** 11:17

**point** 31:6,9,13 45:7,
12 47:2 49:15 53:4,7
55:24 62:24 93:2
94:2 130:16 147:22
149:6 193:18 208:16

**pointed** 94:24

**pointing** 91:21
241:24

**points** 238:21

**policies** 104:11,17,
23 148:2

**polite** 224:4

**portfolio** 22:5,6
186:23 187:4,6,8,12,
17

**position** 49:11 191:3
232:15 233:19
234:10 239:8 242:7

**positions** 123:18

**positive** 123:24

**possibility** 199:16
210:8

**post** 16:12

**post-confirmation**
15:3

**post-payment**
200:11 219:14

**pot** 40:18 41:3,8,14,
16 42:3 44:16 45:11,
17 47:4 52:16 222:11

**potential** 77:3,23,24
168:17 175:2,8 188:6
190:4 191:22 192:2
235:13

**potentially** 54:9
118:6 125:11 176:8
178:25 191:12

**power** 184:10

**practice** 82:24
175:20 204:5 213:3

**practices** 104:14

**practitioner** 14:8

**preamble** 56:8

**precarious** 53:21

**precise** 186:15

**precondition** 234:18

**prefer** 139:8 140:12

**preferred** 154:5

**premarked** 196:7
206:23 213:23
245:16

**prepaid** 92:7,8,13,
14,18,25 93:12
98:15,19 142:7

**preparation** 148:21,
23

**prepared** 10:4 92:19
118:18,25 235:8,15
247:11

**preparing** 116:15

**prepay** 66:2,17
67:16,18,21

**prepayment** 65:25
66:16 68:2 142:20

**prepayments** 93:9
141:23

**presentment** 69:6
98:2 219:20

**press** 22:3

**pressed** 74:14

**pretty** 11:24 23:6
35:5 46:14 48:2 52:8,
9 64:8,17 74:2 98:20
131:19 147:20 166:4
207:11 221:15
224:15 232:22
237:12 242:4 252:14

**prevailing** 136:23

**previous** 93:2

**previously** 17:3
112:17 258:13

**principal** 51:25
56:23 66:18 67:2
89:7 90:25 91:17
149:3 198:17 219:2
220:4 230:9,10,21
231:18

**principals** 123:22
236:15

**print** 112:11

**printed** 196:22

**prior** 10:8 13:13 17:4,
11 22:23 32:2 39:9
42:21 46:4 55:18,20
56:4,7,12 59:2 61:3,
20 67:6 71:6 75:13
80:4,14 85:17 90:23
94:15 98:10 100:18
104:10 106:16 108:3
112:12 113:19 123:7
126:14,15,21 128:12
144:18,19,24 145:20
162:10 164:11,14,15
165:5,6 169:25
196:14 229:17 230:7

**privilege** 77:24

**privileged** 78:14,19
198:13

**problem** 42:25

**problematic** 182:12

**problems** 60:2

**procedure** 74:22

**procedures** 104:12,
17,23 148:2

**proceeding** 109:10

**proceedings** 11:10

**process** 108:12
191:20

**produce** 252:12
253:4

**produced** 79:2,11
89:22 90:3,14 199:4
231:6 250:11 251:17
252:10 253:20 256:8,
13,17

**production** 77:4,24
219:8 255:19

**productions** 251:12,
16

**professional** 54:25
138:15

**professionals** 49:3

**program** 175:6

**programs** 174:24

**prohibited** 68:23
157:14

**promissory** 25:7
50:19,23 51:2 55:12
56:11 57:4 58:11
59:4 61:6 122:2,4
124:9,10 125:3 132:6
197:12

**promoted** 153:17

**prompted** 107:16
108:25

**proper** 154:14

**properly** 35:4 236:13

**properties** 254:7

**property** 8:9

**propose** 42:4 44:16

**proposing** 41:8

**prospect** 171:11

**prospects** 187:23

**provide** 52:15 114:8
144:12 145:25 211:5
212:6 253:14

**provided** 31:25
47:17,18 76:25 78:7,
9 114:11,13 115:22
135:25 136:18 147:9

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 179-47    Filed 11/05/04305    Page 106 of 226    PageID 60408

Index: provider..related

201:13 202:2 203:14
204:18 205:13
209:13 215:24 253:4

**provider** 135:16

**providers** 254:21

**providing** 115:7
144:10 147:14 204:5
210:2,17 254:3,4

**proving** 34:6

**provision** 143:2
219:10

**prudence** 136:21

**prudent** 136:23
142:18 145:6

**PST** 254:5

**Public** 6:18

**pull** 89:14 154:18
196:6

**pulled** 43:17

**pulling** 20:15

**purports** 113:3

**purpose** 60:4,5
145:12

**purposes** 21:8 68:13
132:11 179:5 182:11

**pursuant** 17:17
20:21 21:17 82:24
142:18 183:22

**put** 22:2 23:17 24:13
33:16 34:8 41:15
73:14 140:23 148:6
151:20 191:20
236:14

**puts** 117:22

**putting** 108:10


**Q**

**quality** 256:13

**question** 17:23
19:17,18 20:3,25
21:11,12,21 22:22
25:23 28:18 30:19,23
31:16 34:25 35:18,21
36:8 40:21 48:25

55:6,23 57:8,22 59:8
60:10,11 61:10 62:2
64:25 66:12 67:11
72:11 77:10 82:14,20
84:4 85:15 86:18
87:22 90:12 91:5
93:4 94:21 95:17
99:21,22 102:8
105:10,18 111:12,23
113:23 115:18
117:13 120:18 121:2
122:14 124:14
125:10 126:8,20
134:2,10 135:9
137:19 138:9 139:7
140:11 142:15
144:22 146:24
147:11 155:12
157:21 163:20 164:3
165:14 168:11,22
169:11 170:4,8
171:18 172:6,24
175:4 176:12 178:12
179:9 180:10 181:2
183:4,25 184:16,25
185:2,9,17 186:14
188:4,19 189:10,14,
18,23 190:2 191:2,10
192:6,23 195:13
197:15,25 199:12
200:15 201:16,19,20
202:8,22 203:17
205:9,18 209:16
210:6 212:9,11
216:3,15,17 217:4,6,
16,25 218:16 219:6
220:15 221:2,11
225:9 226:14,22
228:9 230:3 232:20
233:3,12 234:9
235:4,19 236:7
237:18 238:6 239:3
240:2,11,18 241:19
242:2 245:11 248:21
249:5

**questioner** 223:7

**questioning** 99:8
160:25 194:17

**questions** 21:8
85:16 102:5,15
235:22 248:23 249:6

**quick** 136:12 147:7
207:11

**quickly** 23:7 100:4

**Quinn** 69:24 70:6

**quip** 189:21,24

**quote** 44:7 182:6


**R**

**raise** 155:13

**ramifications**
137:16 140:21 141:3
143:19,21

**ran** 22:14 256:5

**range** 162:25 164:18,
21 166:4

**rare** 174:20

**rate** 54:5

**re-trades** 46:4

**read** 21:12 51:19
56:2 62:20 65:14,22
66:16,22 67:8 101:2,
11,14,16,23 102:2
110:24 113:2 136:7,
15,16 137:5 141:14
147:10 150:10 170:5,
7 185:2,7,8 229:4
234:5,8 247:16
259:11

**reading** 22:4 137:12
143:5

**real** 8:8 45:15 62:13
136:11 147:7 244:18

**reality** 222:25

**realize** 132:5

**realized** 107:25
111:18

**reason** 30:12 43:22
57:16,18 64:7 73:23
83:11 111:8 113:12
117:11,16 120:9
184:9 219:15,17
224:5 227:8,25
247:13,25

**reasonable** 117:8

**recall** 23:13,25 37:6,
10,14,18,21 38:5,17,
21,23 39:4 40:19

43:13 47:6,21 58:6
64:5 71:9,12 72:14
73:13 74:13,23 76:9,
16,20,25 80:21 81:2,
4,21,23 82:9,15
84:12,17,19,21,25
89:2 94:5,14 101:14
104:5,7,16,20,22
107:12,16 109:4,8,9,
11 110:5,23 113:24
119:23 120:4 126:24
127:21 129:20
130:19,20 131:19
145:17 150:19
151:18 152:25 153:3
157:7,11 162:6
173:2,16 182:5 188:5
195:14 198:19,21
199:2,21 201:2,11
208:2 209:23,24
216:17 217:8,9,20
218:6,19 219:23
221:4,7 222:19,21
226:15 227:14,18
228:17 230:25 246:7,
24 249:9

**receive** 174:25

**received** 81:24 108:5
115:24 176:8 177:23
203:20 215:12 216:7
217:13 225:17
243:15 251:13

**receives** 167:4
179:12

**recently** 251:14

**recess** 99:3 112:5
146:16 160:10
213:18 248:11

**recitation** 11:13

**recognize** 70:21
107:10 227:22

**recollect** 177:7
229:10

**recollection** 39:5
40:9 82:9 88:15
93:11 97:2 100:14,
17,21 102:23 134:24
151:6 164:18 211:8,
19 212:3,11 228:21
229:9 230:18

**reconsider** 138:4

**reconstituted** 14:16

**record** 8:4 23:17
24:14 38:15 53:14
73:23 74:14,25 99:2,
5,7 111:25 112:4,7
146:15,18 160:9,12
213:17,20 248:10,13
257:16

**recorded** 74:18 80:5
83:12

**recording** 99:23
100:12

**redacted** 251:21

**Redeemer** 237:2

**reduce** 110:11

**reduction** 132:15

**refer** 187:8,17 202:9,
25

**reference** 108:18
127:8 149:22

**references** 55:18

**referred** 143:16
186:23 187:4,5

**referring** 96:5 116:4
202:19,23

**refresh** 23:18 24:5
128:10 164:17

**regard** 198:16

**regular** 8:15 71:13
132:11

**reimbursed** 209:22

**reimbursement**
110:15 209:20

**reimbursements**
209:2,6

**reinstate** 157:15
159:17

**reiterated** 108:9

**relate** 226:18

**related** 32:23 80:23
95:4 103:22 104:17
114:16 124:18
129:23 174:16

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 179-47    Filed 11/06/04305    Page 107 of 226    PageID 60409
Index: relation..search

182:18 209:5 223:9
227:4,5 240:5

**relation** 178:7

**relationship** 62:6
138:12 169:25

**relevant** 11:14 130:4
223:18 224:4

**relied** 48:10

**rely** 59:15 117:9

**remain** 167:15

**remember** 36:25
71:16 79:19 84:8
108:19 129:15
131:16 133:20 151:3
155:18 181:22
194:19 224:12,14

**remotely** 7:3

**removed** 17:18
21:24

**remuneration** 115:25

**renegotiating** 68:23

**renegotiation** 68:2,
4,9,20

**reorganization** 165:19

**reorganized** 15:9,
13,15,20 16:2,3
24:19,23 30:13 41:17
77:2,15 153:13

**rephrase** 7:25 19:18
218:3

**replace** 133:7,8

**report** 16:10 81:25
83:22 90:9 112:12

**reported** 22:12
143:17

**reporter** 5:11 6:9,15
18:12 19:5 21:14
29:4 37:25 46:20
62:15 76:12 82:5
86:4 87:13 90:19
94:19 99:11 100:3,7
121:14 125:7 135:5
138:11 152:10 169:9
170:7 171:8 185:7,8

190:18 234:8

**Reporting** 5:11,13

**reports** 22:4 92:20

**represent** 5:17 43:16
90:2 112:14 113:6
231:22 256:4

**representations** 58:23

**representatives** 51:22

**represented** 102:14

**representing** 5:23
6:4,12

**request** 36:17

**requested** 76:9
118:18 258:13

**requesting** 74:18

**requests** 75:23 76:5,
6,17 77:20 78:17
254:17 255:8

**required** 130:9
142:25 145:6 219:18

**requirement** 219:21

**requires** 33:4

**resignation** 23:9

**resigned** 24:6 26:11
35:16

**respect** 11:12,25
14:19 17:24 33:2
35:13,23,25 36:5,6,
14 62:3,11 77:18
84:6 85:20 101:20
104:12 106:5 120:8,
15 121:24 122:2,3
123:8 125:2,16
128:16 129:5 133:10,
12 135:10 141:7,8
143:5,11,18 144:16
148:3 154:24 155:4
156:20 175:13
176:22 210:16
218:23 219:19
232:21 236:16
238:12 243:25
246:11,17

**respective** 123:22

**respects** 133:11

**respond** 71:22
254:16

**responding** 75:22
217:12 218:13

**response** 76:16
130:2

**responsibility** 116:22

**responsible** 116:18
154:13 156:14

**responsive** 76:2,19
77:19 78:7,16 253:20
254:13 255:7

**restate** 33:23

**restated** 112:22
113:4,16

**restroom** 98:23
146:8

**restructured** 150:13
151:9

**restructuring** 39:17
161:14,23

**retail** 144:11

**retain** 153:13 175:12
179:14

**retained** 24:24

**retention** 179:13

**return** 110:6,8

**returns** 169:2

**Revenue** 182:16

**review** 77:4,17,24
136:8 141:19 203:24
247:23 253:19
255:22 256:2,11

**reviewed** 247:10

**reviewing** 7:4

**revisit** 140:18

**RIF** 132:14

**rights** 59:4 60:23
61:5

**rise** 238:25 241:5

**risen** 73:20

**risk** 147:12

**risks** 236:16

**Rober** 133:20

**Robert** 255:18,21
256:9

**role** 12:6 13:14
14:18,22 15:7 20:22
21:18 22:5 26:4
49:17 121:25 122:12
124:5 133:15 143:4
144:19 174:22
238:19 239:12
242:12,14 246:11

**roles** 21:24 23:21
242:9

**roll** 54:21

**roll-up** 53:17,18
56:12 61:21 62:11
63:13 151:24

**rolled** 54:2,22
145:10,19 151:13
152:6,17 153:8

**rolling** 60:3 144:18
236:19

**Romey** 150:9,19

**room** 54:18

**roughly** 57:11 136:4
137:6

**roughshod** 22:15

**round** 23:6 88:2,8
134:17

**RQ** 250:21 258:10

**rude** 228:12

**Rukavina** 5:16,17
6:21 8:17 9:11,14
18:17 19:11 23:15,24
33:2,10,14,19,24
34:3,11,14 38:8 43:7
46:24 55:9,16 62:17
69:11 70:19 76:15
79:4 86:9 87:16
89:13,20 90:20 98:22
99:6,16 106:23,25
107:9 111:24 112:9
146:7,10,19 148:6,9,
14 149:25 152:11

159:21,24 160:24
183:9,13 194:16
220:20 223:14
228:16 235:21
248:19,25 249:4
250:21 251:8,13,24
252:5,9,13,16 257:8,
14

**Rukavina's** 196:9

**rule** 18:8 186:7

**run** 15:23 50:15
114:7 140:22 167:7,8
185:20 212:21
238:15

**running** 21:10 27:23
239:10

**runs** 16:5

**Russ** 76:13

**Russell** 12:24

---

**S**

**salary** 155:14 173:11

**sales** 19:3,6,7

**sat** 188:14

**satisfy** 35:8

**satisfying** 219:3

**scam** 180:14

**schedule** 54:21
117:23 249:19,22

**scheduled** 118:3,6
131:8,10 142:4,7
146:3

**schedules** 245:24
246:4 251:17

**scheduling** 133:13

**School** 10:23,25

**Scott** 40:3

**screen** 196:18

**scroll** 89:23 90:16
91:12,18 207:21
213:25

**search** 178:14 256:5,
9

**searches** 254:16 256:6

**searching** 255:2

**secret** 212:23

**section** 56:2 65:13 66:4,15 67:7,16,24, 25 102:6 116:14 135:12,21 136:5,7 137:8 141:6 142:19 143:3 144:17

**security** 54:6

**seek** 63:8

**seeking** 72:18 74:25 209:22

**Seery** 5:1,5,24 6:1,24 7:1 8:1,23 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1,9 44:1 45:1,8 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1,24,25 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,20 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,7 80:1 81:1 82:1,10 83:1 84:1 85:1 86:1 87:1 88:1 89:1,22 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1,8,17 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1,15 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1

137:1 138:1,3 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,6,14 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1,2,15,20 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1,18 170:1,10 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1,16 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1,22 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1,2, 19 224:1,23 225:1,2, 18 226:1,15 227:1,22 228:1 229:1 230:1 231:1 232:1,14 233:1,2,13 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1,22 242:1 243:1 244:1 245:1 246:1 247:1 248:1,16,21 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1,16 257:1,18 258:1 259:1,23

**Seery's** 138:21

**segment** 194:2

**Select** 18:22 22:7 27:8

**sell** 63:8

**selling** 87:8

**send** 67:21 77:23 85:10 107:17 218:24

219:7 251:4 254:11

**sending** 71:6 72:9 94:15 98:10

**senior** 11:18 173:4, 17,18 174:17,25 176:21

**sense** 35:19 229:8

**sensitive** 30:14

**sentence** 65:14,18 135:22

**separate** 30:12 155:3 223:10

**separately** 142:10

**separation** 46:16

**September** 46:3 246:10,12

**server** 77:15

**service** 82:20 117:20 127:4 129:6,22 134:13 158:11 201:17 208:19 222:3, 8 223:4 229:2,11

**services** 36:2,5,15, 16 37:11 38:19 39:2, 8 46:22 62:5 95:4 103:21 110:14 112:21,23 113:4,17 114:8,12,13 115:6 116:2,8,13 127:22 129:25 130:8 132:22 134:24 135:15 139:12,24 143:22 144:6,11,12 147:8,9, 14 153:14,24 158:7, 21 161:13,17 162:23 167:6 198:16 200:9 201:13,14,21 202:2, 3,9 203:10,14,15,21 204:6,7,8,18,19 205:2,7,13,15,22,24 206:7,10,18,19 209:5,8,12,13 210:3, 4,10,17 211:5,6 212:5,6,7,14 215:25 216:4,9 219:12 222:13,18 224:21 225:6,17,24 226:5,19 227:4

**Services'** 205:5

**set** 81:17 85:9 114:6

**settled** 27:16

**settlement** 20:21 21:17,23 44:11,18 45:9 46:13 156:7

**settlements** 156:19

**severance** 176:24

**Sevilla** 207:24 208:8, 10,13

**shady** 151:23

**shared** 35:25 36:5, 14,16 37:10 38:19 39:2,7 46:22 62:5 80:16 82:20 95:3 103:20 110:14 112:21,23 113:4,16 127:4,22 129:6,22,25 130:8 134:13,23 143:21 147:8 153:14 158:7,10,20 201:13, 17 202:2,9 204:6 206:18 209:5 212:6, 14,24 222:2,8,18 223:4 224:21 225:6, 24 226:5,19 227:4 229:2,11

**shares** 188:11

**sheet** 28:24 29:9 31:14,18 35:4,7 236:14

**sheets** 222:12

**shocks** 184:17

**shoes** 241:14

**shorting** 27:10,11

**shortly** 71:14 95:21 206:25

**show** 118:17 196:5 206:21 236:15 245:15 249:21 251:22 254:5

**showed** 99:8

**showing** 213:22 245:20 250:5 251:17 254:7

**shows** 185:22 222:15 237:13 249:20,22

**side** 8:7 48:19 64:11 125:17 225:20,23

**sides** 54:2 145:21

**sign** 91:9

**signature** 70:24 107:14 246:19

**signed** 184:8 247:3

**significant** 13:20,22 168:23 174:14 236:12

**significantly** 169:15,19 170:11,17 171:2,9,15,23,24

**similar** 77:10 80:4 126:5 143:23,25 153:8 166:24 174:24 196:3 200:4,12 206:6 216:4 236:21

**simp** 228:5

**simple** 147:11 233:12

**simply** 171:12 174:6 226:18

**simultaneous** 9:13 21:13 29:2,25 33:21 42:23 44:6 49:22 59:10 70:18 79:3 85:24 94:11,18 98:24 102:12 109:12 121:13 122:22 132:16 135:4 138:10 142:23 143:24 152:8 163:4 164:24 165:21 169:8 171:7 180:21 185:4 189:16 190:17 191:15 204:24 210:22 223:11 230:12 233:4 244:22 246:22 247:22 252:2 253:24 255:11 257:11

**simultaneously** 124:7 125:6

**single** 73:24

**sir** 6:22 8:4 9:15,23 12:23 13:10 14:22 16:11,23 24:2 28:21 33:14 43:14 49:20 51:11 56:16 61:3

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 179-47    Filed 11/09/04305    Page 109 of 226    PageID 60411

Index: sit..systems

65:12,13,18 66:20
68:22 69:12 88:24
90:18 91:15 92:4
106:25 107:9 112:19,
25 115:12,21 120:11
124:6,19 135:13,22
136:6 141:6 142:17
147:8 148:7,15
150:2,17 151:21
152:12 159:3 252:17

**sit** 164:8 165:8
228:22 247:12,20

**sitting** 10:9 109:15
113:11 129:15 131:5,
15 137:8

**situation** 175:7
196:3

**sixty** 38:4

**sixty-day** 37:24 38:2

**skill** 136:21

**skills** 26:21

**Skyview** 208:16

**slice** 245:20

**sloppiness** 66:10

**slow** 100:5

**slowly** 160:18

**small** 186:20

**smart** 227:23

**Smith** 5:12

**sold** 22:11 188:10

**solely** 13:14 182:14

**solicit** 63:16

**solve** 234:20

**solvency** 28:4,10,13,
19 29:21 30:7,17,24
31:5,7 34:4,5,6
232:6,17 233:23
234:15 235:5,10,16,
23

**solvent** 233:21
234:12 236:4

**sort** 43:3 48:15
111:21 188:12
204:10 244:19,20

**sound** 43:2 182:8

**sounds** 48:18

**speaking** 9:13 21:13
29:2,25 33:21 42:23
44:6 49:22 59:10
70:18 79:3 85:24
94:11,18 98:24 100:3
102:12 109:12
121:13 122:22 125:6
132:16 135:4 138:10
142:23 143:24 152:8
163:4 164:24 165:21
169:8 171:7 180:21
185:4 189:16 190:17
191:15 204:24
210:22 211:19
223:11 230:12 233:4
244:22 246:22
247:22 252:2 253:24
255:11 257:11

**speaks** 113:25

**specific** 20:13 39:4
46:4 47:23 76:8,21,
22 84:12 93:10 97:25
120:4 154:21 171:19
202:10 206:5 211:15,
18 212:2,10 216:18
218:21 221:4 224:12,
14 227:18,20 228:18
229:9 230:17 235:22,
24 249:10

**specifically** 43:15
71:12 77:8 81:23
90:5,6 97:24 118:5
122:3 133:5,7 135:25
150:24 152:25 153:3
155:19 162:12
198:21 199:2,21
201:11 208:3 209:24
210:19 219:24
227:16 228:15
230:25 246:8

**specifics** 217:20

**speculate** 111:13,
16,17

**speculating** 108:12,
15 111:14,15

**speculation** 152:3

**spend** 86:22

**spent** 13:18,20,22

**spoke** 177:13

**spoken** 208:9

**spreadsheets** 253:3

**spring** 203:25

**staff** 135:15

**stand** 107:21

**standalone** 203:2

**standard** 72:5 74:21
79:24 144:17

**standards** 61:7,11

**Stang** 5:20

**start** 5:3 52:20 179:3
183:15 190:20

**started** 46:16 160:24
213:8

**starting** 40:23 41:8
42:10 44:15

**State** 6:23 8:10,14

**statement** 52:4
58:18 128:25 246:2

**statements** 251:20
258:19

**states** 11:3

**status** 200:20,25
201:6

**stayed** 18:3

**step** 180:15 239:11
243:2

**stepped** 238:19
242:11

**stepping** 241:14,21

**steps** 98:9 242:22

**stick** 105:12

**Stinson** 6:2,4

**stock** 164:22 173:12

**stooge** 154:9

**stop** 193:18 196:23

**stopped** 45:7,9

**story** 76:23 159:2
222:10 225:15 233:8

**Strand** 12:16 13:14

**street** 140:25

**strewn** 140:25

**strictly** 60:23 225:21

**strike** 26:24 39:15
47:8 51:18 53:8
61:17 78:4,12 83:17
86:12 93:23 110:7
127:13 133:11
172:17 185:24
190:20 205:9 220:9
231:24 233:11 244:8

**strip** 140:2

**stripping** 53:23
144:14

**structure** 45:17
155:15 166:12
179:21

**structured** 173:6,8
177:18 181:4

**structuring** 182:10,
13

**struggle** 85:14

**style** 67:24

**stylistic** 68:13

**Sub-trust** 16:8

**subject** 10:2 18:5
54:9 145:16 182:19
184:11 188:25

**subsequent** 76:23
113:20 179:5 232:24
237:6

**subsequently** 12:8
18:10,13 19:2 120:23

**substance** 72:12
73:12,14 79:20 81:9
102:17 143:14

**substantial** 87:9
161:5

**substantially** 63:25
64:6,7

**successful** 168:6
169:5,14 191:25
192:13,18

**successfully** 189:6

**sucked** 35:14

**sued** 33:3

**sufficient** 199:14
244:6

**suggest** 60:22

**suggests** 68:22

**suing** 63:10 87:11

**suit** 64:9

**Sullivan** 177:15

**sum** 118:13,16

**summarize** 118:4

**summary** 17:16,20
242:5

**superior** 126:11

**superseded** 55:20
56:4

**supplemental**
251:12,16

**supplied** 93:16

**support** 43:10 58:24
115:23 147:18

**supporting** 147:23

**supports** 228:20

**supposed** 234:21
241:14 242:17
244:15,17,21 245:7

**Surgent** 16:24 17:3
40:8 153:2 211:20,22

**Surgeon** 17:2

**surprised** 193:24

**surprises** 184:14,22
185:14

**suspect** 113:12

**swear** 6:15

**sworn** 6:18

**syphoned** 62:9

**system** 254:13

**systems** 253:18,19

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 179-47    Filed 11/09/04305    Page 110 of 226    PageID 60412
Document    Page 110 of 226

Index: takes..twenty

# T

**takes** 8:14 239:9,11
242:8

**taking** 7:4 73:21
123:7 140:15 166:14
236:18 244:3

**talk** 7:23 24:16
108:14 177:14
178:18 200:19,23
201:4 240:23 251:24
252:5 253:10

**talked** 27:9 41:4
71:14 106:15 177:16

**talking** 56:11 57:10
61:13 71:19 80:15
133:13 156:8,21
166:23 180:24 188:5
194:20 202:15 232:2
239:22 240:7

**talks** 66:15 68:8,12
88:21 147:11

**tangential** 62:6

**tax** 179:5 180:17,22
181:5,8,10,16,18
182:11

**taxes** 173:9 179:6,21
180:8 182:14,15

**taxi** 181:17,19

**team** 46:17 47:18
49:9 92:21 117:22
155:5 156:24 157:5,6
168:25 211:11
247:11 252:12

**technical** 183:5

**technically** 161:24

**TECHNICIAN** 5:2
6:14 98:25 99:4
112:3,6 146:14,17
160:8,11 213:16,19
248:9,12 259:2

**telephone** 106:10

**telling** 43:19 165:12

**tells** 131:2 134:3

**ten** 98:23 140:18
171:16 178:2 193:13

194:9 245:5

**tenor** 63:9

**tens** 154:23

**tentacle** 154:9

**term** 41:3,10 51:3
53:4,10,15,16,17
54:8 59:19 60:7 65:3,
6 95:8 145:10,18
178:10 179:4,5
180:17 182:22
183:18,23 194:22
195:3,6,10,11,19
198:16 199:19
214:22,25 216:11
219:14,15 222:12
229:16,25

**terminate** 37:16
144:5

**terminated** 37:20
38:7 114:20,25
158:8,22

**termination** 38:22,
25 39:7 46:18,22
113:20 115:2 153:14
158:20

**terminations** 132:11

**terms** 54:2,3,6 60:24
65:12 108:6 115:15,
23 147:18 183:22
220:6 254:22 256:5,9

**terrible** 172:14

**test** 31:14,18,21

**testified** 6:19 59:24
62:22 101:19 107:22
117:7 119:20 120:7
127:3 141:25 151:19,
22 227:17 238:17
245:5

**testify** 10:4 128:12
159:5 182:20

**testifying** 109:4

**testimony** 61:3
101:22 119:24
126:15 127:15
221:14 224:8 225:21
229:5 238:20 239:5,
21 240:3,19 241:20
259:14

**Texas** 8:10,14

**texts** 7:5

**there'll** 99:20

**thing** 7:21 42:21
65:10 73:24 99:25
111:21 130:24 153:9
162:15 181:15
196:23 225:23

**things** 18:11,14
19:13 22:13 50:8
53:19 76:24 115:9
153:10 155:3 166:14
202:12 203:3 204:13
205:2 206:4 234:19
245:4 254:11

**thinking** 249:12

**third-party** 206:7

**thirteen-week** 82:4,
6 83:22 84:6

**thirty** 38:5 54:4 62:12
138:16 165:25
236:19

**thirty-year** 53:10
87:5 161:9

**Thomas** 16:24

**thought** 27:13 50:14
52:14 59:24 65:10
78:7 144:9 195:15
199:20 219:22
235:23 244:23

**threat** 177:12

**Thursday** 259:4

**ties** 67:6

**tight** 35:12

**Tim** 176:5

**time** 13:7,18,19,21,22
19:9 23:8 27:2,12,24
40:15 44:2 45:7,25
47:2 49:15 50:14
51:3 52:7,13,17,19,
23 53:4,7,24 54:16
57:20 59:2,18 60:8
62:24 71:17 75:15
80:7 83:4 94:2,8
95:21 98:25 99:4
100:18 103:19 112:3,
6 124:17,19 126:15,

24 128:5 130:17
134:13 145:3 146:14,
17 147:4,5,18 149:6
153:11 154:22
159:13 160:8,11
188:10 195:16 201:7,
10 208:11 211:16
213:11,16,19 221:9,
19,21 227:2 228:18
233:21,22 234:12,13
235:10 248:2,9,12
255:23 259:2

**timely** 116:23

**times** 7:15 35:14
58:2 135:8 140:18
145:8,9 204:14
227:24 242:21
257:13

**timing** 127:8

**today** 5:24 9:17 10:5,
9 14:20 24:17 55:11
109:15 113:11
129:15 131:5,16
137:9 165:8 182:20
202:17 228:23
235:15 247:12

**today's** 150:15 259:3

**told** 34:21 72:17
81:14,21 82:10 84:15
96:18,21 97:2,3
99:18,19 101:19
102:18 118:2,11
119:10,16,17 140:20
156:24 157:3 211:6
229:10

**tons** 62:9

**top** 64:4 115:7 162:5
246:25

**top-level** 162:9,10

**topic** 88:9 94:25
134:18 234:2

**topics** 9:4,9 10:5,8
76:21,22 223:9

**total** 91:15 110:11
149:3 167:19 190:13
216:20,23 217:18
230:7,8,20,21 243:7

**totally** 79:4

**touched** 245:12

**traded** 18:21

**transaction** 145:21
180:18 181:3,8
182:10,13 188:24
192:3

**transcript** 101:24
102:3 110:25 259:12

**transfer** 33:4,9 34:2,
9 217:23 232:12
257:20

**transferred** 147:20

**transition** 104:2
208:14,18

**treasurer** 49:24
123:15 124:9 125:14

**treasury** 132:21

**treat** 168:25

**trial** 38:18,21

**TRO** 43:10

**true** 36:20 43:4 52:4
86:23 112:16 113:7
117:4 206:5,7 259:15

**Trussway** 186:11,19
187:5 188:2,7 190:6,
21

**trust** 6:13 15:12,22,
24 16:5 45:20 179:20

**trust-me** 179:17,19

**trustee** 15:3,5,6,8,
10,11 238:13 243:2

**truth** 43:19 224:10

**TSG** 5:10,12

**Tuesday** 81:20

**turn** 135:12

**turned** 79:14 87:18

**TWA** 161:7

**twelve** 176:17 178:2
194:9 236:8

**twelve-minute**
193:13

**twenty** 171:4,9
193:15

Case 21-03007-sgj   Doc 153   Filed 01/20/22   Entered 01/20/22 22:37:32   Desc Main
Case 3:21-cv-00881-X   Document 179-17   Filed 11/04/24   Page 111 of 226   PageID 60413

Index: twenty-five..Zoom

**twenty-five** 7:16

**twenty-plus** 88:7

**type** 166:9,20 171:12 202:23 249:17

**types** 167:2 175:11

**typical** 166:6

**typically** 65:24 74:11 83:2 145:5 167:8 170:21 173:4 216:25

**tyrant** 140:9

**U**

**Uh-huh** 56:9,17 94:13 116:6 141:15

**ulterior** 60:4,5

**ultimate** 35:8 192:10

**ultimately** 25:10 47:18 63:8 97:13 118:4

**unable** 29:14 224:14

**unclear** 57:24 102:7

**uncommon** 61:15

**underlaid** 241:13

**underlying** 60:24

**understand** 7:25 21:22 28:12 41:7 48:18 49:16 53:3,9, 12 58:15 61:7 65:5 94:2 132:2 138:14,20 163:11 172:4 180:18 185:5 190:6 216:16 217:6 225:18 228:17 239:21 253:25

**understanding** 14:4 20:9 25:25 26:2 44:24 108:7 114:3 115:14,20 118:14 119:6 120:12 121:6 123:21 127:13 132:19 137:8 141:3 142:2 166:5 179:10 180:6 201:12,25 215:23 220:8,10

**understood** 78:22 79:15 131:25 194:24

221:23 236:16

**undertaken** 97:7 174:10

**undertook** 243:25 245:8

**unfair** 59:9 60:13

**United** 161:7

**units** 14:17 15:13,15

**universe** 103:11

**university** 10:18,20, 21

**unpaid** 22:5 51:25 60:20 66:18,24 67:2

**unsecured** 64:18 88:6

**unusual** 73:14

**unwritten** 212:4,17, 23

**upcoming** 119:13 134:21

**update** 83:24

**Upper** 8:6

**upside** 170:15 188:7, 9,14 190:4,5 191:23

**V**

**Vague** 24:3

**vaguely** 24:3

**values** 30:9

**vehicle** 140:2

**version** 9:10

**versions** 253:6 258:13

**veteran** 7:22

**video** 5:2 6:14 98:25 99:4 101:8 112:3,6 146:14,17 160:8,11 213:16,19 248:9,12 259:2

**video-record** 74:4

**video-recorded** 5:4

**view** 34:15 45:21 146:20 147:2 215:2

**viewed** 64:12

**views** 153:23

**violation** 182:15

**virtually** 59:11 243:8

**virtue** 54:19

**vis-a-vis** 45:11 102:18 131:7

**visually** 83:12

**void** 56:5

**volunteer** 94:17

**volunteered** 98:18

**W**

**wait** 88:6

**waived** 98:2

**waiver** 69:5,7 219:19

**waives** 69:6

**wanted** 22:2 60:6 99:25 156:15 193:23 206:12

**warning** 213:10

**Warren** 6:7,10

**waste** 44:2

**Waterhouse** 36:20 39:6,21 47:2,12 48:20 49:8,17 81:6,9 83:3 84:18 92:12 96:23,24 97:2 99:19 100:23 101:18 102:17 103:6 106:4, 9,15 109:18 117:7 118:10,19 119:16,20 120:14 122:8,9,18 123:12 124:2,7,20 125:12 126:5,16 131:2 133:19 137:13 139:11 140:4,13,20 141:4 143:11 148:18, 25 149:12,17 153:5, 13,21 154:8 155:4,10 156:6 157:4,14 158:16 159:5 200:24 207:24 211:13,24

**Waterhouse's** 92:21 102:3 103:10 106:13 110:24 119:2 149:11 229:5

**ways** 20:16 257:2

**wearing** 122:23

**Webex** 74:10,14,21

**Wednesday** 81:20

**week** 81:17,19 109:13

**weekly** 81:15 82:25

**West** 8:6

**whatsoever** 53:25 170:2 185:19 224:24

**wherewithal** 35:7

**whomever** 247:11 248:17

**win** 64:9 237:3

**wire** 217:22 218:5,10, 20,22 257:22

**withdraw** 228:13

**withhold** 78:4,12,15, 18 79:10

**word** 43:4 45:24 50:4 66:4 67:25 130:22 154:8,13 253:5 254:6,7 258:13

**words** 14:14 44:12 99:21 108:11 137:11 151:20 152:2 220:21 221:5,7,17 224:13,15 226:16 227:12,13,15, 18,20 228:18

**wore** 123:12

**work** 8:12 117:17 138:13 142:3 174:5 203:6,8 206:2

**worked** 22:19 97:18 121:21 169:25 173:18 174:4 255:4,7

**working** 203:9 208:14,17 254:19

**works** 140:13

**world** 233:7

**worth** 164:23 165:2, 6,7 191:8,12,21 192:4,19

**write** 197:7

**writes** 150:10

**writing** 73:21 99:23 157:7

**written** 104:11 148:2 202:16 212:17,20 214:11

**wrong** 9:12 113:8 177:6 241:22

**wrote** 197:8,10,18,22 198:4

**Y**

**Yang** 176:5,22 177:20

**year** 19:2 65:17 163:15 164:13,14 168:8,15 169:13,20 170:12 171:16 172:3, 4,8 204:2 217:2

**year-and-a-half** 187:15

**years** 22:20 54:4 57:11 60:21 62:12 88:7 138:16 164:14 165:25 167:3,19,23 176:18 178:2 201:24 229:20 230:23 236:20

**yesterday** 108:17 119:25

**York** 8:6 10:23,24 11:5 176:23

**Z**

**Ziehl** 5:20

**Zoom** 27:10 74:9,14, 21 112:17

# Exhibit B

1           McGovern - 11-9-2021

2         IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3                 DALLAS DIVISION

4     In re:                        )
                                    )
5     HIGHLAND CAPITAL              )   Case No.
      MANAGEMENT, LP,               )   19-34054 L.P.
6                                   )   Chapter 11
            Debtor,                 )
7     -----------------------------)
      HIGHLAND CAPITAL MANAGEMENT,  )
8     LP,                           )
                                    )
9           Plaintiff,              )  Adversary No.
                                    )  21-03003-sgi
10        vs.                       )
                                    )
11    JAMES D. DONDERO,             )
                                    )
12          Defendant.              )

13

14

15

16

17              REMOTE DEPOSITION OF

18                 BRUCE McGOVERN

19                 Houston, Texas

20        Tuesday, 9th day of November, 2021

21

22

23    Reported by:

24    Daniel J. Skur, Notary Public and CSR

25    Job No. 202067

Page 2

```
 1                 McGovern - 11-9-2021
 2
 3
 4
 5
 6
 7        9th day of November, 2021
 8        10:01 a.m. - 10:34 a.m.
 9
10
11        Remote Deposition of BRUCE McGOVERN,
12   located in Houston, Texas, before Daniel J.
13   Skur, Notary Public and Certified Shorthand
14   Reporter in and for the State of Texas
15   located in Waxahachie, Texas.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 McGovern - 11-9-2021
 2   A P P E A R A N C E S :
 3        Pachulski Stang Ziehl & Jones
 4        Attorney(s) for Debtor
 5        780 Third Avenue
 6        New York, New York 10017
 7        By: John Morris, Esq.
 8
 9
10
11
12        Stinson
13        Attorney(s)for James Dondero, HCMS
14        and HCRE
15        3102 Oak Lawn Avenue
16        Dallas, Texas 75219
17        By: Michael Aigen, Esq.
18
19
20
21
22   ALSO PRESENT:
23            La Asia Canty, Paralegal
24            Haley Winograd
25
```

Page 4

```
 1                 McGovern - 11-9-2021
 2
 3           IT IS HEREBY STIPULATED AND AGREED
 4   by and between the attorneys for the respective
 5   parties herein, that filing and sealing be and
 6   the same are hereby waived.
 7           IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form  of
 9   the question, shall be reserved to the
10   time of the trial.
11           IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn to and
13   signed before any officer authorized to
14   administer an oath, with the same force and
15   effect as if signed and sworn to before the
16   Court.
17                 - oOo -
18
19
20
21
22
23
24
25
```

Page 5

```
 1                 McGovern - 11-9-2021
 2           P R O C E E D I N G S
 3        REMOTE ORAL DEPOSITION OF
 4             BRUCE McGOVERN
 5        (REPORTER NOTE:  This deposition is
 6   being conducted remotely in accordance with
 7   the Current Emergency Order regarding the
 8   COVID-19 State of Disaster.
 9        Today's date is the 9th day of
10   November, 2021.  The time is 10:01 a.m.
11   Daylight Savings Time.  The witness is
12   located in Houston, Texas.)
13        BRUCE ALLEN MCGOVERN,
14   having been duly cautioned sworn to tell the
15   truth, the whole truth and nothing but the
16        truth, testified as follows:
17             (10:01 a.m.)
18             EXAMINATION
19   BY MR. MORRIS:
20        Q.    Could you please state your name for
21   the record?
22        A.    My name is Bruce Allen McGovern.
23        Q.    Good morning, Mr. McGovern.  My name
24   is John Morris.  I'm an attorney at Pachulski
25   Stang Ziehl & Jones.  We are counsel to
```

Page 6

McGovern - 11-9-2021

1  McGovern - 11-9-2021
2  Highland Capital Management, LP, a company that
3  has been reorganized following its bankruptcy
4  in Texas.
5        Are you aware of the bankruptcy?
6     A.   Yes, I am.
7     Q.   Okay.  And we're here today for your
8  deposition; is that right?
9     A.   Yes, that's correct.
10    Q.   And you've been deposed on a number
11 of occasions in your professional capacity.
12       Do I have that right?
13    A.   I believe there have been three
14 occasions, yes.
15    Q.   Okay.  So I'm not going to ask you
16 about those occasions.  I want to try to get
17 this done as quickly as we can.
18       I'll just tell you that -- I don't
19 know if any of those occasions were remote
20 depositions, but remote depositions are
21 particularly difficult, only because we're not
22 in the same room.
23       From time to time, we'll put
24 documents on the screen.  If there's anything
25 that you need to see, will you please let me

Page 7

1  know that?  And we'll scroll down to the
2  portions that you think you need to see.
3        Is that okay?
4     A.   Yes, I will.
5     Q.   And if there's anything that I ask
6  that you don't understand, will you let me know
7  that?
8     A.   Yes, I will.
9     Q.   Okay.  You were retained by the
10 Stinson firm to provide expert testimony on
11 behalf of James Dondero; is that correct?
12    A.   Yes, that's correct.
13    Q.   Okay.  And when were you retained?
14    A.   I was retained sometime at the
15 beginning of 2021, I believe.  I don't recall
16 the exact date, but it was in the first few
17 months of 2021.
18    Q.   How did it come -- how did your
19 retention come about?
20    A.   I received a phone call, I believe,
21 from Michael Aigen, who is here today; and he
22 discussed with me the general nature of the
23 underlying litigation and the issue on which he
24 and his firm were seeking expert testimony.

Page 8

1        McGovern - 11-9-2021
2  And after discussing that with him, I agreed to
3  serve as an expert witness.
4     Q.   And what exactly were you asked to
5  do?
6     A.   I was asked to prepare a report on a
7  specific legal issue that has to do with the
8  structure of some loans from Highland Capital
9  Management, LP, to Mr. Dondero and subsequently
10 to -- I understand there were similar loans to
11 entities controlled by Mr. Dondero.
12    Q.   When we use the phrase "Highland"
13 today, can we agree that we're specifically
14 referring to Highland Capital Management, LP?
15    A.   Yes, that's fine.
16    Q.   Okay.  When you were told about the
17 nature of the litigation, do you recall whether
18 you were informed that Mr. Dondero had already
19 filed an answer to the complaint?
20    A.   Yes.  I was informed of that, and I
21 was provided with copies -- at least at that
22 time, copies of the promissory notes that he
23 had signed and also the complaint that Highland
24 Capital against Mr. Dondero as well as the copy
25 of the amended answer in the litigation.

Page 9

1        McGovern - 11-9-2021
2     Q.   Okay.  So -- so you were given a
3  copy of the amended answer that he filed at the
4  time that you were retained?  Do I have that
5  right?
6     A.   That's correct.
7     Q.   So you couldn't have been retained
8  before the time the amended answer was filed;
9  is that fair?
10    A.   I'm just thinking through your
11 question, so... That's correct.  That's
12 correct.
13    Q.   Okay.  Have you ever been retained
14 by the Stinson firm before your engagement in
15 this case?
16    A.   No, I have not.
17    Q.   Okay.  Have you ever provided any
18 services to Highland before?
19    A.   No, I have not.
20    Q.   Have you ever met James Dondero?
21    A.   No, I have never met him.
22    Q.   Have you ever spoken with him?
23    A.   No, I have not.
24    Q.   So your report is not based in any
25 way on anything Mr. Dondero has told you; is

Page 10

McGovern - 11-9-2021

1
2  that fair?
3       A.    That's correct.
4       Q.    Okay.  And I want to go a little bit
5  broader.  I think I used the words whether
6  you -- I'd asked whether you had spoken with
7  him.
8            So let me ask a different question:
9  Have you ever communicated with Mr. Dondero by
10 email or otherwise?
11      A.    No.  I've never had any
12 communications with him.
13      Q.    Is it fair to say that all of your
14 communications relating to the work that you've
15 done in this lawsuit have been exclusively with
16 one or more lawyers from the Stinson firm?
17      A.    Yes, that's correct.
18      Q.    Okay.  Have you ever communicated
19 with anybody else regarding any of the work
20 that you've done in connection with this
21 engagement other than lawyers from the Stinson
22 firm?
23      A.    No.  I have not.
24      Q.    Okay.  I'm going to ask you --
25      MR. AIGEN:  John.

Page 11

McGovern - 11-9-2021

1
2       MR. MORRIS:  Yes.
3       MR. AIGEN:  I just want to point
4  something out.  The witness may not be
5  aware that one of our conversations, Dan
6  Elms was listening, I believe.
7            Actually, I apologize.  I may be
8  convincing -- confusing this with other
9  witnesses.  Dan Elms is not a lawyer at our
10 firm.  Now that I'm saying that, I actually
11 may be confusing it with conversations with
12 our other expert, so...
13      A.    I don't recall him being in any of
14 our discussions.
15      MR. AIGEN:  I apologize.  I probably
16 should just be quiet.
17 BY MR. MORRIS:
18      Q.    I'm going to ask my colleague, La
19 Asia Canty, to put on the screen a copy of your
20 report, which has been premarked as Exhibit 61.
21      (Exhibit 61 introduced.)
22 BY MR. MORRIS:
23      Q.    And can you see that, sir?
24      A.    Yes, I can.
25      Q.    Okay.

Page 12

McGovern - 11-9-2021

1
2       MR. MORRIS:  And if we could just
3  scroll to the last page, the signature
4  line.
5  BY MR. MORRIS:
6       Q.    And that's your signature, sir?
7       A.    Yes, it is.
8       Q.    And did you sign this on or around
9  May 28th, 2021?
10      A.    Yes, I did.
11      MR. MORRIS:  You can go back to the
12 top.
13 BY MR. MORRIS:
14      Q.    As you sit here today, is there
15 anything that you believe is inaccurate about
16 your report?
17      A.    No.
18      Q.    Is there anything that you believe
19 should be modified to state more clearly the
20 opinions and the bases for them, as set forth
21 in this report?
22      A.    No.
23      Q.    Your report has not been amended or
24 supplemented in any way, correct?
25      A.    That is correct.

Page 13

McGovern - 11-9-2021

1
2       MR. MORRIS:  If we can scroll down a
3  little bit.
4  BY MR. MORRIS:
5       Q.    You reviewed five documents for
6  purposes of preparing your report.  Do I have
7  that right?
8       A.    Yes, that's correct.
9       Q.    Okay.  And it's those five documents
10 that are listed in the first page of your
11 report, right?
12      A.    Yes, that's correct.
13      Q.    Okay.  Since signing this report on
14 May 28th, 2021, have you been provided with any
15 additional documents that relate in any way to
16 your opinions?
17      A.    I've been provided with copies of
18 the promissory notes that were executed on
19 behalf of some of the entities controlled by
20 Mr. Dondero in favor of Highland Capital, and I
21 believe I also have a copy of the complaint in
22 the adversary proceeding filed against the
23 entities.
24      Q.    When were you given those documents?
25      A.    I was provided those documents, I

Page 14

McGovern - 11-9-2021

1  believe, sometime last week.
2       Q.    And to confirm, those documents
3  haven't caused you to change your opinions as
4  set forth in your report in any way, correct?
5       A.    That's correct.
6       Q.    Did you have any discussion with
7  anybody about why you weren't given those
8  documents before you completed your report on
9  May 28th?
10      A.    No.  I was not provided any
11 explanation of that.  What did occur is that I
12 met with attorneys from the Stinson law firm to
13 discuss the deposition today; and following
14 that conversation, I was sent by email copies
15 of the additional documents.
16      Q.    Okay.  But you don't recall having
17 any discussion about why you hadn't been given
18 copies of those documents before you completed
19 your report on May 28th, 2021, correct?
20      A.    That's correct.
21      Q.    Okay.  Were you ever given any
22 information concerning Highland's treatment of
23 the loans on Highland's books and records?
24      A.    No, I was not.

Page 15

McGovern - 11-9-2021

1       Q.    Did you ever ask for any information
2  concerning Highland's treatment of the loans in
3  its books and records?
4       A.    No, I did not.
5       Q.    Is Highland's treatment of the loans
6  in its books and records relevant at all to
7  your opinions as set forth in Exhibit 61?
8       A.    No, I don't believe it is.
9       Q.    Were you given copies of Highland's
10 audited financial statements?
11      A.    No, I was not.  I've discussed
12 already all of the documents that I was
13 provided to you, both to prepare the report and
14 that I was provided subsequent to the report.
15      Q.    Did you ask to see Highland's
16 audited financial statements?
17      A.    No, I did not.
18      Q.    Is it fair to say that the treatment
19 of the loans in Highland's audited financial
20 statements is irrelevant to your opinions as
21 set forth in Exhibit 61?
22      A.    Yes.  I think that's a fair
23 assessment.
24      Q.    Did you ask for any documents that

Page 16

McGovern - 11-9-2021

1  are not listed in your report?
2       A.    No, I did not.
3       Q.    So is it fair to say that you never
4  looked at any documents that were filed in
5  Highland's bankruptcy case?
6       A.    The only documents I've looked at
7  that were filed in the bankruptcy case are the
8  complaint and the amended answer.
9       Q.    And you never asked for any
10 documents that were filed in the bankruptcy
11 case other than the documents set forth in your
12 report, correct?
13      A.    That's correct.
14      Q.    As a general matter, is Highland's
15 treatment of the loans relevant at all to your
16 opinions?
17      A.    No, it's not, because I was asked to
18 make certain assumptions in connection with
19 preparing my report.
20      Q.    Okay.  Can you identify any of the
21 promissory notes that you were given in the
22 last week or so?
23      A.    Off the top of my head, I can't.
24 I'd have to look in my files, but I recall, for

Page 17

McGovern - 11-9-2021

1  example, that there were promissory notes
2  signed by a few different entities controlled
3  by Mr. Dondero that were organized in different
4  forms.
5       One, I believe, was HCE, but I can't
6  recall off the top of my head if that was a
7  limited partnership or a corporation.
8       Q.    I take it that you have never seen
9  any of Mr. Dondero's written responses to
10 Highland's discovery requests?
11      A.    That is correct.
12      Q.    Have you ever seen any transcripts
13 from any depositions that have been given in
14 these adversary proceedings?
15      A.    No, I have not.
16      Q.    Have you ever asked to see any
17 transcripts of any depositions that were given
18 in these adversary proceedings?
19      A.    No, I have not.
20      Q.    Okay.  So your opinions don't take
21 into account any of the testimony that was
22 adduced in any depositions that were given in
23 these adversary proceedings, correct?
24      A.    That's correct.

**App. 191**

Page 18

McGovern - 11-9-2021

1   Q.   Okay.

2        MR. MORRIS:  If we could turn to the

3   assumptions.

4        Okay.  Right there is fine.

5   BY MR. MORRIS:

6   Q.   So you were asked to assume the

7   facts that are set forth in the five numbered

8   paragraphs on this page, correct?

9   A.   Yes, that's correct.

10  Q.   Okay.  And, in fact, you satisfied

11  yourself, have you not, that Assumed Fact

12  Number 1 is actually true, correct?

13  A.   That is an assumption.

14       MR. AIGEN:  Objection, form.

15  A.   I don't have any basis for -- for

16  example, identifying that that's actually

17  Mr. Dondero's signature; but I was asked to

18  assume that for purposes of the report, that he

19  had signed these promissory notes.

20  BY MR. MORRIS:

21  Q.   Did anybody tell you that

22  Mr. Dondero disputed his execution of the three

23  promissory notes that were given to you?

24  A.   No.

Page 19

McGovern - 11-9-2021

1   Q.   Okay.  Let's look at the second

2   assumed fact.

3        It says, quote:  Subsequent to

4   Mr. Dondero's execution of the notes, but

5   before Highland Capital made demand for payment

6   of the notes, Highland Capital and Mr. Dondero

7   entered into an oral agreement, which I think

8   you're defining there as "the subsequent

9   agreement."

10       Have I read that correctly?

11  A.   Yes, that is correct.

12  Q.   Have you been given any document --

13  withdrawn.

14       Have you been given any documentary

15  evidence concerning the subsequent agreement?

16  A.   No, I have not.

17  Q.   Do you know whether -- has anybody

18  ever informed you whether such documentation

19  exists?

20  A.   Nobody has ever suggested that to

21  me.

22  Q.   Okay.  Did you ask to see any

23  documents concerning the existence of the

24  subsequent agreement?

Page 20

McGovern - 11-9-2021

1   A.   No, I did not.

2   Q.   And that's because you were just

3   asked to assume that the subsequent agreement

4   existed, correct?

5   A.   It's because I was asked to assume

6   that there was an oral agreement, and normally

7   there would be no documentation of an oral

8   agreement.

9   Q.   Okay.  It's possible that after

10  somebody enters into an oral agreement,

11  somebody makes a note to -- to write down the

12  terms that were agreed to; isn't that fair?

13  A.   Yes, that's possible.

14  Q.   Okay.  And in your expertise, would

15  you expect somebody to -- withdrawn.

16       Do you know when the subsequent --

17  withdrawn.

18       I'm going to use the phrase

19  "subsequent agreement" to refer to the

20  agreement that's described in Assumption Number

21  2.  Is that okay?

22  A.   Yes, that's fine.

23  Q.   Okay.  Do you know when the

24  subsequent agreement was entered into?

Page 21

McGovern - 11-9-2021

1   A.   I don't know the exact date.  I was

2   asked to assume only that it had occurred after

3   the execution of the original promissory notes.

4   Q.   Were you asked to make any

5   assumptions concerning the number of subsequent

6   agreements that were entered into between

7   Mr. Dondero and Highland Capital?

8   A.   I'm sorry, could you -- could you

9   restate that?

10  Q.   Were you asked to assume that there

11  was one subsequent agreement between Highland

12  Capital and Mr. Dondero or more than one

13  subsequent agreement between Highland Capital

14  and Mr. Dondero?

15  A.   My assumption has been that there

16  was only a single oral agreement; however,

17  given that there were multiple promissory

18  notes, it's conceivable that there could have

19  been separate oral agreements for each note.

20  But, in general, I've been assuming a single

21  oral agreement that applied to all of the

22  notes.

23  Q.   And you don't have any personal

24  knowledge regarding the number of subsequent

**App. 192**

Page 22

McGovern - 11-9-2021

1    McGovern - 11-9-2021
2    agreements that may exist, correct?
3        A.    That's correct.
4        Q.    And you weren't asked to assume that
5    more than one subsequent agreement existed,
6    correct?
7        A.    That's correct.
8        Q.    And when you prepared your report,
9    the assumption that you made was that there was
10   only one subsequent agreement, correct?
11       A.    Yes, the subsequent agreement to
12   which I refer in my report.
13       Q.    Okay.  Do you know who entered the
14   subsequent agreement on behalf of Highland
15   Capital?
16       A.    No, I do not.
17       Q.    Do you know if the subsequent
18   agreement was ever disclosed to Highland
19   Capital's outside auditors?
20       A.    No, I do not.
21       Q.    Is it fair to say that the
22   circumstances surrounding the entry into the
23   subsequent agreement are not relevant to your
24   opinions as set forth in Exhibit 61?
25       A.    Yes, that's correct, because I'm

Page 23

1    McGovern - 11-9-2021
2    assuming only that there was a subsequent
3    agreement that occurred after the execution of
4    the notes, but before demand for payment on the
5    notes had been made.
6        Q.    So you're not offering any opinion
7    that the subsequent agreement actually exists,
8    correct?
9        A.    That's correct.
10       Q.    And you're not offering any opinion
11   that the terms of the subsequent agreement were
12   reasonable, correct?
13       A.    That's correct.
14       Q.    You're not offering any opinion that
15   the subsequent agreement was fair to both
16   parties, correct?
17       A.    That's correct.
18       Q.    And you're not offering any opinion
19   that the person who entered into the subsequent
20   agreement on behalf of Highland Capital
21   fulfilled his or her or its duties, correct?
22       A.    That's correct.
23       Q.    Are you offering any opinion at all
24   about the subsequent agreement?
25             MR. AIGEN:  Objection, form.

Page 24

1    McGovern - 11-9-2021
2        A.    I'm offering an opinion only about
3    the effect of the subsequent agreement,
4    assuming that the subs- -- subsequent agreement
5    is as I described in my report.
6    BY MR. MORRIS:
7        Q.    Okay.  What if I asked you to assume
8    that there was no subsequent agreement?  Would
9    that change your opinions?
10             MR. AIGEN:  Objection, form.
11       A.    It -- it would not change my
12   ultimate opinion, which is that there is no
13   cancellation of indebtedness income for
14   Mr. Dondero.
15   BY MR. MORRIS:
16       Q.    And your opinion today is that
17   there's no taxable income to Mr. Dondero
18   because the conditions subsequent that you were
19   asked to assume have not yet been satisfied; is
20   that fair?
21       A.    That's correct.  My opinion is that
22   there was no income for him at the time of the
23   original loans because of his obligation to
24   repay, and that assuming the subsequent
25   agreement occurred, that the subsequent

Page 25

1    McGovern - 11-9-2021
2    agreement did not change the outcome for him,
3    that it -- it would not cause him to have
4    income from the -- the loans.
5        Q.    And so if there is no subs- -- if I
6    ask you to assume that there is no subsequent
7    agreement, would your opinion be that
8    Mr. Dondero therefore owes any unpaid principal
9    and interest due under each of the notes that
10   you've reviewed?
11       A.    Based on the -- my review of the
12   promissory notes, yes, that the notes are
13   demand notes in favor of Highland Capital.
14       Q.    Okay.  Let's go to Assumed Fact
15   Number 3.  It states, quote:  In the subsequent
16   agreement between Highland Capital and
17   Mr. Dondero, Highland Capital agreed that it
18   would not collect on the notes unless certain
19   conditions defined as "the conditions," could
20   not be satisfied.  In other words, Highland
21   Capital agreed that the loans will be forgiven
22   only if the conditions are satisfied.
23             Do I have that right?
24       A.    Yes, that's correct.
25       Q.    Okay.  And -- and -- and that -- all

**App. 193**

Page 26

McGovern - 11-9-2021

1  of that -- everything in Number 3 is -- is an
2  assumption that you were asked to make in
3  rendering your opinion, correct?
4      A.   Yes, that's correct.
5      Q.   Do you know what the conditions
6  were?
7      A.   I don't know the details of the
8  conditions.  I was asked to assume only that
9  the conditions related to things beyond
10  Mr. Dondero's control, such as the sale of
11  certain assets above cost.
12      Q.   Okay.  That bleeds into the fourth
13  assumption, but I just want to stick with
14  Number 3 for the moment.  Do you have any other
15  information about what the conditions were,
16  other than the sale of an asset above cost?
17      A.   No, I do not.
18      Q.   Did you ask any questions about the
19  nature, extent, and scope of the conditions?
20      A.   Only if whether the conditions were
21  things beyond his control, but other than that,
22  I did not ask for details.
23      Q.   Were you given any information
24  concerning the likelihood that the conditions

Page 27

McGovern - 11-9-2021

1  would be satisfied?
2      A.   No, I was not.
3      Q.   Did you ask any -- did you ask for
4  any information concerning the likelihood that
5  the conditions would be satisfied?
6      A.   No, I did not.
7      Q.   Is it fair to say that the opinions
8  set forth in Exhibit 61 do not take into
9  account the likelihood that the conditions
10  would be satisfied?
11      A.   I think that's an accurate
12  statement.  The -- the only assumption is that
13  these conditions are things that will be beyond
14  Mr. Dondero's control and subject to
15  influences, such as market values.
16      Q.   So the likelihood that the
17  conditions would be satisfied was not relevant
18  to your analysis, correct?
19      A.   As far as probability, that's
20  correct.
21      Q.   Okay.  And you're not offering any
22  opinion as to the likelihood that any of the
23  conditions would be satisfied, correct?
24      A.   That's correct.

Page 28

McGovern - 11-9-2021

1      Q.   Okay.  Let's move on to the fourth
2  assumed fact.  It states, quote:  Whether the
3  conditions are satisfied was not and is not
4  within Mr. Dondero's control because they
5  included the condition that certain portfolio
6  company assets be sold above cost or in a
7  manner outside of Mr. Dondero's control.
8      Have I read that correctly?
9      A.   Yes, you did.
10      Q.   What if the satisfaction of the
11  conditions was within Mr. Dondero's control?
12  If you make that assumption, how does your --
13  how do your opinions change, if at all?
14      A.   I'm just thinking through your
15  question.  If the conditions are within his
16  control, then that could potentially change the
17  outcome as to whether there was income from the
18  discharge of indebtedness, but in order to
19  provide an opinion on that, I would have to
20  know the details of the conditions; that is,
21  exactly what they are and how it is that he has
22  control over them.
23      Q.   Okay.  So are you aware that
24  Mr. Dondero controlled Highland prior to the

Page 29

McGovern - 11-9-2021

1  bankruptcy?
2      A.   Yes, I am.
3      Q.   Are you aware that he had -- I'll --
4  I'll ask you to assume that he had the
5  authority to buy and sells assets on behalf of
6  Highland.  Can you -- can you accept that
7  assumption?
8      A.   Yes.
9      Q.   Okay.  If you -- if you accept that
10  assumption for purposes of my hypothetical, and
11  you also assume that the portfolio company
12  assets that are the subject of the conditions
13  were valued above cost at the time the
14  subsequent agreement was entered into, would
15  that impact your opinions if you assumed -- so
16  I'm asking you to really make just two
17  assumptions:  Number one, Mr. Dondero had the
18  ability to sell the portfolio company assets
19  any time he wanted, and number two, that at the
20  time he entered into the subsequent agreement,
21  the value of the portfolio company assets was
22  above cost.  How did those two assumptions, if
23  you -- if you accept them, how do they change
24  your analysis, if -- if at all?

**App. 194**

Page 30

McGovern - 11-9-2021

1

2      A.      Assuming those two facts, they could
3   change the analysis of the issue of whether
4   Mr. Dondero had income from the cancellation of
5   indebtedness.  The key question really is
6   whether Highland Capital, at the time of the
7   subsequent agreement, was actually agreeing to
8   cancel the loans at that time, or was it
9   agreeing in the future to cancel the loans if
10  certain conditions occurred?
11          If those conditions are within the
12  control of Mr. Dondero and in effect already in
13  place, then it's quite possible that he would
14  have had income from the discharge of
15  indebtedness at that time because the loans in
16  fact had been forgiven.
17      Q.      But you weren't ass- -- you weren't
18  asked to assume that Highland placed any
19  condition on the timing of the forgiveness,
20  correct?
21      A.      That's correct.
22      Q.      And -- and you, in fact, were asked
23  to assume that if the portfolio company assets
24  were sold above cost, the loans would be
25  forgiven, correct?

Page 31

McGovern - 11-9-2021

1

2      A.      That's correct.  Although in -- in
3   fairness, as I've said, I don't know the
4   details of all the conditions, but was asked to
5   assume that they included the condition that
6   these assets be sold above cost.
7      Q.      Yeah, I just want to focus on -- on
8   the assumptions that you were asked to make, so
9   let me give you a hypothetical.  Let's say one
10  of the company assets was valued at $50 million
11  on the date the subsequent agreement was
12  entered into, but that Highland's cost for
13  acquiring its interest in that asset was only
14  $10 million, and Mr. Dondero had the ability to
15  sell that asset at -- at any time prior to the
16  bankruptcy filing.
17          Under that hypothetical, would
18  Mr. Dondero have to realize the income?
19      A.      If he actually sold the assets, then
20  -- then yes.
21      Q.      And what about if he didn't sell the
22  assets, but that it was within his control to
23  do so at any time?
24      A.      It's possible that that could change
25  the outcome, as far as whether he had income

Page 32

McGovern - 11-9-2021

1

2   from the cancellation of indebtedness, but if
3   that's true, that means that the loans actually
4   had been forgiven at that time.
5      MR. MORRIS:  I have no further
6   questions.
7      MR. AIGEN:  I have one thing to
8   clear up, I think.
9              EXAMINATION
10  BY MR. AIGEN:
11      Q.      Early on in the deposition, when
12  asked what your assignment was, you mentioned
13  that you were providing an opinion on a legal
14  issue.  I just want to make sure, you we- --
15  you're not sitting here today opining on the
16  law.  You're applying certain facts to the law;
17  is that correct?
18      A.      That's correct.  I am taking an
19  assumed set of facts, and I've been asked to
20  provide an opinion on what is the outcome on a
21  particular legal issue as app- -- applying the
22  law to those facts, that's correct.
23      MR. AIGEN:  Okay.  That's all I
24  have, John.
25      MR. MORRIS:  Okay.  Thank you,

Page 33

McGovern - 11-9-2021

1

2   professor.  I appreciate your time and --
3   and -- and your attention.
4      THE WITNESS:  All right.  Thank you
5   so much.
6      MR. MORRIS:  Okay.  Have a good day.
7      THE WITNESS:  Thank you.
8      MR. MORRIS:  Bye, now.
9      THE REPORTER:  Mr. Aigen, do you
10  need a copy of this deposition?
11      MR. AIGEN:  If we can just get a
12  rough when one's available, and then we'll
13  take the original whenever it's due.
14      (Time Noted:  10:34 a.m.)
15
16
17
              BRUCE McGOVERN
18
19  Subscribed and sworn to before me
    this _____ day of _____, 2021.
20
21
22
23
24
25

**App. 195**

```
                                                Page 34
1              McGovern - 11-9-2021
2              C E R T I F I C A T E
   STATE OF TEXAS      )
3                      )
   COUNTY OF ELLIS     )
4
5         I, Daniel J. Skur, a Notary Public
   within and for the State of Texas, do
   hereby certify:
6         That BRUCE McGOVERN, the witness
   whose deposition is hereinbefore set forth,
7  was duly sworn by me and that such
   deposition is a true record of the
8  testimony given by such witness.
9         That pursuant to Rule 30 of the Federal
   Rules of Civil Procedure, signature of the
   witness was not reserved by the witness or
10 other party before the conclusion of the
   deposition;
11        I further certify that I am not
   related to any of the parties to this
12 action by blood or marriage; and that I am
   in no way interested in the outcome of this
13 matter.
14        IN WITNESS WHEREOF, I have hereunto
   set my hand this 9th day of November,
   2021.
15
16
17
18        Daniel J. Skur
19        Notary Public, State of Texas.
          My Commission Expires 7/7/2022
20        TSG Reporting, Inc.
          228 East 45th Street, Suite 810
          New York, New York
21        (877) 702-9580
22
23
24
25
```

```
                                                Page 35
1                    ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads      Should Read  Reason
6  ___  ___ _____     _____   _____
7  ___  ___ _____     _____   _____
8  ___  ___ _____     _____   _____
9  ___  ___ _____     _____   _____
10 ___  ___ _____     _____   _____
11 ___  ___ _____     _____   _____
12 ___  ___ _____     _____   _____
13 ___  ___ _____     _____   _____
14 ___  ___ _____     _____   _____
15 ___  ___ _____     _____   _____
16 ___  ___ _____     _____   _____
17 ___  ___ _____     _____   _____
18 ___  ___ _____     _____   _____
19 ___  ___ _____     _____   _____
20
                        _____
21                      Signature of Deponent
22 SUBSCRIBED AND SWORN BEFORE ME
23 THIS ____ DAY OF _____, 2021.
24 _____
25 (Notary Public)  MY COMMISSION EXPIRES:_____
```

```
                                                Page 36
1              McGovern - 11-9-2021
2              -------I N D E X-------
3  WITNESS:        EXAMINATION BY        PAGE:
4  BRUCE McGOVERN
5         Mr. Morris              5
6         Mr. Aigen              32
7
8              *****
9  -------------------EXHIBITS-------------------
10                        PAGE/LINE
11 Exhibit 61  Expert Report of      11/21
              Bruce McGovern
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 179-47    Filed 12/09/04305    Page 123 of 226    PageID 60425
Document Page 123 of 305

Index: $10..Dan

**$**

**$10** 31:14

**$50** 31:10

**1**

**1** 18:13

**10:01** 5:10,17

**10:34** 33:14

**11-9-2021** 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1

**2**

**2** 20:22

**2021** 5:10 7:16,18
12:9 13:14 14:20
33:19

**28th** 12:9 13:14
14:10,20

**3**

**3** 25:15 26:2,15

**6**

**61** 11:20,21 15:8,22
22:24 27:9

**9**

**9th** 5:9

**A**

**a.m.** 5:10,17 33:14

**ability** 29:19 31:14

**accept** 29:7,10,24

**accordance** 5:6

**account** 17:22 27:10

**accurate** 27:12

**acquiring** 31:13

**additional** 13:15
14:16

**adduced** 17:23

**adversary** 13:22
17:15,19,24

**agree** 8:13

**agreed** 8:2 20:13
25:17,21

**agreeing** 30:7,9

**agreement** 19:8,10,
16,25 20:4,7,9,11,20,
21,25 21:12,14,17,22
22:5,10,11,14,18,23
23:3,7,11,15,20,24
24:3,4,8,25 25:2,7,16
29:15,21 30:7 31:11

**agreements** 21:7,20
22:2

**Aigen** 7:22 10:25
11:3,15 18:15 23:25
24:10 32:7,10,23
33:9,11

**Allen** 5:13,22

**amended** 8:25 9:3,8
12:23 16:9

**analysis** 27:19 29:25
30:3

**apologize** 11:7,15

**app-** 32:21

**applied** 21:22

**applying** 32:16,21

**Asia** 11:19

**ass-** 30:17

**assessment** 15:24

**asset** 26:17 31:13,15

**assets** 26:12 28:7
29:6,13,19,22 30:23
31:6,10,19,22

**assignment** 32:12

**assume** 18:7,19
20:4,6 21:3,11 22:4
24:7,19 25:6 26:9
29:5,12 30:18,23
31:5

**assumed** 18:12 19:3
25:14 28:3 29:16
32:19

**assuming** 21:21
23:2 24:4,24 30:2

**assumption** 18:14
20:21 21:16 22:9
26:3,14 27:13 28:13
29:8,11

**assumptions** 16:19
18:4 21:6 29:18,23
31:8

**attention** 33:3

**attorney** 5:24

**attorneys** 14:13

**audited** 15:11,17,20

**auditors** 22:19

**authority** 29:6

**aware** 6:5 11:5 28:24
29:4

**B**

**back** 12:11

**bankruptcy** 6:3,5
16:6,8,11 29:2 31:16

**based** 9:24 25:11

**bases** 12:20

**basis** 18:16

**beginning** 7:16

**behalf** 7:12 13:19
22:14 23:20 29:6

**bit** 10:4 13:3

**bleeds** 26:13

**books** 14:24 15:4,7

**broader** 10:5

**Bruce** 5:4,13,22

**assignment** 33:17

**buy** 29:6

**Bye** 33:8

**C**

**call** 7:21

**cancel** 30:8,9

**cancellation** 24:13
30:4 32:2

**Canty** 11:19

**capacity** 6:11

**Capital** 6:2 8:8,14,24
13:20 19:6,7 21:8,13,
14 22:15 23:20
25:13,16,17,21 30:6

**Capital's** 22:19

**case** 9:15 16:6,8,12

**caused** 14:4

**cautioned** 5:14

**change** 14:4 24:9,11
25:2 28:14,17 29:24
30:3 31:24

**circumstances**
22:22

**clear** 32:8

**colleague** 11:18

**collect** 25:18

**communicated**
10:9,18

**communications**
10:12,14

**company** 6:2 28:7
29:12,19,22 30:23
31:10

**complaint** 8:19,23
13:21 16:9

**completed** 14:9,19

**conceivable** 21:19

**condition** 28:6 30:19
31:5

**conditions** 24:18
25:19,22 26:6,9,10,

16,20,21,25 27:6,10,
14,18,24 28:4,12,16,
21 29:13 30:10,11
31:4

**conducted** 5:6

**confirm** 14:3

**confusing** 11:8,11

**connection** 10:20
16:19

**control** 26:11,22
27:15 28:5,8,12,17,
23 30:12 31:22

**controlled** 8:11
13:19 17:3 28:25

**conversation** 14:15

**conversations** 11:5,
11

**convincing** 11:8

**copies** 8:21,22 13:17
14:15,19 15:10

**copy** 8:24 9:3 11:19
13:21 33:10

**corporation** 17:8

**correct** 6:9 7:12,13
9:6,11,12 10:3,17
12:24,25 13:8,12
14:5,6,20,21 16:13,
14 17:12,24,25 18:9,
10,13 19:12 20:5
22:2,3,6,7,10,25
23:8,9,12,13,16,17,
21,22 24:21 25:24
26:4,5 27:19,21,24,
25 30:20,21,25 31:2
32:17,18,22

**correctly** 19:11 28:9

**cost** 26:12,17 28:7
29:14,23 30:24 31:6,
12

**counsel** 5:25

**COVID-19** 5:8

**Current** 5:7

**D**

**Dan** 11:5,9

Index: date..Mcgovern

**date** 5:9 7:17 21:2 31:11

**day** 5:9 33:6,19

**Daylight** 5:11

**defined** 25:19

**defining** 19:9

**demand** 19:6 23:4 25:13

**deposed** 6:10

**deposition** 5:3,5 6:8 14:14 32:11 33:10

**depositions** 6:20 17:14,18,23

**details** 26:8,23 28:21 31:4

**difficult** 6:21

**Disaster** 5:8

**discharge** 28:19 30:14

**disclosed** 22:18

**discovery** 17:11

**discuss** 14:14

**discussed** 7:23 15:12

**discussing** 8:2

**discussion** 14:7,18

**discussions** 11:14

**disputed** 18:23

**document** 19:13

**documentary** 19:15

**documentation** 19:19 20:8

**documents** 6:24 13:5,9,15,24,25 14:3,9,16,19 15:13,25 16:5,7,11,12 19:24

**Dondero** 7:12 8:9,11,18,24 9:20,25 10:9 13:20 17:4 18:23 19:7 21:8,13,15 24:14,17 25:8,17 28:25 29:18 30:4,12 31:14,18

**Dondero's** 17:10 18:18 19:5 26:11 27:15 28:5,8,12

**due** 25:9 33:13

**duly** 5:14

**duties** 23:21

**E**

**Early** 32:11

**effect** 24:3 30:12

**Elms** 11:6,9

**email** 10:10 14:15

**Emergency** 5:7

**engagement** 9:14 10:21

**entered** 19:8 20:25 21:7 22:13 23:19 29:15,21 31:12

**enters** 20:11

**entities** 8:11 13:19,23 17:3

**entry** 22:22

**evidence** 19:16

**exact** 7:17 21:2

**EXAMINATION** 5:18 32:9

**exclusively** 10:15

**executed** 13:18

**execution** 18:23 19:5 21:4 23:3

**exhibit** 11:20,21 15:8,22 22:24 27:9

**exist** 22:2

**existed** 20:5 22:5

**existence** 19:24

**exists** 19:20 23:7

**expect** 20:16

**expert** 7:11,25 8:3 11:12

**expertise** 20:15

**explanation** 14:12

**extent** 26:20

**F**

**fact** 18:11,12 19:3 25:14 28:3 30:16,22

**facts** 18:8 30:2 32:16,19,22

**fair** 9:9 10:2,13 15:19, 23 16:4 20:13 22:21 23:15 24:20 27:8

**fairness** 31:3

**favor** 13:20 25:13

**filed** 8:19 9:3,8 13:22 16:5,8,11

**files** 16:25

**filing** 31:16

**financial** 15:11,17,20

**fine** 8:15 18:5 20:23

**firm** 7:11,25 9:14 10:16,22 11:10 14:13

**focus** 31:7

**forgiven** 25:21 30:16,25 32:4

**forgiveness** 30:19

**form** 18:15 23:25 24:10

**forms** 17:5

**fourth** 26:13 28:2

**fulfilled** 23:21

**future** 30:9

**G**

**general** 7:23 16:15 21:21

**give** 31:9

**good** 5:23 33:6

**H**

**HCE** 17:6

**head** 16:24 17:7

**Highland** 6:2 8:8,12, 14,23 9:18 13:20 19:6,7 21:8,12,14 22:14,18 23:20 25:13,16,17,20 28:25 29:7 30:6,18

**Highland's** 14:23,24 15:3,6,10,16,20 16:6, 15 17:11 31:12

**Houston** 5:12

**hypothetical** 29:11 31:9,17

**I**

**identify** 16:21

**identifying** 18:17

**impact** 29:16

**inaccurate** 12:15

**included** 28:6 31:5

**income** 24:13,17,22 25:4 28:18 30:4,14 31:18,25

**indebtedness** 24:13 28:19 30:5,15 32:2

**influences** 27:16

**information** 14:23 15:2 26:16,24 27:5

**informed** 8:18,20 19:19

**interest** 25:9 31:13

**introduced** 11:21

**irrelevant** 15:21

**issue** 7:24 8:7 30:3 32:14,21

**J**

**James** 7:12 9:20

**John** 5:24 10:25 32:24

**Jones** 5:25

**K**

**key** 30:5

**knowledge** 21:25

**L**

**La** 11:18

**law** 14:13 32:16,22

**lawsuit** 10:15

**lawyer** 11:9

**lawyers** 10:16,21

**legal** 8:7 32:13,21

**likelihood** 26:25 27:5,10,17,23

**limited** 17:8

**listed** 13:10 16:2

**listening** 11:6

**litigation** 7:24 8:17, 25

**loans** 8:8,10 14:24 15:3,6,20 16:16 24:23 25:4,21 30:8,9, 15,24 32:3

**located** 5:12

**looked** 16:5,7

**LP** 6:2 8:9,14

**M**

**made** 19:6 22:9 23:5

**make** 16:19 21:5 26:3 28:13 29:17 31:8 32:14

**makes** 20:12

**Management** 6:2 8:9,14

**manner** 28:8

**market** 27:16

**matter** 16:15

**Mcgovern** 5:1,4,13, 22,23 6:1 7:1 8:1 9:1

Case 21-03007-sgj    Doc 153    Filed 01/20/22    Entered 01/20/22 22:37:32    Desc Main
Case 3:21-cv-00881-X    Document 179-47    Filed 12/04/04305    Page 125 of 226    PageID 60427

Index: means..statements

10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1,
17

**means** 32:3

**mentioned** 32:12

**met** 9:20,21 14:13

**Michael** 7:22

**million** 31:10,14

**modified** 12:19

**moment** 26:15

**months** 7:18

**morning** 5:23

**Morris** 5:19,24 11:2,
17,22 12:2,5,11,13
13:2,4 18:3,6,21
24:6,15 32:5,25 33:6,
8

**move** 28:2

**multiple** 21:18

### N

**nature** 7:23 8:17
26:20

**note** 5:5 20:12 21:20

**Noted** 33:14

**notes** 8:22 13:18
16:22 17:2 18:20,24
19:5,7 21:4,19,23
23:4,5 25:9,12,13,18

**November** 5:10

**number** 6:10 18:13
20:21 21:6,25 25:15
26:2,15 29:18,20

**numbered** 18:8

### O

**Objection** 18:15
23:25 24:10

**obligation** 24:23

**occasions** 6:11,14,
16,19

**occur** 14:12

**occurred** 21:3 23:3
24:25 30:10

**offering** 23:6,10,14,
18,23 24:2 27:22

**one's** 33:12

**opining** 32:15

**opinion** 23:6,10,14,
18,23 24:2,12,16,21
25:7 26:4 27:23
28:20 32:13,20

**opinions** 12:20
13:16 14:4 15:8,21
16:17 17:21 22:24
24:9 27:8 28:14
29:16

**oral** 5:3 19:8 20:7,8,
11 21:17,20,22

**order** 5:7 28:19

**organized** 17:4

**original** 21:4 24:23
33:13

**outcome** 25:2 28:18
31:25 32:20

**owes** 25:8

### P

**Pachulski** 5:24

**paragraphs** 18:9

**parties** 23:16

**partnership** 17:8

**payment** 19:6 23:4

**person** 23:19

**personal** 21:24

**phone** 7:21

**phrase** 8:12 20:19

**place** 30:13

**point** 11:3

**portfolio** 28:6 29:12,
19,22 30:23

**portions** 7:3

**potentially** 28:17

**premarked** 11:20

**prepare** 8:6 15:14

**prepared** 22:8

**preparing** 13:6
16:20

**principal** 25:8

**prior** 28:25 31:15

**probability** 27:20

**proceeding** 13:22

**proceedings** 17:15,
19,24

**professional** 6:11

**professor** 33:2

**promissory** 8:22
13:18 16:22 17:2
18:20,24 21:4,18
25:12

**provide** 7:11 28:20
32:20

**provided** 8:21 9:17
13:14,17,25 14:11
15:14,15

**providing** 32:13

**purposes** 13:6 18:19
29:11

**put** 6:23 11:19

### Q

**question** 9:11 10:8
28:16 30:5

**questions** 26:19
32:6

**quickly** 6:17

**quiet** 11:16

**quote** 19:4 25:15
28:3

### R

**read** 19:11 28:9

**realize** 31:18

**reasonable** 23:12

**recall** 7:16 8:17
11:13 14:17 16:25
17:7

**received** 7:21

**record** 5:21

**records** 14:24 15:4,7

**refer** 20:20 22:12

**referring** 8:14

**relate** 13:15

**related** 26:10

**relating** 10:14

**relevant** 15:7 16:16
22:23 27:18

**remote** 5:3 6:19,20

**remotely** 5:6

**rendering** 26:4

**reorganized** 6:3

**repay** 24:24

**report** 8:6 9:24 11:20
12:16,21,23 13:6,11,
13 14:5,9,20 15:14,
15 16:2,13,20 18:19
22:8,12 24:5

**REPORTER** 5:5 33:9

**requests** 17:11

**responses** 17:10

**restate** 21:10

**retained** 7:10,14,15
9:4,7,13

**retention** 7:20

**review** 25:11

**reviewed** 13:5 25:10

**room** 6:22

**rough** 33:12

### S

**sale** 26:11,17

**satisfaction** 28:11

**satisfied** 18:11 24:19
25:20,22 27:2,6,11,
18,24 28:4

**Savings** 5:11

**scope** 26:20

**screen** 6:24 11:19

**scroll** 7:2 12:3 13:2

**seeking** 7:25

**sell** 29:6,19 31:15,21

**separate** 21:20

**serve** 8:3

**services** 9:18

**set** 12:20 14:5 15:8,
22 16:12 18:8 22:24
27:9 32:19

**sign** 12:8

**signature** 12:3,6
18:18

**signed** 8:23 17:3
18:20

**signing** 13:13

**similar** 8:10

**single** 21:17,21

**sir** 11:23 12:6

**sit** 12:14

**sitting** 32:15

**sold** 28:7 30:24 31:6,
19

**specific** 8:7

**specifically** 8:13

**spoken** 9:22 10:6

**Stang** 5:25

**state** 5:8,20 12:19

**statement** 27:13

**statements** 15:11,
17,21

Case 21-03007-sgj   Doc 153   Filed 01/20/22   Entered 01/20/22 22:37:32   Desc Main
Case 3:21-cv-00881-X   Document 179-17   Filed 12/09/04305   Page 126 of 226   PageID 60428

Index: states..Ziehl

**states** 25:15 28:3

**stick** 26:14

**Stinson** 7:11 9:14 10:16,21 14:13

**structure** 8:8

**subject** 27:15 29:13

**subs-** 24:4 25:5

**Subscribed** 33:19

**subsequent** 15:15 19:4,9,16,25 20:4,17, 20,25 21:6,12,14,25 22:5,10,11,14,17,23 23:2,7,11,15,19,24 24:3,4,8,18,24,25 25:6,15 29:15,21 30:7 31:11

**subsequently** 8:9

**suggested** 19:21

**supplemented** 12:24

**surrounding** 22:22

**sworn** 5:14 33:19

**T**

**taking** 32:18

**taxable** 24:17

**terms** 20:13 23:11

**testified** 5:16

**testimony** 7:11,25 17:22

**Texas** 5:12 6:4

**thing** 32:7

**things** 26:10,22 27:14

**thinking** 9:10 28:15

**time** 5:10,11 6:23 8:22 9:4,8 24:22 29:14,20,21 30:6,8, 15 31:15,23 32:4 33:2,14

**timing** 30:19

**today** 6:7 7:22 8:13

12:14 14:14 24:16 32:15

**Today's** 5:9

**told** 8:16 9:25

**top** 12:12 16:24 17:7

**transcripts** 17:13,18

**treatment** 14:23 15:3,6,19 16:16

**true** 18:13 32:3

**truth** 5:15,16

**turn** 18:3

**U**

**ultimate** 24:12

**underlying** 7:24

**understand** 7:7 8:10

**unpaid** 25:8

**V**

**valued** 29:14 31:10

**values** 27:16

**W**

**wanted** 29:20

**we-** 32:14

**week** 14:2 16:23

**withdrawn** 19:14 20:16,18

**witnesses** 11:9

**words** 10:5 25:20

**work** 10:14,19

**write** 20:12

**written** 17:10

**Z**

**Ziehl** 5:25

# Exhibit C

Privileged and Confidential - Work Product

**Notes Payable to Highland**

8-Apr-21

| Maker | Term | Amount Owed Per Lawsuit | Original Loan Amount | Loan Date | Adversary Proceeding |
|---|---|---|---|---|---|
| Nexpoint Advisors | 30 yr | 23,071,195 | $30,746,812 | 5/31/2017 | 21-3005 |
| HCM Services | 30 yr | 6,757,249 | $20,247,628 | 5/31/2017 | 21-3006 |
| HCM Services | Demand | 947,519 | 150,000.00 | 3/26/2018 | 21-3006 |
| | | | 200,000.00 | 6/25/2018 | 21-3006 |
| | | | 400,000.00 | 5/29/2019 | 21-3006 |
| | | | 150,000.00 | 6/26/2019 | 21-3006 |
| JD | Demand | 9,004,013 | $3,825,000 | 2/2/2018 | 21-3003 |
| | | | $2,500,000 | 8/1/2018 | 21-3003 |
| | | | $2,500,000 | 8/13/2018 | 21-3003 |
| HCRE | 30 yr | 6,145,467 | $6,059,832 | 5/31/2017 | 21-3007 |
| HCRE | Demand | 5,012,261 | 100,000.00 | 11/27/2013 | 21-3007 |
| | | | 2,500,000.00 | 10/12/2017 | 21-3007 |
| | | | 750,000.00 | 10/15/2018 | 21-3007 |
| | | | 900,000.00 | 9/25/2019 | 21-3007 |
| | | 50,937,704 | | | |

App. 202

Confidential

DEFENDANTS-0000434

# Exhibit D

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Wed, 25 Nov 2020 10:01:23 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Wednesday, November 25, 2020 10:01 AM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | | |
|---|---|---|---|
| AT&T | USD | 2,845.06 | |
| Grubhub | USD | 1,422.24 | |

**HCMFA**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 17,373.85 | Dec premiums |

**NPA**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 38,453.01 | Dec premiums |
| UMB Bank | USD | 355.31 | |

**HCFD Operating**

| | | | |
|---|---|---|---|
| HCMFA | USD | 61,691.00 | Shared Services |
| HCM Insurance Acct | USD | 51,779.84 | Dec premiums |

**Eagle Equity**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 2,323.63 | Dec premiums |

Okay to release?

**Kristin Hendrix, CPA | Assistant Controller**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com



**App. 204**

ACL-019692

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Mon, 30 Nov 2020 10:45:44 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Monday, November 30, 2020 10:46 AM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**
Arris Western   USD   11,000.00

**HCMFA**
| | | | |
|---|---|---|---|
| HCM | USD | 308,374.00 | Shared Services |
| HCFD Oper | USD | 250,000.00 | Equity Contribution |

**NPA**
| | | | |
|---|---|---|---|
| HCMFA | USD | 325,000.00 | one day loan |
| HCFD Oper | USD | 120,762.09 | Transfer Pricing |

**HCFD Oper**
Sea Island   USD   23,511.90   Final Presidents Club bill

**HCFD 12B-1**
HCMFA   USD   37,822.00   12B-1 Reimbursement

**Falcon GP**
HCM   USD   15,000.00   Shared Services

**NREA**
HCM   USD   80,000.00   Shared Services

Okay to release?

**Kristin Hendrix, CPA | Assistant Controller**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

**App. 205**
ACL-012579

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Tue, 1 Dec 2020 12:04:49 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Tuesday, December 1, 2020 12:00 PM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | |
|---|---|---|
| Crescent TC | USD | 158,695.74 |
| Seery | USD | 150,000.00 |
| Nelms | USD | 30,000.00 |
| Dubel | USD | 30,000.00 |
| Simek | USD | 42,598.52 |

**HCMNY**

| | | |
|---|---|---|
| Times Sq | USD | 27,454.67 |

**HCMFA**

| | | | |
|---|---|---|---|
| NPA | USD | 325,000.00 | 11/30/2020 Loan Repayment |
| HIGHLAND TOTAL RETURN | USD | 72,912.75 | Advisory Fees |
| HIGHLAND FIXED INCOME | USD | 55,287.79 | Advisory Fees |
| HIGHLAND/IBOXX SRLOAN ETF | USD | 25,004.95 | Advisory Fees |
| HIGHLAND SMALL CAP EQUITY | USD | 19,293.59 | Advisory Fees |

**HCFD**

| | | | |
|---|---|---|---|
| Paul DeMaio | USD | 2,000.00 | Return of IT Holdback |

Okay to send?

**Kristin Hendrix, CPA** | Assistant Controller



300 Crescent Court | Suite 700 | Dallas, Texas 75201

**App. 206**

ACL-020136

**From:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>
**Subject:** FW: HCM - HCMFA/NPA
**Date:** Mon, 21 Dec 2020 12:30:25 -0600
**Importance:** Normal

---

FYI

**From:** Jack Donohue
**Sent:** Monday, December 21, 2020 12:15 PM
**To:** Kristin Hendrix
**Cc:** Fred Caruso
**Subject:** HCM - HCMFA/NPA

Kristin,

Has NPA paid the December payments $168k and 252k payments for shared service and subadvisor? The last payment I see was 11/2/2020. Has HCMFA paid the December payment of $416k? The last payment I see was on 11/2/2020.

Thanks,

Jack

---

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

**http://DSIconsulting.com/**

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** Re: Wires for today
**Date:** Wed, 23 Dec 2020 11:05:46 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Ok


On Dec 23, 2020, at 11:00 AM, Kristin Hendrix wrote:


**HCM**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 49,213.01 | health insurance premium funding |
| EAC | USD | 36,000.00 | Retainer Invoice; approved by Seery |

**HCMFA**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 8,686.93 | health insurance premium funding |
| ACA | USD | 375.00 | |
| Principal Life | USD | 71.53 | |

**NPA**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 20,079.46 | health insurance premium funding |

**HCFD Oper**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 26,339.40 | health insurance premium funding |

**EEA**

| | | | |
|---|---|---|---|
| HCM Ins | USD | 1,161.82 | health insurance premium funding |

Okay to release?

**Kristin Hendrix, CPA** | Assistant Controller

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com



# Exhibit E

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** Re: Wires for today
**Date:** Thu, 31 Dec 2020 12:13:42 -0600
**Importance:** Normal

Ok

On Dec 31, 2020, at 12:11 PM, Kristin Hendrix wrote:

**HCM**

| | | | |
|---|---|---|---|
| Meta-e | USD | 360,384.10 | approved by Seery |
| Houlihan Lokey | USD | 41,460.00 | approved by Seery |
| Bloomberg Finance LP | USD | 16,491.04 | approved by Seery |
| Arris Western Corp. | USD | 11,000.00 | approved by Seery |
| TW Telecom Holdings, llc | USD | 6,182.17 | approved by Seery |
| Mauro Staltari | USD | 3,299.50 | final Garden leave payment (processed outside of payroll) |
| Canteen Vending Services | USD | 2,243.84 | approved by Seery |
| Shawn Raver | USD | 1,984.95 | approved by Seery |
| Four Seasons Plantscaping | USD | 481.71 | approved by Seery |
| Action Shred of Texas | USD | 450.00 | approved by Seery |
| ProStar Services, Inc | USD | 367.38 | approved by Seery |
| UPS Supply Chain Solutions | USD | 164.31 | approved by Seery |

**HCMFA**

| | | |
|---|---|---|
| Shawn Raver | USD | 4,631.55 |
| DTCC ITP LLC | USD | 892.88 |

**NPA**

| | | |
|---|---|---|
| Bloomberg Finance LP | USD | 26,177.78 |
| DST Asset Manager Solutions | USD | 17,152.20 |
| Dallas Zoological Society | USD | 9,404.00 |
| AnchorsGordan, PA | USD | 1,605.75 |
| Dow Jones & Company, Inc. | USD | 1,599.00 |
| UPS Supply Chain Solutions | USD | 521.37 |
| CHASE COURIERS, INC | USD | 24.48 |

**HCFD Oper**

| | | | |
|---|---|---|---|
| Highland Capital Management Fund Advisors | USD | 64,562.00 | Nov shared services |
| DST Technologies, Inc. | USD | 5,741.59 | |
| UPS Supply Chain Solutions | USD | 114.68 | |

**Falcon**
**E&P**

| | | | |
|---|---|---|---|
| HCM | USD | 15,000.00 | Dec shared services |



**App. 210**
ACL-026166

# Exhibit F

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Adversary Proceeding No. |
| DONDERO, NANCY DONDERO, AND | § | 21-03005 |
| THE DUGABOY INVESTMENT | § | |
| TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HIGHLAND CAPITAL | § | Adversary Proceeding No. |
| MANAGEMENT SERVICES, INC., | § | 21-03006 |
| JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HCRE PARTERS, LLC (N/K/A/ | § | Adversary Proceeding No. |
| NEXPOINT REAL ESTATE | § | 21-03007 |
| PARTNERS, LLC), JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**EXPERT REPORT OF
STEVEN J. PULLY, CPA, CFA, ESQ.**

**December 10, 2021**

*Confidential*

**App. 212**

## TABLE OF CONTENTS

I.    BACKGROUND AND QUALIFICATIONS ........................................................................ 3

II.   ENGAGEMENT .......................................................................................................... 6

III.  BRIEF SUMMARY OF OPINIONS ............................................................................... 7

IV.   ASSUMPTIONS ......................................................................................................... 7

V.    SERVICES AGREEMENTS GENERALLY ................................................................... 13

VI.   OPINIONS ............................................................................................................... 15

VII.  CONCLUSION ......................................................................................................... 21

## I. BACKGROUND AND QUALIFICATIONS

1. My professional background includes over thirty-six years of experience as an investment banker, corporate board member, corporate executive, hedge fund executive, attorney, consultant, and expert witness.

2. I graduated with honors from Georgetown University in 1982 with a BSBA in Accounting, and I graduated from The University of Texas at Austin in 1985 with a Doctor of Jurisprudence degree. I hold the Chartered Financial Analyst (CFA) designation and am a licensed CPA and attorney in the State of Texas. I also hold the Series 7, 63, and 79 FINRA securities licenses[1]. My CFA designation and my law, CPA, and FINRA licenses are all current.

3. I currently work as a corporate executive, as a corporate board member, as an investment banker, and as an expert witness.

   a. I work on a part-time basis as the Chief Executive Officer of Harvest Oil & Gas, a former public company that is in the process of dissolving. I was Chairman of the Board of Harvest before assuming the Chief Executive Officer role. Until recently, Harvest was largely managed by another company pursuant to a services agreement. When the services agreement was entered into, the services provider and the predecessor of Harvest were affiliates, which they ceased to be during the term of the agreement. Services provided under the agreement included treasury, accounting, and operating functions. One of my roles as Chief Executive Officer is to replace the former service provider by bringing most business functions in-house.

   b. I currently serve on the boards of seven private companies. I am typically appointed to boards by large shareholders. In total, I have been on the boards of thirty-two public and private companies. Those companies have operated in a broad cross section of industries, including agriculture, aviation, energy, entertainment, manufacturing, real estate, refining, retail, restaurants, technology, and telecom. I have served on the boards of companies that have outsourced most of their corporate functions or provided outsourcing services for other companies.

   c. I conduct my investment banking work through Speyside Partners, LLC ("Speyside Partners"), an entity that I co-founded.[2] At Speyside I work on mergers, acquisitions and divestitures, financings, and restructurings.

4. Through the end of 2014, I spent thirteen years working for two different hedge funds. I was the General Counsel and a partner of Carlson Capital, the most recent hedge fund for which I worked. Carlson Capital managed approximately $9 billion across a number of different funds during much of my tenure and followed a multi-strategy investing approach. Prior to working at Carlson Capital, I worked for Newcastle Capital Management, a hedge fund that pursued a deep value and activist investment strategy. I was the President of Newcastle Capital

---

[1] I formerly held the Series 24 FINRA license.
[2] The website for Speyside Partners is www.speysidepartners.com.

**App. 214**

Management and worked there for almost six years. Newcastle Capital Management managed as much as $650 million across a variety of funds while I was employed there. During my tenure, I served as the Chief Executive Officer of two companies controlled by the firm. Both Carlson Capital and Newcastle Capital Management had "shared-services" arrangements, where a separate entity provided a variety of back office, mid-office, and front office services to an affiliated party.

5. Prior to becoming a hedge fund executive, I was an investment banker for approximately twelve years at various large firms, including as a Managing Director for Bank of America Securities and as a Senior Managing Director for Bear Stearns. I also worked as an investment banker at Kidder Peabody, PaineWebber, and Wasserstein Perella. Over the course of my work at large investment banking firms, I focused on mergers, acquisitions, divestitures, capital raising, and restructurings.

6. Prior to becoming an investment banker, I was a securities and corporate lawyer for almost four years at Baker Botts.

7. Based on the work that I have done over the past thirty-six years, I have developed a deep understanding of services agreements and outsourcing generally as well as corporate governance-related matters. I applied the knowledge and experience that I have gained over the past thirty-six years to my analysis in this report.

8. I have previously served as a testifying and/or consulting witness in the following actions:

   a. Ascent Resources – *Utica, LLC (f/k/a American Energy – Utica, LLC); Ascent Resources, LLC (f/k/a American Energy Appalachia Holdings, LLC); Ascent Resources Utica Holdings, LLC (f/k/a American Energy Ohio Holdings, LLC); The Energy & Minerals Group Fund III, LP; EMG Fund III Offshore Holdings, LP; FR AEU Holdings, LLC and FR AE Marcellus Holdings, LLC v. Duane Morris LLP*, in the 165th Judicial District Court of Harris County, Cause No. 2015-46550) — Consulting and Testifying witness for Plaintiffs.

   b. *In re Paladin Energy Corp.*, Case No. 16-13590, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division — Consulting and Testifying witness for Debtor.

   c. *In re: Potential Complaint Against Larry Noble, Noble Operating, LLC, Noble Natural Resources, L.L.C. and Javier Urias to Avoid Transfers* — Testifying witness for Potential Defendants.

   d. *James D. Sallah, not individually but solely in his capacity as Corporate Monitor for OM Global Investment Fund LLC and OM Global LP, Plaintiff, v. BGT Consulting, LLC, d/b/a BGT Fund Administration, and Lara Goldberg, Defendants* — Testifying witness on behalf of Defendants BGT Consulting, LLC, d/b/a BGT Fund Administration and Lara Goldberg.

   e. *Kenneth A. Kristofek, Gruene Interests, LLC and Gruene Interests Services, LLC, Gran Toro Rojo, LLC, and Gruene USFC, LLC, v. David Gunderson, Horace Winchester, Stan*

4

**App. 215**

*Bradshaw, and Jerry Williamson, Gruenepointe Holdings, LLC, Adora 8, LLC, Adora 9, LLC, Adora 10, LLC, Adora 14 Realty, LLC, Onpointe Healthcare Development, LLC, U.S. Freedom Capital Holdings, LLC, Lake Ohana, LLC, U.S. Freedom Capital, LLC, and Encantado Investments, LLC*, in the District Court of Dallas County, Texas, No. DC-16-07674 — Testifying witness on behalf of Plaintiffs.

f.  *In re SunEdison Securities Litigation,* in the U.S. District Court for the Southern District of New York, 16-md-2742-PKC  —  Testifying witness on behalf of Plaintiffs.

g.  *Avid Controls, Inc. v. GE Energy Power Conversion Technology, Ltd.; General Electric Company; and Current Power Solutions, Inc*., In the United States District Court for the Southern District of Texas  -  Houston Division,  Civil Action No. 4:19-CV-01076 — Testifying witness on behalf of Plaintiff.

h.  *Lumos Partners, LLC, Claimant v. VAC-TRON EQUIPMENT, L.L.C., Respondent,* In Arbitration before the American Arbitration Association — Testifying witness on behalf of Claimant.

i.  *Lord Abbett Affiliated Fund, Inc., et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Navient Corporation, et al., Defendants*, Case No. 1:16-cv-112-GMS, in the United States District Court for the District of Delaware, Case No. 1:16-cv-112-MN — Testifying witness on behalf of Plaintiff.

j.  *Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation, Plaintiffs, v. Greg E. Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC and Private Bankers Life and Annuity Co., Ltd., Defendants*, in the General Court of Justice Superior Court Division, 19 CV 13093 —Testifying witness on behalf of Defendants.

k.  *Baylor University and Southwestern Baptist Theological Seminary, Plaintiffs, v. Harold E. Riley Foundation and Mike C. Hughes, Defendants*, in the District Court of Tarrant County, Texas, 67th Judicial District — Testifying witness on behalf of Defendants.

l.  *Advsr, LLC, Plaintiff, v. Magisto, Ltd. And Yahal Zilka, Defendants,* in the United States District Court, Northern District of California, San Francisco Division, Case No. 3:19-cv-2670  — Testifying witness on behalf of Defendants.

m. *Lumos Partners, LLC, Claimant v. Altavian, Inc.,* In Arbitration before the American Arbitration Association —  Testifying witness on behalf of Claimant.

n.  *Fouad Saade; and Kobi Electric, LLC, Claimants, v. Woodbridge International LLC, f/k/a Woodbridge Group, LLC; and Texender "Tex" Sekhon, Respondents,* In Arbitration before the American Arbitration Association  -  Testifying witness on behalf of Claimant.

9.  I have attached a copy of my curriculum vitae as <u>Exhibit A</u> to this expert report ("Report").

## II. **ENGAGEMENT**

10. Highland Capital Management, L.P., is the debtor in the bankruptcy proceeding, *In re: Highland Capital Management, L.P., Debtor,* and is referred to herein as the "Debtor" or the "Plaintiff." I have been engaged in the matters related to the bankruptcy proceeding that are listed below (collectively referred to as the "Actions").

   a. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03005, as a consulting and testifying expert witness on behalf of NexPoint Advisors, L.P. ("NexPoint"), and James Dondero ("Dondero" and NexPoint are collectively referred to as the "NexPoint Defendants").

   b. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03006, as a consulting and testifying expert witness on behalf of Highland Capital Management Services, Inc. ("HCMS"), and Dondero (Dondero and HCMS are collectively referred to as the "HCMS Defendants").

   c. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HCRE PARTERS, LLC (N/K/A/ NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,* Defendants, Adversary Proceeding No. 21-03007, as a consulting and testifying expert witness on behalf of HCRE Partners, LLC ("HCRE"), and Dondero (Dondero and HCRE are collectively referred to as the "HCRE Defendants").

   d. The NexPoint Defendants, the HCMS Defendants, and the HCRE Defendants are collectively referred to as the "Defendants."

11. The Plaintiff has made claims against the Defendants for breach of contract, turnover of property, fraudulent transfer, and breach of fiduciary duty.

12. My engagement is through the law firms of Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") and Stinson LLP ("Stinson"), which are acting as counsel to the Defendants. I am being compensated for my time at the rate of $750.00 per hour. My compensation is not in any way contingent on (i) the opinions I express in this Report or any additional report, (ii) the content of any testimony I may give, or (iii) the outcome of the Action.

13. I have met with Dondero as well as D. J. Sauter, who is the General Counsel of NexPoint. I have also met with attorneys from counsel to the Defendants: Munsch Hardt, and Stinson.

14. I was asked to provide my opinion regarding whether it was appropriate for the Plaintiff to not pay the interest and principal on the Notes (as hereinafter defined) on behalf of NexPoint, HCMS and HCRE (collectively, the "Makers") by December 31, 2020.

6

## III. BRIEF SUMMARY OF OPINIONS

15. I believe that the Plaintiff did not act reasonably by failing to pay amounts due on the Notes on behalf of the Makers by December 31, 2020, and otherwise in how it comported itself with respect to the Notes. Section 6.01 of the NexPoint Services Agreement (as hereinafter defined) sets forth a standard of care that the Plaintiff was supposed to comply with in paying the NexPoint Term Note; I also believe that each of the services agreements between the Plaintiff and the Makers required the Plaintiff to act in a reasonable way.

16. In forming my opinions and preparing this Report, I relied on all the materials listed in Exhibit B or otherwise cited herein as well as my background and personal experiences.

17. In offering my opinions, I am not opining on the legal enforceability of any agreements between the parties to the Actions.

18. I reserve the right to amend my Report should new information become available, including any assertions of the parties, witnesses, or any experts made in response to this Report.

## IV. ASSUMPTIONS

19. The Debtor filed for bankruptcy on October 16, 2019.  During the Debtor's bankruptcy, James Seery ("Seery") served as the Chief Executive Officer and/or Chief Restructuring Officer of the Debtor.

20. The Debtor was formerly managed by Dondero, who was the firm's co-founder and was its President until January 9, 2020, at which time he resigned all positions with the Debtor and also relinquished control of the Debtor.[3]  As of October 9, 2020, Dondero ceased to have any involvement as an officer or director of the Debtor.[4]  Dondero also testified that there was tension between Seery and him as well as Seery and others at Highland.[5]

21. During 2020, the relationship between Dondero and the Plaintiff became increasingly adversarial.  For example, in addition to Dondero ceasing to have any involvement as an officer or director of the Plaintiff, there were various adversarial proceedings between the parties.[6]

22. NexPoint, HCMS and HCRE executed certain notes in favor of the Debtor as described below:

   a. NexPoint executed a promissory note in the original principal amount of $30,746,812.33, and payable in thirty annual installments beginning by December 31, 2017 (the "NexPoint Term Note").[7]  The NexPoint Note was fully payable in

---

[3] Dondero Deposition, Volume 2, Page 291, lines 9 – 12.
[4] *Id.* at Page 374, lines 8 – 10.
[5] *Id.* at page 87, lines 8 – 14.
[6] *See, e.g., Id.* at page 374, lines 6 – 9.
[7] Amended Complaint dated August 27, 2021 (the "NexPoint Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

**App. 218**

the event of default.[8]   As of December 31, 2020, $23,610,194.59 of principal remained outstanding on the NexPoint Term Note.[9]

    b.  HCMS executed a term note in the original principal amount of $20,247,628.02 and payable in thirty annual installments beginning on December 31, 2017 (the "HCMS Term Note").[10]   The HCMS Term Note was fully payable in the event of default.[11]

    c.  HCRE executed a term note in the original principal amount of $6,059,831.51 and payable in thirty annual installments beginning on December 31, 2017 (the "HCRE Term Note").[12]   The HCRE Term Note was fully payable in the event of default.[13]

23. The Debtor and the Makers were all involved in the investment management business, collectively managing billions of dollars on behalf of investors at various points over the course of their relationship with each other. At the time that the NexPoint Term Note, the HCMS Term Note, and the HCRE Term Note (collectively, the "Notes") were entered into, the Plaintiff, NexPoint, HCMS, and HCRE were all related parties as a result of overlapping equity ownership of the entities. As of December 31, 2020, NexPoint, HCMS, and HCRE ceased to have any overlapping equity ownership with the Plaintiff but continued to have overlapping ownership with each other.

24. The Plaintiff and NexPoint are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (the "NexPoint Services Agreement") pursuant to which Plaintiff provided a broad array of services to NexPoint.[14]   NexPoint operated its business with a small number of employees, relying on Plaintiff's much larger workforce to provide many key services for NexPoint to run its business. The NexPoint Services Agreement details numerous areas where the Plaintiff was to provide services to NexPoint, with the Plaintiff essentially providing the entire workforce for most areas of NexPoint's business. The areas that the Plaintiff provided services to NexPoint were detailed under the following headings in the NexPoint Services Agreement: Back- and Middle-Office, Legal Compliance/Risk Analysis, Tax, Management of Clients and Accounts, Valuation, Execution and Documentation, Marketing, Reporting, Administrative Services, Ancillary Services, and Other.[15]   The NexPoint Services Agreement essentially covered all functional areas of NexPoint's business other than the executive and investment functions.

---

[8] NexPoint Amended Complaint, Exhibit 3.  Additionally, I am informed that there was the potential for forgiveness of the Notes in certain circumstances that had also not occurred by December 31, 2020.

[9] D-NNI -074142.

[10] Amended Complaint dated August 27, 2021 ("HCMS Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, Highland Capital Management Services, Inc., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

[11] HCMS Amended Complaint, Exhibit 6.

[12] Amended Complaint dated August 27, 2021 ("HCRE Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, HCRE Partners, LLC, James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

[13] HCRE Amended Complaint, Exhibit 6.

[14] Amended and Restated Services Agreement dated January 1, 2018, Exhibit 9 to Seery Deposition.

[15] *Id.* at pages 3 – 5.

25. The NexPoint Services Agreement contains several provisions relating to the Plaintiff's obligation to make interest and principal payments on the NexPoint Term Note, including the following:

    a. Section 2.02(a) details various "Back and Middle Office" tasks that the Plaintiff was responsible for performing on behalf of NexPoint.[16] Those services included "payments,"[17] which encompassed payments of interest and principal on the NexPoint Term Note.

    b. Section 2.02 (b) provided for the Plaintiff to provide "[a]ssistance and advice with respect to legal issues…".[18]

    c. Section 6.01 describes the standard of care that the Plaintiff was supposed to provide to NexPoint.[19] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

    d. Section 8.01 required that any amendments or modifications to the agreement were required to be in writing and signed by each party.[20]

    e. Section 8.07 provided that any "condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties."[21]

26. The Plaintiff first sought to provide notice of termination of the NexPoint Services Agreement in November of 2020, however, the termination date was extended[22] and the NexPoint Services Agreement was still in effect as of December 31, 2020.

27. While there was no written agreement between either HCMS or HCRE, on the one hand, and the Plaintiff, on the other hand, relating to services that the Plaintiff was to supply to either party, the services that the Plaintiff provided to HCMS and HCRE were essentially the same services that the Plaintiff provided to NexPoint[23] and involved a comprehensive array of services that were necessary in the day-to-day operations of the business of HCMS and HCRE. Like with NexPoint, by December 31, 2020, there was a long history of the Plaintiff having provided services to HCMS and HCRE.[24]

---

[16] *Id*. at pages 3 - 4.

[17] *Id.,* Section 2.02(a) provided, "Back- and Middle Office. Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, payments, operation, bookkeeping, cash management . . . accounts payable . . ."

[18] *Id.* at page 4.

[19] *Id*. at 11.

[20] *Id.* at 14.

[21] *Id*. at 16.

[22] Dondero Deposition, Volume 2, page 375, lines 3-10.

[23] *See, e.g.,* Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13; Waterhouse Deposition, page 353, lines 6 – 10, and page 357, lines 19 – 24.

[24] Dondero Deposition, Volume 2, page 94, lines 20 – 22; page 95, lines 4 – 9.

**App. 220**

28. When asked about whether the Plaintiff had a services agreement with HCMS, Dondero replied as follows during his deposition[25]:

> My answer would be the advisors like NexPoint and HFAM that had to have by law and regulatory statute have to have formal sub advisors and shared services agreements had formal shared services agreement. Entities that didn't need to have formal written shared services agreements were often serviced similarly or -- or exactly the same as those entities, but without a written agreement, but with a verbal shared services agreement providing, again, all the same similar services, and the entities that didn't have a written shared services agreement ·weren't getting shared services or support from any other entities other than Highland doing the same thing for them that it did for the mutual funds.

29. Dondero had a similar response with regard to there being an oral agreement for the Plaintiff to provide services to HCRE.[26]

30. There was extensive testimony about the services that the Plaintiff provided to HCMS and HCRE:

   a. Under the oral agreements to provide services to HCMS and HCRE, the Plaintiff was responsible for making payments of interest and principal on the HCMS Notes and the HCRE Notes, which had previously been made by December 31, 2017, 2018, and 2019.[27]

   b. HCMS and HCRE relied on the Plaintiff to provide services because HCMS and HCRE, like NexPoint, did not have the employees or infrastructure to run its business without the services provided by the Plaintiff.[28]

   c. According to Frank Waterhouse ("Waterhouse"), the Chief Financial Officer of the Plaintiff throughout 2020[29], the Plaintiff provided the same services to HCRE and HCMSS that it did for NexPoint.[30] He also specifically testified that Plaintiff's services included timely paying of bills and loan payments for HCMS[31] and the same bill paying for HCRE that it did for HCMS and NexPoint.[32]

31. Interest and principal were due on the Notes by December 31, 2020. Neither interest nor any principal payments were paid on any of the Notes by December 31, 2020. The Plaintiff was supposed to facilitate these payments even though the payments were supposed to be to itself.

---

[25] Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13.
[26] *Id.* at page 381, lines 10 – 23.
[27] Waterhouse Deposition, page 354, lines 2 – 23, page 357, lines 2 – 18.
[28] Dondero Deposition, Volume 2, page 371, lines 5-9.
[29] Waterhouse Deposition, page 28, lines 15-16.
[30] *Id.,* page 353, 6-10; 357: 19 – 24.
[31] *Id.* at page 354, lines 2 to page 357, line 18.
[32] *Id.* at page 358, lines 12 – 24.

**App. 221**

32. On January 7, 2021, the Debtor delivered a letter to each of the Makers (the "Acceleration Letters") indicating that a default had occurred on each of the Notes and demanding the immediate full payment of "all principal, interest, and any other amounts due on the Note…".[33] The effect of the Acceleration Letters was that millions of dollars of principal payments were suddenly due; had the Acceleration Letters not been sent, principal on the Notes would have amortized ratably through 2047.

33. In addition to being the Plaintiff's Chief Financial Officer, Waterhouse was also an officer of two of the three Makers as of December 31, 2020.

   a. He was the Treasurer of NexPoint, an officer-level role, during all periods relevant to my Report. Waterhouse reported at his deposition, "I still manage the finance and accounting function for NexPoint."[34]

   b. He was the treasurer and acting treasurer of HCMS.[35]

34. Plaintiff alleges that Dondero orally instructed Waterhouse to not pay the interest and principal on the NexPoint Term Note that was due on December 31, 2021.[36] No evidence has been presented that suggests that Dondero's alleged instructions for the Plaintiff to not pay interest and principal on the NexPoint Term Note was in writing. The apparent rational for the alleged instruction was that NexPoint believed that there had been substantial overcharges totaling in the millions of dollars by the Plaintiff under the NexPoint Services Agreement. The overcharges related to charges for employees who were no longer working for the Plaintiff but that were still being charged to NexPoint, which was a violation of the NexPoint Services Agreement. Furthermore, Dondero denies that he instructed Waterhouse not to pay the NexPoint Term Note.[37]

   a. Dondero denies that he instructed that no interest and principal be paid on the NexPoint Term Note, testifying, "There is no logical reason, nor would I have ever authorized or suggested no payment to put us…in default due to a *deminimis* amount of money….even if I was highly annoyed with Seery, even if we knew that Seery and Highland had overcharged NexPoint by whatever it was, 14, 16, million bucks, I would not have let a small amount cause a…breach."[38]

   b. Dondero also testified that the Plaintiff made the payments due on the Notes by December 31 of 2017, 2018 and 2019 without any specific authorization from any of the Makers.[39]

35. No evidence was presented suggesting that Dondero, HCMS or HCRE instructed the Plaintiff not to make payments on the HCMS Term Note or the HCRE Term Note. HCMS and HCRE had a reasonable expectation that interest and principal on the HCMS Notes and HCRE Notes

---

[33] Exhibit 6 to Seery Deposition taken on October 21, 2021.
[34] Waterhouse Deposition, page 28, lines 15-16.
[35] *Id*., at page 30, lines 9 – 16.
[36] *Id*., at page 390, lines 4 – 13.
[37] Dondero Deposition, Volume 2, page 391:18-25.
[38] *Id.*
[39] *Id*. at page 463, lines 10-25.

would be paid by December 31, 2020, given past practices and the Plaintiff's obligation to do so.

36. Mr. Waterhouse testified about his responsibility in connection with making the payments on the Notes that were due by December 21, 2020[40]:

> Q:  Did you approve of each payment that was made against principal and interest on the notes that were given by the affiliates of Mr. Dondero?
>
> A:  Did I approve the payments?  I approve  -  I approve  -  if there was cash  -  if there was cash being repaid on a note payment, yes, I approved in the general sense of being made aware of the payment and the amount."
>
> Q:   And are you the person who authorized Highland's employees to effectuate those payments?
>
> A:  Yes.

37. No evidence has been presented of any discussions that the Plaintiff had with Dondero or any of the Makers prior to December 31, 2020, with regard to payments on the Notes other than the alleged discussion between Dondero and Waterhouse described above relating to the NexPoint Term Note.  Specifically, the evidentiary record reflects that there was no follow-up by Waterhouse or anyone else at the Plaintiff confirming that it was Dondero's intent for there not to be any payments made on the NexPoint Term Note.[41]

   a.  A number of Plaintiff's employees knew about Dondero's alleged instructions prior to December 31, 2020, with respect to the NexPoint Term Note, yet no effort was undertaken to investigate Dondero's instructions by speaking with him or otherwise confirming what NexPoint's intent was regarding the NexPoint Term Note.

   b.  Deposition testimony by Kristin Hendrix ("Hendrix"), who was the assistant controller of the Plaintiff at the time, revealed that she knew by November 30, 2020, or December 1, 2020, that the Plaintiff was not going to pay the interest and principal on the NexPoint Term Note that was due by December 31, 2020.[42]

   c.  Waterhouse testified that he did not follow-up with Dondero about whether NexPoint should make the payments required by December 31, 2020.[43]

38. Waterhouse also testified that there had not been any instructions from anyone to the Plaintiff to not make the required payments on the HCMS Term Note or the HCRE Term Note by December 31, 2020.[44]  When asked about Dondero's tone when he talked to him about the fact that the payments had not been made on the HCMS Term Note and the HCRE Term Note,

---

[40] Waterhouse Deposition, page 56, line 21 to page 57, line 10.
[41] *Id.*, at page 391, lines 18 – 21.
[42] Hendrix Deposition, page 12, lines 4 – 7.
[43] Waterhouse deposition, pages 391: line 18 to page 392, line 2.
[44] Waterhouse Deposition, pages 393, line 21 – 25 to page 394, line 4.

**App. 223**

Waterhouse said that the tone was very negative and that Dondero's reaction was consistent with the fact that Dondero was surprised that the payments had not been made.[45]

## V. <u>SERVICES AGREEMENTS GENERALLY</u>

39. Companies seeking to conduct operations more efficiently frequently outsource various operational, accounting, treasury, and other functions to a service provider. By outsourcing such functions, the customer of the services provider can avoid costly employee and infrastructure investments that would otherwise be required to conduct the outsourced functions.

40. The agreement between the party receiving the services and the party providing the services is often referred to as a "services agreement," an "outsourcing agreement," or a "shared services agreement." These terms have the same meaning for purposes of this Report although the term "shared services" is often used in the context of a company sharing services with an affiliated party.

41. The parties to a services agreement are sometimes related and other times are completely separate with no prior business relationship.

42. The actual agreement that comprises the services to be provided under a services agreement varies in form. Some services agreements are comprehensive, others provide limited written direction, and still others are oral.

43. Smaller companies are often more likely to outsource a broad set of business functions, typically because they are growing rapidly and do not have the financial resources or time to build out various important business functions.

44. Virtually every company outsources some type of business function to a third-party. For example, many companies outsource limited functions such as payroll processing or IT services to various vendors. There is a distinct difference, however, between outsourcing limited functions to a vendor that provides services for many clients versus the more fulsome relationship that is embodied by the typical services agreement involving the services provider managing major aspects of a company's operational and back-office functions.

   a. Providers of more fulsome services have additional duties relative to a provider that is responsible for limited services. Those additional duties generally emanate from the level of responsibility that the services provider takes on and the services provider's more intimate knowledge of its customer's business.

   b. Said another way, a provider of a straightforward and often outsourced service such as payroll processing has no reason to understand the underlying business issues of its customers or the perspectives of the employees for which it processes payroll. On the other hand, a provider of more fulsome services has an intimate knowledge

---

[45] *Id.* at page 394, lines 12 – 21.

of the goals, objectives, and capabilities of its customers and in discharging its obligations, cannot ignore that knowledge.

45. In the case of services agreements that cover a fulsome set of activities for the customer, even if there is a comprehensive agreement between the parties, it is difficult to enumerate with specificity each individual task that the services provider is expected to perform. Tasks are therefore often described in broad terms as opposed to specific detail (i.e., the service provider is required to handle accounting functions for its customer as opposed to saying that a trial balance is required 15 days after month-end, or the annual audit must be completed by a specified date).

    a. Despite the difficulty in describing each task with specificity that the services provider is required to perform, the specific tasks become apparent as the services provider performs functions on behalf of its customer. In the ordinary course, practices develop that inevitably are deemed acceptable to the services provider and its customer. Such practices are generally fully clarified within one year of the inception of the services agreement because that timeframe allows the parties to interact with each other over the course of a full accounting cycle.

    b. Following the initial cycle of activities, those previously performed practices are often referred to as "past practices" and such past practices become an important piece in gauging whether the services provider has met it obligations in future periods. Having been affiliated with companies that are customers of services providers, I think of past practices as having virtually the same effect as a written document provided that the services agreement is not written in a way that prohibits such an interpretation.

46. Services agreements between related parties often present complicated issues, especially if the relationship changes between the parties during the term of the services agreement. For example, at the beginning of the term of the services agreement, two related parties might constructively work together, almost obviating the need for a detailed agreement between the parties. If there is a change in the relationship between the parties that leads to less cooperation, the original agreement may not be comprehensive enough to optimally deal with the change in circumstances.

    a. In such situations, past practices can become an even more important factor in determining the services provider's obligations and the reasonable expectations that the customer should have if the contract language is not explicit on the point.

    b. While the services provider and a customer that is related at the outset of an agreement may cease to be related at some point during the term of the agreement, the services provider's knowledge of the customer's business objectives does not necessarily become stale immediately upon the change in affiliate status. Consequently, any higher duty that comes about from the knowledge that the services provider has about its customer is not necessarily impacted if the affiliate status of the services provider and its customer changes.

14

# VI. <u>OPINIONS</u>

**A. *The Plaintiff was obligated to pay interest and principal on the NexPoint Term Note by December 31, 2021, on behalf of NexPoint. Despite the alleged instruction from Dondero that the Plaintiff should not make any payments on NexPoint's behalf, the Plaintiff's obligations to make the payments did not end. At a minimum, the Plaintiff had a duty to investigate whether the payments should have been made, which it did not do. In not making the payments on the NexPoint Term Note and not undertaking steps to further investigate whether the payments should have been made, the Plaintiff did not act reasonably.***

47. The payment terms of the NexPoint Term Note required that interest and principal was due to the Plaintiff from NexPoint on or before December 31, 2020. It is undisputed that interest and principal were not paid on the NexPoint Term Note by the required date.

48. The Plaintiff was obligated to make the payment of interest and principal on behalf of NexPoint on or before December 31, 2020, under the NexPoint Services Agreement.

49. The Plaintiff has taken the position that the interest and principal that was due on the NexPoint Term Note by December 31, 2020, was not paid because of Dondero's alleged directive to Waterhouse to not make the payments.[46]

50. The evidentiary record highlights several noteworthy facts:

   a. The Plaintiff had conflicting roles because it was the payee of the NexPoint Term Note and also had the obligation to cause the payments to be made on the NexPoint Term Note. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

   b. The Plaintiff stood to benefit mightily if NexPoint defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of the NexPoint Term Note. Without a default, some of the principal of the Notes could have been outstanding until 2047.

   c. Waterhouse was an officer of the Plaintiff and was also an officer of NexPoint, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given his dual roles, he had knowledge of the business objectives and financial condition of NexPoint, which should have made it clear to him that NexPoint would not welcome a default on the NexPoint Term Note.

   d. NexPoint allegedly made overpayments to the Plaintiff that Dondero wanted to be offset against the required interest and principal payments on the NexPoint Term Loan.[47] The overpayments related to workers that the Plaintiff was charging to NexPoint that no longer worked for the Plaintiff, which violated the terms of the

---

[46] Waterhouse Deposition, page 390, lines 4 – 13.
[47] Seery Deposition, page 226, lines 2 – 4; Dondero Deposition, Volume 2, page 392, lines 3 – 7.

NexPoint Services Agreement. There were ongoing discussions between Dondero and Seery leading up to the end of 2020 relating to the topic.

e.   There is no evidentiary record describing any effort by the Plaintiff to warn NexPoint of the implications of Dondero's alleged request for the payments on the NexPoint Term Note to not be made. For example, despite the fact that the NexPoint Services Agreement required the Plaintiff to provide NexPoint with legal services, the Plaintiff failed to provide NexPoint with legal advice that failing to pay interest and principal could result in an acceleration of the NexPoint Term Loan.

51. In my opinion, Dondero's alleged statement to Waterhouse that the Plaintiff should not make payments on the NexPoint Term Note on December 31, 2020, did not provide a basis for the Plaintiff to not make the payments on the Notes given its obligations to NexPoint under the NexPoint Services Agreement. Several reasons support my opinion:

a.   There is no evidence that the Plaintiff took any reasonable steps to address the myriad of conflicts that it faced.

i.   The Plaintiff's obligations regarding the required payments of the Notes involved the conflict-ridden task of authorizing and making a payment to itself. Additionally, the Plaintiff stood to benefit significantly by putting the NexPoint Term Note into default given that a default would allow the Plaintiff to realize the proceeds from repayment of the note far earlier than it otherwise would have; had the NexPoint Term Loan not been accelerated, it would have remained outstanding until 2047. While the evidence is silent on whether the Plaintiff was considering the repayment benefit of the NexPoint Term Loan to itself, from an appearance standpoint, the conflict was glaring.

ii.   The Plaintiff apparently took no steps to address these conflicts either by conferring with NexPoint or Dondero. Conferring with NexPoint or Dondero would have helped in establishing that NexPoint and Dondero really did not want the Plaintiff to transfer funds to pay interest and principal on the NexPoint Term Loan.

iii.   The Plaintiff also has presented no evidentiary record reflecting how any internal steps were taken to address the conflict. Such steps might have included conducting meetings internally with minutes to reflect discussion regarding the conflict or any efforts to seek guidance from counsel to assist with the conflict.

iv.   According to deposition testimony by Hendrix, who was the assistant controller of the Plaintiff at the time[48], she recalled receiving a phone call from Waterhouse on either November 30, 2020, or December 1, 2020, where Waterhouse indicated that no payments would made by the Plaintiff

---

[48] Hendrix Deposition, page 12, lines 4 – 7.

16

**App. 227**

on behalf of NexPoint.[49]   Accordingly, it seems that Plaintiff decided as early November 30, 2020 or December 1, 2020, to not make the payments on the NexPoint Term Note.  Given the apparent time frame of the decision to not make the payment, the Plaintiff had ample time to confirm in writing with Dondero that the payments should not be made or to otherwise take reasonable steps to ensure that a mistake was not being made and that the Plaintiff was acting reasonably.

b.  The Plaintiff had an obligation to act reasonably in discharging its obligations to make the payments on the NexPoint Term Note on behalf of NexPoint.  In addition to not properly addressing conflicts as set forth above, the evidentiary record further reflects that the Plaintiff did not act reasonably.

   i.  No effort was undertaken to inform Dondero that the Plaintiff disagreed with his assumption that there were offsets to the required interest and principal payment requirements on the NexPoint Term Note. Absent any communication from the Plaintiff, Dondero simply had no way of knowing that the Plaintiff disagreed with his perspective that a right of offset did exist, so it was reasonable for him to think that discussion of an offset was on the table.

   ii.  Waterhouse had worked for or with Dondero for many years, making him very familiar with Dondero's management style.  Dondero is a decisionmaker who is willing and does change his mind when presented with new facts, something that Waterhouse should have been aware of yet did nothing to address.

   iii.  Given the massive implications of a default of the NexPoint Term Loan to NexPoint, which the Plaintiff should have understood given the robust services that it was providing to NexPoint and the dual financial responsibilities that Waterhouse had to both organizations, the Plaintiff should have acted more responsibly by engaging with NexPoint and Dondero to confirm NexPoint's intent.

   iv.  The NexPoint Services Agreement provides that the Plaintiff was supposed to provide NexPoint with legal advice. In effect, the Plaintiff was NexPoint's law firm.  Had the Plaintiff met its commitment, it would have had its internal counsel consult with NexPoint to point out the legal ramifications of the interest and principal payments not being made.  There is no evidence suggesting that the Plaintiff took any steps to meet its obligation to provide legal advice as required under the NexPoint Services Agreement.

c.  Waterhouse had a conflict separate from the conflicts that the Plaintiff otherwise had given that he was an officer of both the Plaintiff and the NexPoint.  Among

---

[49] *Id*. at 71, lines 4 – 7.

other things, Waterhouse's officer role for NexPoint must have provided him with insights into NexPoint's business objectives, which could not have included any appetite for having the Notes accelerated. Yet there is no evidence that Waterhouse's knowledge was utilized in Plaintiff's decision making regarding the required payments of the Notes. It is inapposite to argue that because Waterhouse had knowledge about NexPoint from a source other than the Plaintiff, that he was entitled to ignore that knowledge. In discharging its duties under the NexPoint Services Agreement, the Plaintiff should have been using all information that it had available in its work on behalf of NexPoint.

d. The NexPoint Services Agreement provided that any amendment to the agreement needed to be in writing[50] and any consent to a change in the agreement needed to be in writing.[51] No such effort to comply with the writing requirement was undertaken and highlights the fact that any oral statement by Dondero regarding the NexPoint Term Loan not being paid was insufficient under the express terms of the NexPoint Services Agreement.

e. Section 6.01 of the NexPoint Services Agreement also describes the standard of care that the Plaintiff was supposed to provide to NexPoint in the discharge of its obligations under the agreement.[52] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." For reasons already described herein, the Plaintiff did not discharge its duties with such care.

52. For the foregoing reasons, any alleged default under the NexPoint Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to NexPoint.

**B. Based on the oral agreement that the Plaintiff had with HCMS and HCRE and consistent with the services that the Plaintiff had previously provided, HCMS and HCRE had a reasonable expectation that the Plaintiff would continue paying interest and principal on behalf of those entities absent explicit direction to the contrary. As there was no directive from anyone affiliated with HCMS or HCRE to relieve the Plaintiff of that responsibility, the Plaintiff did not act reasonably by not meeting its obligations to make payments of interest and principal on behalf of HCMS and HCRE.**

53. While the services agreements between Plaintiff, on the one hand, and HCMS and HCRE, on the other hand, were oral, the existence of an oral services agreement between affiliated parties involved in the investment management business is common and is something that I have regularly observed.

---

[50] Amended Services Agreement, Section 8.01.
[51] *Id.* at Section 8.07.
[52] *Id.* at Section 6.01.

54. Like with NexPoint, the Plaintiff provided HCMS and HCRE with a comprehensive array of services that were necessary to the day-to-day operation of their businesses. There was a lengthy history of the Plaintiff providing HCMS and HCRE with such services. The broad array of services provided by the Plaintiff to NexPoint were the same as the scope of work performed by the Plaintiff for HCMS and HCRE.

55. The evidentiary record highlights several noteworthy facts:

    a. The evidentiary record reflects that the Plaintiff historically made payments on behalf of the HCMS Term Note and HCRE Term Note in addition to providing an array of other critical services to HCMS and HCRE not dissimilar from many of the services that the Plaintiff provided to NexPoint under the NexPoint Services Agreement.[53]

    b. No evidence has been presented suggesting that there was any communication from HCMS, HCRE, or Dondero suggesting that the payments on the HCMS Term Note and the HCRE Term Note should not continue.

    c. No evidence has been presented suggesting that on payment dates in years prior to 2020 HCMS or HCRE had to notify the Plaintiff that it wanted the Plaintiff to make the required payments on the HCMS Term Note or the HCRE Term Note. Accordingly, it would not have been reasonable for the Plaintiff to expect that HCMS or HCRE were required to take any affirmative steps to have payments made on their notes.

    d. The Plaintiff had conflicting roles because it was the payee of the HCMS Term Note and the HCRE Term Note and also had the obligation to cause the payments to be made of those notes. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

    e. The Plaintiff stood to benefit mightily if HCMS and HCRE defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of those notes. Without a default, some of the principal of the HCMS Term Note and the HCRE Term Note could have been outstanding until 2047.

    f. Waterhouse was an officer of the Plaintiff and was also an officer of HCMS, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given Waterhouse's dual roles, he had knowledge of HCMS's business objectives and financial condition, which should have alerted him that HCMS would not welcome a default on the HCMS Term Note.

---

[53] *See, e.g.,* Dondero Deposition, Volume 2, pages 335:19 to 336:13; page 381, lines 10-23.

g. The Plaintiff made no effort to warn HCMS or HCRE of the implications of the Plaintiff not making payments on the HCMS Term Note or HCRE Term Note by December 31, 2020.

56. Dondero testified about the payments that were required on the HCMS Term Note by December 31, 2020, indicating that there was an expectation by HCMS that the payments were going to be made, regardless of whether there were specific instructions by HCMS to do so:[54]

> Q: Okay. Do you know whether anybody acting on behalf of HCMS ever instructed or authorized Highland to make a payment on account of HCMS's term note to Highland?
>
> A. Well, again, and maybe I didn't say it clearly enough. I think there was a reliance in the due course aspect, especially on small amounts, and it would have been done by Highland personnel on behalf of Services.
>
> * * * * *
>
> Q. And I'm going to ask you, Mr. Dondero, to be patient with me and to listen carefully to my question. Are you aware of anybody acting on behalf of HCMS, whoever instructed Highland to make a payment in satisfaction of any payment that was due at the year-end of 2020 under the term note?
>
> A. Not specifically, but I'm saying I don't think it needed to be made specifically.

57. The Plaintiff was required to act reasonably in the performance of its obligations to HCMS and HCRE given the record of past practices and the precedent created by similar work done by the Plaintiff for NexPoint. With respect to the payments required under the HCMS Term Note and the HCRE Term Note by the Plaintiff, HCMS and HCRE had a reasonable expectation that they would continue receiving such payment services absent a clear termination by Plaintiff of its obligations to HCMS and HCRE. Given that there is no evidence suggesting that any of the parties had terminated the Plaintiff's obligations to provide services to HCMS and HCRE as of December 31, 2020, especially given that the Plaintiff continued to perform other services on behalf of those entities as of such date, the Plaintiff did not act reasonably by not making the payments on the HCMS Term Note and the HCRE Term Note by December 31, 2021. Likewise, it was also not reasonable for the Plaintiff to not discuss with HCMS and HCRE that payments were not going to be made on the HCMS Term Note and the HCRE Term Note given that payments had been made in prior years without any request by HCMS or HCRE.

58. Hendrix testified that the instruction to her not to make the NexPoint Term Loan payment by December 31, 2020, did not apply to the payments required on the HCMS Term Note and the HCRE Term Note by December 31, 2020.[55] She also testified that she made no attempt or effort to determine whether Dondero wanted the payments required on the HCMS Term Note

---

[54] Dondero Deposition, Volume 2, pages 371:23 – 372:18.
[55] Hendrix Deposition, page 100, lines 20 – 23; page 101, lines 8 – 12.

**App. 231**

and the HCRE Term Note to be paid by December 31, 2020.[56]  Finally, Hendrix made no attempt to check with anyone whether the payments should be made.[57]  Hendrix's testimony underscores that Plaintiff did not act reasonably in discharging its obligations to HCMS and HCRE.

59. For the foregoing reasons, any alleged default under the HCMS Term Note and the HCRE Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to HCMS and HCRE.

## VII.   <u>CONCLUSION</u>

60. In summary, based on the evidence that I have reviewed and relied upon, as well as my training and experience, it is my opinion that the Plaintiff did not act reasonably in choosing not to pay the interest and principal due under the Notes. As a result of Plaintiff's failures to act reasonably, it should not have accelerated payment of the principal amount of the Notes.

Respectfully submitted,

_____

Steven J. Pully, CPA, CFA, ESQ.

---

[56] *Id*. at page 102, lines 10 – 13.
[57] *Id*. at page 105, lines 8 – 11.

**Exhibit A**

**STEVEN J. PULLY**

**4564 Meadowood Road, Dallas, Texas**

**(214) 587-6133**

**sjpully@yahoo.com**

---

### *Employment History*

---

| | |
|---|---|
| October 2014 – Present | **SPEYSIDE PARTNERS/INVESTMENT BANKER/CONSULTANT/BOARD DIRECTOR/CORPORATE EXECUTIVE** |

- *Investment banker/consultant to companies, investors and creditors on matters including capital raising, distressed debt restructurings, asset dispositions, activist investing defense, strategic opportunities, and expert witness matters*
- *Chief Executive Officer and Chairman, Harvest Oil & Gas (post-reorg)*

| | |
|---|---|
| January 2008 – Sept. 2014 | **CARLSON CAPITAL, L.P.,** General Counsel and Partner, Dallas, Texas |

- *Responsible for legal affairs of hedge fund with over $9.0 B of AUM; worked closely with affiliated oil and gas private equity fund with $700 of AUM beginning in 2010*
- *Member of Management, Operating and Valuation Committees (Chair)*

| | |
|---|---|
| Dec. 2001 – October 2007 | **NEWCASTLE CAPITAL MANAGEMENT, L.P.,** President, Dallas, Texas |

- *Activist fund with $650 MM of assets under management*
- *Operating positions for portfolio companies: CEO of Pinnacle Frames, Jan. 2003 – June 2004 (largest domestic picture frame manufacturer with 600 employees; involved in multiple visits to Wal-Mart, visited China and identified new CEO for company); CEO of New Century Equity Holdings, June 2003 – Oct. 2007 (cash shell seeking to acquire business)*

| | |
|---|---|
| May 2000 – Dec. 2001 | **BANC OF AMERICA SECURITIES**, Managing Director, Investment Banking - M&A/ Energy & Power Groups; Houston and Dallas, Texas |
| January 1997 – May 2000 | **BEAR STEARNS & CO. INC.,** Senior Managing Director - Investment Banking Department; Dallas, Texas |
| April 1996 – Dec. 1996 | **CONVERGENT ASSOCIATES, INC.,** President, Dallas, Texas. |

- *Private equity firm that controlled three technology-oriented companies involved in travel, media and software; affiliated with EDS*

| | |
|---|---|
| January 1996 - April 1996 | **WASSERSTEIN PERELLA & CO., INC.,** Vice President - Investment Banking Department; Dallas, Texas |

- *Left after brief association because supervisor announced departure plans*

| | |
|---|---|
| July 1989 - Dec. 1995 | **PAINEWEBBER INCORPORATED/ KIDDER, PEABODY & CO.,** First Vice President - Investment Banking Department; New York City and Houston, Texas |

| | |
|---|---|
| October 1985 - July 1989 | **BAKER & BOTTS, Attorneys,** Associate – Corporate Department; Houston, Texas |

---

### *Board Experience*

---

**Board Leadership**  -  Experience as Lead Director, Chairman of the Board, Executive Committee member and Chairman of Audit, Compensation, Governance and Strategic Committees

**Accounting/Finance**  -  CPA and CFA certifications, significant experience with financial statements and analysis, member of several audit committees including chair role

**Strategic Transactions/Capital Raising**  -  Substantial history with successful strategic transactions and efficient capital raising, including debt restructurings

**Governance/Activist Investing Expertise**  -  Extensive experience with shareholder governance and activist investing/defense; positive reputation with shareholders as a value creator

**Legal/Regulatory**  -  Licensed attorney, extensive experience managing legal/compliance department

### Public Company Directorships

**Previous:** Bellatrix Exploration, Energy XXI (Chair – Comp and Strategic), EPL Oil & Gas Inc. (Lead Director, Chair - Comp), Ember Resources, Cano Petroleum, Goodrich Petroleum, Harvest Oil and Gas (Chairman of the Board, Chair – Audit), Peerless Systems (Chair – Audit), New Century Equity Holdings, MaxWorldwide, Geoworks Corporation, Pizza Inn (Chair – Governance), Titan Energy, VAALCO Energy (Chair – Governance, Comp), Whitehall Jewelers (Chairman)

### Private Company Directorships

**Current:** Harvest Oil & Gas (Chairman of the Board and Chief Executive Officer, formerly public company), Limetree Bay Energy, Heritage Power, Response Team 1, Wild Rivers, OWS, ExpressJet

**Previous:**  Fox & Hound, GenCanna Global, Pinnacle Frames & Accents, Aspire Holdings (Chair – Comp), PermianLide, Tribune Resources (Chair – Audit), PGi, Southland Royalty, Greylock Energy, Karya Properties, PRIMEXX Energy, Titan Energy

---

### *Professional Certifications, Education and Other Interests*

---

**CHARTERED FINANCIAL ANALYST,** 2004 (Active member), **CERTIFIED PUBLIC ACCOUNTANT,** Texas, 1985 (Active member), **STATE BAR OF TEXAS,** 1985 (Active member), **FINRA** Series 7, 63 and 79 (Current)

**The University of Texas School of Law, 1985**
International Law Journal, Moot Court, Board of Advocates

**Georgetown University, BSBA with honors, 1982, Major in accounting with 3.90 GPA in major**
President of Student Government Senate, National Model U.N. Team
**Centre for Management Studies, Oxford University, England**, **Summer 1981**

Sailing, golf, writing, biking and travel; married with two adult daughters

Board of Advisors, Georgetown McDonough School of Business, 2015 - 2018

**App. 234**

**Exhibit B to**
**Expert Report of Steven J. Pully**

## Documents Reviewed

Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (Dkt. No. 1, Adv. Proc. No. 21-03004)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03005)

Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint (Dkt. No. 64, Adv. Proc. No. 21-03005)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 68, Adv. Proc. No. 21-03006)

Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint (Dkt. No. 6, Adv. Proc. No. 21-03006)

Defendant Highland Capital Management Services, Inc.'s Answer to Amended Complaint (Dkt. No. 73, Adv. Proc. No. 21-03006)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03007)

Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)'s Answer to Amended Complaint (Dkt. No. 68, Adv. Proc. No. 21-03007)

Defendant James Dondero's Answer to Amended Complaint (Dkt. No. 83, Adv. Proc. No. 21-03003)

Remote Videotaped Deposition of Frank Waterhouse, taken October 19, 2021 and Exhibits

Video Deposition of James P. Seery, Jr., taken October 21, 2021 and Exhibits

Deposition of Kristin Hendrix, taken October 27, 2021 and Exhibits

Deposition of David Klos, taken October 27, 2021

Remote Deposition of James Dondero, Volume II, taken October 29, 2021 (Rough draft) and Exhibits

Remote Deposition of James Dondero, Volume III, taken November 4, 2021 (Rough draft) and Exhibits

# Exhibit G

STRICTLY CONFIDENTIAL

```
--------------------------------------------------------------x
                                                              :
                                                              :
                                                              :
                                                              :
                                                              :
                                                              :
RE: Highland Capital Management, L.P.                         :
                                                              :
                                                              :
                                                              :
                                                              :
                                                              :
                                                              :
                                                              :
--------------------------------------------------------------x
```

## <u>EXPERT REPORT OF ALAN M. JOHNSON</u>

### MAY 28, 2021

STRICTLY CONFIDENTIAL

# TABLE OF CONTENTS

| | **Page** |
|---|---|
| Introduction | 3 |
| Background | 4 – 5 |
| Summary of Opinions | 6 – 7 |
| Statement of Opinions | 8 – 15 |
| Conclusion | 16 |
| Exhibit A:  Work History and Education | 17 |
| Exhibit B:  Alan M. Johnson Prior Expert Testimony Since 2016 | 18 |
| Exhibit C:  Actual Compensation vs. Estimated Market Compensation Range | 19 |
| Exhibit D:  Select Public Peer Comparators | 20 |
| Exhibit E:  Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019) | 21 – 23 |
| Exhibit F: Discussions of Investment Management Compensation in the Public Domain | 24 |
| Documents Reviewed | 25 |
| Bibliography | 26 |

**App. 238**

STRICTLY CONFIDENTIAL

## INTRODUCTION

I have been retained by Stinson LLP ("Stinson"), counsel to Mr. James Dondero, to provide expert opinions based on my knowledge and experience advising asset management and other financial service firms on compensation over the period 2013 to 2019.  Specifically, I have been asked to independently analyze the competitiveness of compensation provided to Mr. Dondero compared to compensation received by executives and senior employees with similar experience and roles. In addition, I was asked to opine on and provide information on the use of loans in the marketplace as a form of compensation.  Mr. Dondero is the Founder and, throughout the period, was the CEO, and head portfolio manager of Highland Capital Management LP ("HCM") and in that role, performed the same services for related companies and companies managed by HCM, including Highland Capital Management Financial Advisors ("HCMFA") and NexPoint Advisors ("NPA").  Market competitive compensation for Mr. Dondero during this period is relevant based on the apparent shortfall in annual compensation to Mr. Dondero. Throughout this period, he received loans in lieu of additional current compensation. Consistent with company practice, the loans were considered a form of deferred compensation that could be realized over time as the loans were forgiven and the income recognized by the individuals.

My opinions in this report are based on my experience consulting on executive compensation since 1980, my review of certain materials produced on Highland and its affiliates, and my perspectives on compensation programs for comparable senior executives and key employees in the industry.

**App. 239**

STRICTLY CONFIDENTIAL

# BACKGROUND

## Professional Experience

The issues I have been asked to provide opinions on are topics I have regularly encountered during many years of advising financial services firms, including asset management firms.  I am an executive compensation consultant, and my firm, Johnson Associates, is a prominent boutique compensation consulting firm.  My firm has specialized for many years in analyzing and advising the financial services industry, including major investment and asset management firms, hedge funds and other alternative investment firms, advisory firms, commercial banks, insurance companies, and brokerage firms.

I have extensive experience reviewing and assessing appropriate market levels of compensation for clients.  I have worked as a compensation consultant since 1980.  In 1992, I founded my own compensation consulting firm, Johnson Associates in New York City.  Johnson Associates, where I am currently Managing Director, is a boutique firm specializing in compensation consulting for the financial services industry.  We routinely consult on and have a strong understanding of market compensation levels for senior professionals and executives.  Prior to founding my own firm, I was a consultant at several leading compensation advisory firms.

Our clients have included many of the world's most significant financial institutions, asset managers and alternative investment firms across a broad range of issues.  A summary of my work history and education is attached as Exhibit A.  I am regularly quoted on compensation issues in major publications, including *The Wall Street Journal*, *Business Week*, *The New York Times*, *Fortune*, *The Washington Post*, *Bloomberg* and many others.

**App. 240**

Over the past 20 years, I have provided expert testimony in more than 40 cases and have been qualified as an expert in the field of executive compensation 30+ times since founding my firm in 1992 (both on the employee and employer side). A list of cases in which I have rendered expert testimony since 2016 is attached as Exhibit B.

**Compensation**

I am being compensated at my normal hourly rate of $715 per hour for preparing this report. My compensation is not contingent on the content of my opinions. I have been assisted in this engagement by my associate, Michael Perniciaro. Michael's normal hourly rate is $225 per hour. All opinions in this report are my own.

**Facts and Data Considered**

In preparing this report, I considered certain documents provided to me, interviews with Mr. Dondero and former Highland or affiliate employees. The documents include information about Highland and its related entities, Mr. Dondero's compensation history, and financial statements over the period. Importantly, given the state of document production in this case, I did not receive all the documents typical for an assessment of compensation. The result of which could lead to a conservative bias in my assessment of market competitive compensation. I have evaluated publicly disclosed proxy statements of a select group of Highland peer firms, as well as information from news sources. The information is consistent with the data and outcomes across our client studies.

**App. 241**

STRICTLY CONFIDENTIAL

## SUMMARY OF OPINIONS

Based on my experience as an executive compensation consultant and my review of the compensation and other documents, it is my opinion that:

- Reasonable compensation for Mr. Dondero's role is positioned well above the market median, toward the market high end. Based on analysis and market research, it is apparent that Mr. Dondero was the key leader of the firm and deeply involved in all its operations, with contributions well beyond the traditional CEO / Chief Investment Officer role at comparators. Competitive market high-end for Mr. Dondero's role is about $6.0M per year while his actual compensation over the period was an average of about $3.0M per year. Therefore, the aggregate shortfall in compensation provided to Mr. Dondero against reasonable compensation levels in the market is at least $21M over the period I examined. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder. Founders are often paid significantly more in the market.

- I understand from Mr. Dondero that the 2018 loans that are the subject of this suit were modified by an agreement in late 2018 or early 2019 under which the loans would be forgiven upon the sale at over cost of substantially all of any of three portfolio company assets held in the Highland platform, MGM, Cornerstone and/or Trussway. Based on interviews from prior employees, the use of forgivable loans was a known business practice at Highland and there was a clear expectation similar loans would be forgiven. Loans are often used both in private firms and more broadly in the market, both as a perk without forgiveness and also with forgiveness as deferred compensation.

**App. 242**

STRICTLY CONFIDENTIAL

- While I do not have sufficient data to know the capital in the firm at year end 2018,[1] the substantial amount of capital remaining in the firm at the time of bankruptcy (i.e., ≅ $399.6M) includes undistributed earnings to its Founders and primary shareholders, Mr. Dondero and Mr. Okada. For asset management firms, it is market practice to distribute most earnings annually to the firm's equity holders. The retention of the earnings in the business, further illustrate the shortfall in payments made to Mr. Dondero over the period.

---

[1] I have been told that the Debtor has not produced much of what was requested by Mr. Dondero and that Mr. Dondero no longer has access to the Highland server. Therefore, I understand, what information he provided was from his own accountants, recollections, and/or from companies over which he still has control.

**App. 243**

STRICTLY CONFIDENTIAL

## STATEMENT OF OPINIONS

### **Factual Background**

From my review and analysis of available materials and research, I understand the consolidated Highland business ("Highland") is a multi-strategy asset management firm focused on CLOs, hedge funds, and several private investments. Prior to the financial crisis, in 2008, Highland was very successful, reaching its peak revenue and assets under management levels. Looking at the post financial crisis period from 2013 to 2019, Highland continued to operate under the leadership of Mr. Dondero. During this period, several loans were made to Mr. Dondero. Part of my mandate was to assess market compensation levels during this period relative to firms with similar size and earnings. To do so, an assessment of Highland's financial information is necessary. I did not receive all of the financial information for HCM that I would have liked to have had because, I was told, HCM refused to produce most of the documentation requested from it. However, I was able to review the actual financials of HCMFA and NPA, and to obtain information Mr. Dondero possessed and/or recollected. The revenues for HCMFA and NPA ranged from $30.5M to $65.9M over the period with assets under management of $4.7B to $7.5B. To complete my analysis, Mr. Dondero provided his best recollection of the size and structure of the consolidated three entities stating assets under management from 2013 to 2019 ranging from $10.0B to $20.0B, with a primary focus on CLOs and an average of about $1.0B being in hedge funds. Based on the incomplete nature of my data review, there is a possibility that the market figures provided in this report could be understated based on my conservative approach, relying primarily on the documented data for HCMFA and NPA but only the recollection of Mr. Dondero for HCM, not the actual documentation, such as audited financial statements.

**App. 244**

When examining Mr. Dondero's role at Highland relative to others in the market, it is apparent that his contributions and responsibilities exceeded the traditional duties of executive officers and lead investors who are paid significant amounts elsewhere. Mr. Dondero was the key man running daily business and operations, attracting clients, and overall investments. Given his outsized role, it would be reasonable to expect his compensation to be well above the market median. The sources utilized to ascertain specifics of his role and arrive at this conclusion include interviews with former Highland or Highland affiliate employees, as well as articles in the public domain and discussions with Mr. Dondero.

The total annual compensation for Mr. Dondero from 2013 - 2019 was $3.0M on average and the aggregate compensation over the period was $21.0M (source: W-2 filings). To assess the compensation in the market and determine the final market range, I utilized three methodologies including: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top portfolio managers. Market compensation figures provided in this report strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

To opine on the use of the loans as a form of compensation, I relied on market research, industry expertise, and interviews. My findings from this assessment are the use of forgivable loans was a normal business practice for Highland and there was a clear expectation they would be forgiven over time, based on varying performance criteria, depending on the employee.

An important additional consideration is the Founders, Mr. Dondero and Mr. Okada, did not receive the typical amount of distribution payments from their equity ownership. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital

**App. 245**

STRICTLY CONFIDENTIAL

in the business amounting to $399.6M. This amount includes undistributed earnings to the original equity shareholders, primarily Mr. Dondero.

## Market Assessment of Executive and Investor Compensation

During my career as a compensation expert, I have had significant experience assessing and designing annual compensation awards across the financial services industry, including comparable asset management firms.  Accordingly, I am familiar with typical annual compensation levels for senior executives and senior portfolio managers at comparable asset management firms.  I would expect pay levels for a key individual such as Mr. Dondero to be substantial, given his contributions, responsibilities, and the competitive market for investment management pay.

To assess reasonable compensation across the competitive market range, it is important to determine Mr. Dondero's responsibilities and contributions relative to others in the industry. It is my understanding that Mr. Dondero worked tremendously long hours, was involved in all aspects of the business including investment decisions, fundraising, business management / administration and the operation of portfolio companies. An article published in the *Dallas Morning News* states, "Mr. Dondero works 70 hours weeks… his days are filled with board and investor meetings, company strategy sessions and constant monitoring and adjusting of the firm's portfolios."[2] In my opinion, Mr. Dondero's role as CEO and head portfolio manager clearly exceeds the traditional duties of executive officers who are paid significant amounts elsewhere. Based on his significant responsibilities and key man status for the firm, it would be reasonable to expect annual compensation significantly above the market median.

---

[2] "High Intensity Pays Off For Highland," The Dallas Morning News, September 3, 2003, https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

STRICTLY CONFIDENTIAL

The appropriate positioning for Mr. Dondero is further accentuated by the assessment of "replacement cost".  If Mr. Dondero departed Highland in the period of 2013 to 2019, the cost of replacing him as CEO / head investor with a similar level of contribution across all functions would be multiples of his annual compensation. In assessing and providing market compensation for Mr. Dondero's role, I considered how his skillsets and contributions are valued in the market. My assessment of market compensation considers the cost of replacing Mr. Dondero with an outside hire.

The final market range provided in Exhibit C reflects my industry experience and expertise as well as three methodologies for determining competitive compensation magnitudes. These methodologies include: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms over the period, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top Portfolio Managers. Several methodologies utilized to capture Mr. Dondero's specific role as CEO and head portfolio manager. The market figures do not include any premium for being a Founder. In the market, Founders can be, and generally are, paid substantially more.

As shown below and in Exhibit E, the average annual compensation of public company asset management CEOs from 2013 to 2019 ranges from $2.1M - $4.1M. Importantly, in the market it is common for some senior investment professionals to earn more than the CEO or other corporate officers.  Incorporating firm leadership functions into the investment role is a savings of sorts, as someone must still do this job.

| Proxy Analysis CEO  Total Compensation (Asset Management) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **Average** |
| **25th Percentile** | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | **$2,049** |
| **Median** | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | **$2,700** |
| **75th Percentile** | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | **$3,375** |
| **90th Percentile** | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | **$4,091** |

**App. 247**

STRICTLY CONFIDENTIAL

While we examined the disclosed compensation of a select group of public peers (Exhibit D), few of Highland's direct competitors are public and disclose the pay of their top investment professionals (see Exhibit F for some discussions about investment management compensation in the public domain).  Instead, firms are either 1) private, or 2) if public, disclosed officers most often are not highly paid portfolio management professionals.

Specifics of individual portfolio management pay are closely guarded for competitive reasons. That said, there are some articles quoting portfolio manager pay in the public domain showing compensation for portfolio managers can be well above the competitive range for public asset management CEOs (see Exhibit F). For example, according to an article published by "efinancialcareers" top performing portfolio managers at the average Hedge Funds with greater than $4.0B assets under management earned $6.8M in total compensation.[3] While Highland's structure differs from a pure hedge fund, the skills and role responsibilities are comparable to Mr. Dondero. Another example is the CEO of the Harvard Endowment, Mr. Narvekar, earned $6.25M in 2019.[4] The McLagan "Highland Capital CEO Compensation Analysis" (April 2020) produced by HCM, shows 2018 total compensation for the Head of Alternative Credit Strategy / CIO of $4.1M at the 75th percentile and 2018 total compensation for CEO With/Without CIO Responsibilities making $5.4M at the market median and $9.6M at the market 75th percentile.

The final method for assessing compensation in the market is a top-down analysis of competitive percentages of revenue attributed to portfolio managers or their teams in the market. Based on competitive market research and industry knowledge, 10% to 12% of revenue would

---

[3] Dan Butcher, "Here Are the Salaries and Bonuses at Hedge Funds in the U.S.," eFinancialCareers, May 5, 2018, https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

[4] Janet Lorin, "Harvard Endowment Chief Narvekar $6.25 Million for 2019," Bloomberg.com (Bloomberg, May 14, 2021), https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

**App. 248**

STRICTLY CONFIDENTIAL

be within the competitive market range for someone in Mr. Dondero's role. One public example of a dual CEO and CIO sharing directly in profitability is Mario Gabelli; he earns a fixed 10% of aggregate pre-tax profit every year per his employment agreement.[5]

The final competitive range below (Exhibit C) reflects the market competitive annual total compensation range. This competitive range was determined based on my interactions with asset management firms and over 30 years of industry experience and the insights gained from the three methodologies for determining competitive market compensation outlined above. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

| *Figures in 000s* | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

Based on the market research and the insights gained through my extensive experience advising on compensation in the industry, reasonable annual compensation for Mr. Dondero's extensive role as CEO and portfolio manager is positioned at the market high-end at **$6.0M per year**. This figure takes into account firm size, profitability, asset class, and both the investment functions, as well as responsibilities for running the firm.  In summary, given his outsized role, his compensation should be positioned toward the market high-end.  If the comparison was directly to hedge fund portfolio managers, the figures would be far higher (i.e., often $10M+

---

[5] "Schedule 14A GAMCO INVESTORS, INC.," SEC.gov, April 29, 2020,
https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020.htm

**App. 249**

STRICTLY CONFIDENTIAL

annually). Additionally, market figures do not include any premium for being a Founder. In the market, Founders are often paid substantially more than the market figures shown.

Mr. Dondero's aggregate compensation during the period of 2013 to 2019 is well below the reasonable market compensation level. Mr. Dondero's aggregate actual compensation from 2013 - 2019 was $21.0M (source: W-2 filings).  Reasonable competitive compensation for Mr. Dondero based on our analysis of his role is $6.0M per year or $42.0M in aggregate over the period. The shortfall in actual compensation to Mr. Dondero versus reasonably expected competitive compensation levels over the period is about **$21.0M** (Exhibit C). Market figures provided do not include any premium as a Founder, which further broadens the shortfall to market. An important additional consideration is the relative lack of typical equity distributions to Mr. Dondero for his historic ownership of the firm.

### Use of Loans as Compensation

In my expert opinion, the use of loans from a company to its senior professionals continues to be a common practice for private businesses. At Highland, the use of loans was a common practice with the clear expectation among senior professionals that the loans would be forgiven over time based on performance, particularly of success in specified projects. I heard from former Highland or Highland affiliate employees that similar loans were used at Highland as deferred incentive compensation and intended to be forgiven over time or on the occurrence of particular achievements.

While, for public companies, Sarbanes Oxley Section 402 explicitly prohibits publicly traded companies from making loans to executive officers it is still a common practice at private

**App. 250**

companies.[6] The use of these loans at private companies is beneficial for retention by allowing the firm to provide annual or periodic or other forgiveness for a portion the loan and eventually forgiving the full amount. The amount of loan forgiveness is considered income to the professionals and is taxable when forgiven. This was the case at Highland as well. In a publicly available article for the *Dow Jones Private Equity Analyst – Global Compensation Study*, two Proskauer partners outline the tax regulations for similar loans to professionals.[7]

## Market Practices on Equity Distributions

It is the standard practice in the market to distribute the majority of earnings to equity owners each year for asset management businesses. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital in the business equaling $399.6M. This amount included undistributed earnings to the primary equity holders, Mr. Dondero and Mr. Okada. Highland did not distribute these earnings based on their philosophy of "delayed gratification". This policy has been in place since the inception of the firm, including the peak years prior to the financial crisis. Very recently, the "delayed gratification" approach paid off in connection with Highland's private direct investment in MGM which was announced to be acquired by Amazon with significant economics attached.[8]

---

[6] Sarbanes-Oxley Act (2002).

[7] Michael J Album and James E Gregory, "Human Capital Considerations For Maturing Private Equity Firms," Dow Jones Private Equity Analyst-Global Compensation Study, 2012, pp. 84-96, https://www.proskauer.com/insights/download-pdf/1930.

[8] Annie Palmer, "Amazon to Buy MGM Studios for $8.45 Billion," CNBC (CNBC, May 26, 2021), https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 251**

## CONCLUSION

It is my opinion that Mr. Dondero's aggregate compensation from 2013 to 2019 is significantly below the reasonable competitive compensation level for his role relative to similarly situated firms. In aggregate, the total shortfall in Mr. Dondero's actual compensation versus reasonable competitive compensation is at least $21.0M. This shortfall does not include any premium as a Founder, which could be considerable. Additionally, it is my opinion that the loans provided to Mr. Dondero should be considered potential deferred compensation as they were similar to loans given to other professionals at the firm. Lastly, the significant amount of capital in the business at the time of bankruptcy is at least partially attributable to Mr. Dondero as un-recognized payments as a prior equity holder, and indicates the rationale for having the potential for considerable deferred compensation.

*       *       *

I reserve the right to supplement this report and/or to supplement or modify my opinions in light of any additional facts or data that may come to my attention.

Dated:  May 28, 2021

Respectfully submitted,

Alan Johnson
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
Phone: (212) 221-740

**App. 252**

**Exhibit A: Work History and Education**

**Alan M. Johnson**
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
(212) 221-7400

**Professional Experience**

- Entire career as executive compensation consultant

| Years | Firm | Title or Equivalent | Duties |
|---|---|---|---|
| 1980 – 1983 | Hewitt Associates | Consultant | Executive Compensation Consultant |
| 1983 – 1986 | Sibson & Company | Principal | Executive Compensation Consultant |
| 1986 – 1989 | Frederic W. Cook & Co. | Partner/Shareholder | Executive Compensation Consultant |
| 1989 – 1990 | Handy Associates | Managing Director | Executive Compensation Consultant |
| 1990 – 1992 | GKR | Managing Director | Executive Compensation Consultant |
| 1992 – Present | Johnson Associates, Inc. | Managing Director | Executive Compensation Consultant |

**Education**

| | |
|---|---|
| 1973 – 1975 | U.S. Naval Academy |
| 1975 – 1977 | University of Florida, B.A. (History/Economics) |
| 1977 – 1978 | University of Virginia, Graduate Economics |
| 1978 – 1980 | University of Chicago, M.B.A. (Finance) |

**Consulting focus:**

- Since about 1990 the bulk of my consulting efforts have involved advising major financial and professional service firms. I consult on the design and magnitudes of compensation programs for senior executives on a regular basis. I am quoted extensively in the press on compensation issues related to major financial service firms.

**App. 253**

STRICTLY CONFIDENTIAL

**Exhibit B: Alan M. Johnson Prior Expert Testimony for Previous Five Years**

| LAW FIRM: | CASE: | COURT: | |
|---|---|---|---|
| Schulte Roth & Zabel LLP | Mark Rohman and Sean Cunningham v. Capstone Advisory Group, LLC. | Arbitration | (April 2016) |
| Gibson Dunn & Crutcher LLP | United States v. Greebel | Eastern District of NY | (December 2017) |
| Cohen Tauber Spievack & Wagner P.C. | Jeffry Brown v. Neuberger Berman Group LLC, and NB Alternatives Advisers LLC | Arbitration | (January 2018) |
| Gibson Dunn & Crutcher LLP | Robert Emerson Mulholland v. UBS Financial Services Inc. | FINRA Dispute Resolution Arbitration | (December 2018) |
| Proskauer Rose LLP | Damian Dalla-Longa v. Magnetar Capital LLC | Arbitration | (September 2019) |
| Skadden, Arps, Slate, Meagher & Flom LLP | Isaly v. OrbiMed | Arbitration | (January 2020) |
| Pachulski Stang Ziehl & Jones LLP | RTI Holding Company vs. Debtors | Delaware Bankruptcy Court | (December 2020) |

**App. 254**

## Exhibit C: Actual Compensation vs. Estimated Market Compensation Range

**Mr. Dondero Actual Compensation (2013 - 2019)**

**Notes:** Mr. Dondero's compensation reflects amounts disclosed in W-2 filings for 2013 to 2019

- Does not include equity distributions over the period; typically, not included in competitive assessments of compensation.

| James Dondero Compensation | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Income | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Average |
| Highland Capital Management W-2 Income | $1,911,538 | $3,282,693 | $2,875,058 | $772,904 | $566,370 | $566,370 | $568,542 | $10,543,475 | $1,506,211 |
| Nexpoint Residential Trust W-2 Income | -- | -- | -- | -- | -- | $893,262 | -- | $893,262 | -- |
| NextPoint Advisors W-2 Income | -- | -- | -- | $1,628,736 | $3,118,250 | $2,870,278 | $1,953,455 | $9,570,718 | $2,392,679 |
| **Total W-2 Income (Source: W-2)** | **$1,911,538** | **$3,282,693** | **$2,875,058** | **$2,401,639** | **$3,684,620** | **$4,329,910** | **$2,521,996** | **$21,007,455** | **$3,001,065** |

**Estimated Market Compensation Range**

**Notes:** Market annual total compensation range reflecting my direct interactions with asset management firms and over 30 years of industry experience

- We have factored in Mr. Dondero's out-sized role / contributions on both the investment management and firm-stewardship responsibilities where applicable.
- Greater than findings from public proxy analysis reflecting higher compensation to portfolio managers in the market / alternatives space.
- Represents finding from the 3 methodologies outlined for determining market compensation.
- Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder

| *Figures in 000s* | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

## Compensation Shortfall

**Notes:** In my opinion, reasonable competitive annual compensation for Mr. Dondero over the period is $6.0M, positioning him toward the market high-end to reflect his out-sized role and contribution to the firm

| Aggregate Reasonable Competitive Compensation | $42,000,000 |
|---|---|
| Less: Actual Total Compensation | $21,007,455 |
| **Shortfall in Compensation** | **$20,992,545** |

**App. 255**

## Exhibit D: Select Public Peer Comparators

**Notes:**

- Industry consolidation continues to shrink pool of publicly available compensation data for the asset management industry, even at much larger firms than Highland
- Group intended to represent a range of firms that are relevant but not perfectly similar
- Disclosure of Portfolio Manager positions limited as typically not included in publicly filed data (no compulsion to disclose as with executive officers)
- Highland data includes good faith estimate of consolidated entities assets under management during the period. Actual financials not assessed due to the non-disclosure of Highland Capital Management ("HCM") information. Data for "HCMFA" and "NPA" reviewed.

| Peers | Assets Under Management ($B) | | | | | | | Revenue ($M) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
| **Asset Management** | | | | | | | | | | | | | | |
| Cohen & Steers | $72 | $55 | $62 | $60 | $53 | $53 | -- | $411 | $381 | $378 | $350 | $329 | $314 | $298 |
| Pzena Investment | $41 | $33 | $39 | $30 | $26 | $28 | $25 | $151 | $154 | $141 | $108 | $117 | $113 | $96 |
| Silvercrest | $25 | $19 | $21 | $19 | $18 | $18 | $16 | $102 | $99 | $91 | $80 | $75 | $69 | $60 |
| Diamond Hill | $23 | $19 | $22 | $19 | $17 | $16 | $12 | $137 | $146 | $145 | $136 | $124 | $105 | $81 |
| Manning & Napier | $19 | $20 | $25 | $32 | $35 | $48 | $51 | $136 | $161 | $202 | $249 | $328 | $405 | $376 |
| Westwood Holdings | $15 | $17 | $24 | $21 | $21 | $20 | $19 | $84 | $122 | $134 | $123 | $131 | $113 | $92 |
| Hennessy Advisors | $5 | $6 | $7 | $7 | $6 | $6 | $4 | $43 | $55 | $53 | $51 | $45 | $35 | $24 |
| Main Street Capital | $4 | $3 | $3 | -- | -- | -- | -- | $173 | $214 | $235 | -- | -- | -- | -- |
| **Consolidated Highland\*** | -- | $10.0 | $14.0 | $15.0 | $18.0 | $20.0 | $19.0 | -- | -- | -- | -- | -- | -- | -- |
| **Highland Hedge Fund\*** | | $1.9 | $1.0 | $0.9 | $1.3 | $1.0 | $0.7 | -- | -- | -- | -- | -- | -- | -- |
| **HCMFA & NP (only)** | $7.5 | $6.1 | $5.1 | $4.8 | $5.2 | $5.7 | $4.7 | $66 | $52 | $42 | $41 | $50 | $31 | $31 |

*Represents estimated for the consolidated three entities. Financial for Highland Capital Management ("HCM") not provided by the debtor

**App. 256**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

**Notes:**

- Reflects disclosed senior executive officer compensation in $ thousands
- CEO <u>not</u> necessarily the highest paid employee at any given firm
- Senior investment professionals' pay often not disclosed and can be greater than CEO
- GAMCO not included; Mr. Gabelli receives 10% of aggregate pre-tax profit annually
- Indicates awards granted for performance each, <u>not</u> outstanding or fully vested compensation
- Where applicable, partial year salaries annualized. One-time awards annualized over appropriate vesting periods. Performance share values reflects target award values; does not reflect payouts from past cycles

### Summary of Proxy Analysis

| Proxy Analysis CEO  Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **Average** |
| **25th Percentile** | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | **$2,049** |
| **Median** | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | **$2,700** |
| **75th Percentile** | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | **$3,375** |
| **90th Percentile** | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | **$4,091** |

### Proxy Analysis by Year and Individual

| Chief Executive Officer - 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
| Cohen & Steers | Steers, R. | CEO | $750 | $835 | **$1,585** | $0 | $2,915 | $0 | **$2,915** | $0 | **$4,500** |
| Manning & Napier | Mayer, M. | CEO | $500 | $2,250 | **$2,750** | $145 | $755 | $0 | **$900** | $0 | **$3,650** |
| Silvercrest | Hough, R. | Pres & CEO | $700 | $1,000 | **$1,700** | $800 | $475 | $0 | **$1,275** | $240 | **$3,215** |
| Main Street Capital | Hyzak, D. | CEO | $625 | $650 | **$1,275** | $0 | $1,395 | $0 | **$1,395** | $0 | **$2,670** |
| Pzena Investment | Pzena, R. | Chairman, CEO, & Co-CIO | $365 | $685 | **$1,055** | $0 | $1,425 | $0 | **$1,425** | $0 | **$2,480** |
| Hennessy Advisors | Hennessy, N. | Chairman & CEO | $350 | $1,455 | **$1,805** | $0 | $155 | $0 | **$155** | $0 | **$1,960** |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $0 | **$650** | $0 | $0 | $0 | **$0** | $0 | **$650** |
| 25th Percentile | | | $435 | $670 | $1,165 | $0 | $315 | $0 | $530 | $0 | $2,220 |
| 50th Percentile | | | $625 | $835 | $1,585 | $0 | $755 | $0 | $1,275 | $0 | $2,670 |
| 75th Percentile | | | $675 | $1,230 | $1,755 | $75 | $1,410 | $0 | $1,410 | $0 | $3,435 |
| 90th Percentile | | | $720 | $1,775 | $2,185 | $405 | $2,020 | $0 | $2,020 | $95 | $3,990 |

**App. 257**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2018

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cohen & Steers | Steers, R. | CEO | $750 | $650 | $1,400 | $0 | $2,355 | $0 | $2,355 | $0 | $3,755 |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $1,065 | $1,715 | $0 | $0 | $1,995 | $1,995 | $0 | $3,710 |
| Pzena Investment | Pzena, R. | Chairman, CEO, & CIO | $365 | $995 | $1,360 | $0 | $1,925 | $0 | $1,925 | $0 | $3,285 |
| Main Street Capital | Hyzak, D. | CEO | $555 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,275 | $0 | $3,230 |
| Silvercrest | Hough, R. | CEO | $700 | $1,600 | $2,300 | $500 | $40 | $0 | $540 | $240 | $3,080 |
| Hennessy Advisors | Hennessy, N. | CEO | $350 | $2,420 | $2,770 | $0 | $220 | $0 | $220 | $0 | $2,990 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $500 | $800 | $0 | $1,000 | $0 | $1,000 | $510 | $2,310 |
| Manning & Napier | Coons, J. | Co-CEO & President | $400 | $520 | $920 | $0 | $0 | $0 | $0 | $0 | $920 |
| Manning & Napier | Goldberg, R. | Co-CEO & Director | $750 | $0 | $750 | $0 | $155 | $0 | $155 | $0 | $905 |
| 25th Percentile | | | $365 | $520 | $920 | $0 | $40 | $0 | $220 | $0 | $2,310 |
| 50th Percentile | | | $555 | $995 | $1,400 | $0 | $220 | $0 | $1,000 | $0 | $3,080 |
| 75th Percentile | | | $700 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,925 | $0 | $3,285 |
| 90th Percentile | | | $750 | $1,765 | $2,395 | $100 | $2,010 | $400 | $2,065 | $295 | $3,720 |

### Chief Executive Officer - 2017

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | CEO | $650 | $1,540 | $2,190 | $0 | $0 | $1,995 | $1,995 | $0 | $4,185 |
| Cohen & Steers | Steers, R. | CEO | $750 | $735 | $1,485 | $0 | $2,615 | $0 | $2,615 | $0 | $4,100 |
| Main Street Capital | Foster, V. | Chairman, CEO | $610 | $1,500 | $2,110 | $0 | $1,780 | $0 | $1,780 | $0 | $3,890 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,240 | $3,590 | $0 | $245 | $0 | $245 | $0 | $3,835 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $2,560 | $2,925 | $0 | $0 | $0 | $0 | $0 | $2,925 |
| Silvercrest | Hough, R. | CEO | $700 | $1,500 | $2,200 | $0 | $40 | $0 | $40 | $240 | $2,480 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $550 | $850 | $0 | $0 | $0 | $0 | $1,180 | $2,030 |
| Manning & Napier | Stamey, C. | Co-CEO, Sales / Distribution | $300 | $1,140 | $1,440 | $0 | $135 | $0 | $135 | $0 | $1,575 |
| 25th Percentile | | | $340 | $1,040 | $1,475 | $0 | $0 | $0 | $30 | $0 | $2,370 |
| 50th Percentile | | | $490 | $1,500 | $2,150 | $0 | $90 | $0 | $190 | $0 | $3,380 |
| 75th Percentile | | | $665 | $1,795 | $2,380 | $0 | $630 | $0 | $1,835 | $60 | $3,945 |
| 90th Percentile | | | $715 | $2,765 | $3,125 | $0 | $2,030 | $600 | $2,180 | $520 | $4,125 |

### Chief Executive Officer - 2016

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | CEO | $650 | $1,350 | $2,000 | $0 | $0 | $3,955 | $3,955 | $0 | $5,955 |
| Cohen & Steers | Steers, R. | CEO | $750 | $675 | $1,425 | $0 | $2,425 | $0 | $2,425 | $0 | $3,850 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,075 | $3,425 | $0 | $350 | $0 | $350 | $0 | $3,775 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $600 | $900 | $0 | $0 | $0 | $0 | $1,180 | $2,080 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $1,600 | $1,965 | $0 | $0 | $0 | $0 | $0 | $1,965 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $55 | $0 | $55 | $240 | $1,720 |
| Manning & Napier | Manning, W. | CEO | $1,400 | $0 | $1,400 | $0 | $0 | $0 | $0 | $0 | $1,400 |
| 25th Percentile | | | $360 | $640 | $1,415 | $0 | $0 | $0 | $0 | $0 | $1,845 |
| 50th Percentile | | | $650 | $725 | $1,425 | $0 | $0 | $0 | $55 | $0 | $2,080 |
| 75th Percentile | | | $725 | $1,475 | $1,985 | $0 | $205 | $0 | $1,390 | $120 | $3,815 |
| 90th Percentile | | | $1,010 | $2,190 | $2,570 | $0 | $1,180 | $1,580 | $3,035 | $615 | $4,690 |

App. 258

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2015

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $2,065 | $2,665 | $0 | $0 | $2,090 | $2,090 | $0 | $4,755 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $2,515 | $2,865 | $0 | $370 | $0 | $370 | $0 | $3,230 |
| Cohen & Steers | Steers, R. | CEO | $750 | $485 | $1,235 | $0 | $1,790 | $0 | $1,790 | $0 | $3,025 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $0 | $500 | $0 | $0 | $2,000 | $2,000 | $0 | $2,500 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $380 | $605 | $980 | $0 | $0 | $1,330 | $1,330 | $0 | $2,310 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $240 | $0 | $240 | $0 | $1,665 |
| 25th Percentile | | | $370 | $545 | $990 | $0 | $0 | $0 | $850 | $0 | $2,405 |
| 50th Percentile | | | $500 | $640 | $1,235 | $0 | $0 | $1,330 | $1,600 | $0 | $2,600 |
| 75th Percentile | | | $650 | $1,395 | $2,045 | $0 | $305 | $1,800 | $1,895 | $0 | $3,130 |
| 90th Percentile | | | $720 | $2,245 | $2,745 | $0 | $940 | $2,035 | $2,035 | $0 | $3,840 |

### Chief Executive Officer - 2014

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,995 | $2,595 | $0 | $0 | $2,060 | $2,060 | $0 | $4,650 |
| Cohen & Steers | Steers, R. | CEO | $750 | $460 | $1,210 | $0 | $1,660 | $0 | $1,660 | $0 | $2,870 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,750 | $2,100 | $0 | $280 | $0 | $280 | $0 | $2,380 |
| Silvercrest | Hough, R. | CEO | $650 | $725 | $1,375 | $0 | $70 | $0 | $70 | $0 | $1,445 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $495 | $995 | $0 | $0 | $0 | $0 | $0 | $995 |
| 25th Percentile | | | $395 | $530 | $1,055 | $0 | $0 | $0 | $125 | $0 | $1,680 |
| 50th Percentile | | | $550 | $685 | $1,295 | $0 | $35 | $0 | $940 | $0 | $2,490 |
| 75th Percentile | | | $640 | $1,495 | $1,920 | $0 | $230 | $1,200 | $1,645 | $0 | $2,805 |
| 90th Percentile | | | $700 | $1,875 | $2,350 | $0 | $970 | $1,830 | $1,860 | $0 | $3,760 |

### Chief Executive Officer - 2013

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Manning & Napier | Cunningham, P. | CEO | $500 | $1,500 | $2,000 | $0 | $4,020 | $0 | $4,020 | $0 | $6,020 |
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,505 | $2,105 | $0 | $0 | $1,395 | $1,395 | $0 | $3,500 |
| Cohen & Steers | Steers, R. | CEO | $750 | $365 | $1,115 | $0 | $1,800 | $0 | $1,800 | $0 | $2,915 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,170 | $1,520 | $0 | $90 | $0 | $90 | $0 | $1,610 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $280 | $1,145 | $1,420 | $0 | $0 | $0 | $0 | $0 | $1,420 |
| Silvercrest | Hough, R. | CEO | $500 | $600 | $1,100 | $0 | $70 | $0 | $70 | $0 | $1,170 |
| 25th Percentile | | | $355 | $620 | $1,110 | $0 | $0 | $0 | $80 | $0 | $1,515 |
| 50th Percentile | | | $500 | $1,145 | $1,420 | $0 | $70 | $0 | $1,395 | $0 | $2,600 |
| 75th Percentile | | | $550 | $1,335 | $1,760 | $0 | $945 | $700 | $1,700 | $0 | $3,210 |
| 90th Percentile | | | $660 | $1,500 | $2,040 | $0 | $2,690 | $1,475 | $2,690 | $0 | $4,510 |

**App. 259**

STRICTLY CONFIDENTIAL

## Exhibit F: Discussions of Investment Management Compensation in the Public Domain

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S." eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

"Eight Hedge Fund Managers Earned More Than $1 Billion Each in 2019. Cue the Questions." *Institutional Investor*.  March 25, 2020. https://www.institutionalinvestor.com/article/b1kwjngp2rnp9y/Eight-Hedge-Fund-Managers-Earned-More-Than-1-Billion-Each-in-2019-Cue-the-Questions

Langlois, Shawn. "Think celebrities and CEOs make way too much money? Check out this chart" *MarketWatch.com*. November 29, 2019. https://www.marketwatch.com/story/hedge-fund-managers-to-taylor-swift-and-disneys-bob-iger-hold-my-beer-2019-11-26

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com. Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

Moore, Heidi.  "Bill Gross reportedly earns $290m bonus even as investors withdraw billions from Pimco funds" *The Guardian*.  November 14, 2014. https://www.theguardian.com/business/2014/nov/14/pimco-paid-15bn-bonus-pool-executives-according-to-disputed-report

Rosenburg, John S.  "Harvard Discloses Leaders' Annual Compensation" *Harvard Magazine*. May 11, 2018 https://www.harvardmagazine.com/2018/05/harvard-endowment-manager-and-administrator-pay

**App. 260**

STRICTLY CONFIDENTIAL

## Documents Reviewed

### Data Items Reviewed from Debtor
- Bates Label Range: D-JDNL-017439 to D-JDNL-017441

### Data Items Reviewed:
- Bates Label Range: EXPERT 0000001 to EXPERT 0002316

### Individual Documents - Starting Bates Label
- Expert 1 – EXPERT 0000001
- Expert 1 – EXPERT 0000003
- Expert 1 – EXPERT 0000004
- Expert 1 – EXPERT 0000024
- Expert 1 – EXPERT 0000026
- Expert 1 – EXPERT 0000028
- Expert 1 – EXPERT 0000030
- Expert 1 – EXPERT 0000365
- Expert 1 – EXPERT 0000367
- Expert 1 – EXPERT 0000372
- Expert 1 – EXPERT 0000383
- Expert 1 – EXPERT 0000384
- Expert 1 – EXPERT 0000385
- Expert 1 – EXPERT 0000387
- Expert 1 – EXPERT 0000389
- Expert 1 – EXPERT 0000679
- Expert 1 – EXPERT 0000703
- Expert 1 – EXPERT 0000928
- Expert 1 – EXPERT 0000929
- Expert 1 – EXPERT 0000931
- Expert 1 – EXPERT 0000933
- Expert 1 – EXPERT 0000935
- Expert 1 – EXPERT 0000937
- Expert 1 – EXPERT 0000940
- Expert 1 – EXPERT 0000942
- Expert 1 – EXPERT 0000944
- Expert 1 – EXPERT 0000968
- Expert 1 – EXPERT 0000970
- Expert 1 – EXPERT 0000972
- Expert 1 – EXPERT 0000974
- Expert 1 – EXPERT 0000979
- Expert 1 – EXPERT 0001003
- Expert 1 – EXPERT 0001021
- Expert 1 – EXPERT 0001023
- Expert 1 – EXPERT 0001324
- Expert 1 – EXPERT 0001578
- Expert 1 – EXPERT 0001579
- Expert 1 – EXPERT 0001580
- Expert 1 – EXPERT 0001581
- Expert 1 – EXPERT 0001881
- Expert 1 – EXPERT 0001897
- Expert 1 – EXPERT 0001898
- Expert 1 – EXPERT 0001900
- Expert 1 – EXPERT 0001902
- Expert 1 – EXPERT 0001903
- Expert 1 – EXPERT 0001905
- Expert 1 – EXPERT 0001928
- Expert 1 – EXPERT 0001935
- Expert 1 – EXPERT 0001957
- Expert 1 – EXPERT 0001975
- Expert 1 – EXPERT 0001998
- Expert 1 – EXPERT 0002233
- Expert 1 – EXPERT 0002234
- Expert 1 – EXPERT 0002253
- Expert 1 – EXPERT 0002260
- Expert 1 – EXPERT 0002267
- Expert 1 – EXPERT 0002285
- Expert 1 – EXPERT 0002304

STRICTLY CONFIDENTIAL

**Bibliography**

"High Intensity Pays Off For Highland." *The Dallas Morning News*, September 3, 2003.
https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S."
eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-
and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com.
Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-
endowment-chief-narvekar-6-25-million-for-2019.

"Schedule 14A GAMCO INVESTORS, INC." SEC.gov, April 29, 2020.
https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020
.htm.

Sarbanes-Oxley Act (2002).
https://www.friedfrank.com/siteFiles/Publications/681A0950DF7BC8CF412DF4C4A4805E09.p
df.

Album, Michael J, and James E Gregory. "Human Capital Considerations For Maturing Private
Equity Firms."  Dow Jones Private Equity Analyst-Global Compensation Study, 2012.
https://www.proskauer.com/insights/download-pdf/1930.

Palmer, Annie. "Amazon to Buy MGM Studios for $8.45 Billion." CNBC. CNBC, May 26,
2021. https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 262**

# Exhibit H

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | Adversary No. 21-03003-sgj |
| | § | |
| JAMES D. DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Adversary No.: 21-03005-sgj |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03007-sgj |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## HIGHLAND'S RESPONSES AND OBJECTIONS TO
## DEFENDANTS' JOINT DISCOVERY REQUESTS

Highland Capital Management, L.P., the reorganized debtor[1] ("Highland" or, as may be temporally required, the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case") and plaintiff in the above-captioned adversary proceedings (the "Adversary Proceedings"), hereby responds to *Defendants' Joint Discovery Requests To Highland Capital Management, L.P.* (the "Requests")[2] served by defendants James Dondero ("Mr. Dondero"), Nancy Dondero, ("Ms.

---

[1] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital* Management, *L.P.*, as modified (the "Plan"). The Plan went Effective (as defined in the Plan) on August 11, 2021, and Highland is the Reorganized Debtor (as defined in the Plan) since the Effective Date. *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 2700].

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Requests.

Dondero"), The Dugaboy Investment Trust ("Dugaboy"), NexPoint Advisors, L.P. ("NexPoint"),

Highland Capital Management Services, Inc. ("HCMS"), and NexPoint Real Estate Partners, LLC

("NREP") (collectively, "Defendants").  Highland's responses and objections to the Requests (the

"Responses") are made pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 33, and 34 as

made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026,

7033, and 7034.

## **GENERAL OBJECTIONS**

Unless otherwise specified, the following general objections and caveats are applicable to

each and every Response and are incorporated into each Response as though set forth in full:

1.    The Responses contained herein are based upon information presently

known and ascertained by the Highland and Highland reserves the right to amend, supplement, or

modify these Responses during depositions or otherwise.

2.    Highland objects to the Requests to the extent they seek information or

documents that are protected from discovery by the attorney-client privilege, the attorney work

product doctrine or any other privilege or immunity.  The inadvertent disclosure or production of

any document that is protected from discovery by any privilege or immunity shall not constitute a

waiver of any such privilege or immunity.  All references in these objections and responses to

Highland's agreement to produce documents shall be construed to mean non-privileged

documents.

3.    Highland objects to the Requests to the extent they request information that

is not reasonably or readily available to it, in its possession, custody or control, or is more readily

available to the Defendants from another source or for which the burden of obtaining such

information is not substantially greater for the Defendants than it is for Highland.

4.      Highland objects to the Requests to the extent they call for legal conclusions and/or analyses.

5.      All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6.      Highland objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7.      Highland's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

8.      Notwithstanding Highland's production of certain documents that were lodged on the main docket or in one or more of the Adversary Proceedings, Highland has not reviewed all documents lodged therein and reserves the right to use, reply upon, or offer into evidence any such documents.

9.      Unless indicated otherwise, Highland's search for responsive documents and communications covers the period December 1, 2018 to the present.

10.     These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 1**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 1, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 2**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 2, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 3**:

Produce all documents and communications supporting or related to your Declaratory Relief claims (Count 5 of the Amended Complaint) made against Dugaboy and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 3, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 4**:

Produce all documents and communications supporting or related to your Breach of Fiduciary Duty claims (Count 6 of the Amended Complaint) made against Dugaboy and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 4, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 5**:

Produce all documents and communications supporting or related to your Aiding and Abetting a Breach of Fiduciary Duty claims (Count 7 of the Amended Complaint) against James Dondero and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 5, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 6**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against NPA.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 6, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 7**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against HCMS.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 7, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 8**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against HCRE.

**RESPONSE:**

Subject to the General Objections and this specific objection, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 8, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.  Highland reserves its right to supplement its Response to this Request in light of ongoing discovery.

**REQUEST FOR PRODUCTION NO. 9**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 9, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 10**:

Produce all documents and communications supporting or related to any damages that you are seeking pursuant to your Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 10, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 11**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that, "At all relevant times, Mr. Dondero controlled the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 11, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 12**:

Produce all documents and communications related to the Alleged Agreement referenced in the Amended Complaints.

**RESPONSE:**

In response to Request for Production No. 12, Highland states that it is not aware of any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "the Debtor's books and records do not reflect the Alleged Agreement."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 13, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 14**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement.)"

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 14, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 15**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 15, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 16**:

Produce all communications between the Debtor and Debtor's outside auditor.

**RESPONSE:**

Highland objects to Request for Production No. 16 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 16, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information concerning or relating to the Notes.

**REQUEST FOR PRODUCTION NO. 17**:

Produce all communications between the Debtor and Debtor's outside auditor related to any allegations in the Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 17, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 18**:

Produce all communications between Mr. Dondero and Debtor's CFO (as that term is used in the Amended Complaints) related to the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 18, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 19**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Nancy Dondero also lacked the authority to enter into the Alleged Agreement or to otherwise bind the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 19, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 20**:

Produce all communications between Nancy Dondero and James Dondero.

**RESPONSE:**

Highland objects to Request for Production No. 20 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it asks for "all" communications between Nancy Dondero and James Dondero. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>. Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 20, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information concerning or relating to the allegations in the Amended Complaint or the Notes or the Amended Answer.

**REQUEST FOR PRODUCTION NO. 21**:

Produce all communications between Nancy Dondero and James Dondero related to the allegations in the Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 21, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 22**:

Produce all communications between Nancy Dondero and James Dondero related to James Dondero's compensation from the Debtor.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 22, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 23**:

Produce all documents and communications supporting or related to the allegations in the Amended Complaints that each of the Defendants entered into the "Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 23, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 24**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that the "Alleged Agreement was not subject to negotiation."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 24, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 25**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "the value of the consideration received by the Debtor for the transfers was not reasonably equivalent value."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 25, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 26**:

Produce all documents and communications evidencing the value of the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 26.

**REQUEST FOR PRODUCTION NO. 27**:

Produce all documents and communications evidencing the value of the consideration received by the Debtor related to the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 27, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 28**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that James Dondero and Nancy Dondero "were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 28, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 29**:

Produce all documents and communications supporting any damages you are seeking related to the Amended Complaints.

**RESPONSE:**

Highland objects to Request for Production No. 29 on the ground that it is duplicative of Request for Production No. 10.  Subject to the General Objections and this specific objection, Highland incorporates by reference its Response to Request for Production No. 10.

**REQUEST FOR PRODUCTION NO. 30**:

Produce all documents and communications relating to the solvency and financial condition of the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 30 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark> Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 30.

**REQUEST FOR PRODUCTION NO. 31**:

Produce all monthly balance sheets of the Debtor for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 31 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark> Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 31.

**REQUEST FOR PRODUCTION NO. 32**:

Produce all of the Debtor's internal monthly reporting packages for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 32 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark> Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 32.

**REQUEST FOR PRODUCTION NO. 33**:

Produce all of the Debtor's financial statements for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 33 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>. Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 33.

**REQUEST FOR PRODUCTION NO. 34**:

Produce all "loan summaries" of the Debtor for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 34 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>. Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 34.

**REQUEST FOR PRODUCTION NO. 35**:

Produce all of the Debtor's audited financial statements for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 35 on the ground that Highland has previously produced documents responsive to this Request and does not intend to produce all such documents again.

**REQUEST FOR PRODUCTION NO. 36**:

Produce all valuation reports, including all annual and/or periodic valuation reports, and all other documents reflecting the enterprise value and/or asset value of the following entities:

Trussway Holdings, LLC, Trussway Industries, LLC, MGM Holdings, and Cornerstone Healthcare for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 36 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark> Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 36.

**REQUEST FOR PRODUCTION NO. 37**:

Produce all valuation reports, including all annual and/or periodic valuation reports, and all other documents reflecting the enterprise value and/or asset value of all entities and assets owned, directly or indirectly, by the following entities and in which the Debtor has an interest: Highland Select Equity Fund, L.P., Highland Restoration Capital Partners, L.P., Highland CLO Funding, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Capital Management Korea Limited, and Cornerstone Healthcare.

**RESPONSE:**

Highland objects to Request for Production No. 37 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark>  .

**REQUEST FOR PRODUCTION NO. 38**:

Produce all documents showing the financial performance of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 38 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark>

**REQUEST FOR PRODUCTION NO. 39**:

Produce all financial statements for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 39 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 40**:

Produce all monthly balance sheets for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 40 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 41**:

Produce all internal monthly reporting packages for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 41 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 42**:

Produce all documents reflecting the assets under management for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 42 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 43**:

Produce all documents reflecting the investment results and/or performance for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 43 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 44**:

Produce all documents reflecting marketing materials for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 44 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 45**:

Produce all documents related to any employment and/or shareholder or partnership agreement between Dondero, on the one hand, and any of the following entities on the other hand, for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 45 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 46**:

Produce all documents related to any compensation (including, without limitation, base salary, annual bonus, long-term incentives, equity distributions, equity interests, perks, long-term awards, loans, forgiveness of debt, or otherwise) received by Dondero from any of the following entities for the period from January 1, 2010 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 46 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).  Subject to the General Objections and these specific

objections, Highland will conduct a reasonable search for, and produce, documents responsive to

this Request to the extent they relate to (i) the Debtor.

**REQUEST FOR PRODUCTION NO. 47**:

Produce all documents related to any compensation (including, without limitation, base salary, annual bonus, long-term incentives, equity distributions, equity interests, perks, long-term awards, loans, forgiveness of debt, or otherwise) received by any Related Entity for Dondero or on Dondero's behalf, from any of the following entities for the period from January 1, 2010 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries,

both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 47 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>.

**REQUEST FOR PRODUCTION NO. 48**:

Produce all documents reflecting and/or relating to any organizational charts for any of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 48 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>.  Subject to the forgoing objection, Highland refers the Defendants to documents filed on this main docket in the above-referenced bankruptcy case.

**REQUEST FOR PRODUCTION NO. 49**:

Produce all documents reflecting and/or relating to Dondero's employment, investment, and/or managerial role(s) in any of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 49 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>.

**REQUEST FOR PRODUCTION NO. 50**:

Produce the Debtor's "books and records" referred to in paragraph 66(j) of the Amended Complaint filed against Defendant James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 50.

**REQUEST FOR PRODUCTION NO. 51**:

Produce all documents and communications evidencing any action taken by any limited partner of the Debtor to (i) take part in the control (within the meaning of the Delaware Act) of the Partnership's business; (ii) transact any business in the Partnership's name; and/or (iii) sign any documents or otherwise bind the Partnership in accordance with the LPA.

**RESPONSE:**

Highland objects to Request for Production No. 51 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 52**:

Produce all documents and communications evidencing the value of the HCRE Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 52.

**REQUEST FOR PRODUCTION NO. 53**:

Produce all documents and communications evidencing the value of the HCMS Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 53.

**REQUEST FOR PRODUCTION NO. 54**:

Produce all documents and communications evidencing the value of the NPA Note.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 54.

**REQUEST FOR PRODUCTION NO. 55**:

Produce all documents and communications evidencing the value of the Dondero Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 55.

**REQUEST FOR PRODUCTION NO. 56**:

Produce the loan documentation for all loans made by Debtor to any then-current executive, consultant, or employee of Debtor or any related Person.

**RESPONSE:**

Highland objects to Request for Production No. 56 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense, *see* Fed. R. Civ. P. 26(b)(1), and (b) the phrases "loan documentation," "consultant," and "any related Person" are vague and ambiguous. Subject to the General Objections and these specific objections, Highland states that loans made by Debtor to any then-current executive, employee, or related party are identified and described in Highland's audited financial statements previously produced to James Dondero.

**REQUEST FOR PRODUCTION NO. 57**:

Produce all documents reflecting the payment status of all loans identified in response to the above (No. 56) Request for Production, and if forgiven, all documents reflecting the conditions for forgiveness.

**RESPONSE:**

Highland objects to Request for Production No. 57 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses, *see* ==Fed. R. Civ. P. 26(b)(1)==, and (b) the phrases "loan documentation," "consultant," and "any related Person" in Request for Production No. 56 are vague and ambiguous. Subject to the General Objections and these specific objections, Highland states that loans made by Debtor to any then-current executive, employee, or related party are identified and described in Highland's audited financial statements previously produced to James Dondero.

**REQUEST FOR PRODUCTION NO. 58**:

Produce all documents related to any audits of the Debtor from 2013 forward, including, but not limited to, any management letters, audit notes, and audit files.

**RESPONSE:**

Highland objects to Request for Production No. 58 on the grounds that  it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* ==Fed. R. Civ. P. 26(b)(1)==.  Subject to the General Objections and these specific objections, Highland and PricewaterhouseCoopers previously produced documents responsive to Request for Production No. 58.

**REQUEST FOR PRODUCTION NO. 59**:

Produce all documents related to the sale or potential sale of any portfolio companies of the Debtor or interests in any portfolio companies owned by the Debtor, including, but not limited to, MGM, Trussway, and Cornerstone.

**RESPONSE:**

Highland objects to Request for Production No. 59 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses, *see* ==Fed. R. Civ. P. 26(b)(1)==, and (b) the phrase "potential sale" is vague and

ambiguous.  Subject to the General Objections and these specific objections, Highland states that

it has no documents responsive to Request for Production No. 59.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1:**

Admit that Highland Capital Management, L.P. entered into the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "LPA"), on or about December 24, 2015.

**RESPONSE:**

Deny.  Highland Capital Management, L.P. did not enter into, and is not a party to, the

LPA.

**REQUEST FOR ADMISSION NO. 2:**

Admit that the LPA provided that the Majority Interest of Highland Capital Management, L.P. could approve compensation for the General Partner and its Affiliates (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  Request for Admission No. 2 inaccurately summarizes Section 3.10 of the LPA,

which speaks for itself.

**REQUEST FOR ADMISSION NO. 3:**

Admit that James Dondero was an Affiliate of the General Partner in 2017 (as those terms are defined in the LPA).

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that James Dondero was an Affiliate of the General Partner in 2018 (as those terms are defined in the LPA).

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 5:**

Admit that James Dondero was an Affiliate of the General Partner in 2019 (as those terms are defined in the LPA).

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 6:**

Admit that James Dondero was an Affiliate of the General Partner in 2020 (as those terms are defined in the LPA).

**RESPONSE:**

Admit that James Dondero was an Affiliate of the General Partner from January 1 through January 9, 2020, and otherwise deny Request for Admission No. 6 on the basis of the corporate governance settlement that Mr. Dondero entered into and that was approved by the Court.  See Docket Nos. 338 and 339.

**REQUEST FOR ADMISSION NO. 7:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2017 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 8:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2018 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2019 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 10:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2020 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2017.

**RESPONSE:**

HCMLP objects to Request for Admission No. 11 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 11.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2017.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2018.

**RESPONSE:**

HCMLP objects to Request for Admission No. 12 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 12.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2018.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2019.

**RESPONSE:**

HCMLP objects to Request for Admission No. 13 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 13.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2019.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2020.

**RESPONSE:**

HCMLP objects to Request for Admission No. 14 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 14.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2020.

**REQUEST FOR ADMISSION NO. 15:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2017.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 15.  HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 16:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2018.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 16.  HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 17:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2019.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 17.  HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 18:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2020.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 18.  HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 19:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2017.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2017.

**REQUEST FOR ADMISSION NO. 20:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities in January 2018.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2018.

**REQUEST FOR ADMISSION NO. 21:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2018.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2018.

**REQUEST FOR ADMISSION NO. 22:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2019.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2019.

## REQUEST FOR ADMISSION NO. 23:

Admit that within Highland each of MGM, Cornerstone and Trussway were referred to as "Portfolio Companies."

## RESPONSE:

Highland objects to Request for Admission No. 24 on the ground that the phrase "within Highland" is vague and ambiguous.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all damages that you are seeking against each of the Defendants, including, how those damages are calculated.

### RESPONSE:

Against each maker of each Notes, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, (b) all accrued and unpaid interest under each Note, and (c) all actual expenses of collection, including court costs, and reasonable attorneys' fees in connection with each of the Adversary Proceedings. HCMLP incorporates by reference its prior written responses to discovery and refers the defendants to the Notes and the invoices of Pachulski Stang Ziehl & Jones, LLP other documents being produced in this adversary proceeding.

Against Nancy Dondero and Dugaboy, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, and (b) all accrued and unpaid interest under each Note.

Against James Dondero for aiding and abetting Nancy Dondero's and Dugaboy's breach of fiduciary duty, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, and (b) all accrued and unpaid interest under each Note.

Damages will continue to increase as interest continues to accrue and Highland continues to incur additional costs of collection.

### INTERROGATORY NO. 2:

Provide the factual basis for your allegation in the Amended Complaints that Dugaboy owed a fiduciary duty to the Debtor.

### RESPONSE:

Assuming that a court of competent jurisdiction finds that Dugaboy entered into an agreement on behalf of HCMLP pursuant to which HCMLP agreed to forgive collection on all or any of the Notes, then Dugaboy will have owed a fiduciary duty to the Debtor because, among

other things, (a) Dugaboy would have been acting on the Debtor's behalf, (b) Dugaboy would have bound the Debtor, and (c) Dugaboy would have been required to act reasonably under the circumstances.

**INTERROGATORY NO. 3:**

Provide the factual basis for your allegation in the Amended Complaints that Nancy Dondero owed a fiduciary duty to the Debtor.

**RESPONSE:**

HCMLP incorporates by reference its response to Interrogatory No. 3 and further notes that Ms. Dondero would have caused Dugaboy to enter into the Alleged Agreement.

**INTERROGATORY NO. 4:**

Identify all acts or omissions by each of the Defendants that breached any alleged fiduciary duties owed to the Debtor.

**RESPONSE:**

Assuming that a court of competent jurisdiction finds that Dugaboy entered into an agreement pursuant to which HCMLP agreed to forgive collection on the Notes, then Dugaboy and Nancy would have breached their fiduciary duties by acting unreasonably by (a) agreeing to forgive Notes with an aggregate principal amount in excess of $70 million for $1 in value, (b) agreeing to forgive Notes with an aggregate principal amount in excess of $70 million at a time when they had no obligation to do so and received woefully inadequate consideration in return, and (c) otherwise acting unreasonably under the circumstances, including failing to perform reasonable diligence, failing to document and otherwise disclose the "agreement" to the Debtor's management and auditors, and by failing to disclose the "agreement" to the Bankruptcy Court at any time.

**INTERROGATORY NO. 5:**

Identify all acts or omissions by each of the Defendants that aided and abetted the breach of any alleged fiduciary duties owed to the Debtor.

**RESPONSE:**

Highland incorporates by reference its response to Interrogatory No. 5 and further states - that James Dondero would have further aided and abetted in the breach of fiduciary duties by using undue influence to persuade Ms. Dondero to enter into the Alleged Agreement on behalf of Dugaboy.

**INTERROGATORY NO. 6:**

Provide the factual basis for your allegation in the Amended Complaints that "At all relevant times, Mr. Dondero controlled the Debtor."

**RESPONSE:**

The evidence that Mr. Dondero controlled the Debtor is extensive and HCMLP objects to Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the General Objections, the evidence that Mr. Dondero controlled the Debtor through at least January 9, 2020, includes his admissions, his control of Strand Advisors, Inc., his role as President of HCMLP, his authorization of the commencement of the Bankruptcy Case on behalf of HCMLP, and his agreement to the corporate governance settlement as embodied in Docket Nos. 338 and 339.

**INTERROGATORY NO. 7:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled NPA.

**RESPONSE:**

The evidence that Mr. Dondero controlled NPA is extensive and HCMLP objects to Interrogatory No. 7 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the

evidence that Mr. Dondero controls NPA includes, among other things, his admissions, the admissions of DC Sauter and Jason Post at various points in this case, and prior judicial findings, holdings, rulings, and orders.

**INTERROGATORY NO. 8:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled HCRE.

**RESPONSE:**

The evidence that Mr. Dondero controlled HCRE is extensive and HCMLP objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the evidence that Mr. Dondero controls HCRE includes, among other things, his own admissions, his direct or indirect ownership interest in HCRE, and the positions he holds and has with respect to HCRE..

**INTERROGATORY NO. 9:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled HCMS.

**RESPONSE:**

The evidence that Mr. Dondero controlled HCMS is extensive and HCMLP objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the evidence that Mr. Dondero controls HCMS includes, among other things, his own admissions, his direct or indirect ownership interest in HCMS, and the positions he holds and has with respect to HCMS.

**INTERROGATORY NO. 10:**

Provide the factual basis for your allegation in the Amended Complaints that "the Alleged Agreement is a fiction."

**RESPONSE:**

Highland incorporates by reference and refers the Defendants to (a) the purported terms of the Alleged Agreement, (b) the purported purpose of the Alleged Agreement, (c) Mr. Dondero's prior sworn testimony in Adv. Pro. 21-03003; (d) documents identified on Docket Nos. 31 and 35, respectively, in Adv. Pro. 21-3004; (e) Mr. Dondero's Rule 26 disclosures in Adv. Pro. 21-03003; (f) the deposition testimony of PricewaterhouseCoopers and the exhibits marked during that deposition; (g) the lack of any documentation memorializing the terms of the Alleged Agreement, and (h) the lack of disclosure of the alleged "agreement" to the Bankruptcy Court .at any time prior to confirmation, including in connection with that objection to the Debtor's Plan.

**INTERROGATORY NO. 11:**

Provide the factual basis for your allegation in the Amended Complaints that "Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor."

**RESPONSE:**

Highland contends that the evidence will prove that the Alleged Agreement is a fiction but if a court of competent jurisdiction finds otherwise, that the evidence will prove that Mr. Dondero entered into the Alleged Agreement when he knew that certain creditors, including the Redeemer Committee and Joshua Terry, were on the verge of obtaining substantial judgments against Highland and as he had at various times in the face of adverse litigation, sought to fraudulently transfer assets to limit (if not eliminate) judgment creditors' ability to collect.

**INTERROGATORY NO. 12:**

Identify the "value of the consideration received by the Debtor for the transfers," as that term is used in the Amended Complaint, and provide the basis for how that value was calculated.

**RESPONSE:**

Highland made the payments reflected in each Note in exchange for a promise by each maker that payment would be made on the terms set forth therein, including the payment of all principal and interest and all costs of collection, including attorneys' fees.

**INTERROGATORY NO. 13:**

Identify any portfolio companies that Debtor owns (wholly or partially).

**RESPONSE:**

Highland objects to Interrogatory No. 13 on the grounds that (a) "portfolio companies" is undefined, and (b) it is overly broad, unduly burdensome and is not relevant to any party's claim or defense nor is it proportional to the needs of this case.

**INTERROGATORY NO. 14:**

Identify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies) owned (wholly or partially) by the Debtor, including, but not limited to, Trussway, MGM and Cornerstone, including the date of the sale, the buyer, and the amount paid.

**RESPONSE:**

Highland objects to Interrogatory No. 14 on the grounds that (a) "portfolio companies" is undefined, (b) the phrase "potential sale" is vague and ambiguous, (c) it is overly broad, unduly burdensome and is not relevant to any party's claim or defense nor is it proportional to the needs of this case, and (d) "potential sales" are not a term of the Alleged Agreement and otherwise constitute proprietary and confidential information.  Subject to the forgoing objections, Highland has not sold Trussway, MGM or Cornerstone as of this time.

Dated: September 27, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:  jpomerantz@pszjlaw.com
ikharasch@pcszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
Email:  MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*